LAW OFFICES OF BRIAN C. LEIGHTON
BRIAN C. LEIGHTON (SBN 090907)
701 Pollasky Avenue
Clovis, CA 93612
Phone: (559) 297-6190
Fax (559) 297-6194
bleighton@arrival.net

HENNIGAN, BENNETT & DORMAN LLP
LAWRENCE M. HADLEY (SBN 157728)
OMER SALIK (SBN 223056)
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Phone: (213) 694-1200
Fax: (213) 694-1234
hadleyl@hbdlawyers.com;
saliko@hbdlawyers.com

THE LAW OFFICES OF RALPH B. WEGIS
RALPH B. WEGIS (SBN 67966)
1930 Truxtun Avenue
Bakersfield, CA 93301
Telephone: (661) 635-2100
Facsimile: (661) 635-2107

Attorneys for Plaintiffs,
DELANO FARMS COMPANY; FOUR STAR FRUIT, INC.;
GERAWAN FARMING, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANO FARMS COMPANY; FOUR STAR FRUIT, INC.; GERAWAN FARMING, INC. ) ) | CASE NO. |
| Plaintiffs, ) ) | **COMPLAINT** |
| vs. ) ) | **DEMAND FOR JURY TRIAL** |
| THE CALIFORNIA TABLE GRAPE COMMISSION ) ) ) | |
| Defendant. ) ) | |

1    For its complaint against Defendant The California Table Grape Commission (the

2    "Commission" or "Defendant"), Plaintiffs Delano Farms Company; Four Star Fruit, Inc.; and

3    Gerawan Farming, Inc. (collectively "CTG Litigants" or "Plaintiffs") alleges as follows:

4                              **JURISDICTION AND VENUE**

5        1.      This is a civil action arising in part under laws of the United States relating to patents

6    (35 U.S.C. §§271, 281, 283, 284 and 285) and the Sherman Act and Clayton Act (15 U.S.C. §1, *et*

7    *seq*.).  This Court has federal jurisdiction of such federal question claims pursuant to 28 U.S.C. §§

8    1331, 1337 and 1338(a).  Additionally, this Court has jurisdiction over the claims for declaratory

9    judgment of invalidity pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

10       2.      This Court has supplemental jurisdiction over the claims in this Complaint that arise

11   under statutory and common law of the State of California pursuant to 28 U.S.C §1367(a), because

12   the state law claims are so related to the federal claims that they form part of the same case or

13   controversy and derive from a common nucleus of operative facts.

14       3.      The acts and transactions complained of herein were conceived, carried out, made

15   effective, and had effect within the State of California and within this district, among other places.

16   Venue is proper under 28 U.S.C. §§1391(b), 1391(c) and 1400(b), in that Defendant resides in this

17   judicial district and has a regular and established place of business in this District and in that a

18   substantial part of the events or omissions giving rise to the claims and the threatened and actual

19   harm to Plaintiffs occurred in this District by reason of Defendant's conduct as alleged below.

20                                  **THE PARTIES**

21       4.      Plaintiff Delano Farms Company is a corporation duly organized and existing under

22   the laws of the State of Washington, with its principle place of business at 815 Eighth Street, P.O.

23   Box 240, Hoquiam, Washington 98550.

24       5.      Plaintiff Four Star Fruit, Inc. is a corporation duly organized and existing under the

25   laws of the State of California, with its principle place of business at 13830 Avenue 24, Delano,

26   California  93215.

27       6.      Plaintiff Gerawan Farming, Inc. is a corporation duly organized and existing under

28   the laws of the State of California, with its principle place of business at 15749 East Ventura,

COMPLAINT

Sanger, California  93657.

7.      Plaintiffs are engaged in the business, *inter alia*, of growing, harvesting and selling table grapes.

8.      Defendant is a corporation of the State of California, established by the 1967 Ketchum Act.  Cal. Food & Agric. Code §§65550 – 65551.  Defendant's principle place of business is at 392 W. Fallbrook, Suite 101, Fresno, California 93711.

9.      The stated purpose of the Commission is to expand and maintain the market for California table grapes for the benefit of the State of California as well as the State's over five hundred California table grape growers.  The Commission is funded primarily by assessments levied on each shipment of California table grapes and paid by the State's table grape shippers.  No general revenues of the State fund the Commission.

## FACTS

### Overview

10.      For years, California table grape growers and shippers have funded a research program under the U.S. Department of Agriculture ("USDA") to develop new table grape varieties. Growers and shippers fund the USDA research program through the Commission by an assessment on each box of table grapes shipped in California.  Prior to 2002, the USDA provided the new varieties under development to area growers for evaluation of growing potential and commercial marketability.  Once new varieties appeared commercially viable, the USDA "released" the variety, and distributed plant material of the variety to area growers free-of-charge.  The USDA did not charge California growers for the new varieties since California growers and shippers already paid for a large portion of the development.

11.      In the late 1990s, the Commission developed a scheme by which it and a few select nurseries could profit from the new varieties that the USDA distributed for free.  At the urging of the Commission, the USDA agreed to begin patenting new table grape varieties.  Although California shippers already funded much of the development, the USDA agreed to give the Commission an exclusive license to all new patented varieties, and to allow the Commission to charge royalties when growers wished to obtain the new varieties.  The USDA also agreed to give the Commission

1  exclusive enforcement powers over its new patent rights.

2      12.    Under the Commission's "patent and licensing" scheme, the Commission hand-

3  selected three nurseries to exclusively sell all new patented table grape varieties.  Unlike the prior

4  free distribution, the nurseries would be allowed to sell new varieties to growers.  Additionally, the

5  nurseries would be required to pay a royalty to the Commission for each plant sold, which the

6  nursery could pass onto the growers.  One of the hand-selected nurseries now able to profit from

7  newly developed varieties previously distributed without charge is owned by the son of a long-

8  standing Commission member.

9      13.    When a grower seeks to obtain a new variety from a nursery, it is required to enter a

10  "Domestic Grower License Agreement" with the Commission.  Under the terms of the Agreement,

11  the grower cannot propagate the variety beyond the plant purchased.  Moreover, if the Commission

12  believes the grower has violated the License Agreement, it can void the Agreement and order that all

13  purchased plants be destroyed.

14      14.    The first three varieties that the Commission identified to the USDA for patenting

15  had been under development for years.  Indeed, at least one of the varieties had been distributed to

16  growers for wide-scale commercial evaluation and sale.

17      15.    Recognizing that at least one of the new varieties identified for patenting (and

18  perhaps all three) had been previously in public use and/or sold commercially, the Commission

19  created a so-called "amnesty program" designed to hide the fact that valid patents could not be

20  obtained, and to extort funds from growers already in possession of the varieties.  Under the amnesty

21  program, the Commission widely disseminated notices to growers and shippers stating that they

22  were in violation of the law if they possessed the varieties intended for patenting.  The notices also

23  offered confidential "settlements" to any growers who, within a narrow window, agreed to license

24  the varieties, pay a "penalty" to the Commission, and accept the Commission's license restrictions

25  on further propagation.  Growers and shippers who refused the "amnesty" were threatened with

26  lawsuits, including money damages and injunctions.

27      16.    Confirming the Commission's expectation that varieties identified for patenting were

28  in public use, at least 17 growers confirmed possession of the varieties and agreed to pay the

COMPLAINT

1  penalties demanded by the Commission.  Astonishingly, the Commission threatened growers and

2  demanded penalties even before the USDA had been issued patents on the new varieties.  Even more

3  troublesome, the USDA and inventor of the new varieties breached their duty of candor to the

4  United States Patent & Trademark Office ("USPTO") by not reporting these prior public uses and

5  sales when applying for patents in the new varieties.  Under Patent Law, public use or sale of an

6  invention more than one year prior filing a patent application bars patentability.

7        17.     Based on these facts, none of the patents on the new varieties are valid.  Moreover,

8  the USDA and inventor committed inequitable conduct before the USPTO.  In demanding licenses

9  and accepting royalties on knowingly invalid patents, the Commission violated federal antitrust

10  laws, and committed other violations of federal and state law.  This action seeks to remedy these

11  wrongs, to hold the patents invalid so the varieties can be freely distributed, to obtain the return of

12  royalty payments illegally collected from growers and shippers, and to stop the Commission from

13  engaging in further illegal activities through the use of patents.

14      ***The Patents at Issue***

15           ***Sweet Scarlet***

16        18.     On February 20, 2003, the USDA filed patent application No. 371,512 (the "'512

17  Application") on a grapevine denominated "Sweet Scarlet."  The application listed David W.

18  Ramming and Ronald E. Tarallo as co-inventors.  On July 26, 2005, the '512 Application issued as

19  U.S. Patent No. PP15,891, entitled "Grapevine Denominated Sweet Scarlet" (the "'891 patent").  A

20  true copy of the '891 patent is attached as Exhibit A.

21        19.     The United States of America, as represented by the Secretary of Agriculture, is the

22  owner by assignment of the '891 patent.

23        20.     On information and belief, the Commission is the exclusive licensee of the '891

24  patent pursuant to a license agreement entered into between the United States Government, as

25  represented by the United States Department of Agriculture, Agricultural Research Services, and the

26  Commission.  The exclusive license includes the right to license the '891 patent and to enforce the

27  '891 patent against alleged infringers.

28

*Autumn King*

21.     On September 28, 2004, the USDA filed patent application No. 953,387 (the "'387 Application") on a grapevine denominated "Autumn King."  The application listed David W. Ramming and Ronald E. Tarallo as co-inventors.  On February 21, 2006, the '387 Application issued as U.S. Patent No. PP16,284, entitled "Grapevine Denominated Autumn King" (the "Autumn King or '284 patent").  A true and correct copy of the '284 patent is attached as Exhibit B.

22.     The United States of America, as represented by the Secretary of Agriculture, is the owner by assignment of the '284 patent.

23.     On information and belief, the Commission is the exclusive licensee of the '284 patent pursuant to a license agreement entered into between the United States Government, as represented by the United States Department of Agriculture, Agricultural Research Services, and the Commission.  The exclusive license includes the right to license the '284 patent and to enforce the '284 patent against alleged infringers.

*Scarlet Royal*

24.     On September 28, 2004, the USDA filed patent application No. 953,124 (the "'124 Application") on a grapevine denominated "Scarlet Royal."  The application listed David W. Ramming and Ronald E. Tarallo as co-inventors.  On January 31, 2006, the '124 Application issued as U.S. Patent No. PP16,229, entitled "Grapevine Denominated Scarlet Royal" (the "Scarlet Royal or '229 patent").  A true and correct copy of the '229 patent is attached as Exhibit C.

25.     The United States of America, as represented by the Secretary of Agriculture, is the owner by assignment of the '229 patent.

26.     On information and belief, the Commission is the exclusive licensee of the '229 patent pursuant to a License Agreement entered into between the United States Government, as represented by the United States Department of Agriculture, Agricultural Research Services, and the Commission.  The exclusive license includes the right to license the '229 patent and to enforce the '229 patent against alleged infringers.

*The Commission's Licenses to Nurseries and Plaintiffs*

27.     The Commission has sublicensed its right to grow and propagate the Sweet Scarlet

variety described in the '891 patent, the Autumn King variety described in the '284 patent, and the Scarlet Royal variety described in the '229 patent (collectively, the "Patented Varieties") to three privately-owned nurseries – Sunridge Nurseries, Vintage Nurseries, and Casa Crystal Nurseries (the "Licensed Nurseries"). Each Licensed Nursery is authorized to sell Autumn King, Sweet Scarlet and Scarlet Royal vines to growers who execute a "Domestic Grower License Agreement" with the Commission. The Domestic Grower Agreement prohibits growers who purchase the Patented Varieties from propagating the vines or distributing the vines to third parties. Under the Domestic License Agreement, the Commission may revoke the license for any grower who violates the terms, and require the grower to destroy all Patented Varieties purchased.

28.     The Commission receives a royalty on each Patented Variety sold. The Licensed Nurseries are responsible for paying the royalty, but the Licensed Nurseries are allowed to pass the royalty amount onto the purchasing growers, which they do and have done. The Commission pays a portion of the royalty to the USDA.

29.     Casa Crystal Nursery is owned by Andrew Zaninovich. Andrew's father is Marco Zaninovich, who has been a long-time and active board member of the Commission.

30.     Plaintiffs are in possession of the Autumn King, Sweet Scarlet and Scarlet Royal varieties, which they purchased through Licensed Nurseries. Plaintiffs paid the royalties on each purchased plant imposed by the Commission.

31.     Plaintiffs have entered into a Domestic Grower License Agreement with the Commission for the '891 patent. In consideration for this limited, nonexclusive license, Plaintiffs have paid a license fee to a Licensed Nursery. Under the terms of this Agreement, Plaintiffs have a limited, nonexclusive license to the '891 patent to grow the Sweet Scarlet variety and sell the fruit produced. Plaintiffs cannot propagate the grapevines or distribute the vines to third parties. Furthermore, Plaintiffs are obligated to destroy all Sweet Scarlet plant material upon termination of the agreement.

32.     Plaintiffs have entered into a Domestic Grower License Agreement with respect to the '284 patent. In consideration for this limited, nonexclusive license, Plaintiffs have paid a license fee to a Licensed Nursery. Under the terms of this Agreement, Plaintiffs have a limited,

nonexclusive license to the '284 patent to grow the Autumn King variety and sell the fruit produced. Plaintiffs cannot propagate the grapevines or distribute the vines to third parties.  Furthermore, Plaintiffs are obligated to destroy all Autumn King plant material upon termination of the agreement.

33.    Plaintiffs have entered into a Domestic Grower License Agreement with respect to the '229 patent.  In consideration for this limited, nonexclusive license, Plaintiffs have paid a license fee to a Licensed Nursery.  Under the terms of this Agreement, Plaintiffs have a limited, nonexclusive license to the '229 patent to grow the Scarlet Royal variety and sell the fruit produced. Plaintiffs cannot propagate the grapevines or distribute the vines to third parties.  Furthermore, Plaintiffs are obligated to destroy all Scarlet Royal plant material upon termination of the agreement.

***The Commission's Patent and Licensing Program***

34.    The Commission requires that California grape shippers pay an assessment of approximately $0.13 per box of table grapes.  The Commission operates at an annual surplus from these assessments, but does not return any of the assessment money back to the California growers or shippers.

35.    Dr. Ramming, the co-inventor of the patented Autumn King, Sweet Scarlet and Scarlet Royal varieties, is a researcher at the Agriculture Research Center ("ARC") of the USDA located in Fresno, California.  For at least 20 years, Dr. Ramming has operated a research program at the ARC relating to the development of new table grape varieties.  Since the early 1980s, the Commission has funded a portion of Dr. Ramming's grapevine breading program with funds collected through the shipper assessments.  In many years, the Commission's funding has amounted to over one-third of the total table grape research budget at the ARC, excluding employee salaries.

36.    Prior to 2003, the USDA had never sought patent protection for any new table grape variety developed at the ARC.  Instead, for nearly two decades, new grape varieties developed by the ARC with California table grape shipper assessment revenues were distributed freely to California growers by the USDA.

37.    In the late 1990s, the Commission adopted a plan to request that the USDA seek patent protection on all new table grape varieties developed prior to general release.  Initially, the

patents were intended to control competition from foreign growers.  In the past, foreign growers frequently obtained new table grape varieties developed through assessments on California shippers, then competed with California growers in markets for the new varieties.  Under the Commission's plan, California growers would be provided patented varieties free of charge, and patented varieties would either be excluded from foreign growers or provided to foreign growers at high royalty rates.  After several meetings between the Commission and the USDA, the USDA ultimately agreed to seek patent protection as requested by the Commission.  The USDA further agreed that the Commission could serve as the exclusive licensee for patented varieties in the collection of royalties and enforcement against infringers.  However, the USDA prohibited the Commission from excluding foreign growers from receiving patented varieties, blocking imports from foreign growers, or otherwise discriminating against foreign growers.

38.     Although the USDA barred the Commission from implementing the original goals behind the patenting program – namely, the control of foreign competition – the Commission agreed to proceed with the patent and licensing plan.  The Commission recognized that the patenting program could have several benefits.  First, the Commission recognized that patenting would give it an important new revenue source through licensing fees.  Second, the Commission, which is controlled by a number of large growers, recognized that it could control access to new varieties, particularly by smaller growers, through the amount of royalties it charged for obtaining the patented varieties and through the terms of its sublicense agreements.  Third, the Commission recognized that nurseries, who are also represented through the Commission, could profit by selling new grapevines, which the USDA previously gave away for free.

39.     In exchange for seeking patent protection, and providing an exclusive license to the Commission, the Commission and the USDA agreed that revenues from the patent licensing program would be shared between the USDA and the Commission.  However, the USDA indicated that it was not interested in profiting from the patenting program.  Additionally, Dr. Ramming received no extra compensation from the patenting of varieties he developed.

40.     In accordance with the agreement between the Commission and the USDA, the Commission charges nurseries who distribute patented varieties a $5,000 participation fee per

patented variety and an additional $1 per production unit royalty.  These costs are then passed on by the nurseries to the California grape growers who purchase the patented plant material from the nurseries, including Plaintiffs who purchased the Patented Varieties.

41.     The California grape growers who bear the ultimate costs of the royalty fees imposed by the Commission are the same California grape growers who bear the cost of the per box assessment charged by the Commission, which funds much of Dr. Ramming's breeding program.  Thus, California table grape growers essentially pay for the development of patented varieties, then pay again to obtain the varieties.

42.     The Commission's Research Committee and Board oversee and administer the patent and licensing program.  Specifically, the Board sets the royalty rates on patented plants, determines penalties for infringement, and establishes enforcement policy.  The Research Committee oversees Dr. Ramming's breeding program and makes recommendations regarding which new varieties should be patented and released.  To date, the USDA has only patented new varieties that the Commission has recommended for patenting, and has only applied for patents once receiving a recommendation from the Commission to do so.

### Prior Uses and Sales of the Patented Varieties

43.     Prior to the Commission's patent and licensing program, the USDA provided varieties under development to certain growers for large-scale evaluation.  Growers participating in these "trials" were allowed to grow the new varieties, sell the fruit produced, and retain any profits.  While certain growers were selected for the trials, the USDA provided no mechanism for preventing other growers from accessing and reproducing the varieties as well.  Accordingly, when a variety under development appeared commercially successful, it was not uncommon for many growers to have reproduced and commercially sold the variety prior to an official "release" by the USDA.  For example, when the USDA developed the "Princess" variety, it was well known that growers throughout the central valley had been reproducing Princess grapevines and selling Princess fruit for years.

44.     Neither the USDA nor the Commission had any incentive to restrict the distribution of new grapevines prior to a release.  Widespread reproduction and sales of new varieties allowed

greater customer acceptance prior to release.  Additionally, growers and shippers contributed substantially to the development of new varieties in Dr. Ramming's grapevine breeding program. Moreover, even after release, the USDA provided plant material from which growers could reproduce the variety free of charge.

45.     The USDA, Dr. Ramming, and the Commission knew that plant material for varieties under development frequently entered the public domain prior to release.

46.     Development of the Patented Varieties began in about 1993.  Prior to 2003, the Dr. Ramming had reproduced each of the Patented Varieties, produced fruit from each of the Patent Varieties, and had evaluated the potential commercialization of each Patented Variety.

47.     Dr. Ramming did not keep the development of the Patented Varieties secret.  To the contrary, Dr. Ramming discussed each of the Patented Varieties with the Commission over many years, including between 2001 and 2003.  Dr. Ramming discussed the Patented Varieties during public meetings of the Commission's Research Committee.  Additionally, prior to 2003, Dr. Ramming displayed fruit from the Patented Varieties at Commission meetings, which area growers and shippers attended.  Attendees were allowed to take samples of fruit from the three varieties.

48.     By 2001, the Commission's Research Committee was actively evaluating the Sweet Scarlet, Autumn King, and Scarlet Royal varieties (among others) for USDA release.  The Commission recommended that Sweet Scarlet should be released in 2002.  The Commission also recommended that the USDA seek patent protection on Sweet Scarlet as the first variety for patenting under the Commission's new patent and licensing program.  After receiving the Commission's recommendation, the UDSA proceeded with the release of Sweet Scarlet and filed a patent application on the Sweet Scarlet variety in February 2003.

49.     Although the Commission recommended proceeding with the release of Sweet Scarlet, the Commission decided to delay any release and patenting of Autumn King and Scarlet Royal.  Instead, the Commission recommended that Autumn King and Sweet Scarlet undergo further evaluation prior to release.  Eventually, the Commission recommended release of Autumn King and Scarlet Royal approximately two years later, in 2004.  At that time, the Commission further recommended that the UDSA seek patent protection for Autumn King and Scarlet Royal.

50.     Despite waiting for the Commission's recommendations on releasing new varieties to seek patent protection, Dr. Ramming could have filed patent applications much earlier.  All three Patented Varieties had been reproduced and undergone several growing cycles well before the Commission recommended release in 2002 for Sweet Scarlet, and 2004 for Autumn King and Scarlet Royal.  By 2001-2002 (if not before), all three varieties had been developed to a point at which they were ready for patenting.  The Commission's recommendations regarding continued evaluation of the Autumn King and Sweet Scarlet varieties prior to release did not prevent the USDA from seeking patent protection on these varieties long before receiving a recommendation regarding release.

51.     Despite delaying the decision to apply for patents on Autumn King and Scarlet Royal, the USDA made little effort to prevent these varieties from entering the public domain.  The USDA did not conceal the varieties.  To the contrary, prior to seeking patent protection, the USDA displayed and discussed the varieties at public meetings.  Moreover, the USDA kept its fully-developed Autumn King and Scarlet Royal plants at unsecured facilities at California State University at Fresno ("Fresno State"), which could be accessed though the Fresno State grounds.  The USDA considered placing a fence around its facilities adjacent to the Fresno State campus, but declined to do so.  Although the USDA purportedly told employees that they were not to take or distribute plant materials from new varieties, the USDA made no efforts to examine materials removed from the USDA facility to ensure that persons entering the facility did not remove plant material for these varieties.  Finally, the USDA never made efforts to secure plant materials sent to other facilities for testing.

52.     While delaying the decision to seek patent protection, and failing to implement security measures at its facilities, the USDA knew that public use of new varieties more than one year before applying for a patent would bar later filing for patent protection.  Indeed, the Commission and Dr. Ramming discussed the fact that public uses and sales of new varieties prior to seeking patent protection could jeopardize the Commission's patenting program.

53.     Not surprisingly, all three Patented Varieties entered the public domain more than one year before the USDA sough patent protection on each respective variety.

54.     The Sweet Scarlet variety and its fruit was publicly used, distributed, offered for sale and sold by growers and shippers prior to February 20, 2002 – more than one year prior to the filing of the '512 Application on the Sweet Scarlet variety.  Specifically, approximately nine growers received Sweet Scarlet from Dr. Ramming for trials in 1999 and 2000.  At least three of these growers sold fruit produced into commercial markets before 2002.

55.     Additionally, at least 17 other growers, who were not part of trials, received and reproduced the Sweet Scarlet variety.  On information and belief, these reproductions took place prior to 2002.  Neither the USDA nor Dr. Ramming oversaw or controlled the reproductions created by these 17 growers.

56.     In early 2002, more than two years before filing the patent applications for Autumn King and Scarlet Royal, a grower in Delano, California (J&J Farms owned by Jim and Jack Ludy) obtained "sticks" of several new varieties, including Autumn King and Scarlet Royal.  Jim and Jack Ludy provided some of the plant material for the new varieties (including Autumn King and Scarlet Royal) to their cousin (Lawrence Ludy) who owned and operated an adjacent farm.  With these sticks, both Ludy farms reproduced Autumn King and Scarlet Royal grapevines on their farms in 2002.  Lawrence Ludy reproduced additional Autumn King on his farm in mid-2003.  In total, J&J Farms and Lawrence Ludy Farms reproduced more than five-hundred Autumn King and Scarlet Royal plants before September 2003.

57.     J&J Farms and Lawrence Ludy Farms received the Autumn King and Scarlet Royal plant material without any written or verbal agreement or restrictions on disclosure or use.  Neither the USDA nor Dr. Ramming oversaw or controlled the reproductions that occurred on the Ludys' farms.  Although both Ludy farms were privately owned, they placed no special restrictions such as fences or gates limiting public access to their fields and the location of the Autumn King and Scarlet Royal plants.  Not did the Ludy Farms place any confidentiality restrictions on employees who viewed the reproduced new varieties.  Finally, prior to September 2003, both J&J Farms and Lawrence Ludy Farms showed the reproduced varieties to members of the public, including neighboring farmers, without any confidentiality restrictions.

***The Commission's Efforts to Hide Prior Public Uses and Sales***

58.     On information and belief, both the USDA and the Commission knew, before the respective patents issued on the Patented Varieties, that (i) Sweet Scarlet had been in the public domain since before February 2002, and (ii) either knew or suspected that Autumn King and/or Scarlet Royal had been in the public domain since before September 2003.

59.     Because the known public use and sale of the Patented Varieties more than one year before the patent application filing dates would prevent issuance of valid patents, the Commission (with the USDA's knowledge and approval), created a scheme to prevent challenges to patentability based on these prior uses and sales.

60.     In May 2004, the Commission sent a notice to all California table grape growers and shippers stating that the UDSA had applied for a patent on the Sweet Scarlet variety.  Although no enforceable patent had yet issued, the Commission offered "amnesty" for any grower who had previously reproduced Sweet Scarlet.   Under its so-called "amnesty" program, if a grower with Sweet Scarlet could keep the vines reproduced, so long as the grower (i) admitted to possession prior to July 2004, (ii) paid $2 per vine reproduced, (iii) paid $2 per box of Sweet Scarlet grapes previously shipped, and (iv) agreed to no further propagation of the Sweet Scarlet variety from the plants possessed.

61.     In July 2004, the Commission sent another notice to all California table grape growers and shippers extending the "amnesty" time period for one month, and extending the "amnesty" to include Autumn King and Scarlet Royal varieties.

62.     In both notices, the Commission threatened to sue growers who did not come forward, and to seek money damages and injunctions.  Yet, at the time of the second notice, the USDA patent application on Sweet Scarlet not only remained un-issued, but had been rejected by the USPTO.  Moreover, the USDA had not even applied for a patent on either Autumn King or Scarlet Royal.  Thus, the USDA had no patent rights, and the Commission lacked any enforcement rights.

63.     On information and belief, at the time the Commission sent the "amnesty" notices in May and June, 2004, the USDA, and Dr. Ramming knew of the public use and sale with respect to

the Sweet Scarlet that occurred prior to February 20, 2002 – more than one year prior to the filing of the '512 Application on the Sweet Scarlet variety.

64.     On information and belief, the Commission, the USDA, and Dr. Ramming learned (prior to the July 25, 2005 issue date for Sweet Scarlet) that at least some of the 17 growers who agreed to the Commission's "amnesty" program for that variety had possessed and reproduced Sweet Scarlet prior to February 2002.  Additionally, on information and belief, the Commission, the USDA, and Dr. Ramming knew that such information was material to the patentability of the Sweet Scarlet variety.

65.     The USDA and Dr. Ramming did not disclose to the USPTO the information regarding all the growers who possessed and reproduced Sweet Scarlet prior to February 20, 2002, which the Commission learned though its "amnesty" program.

## FIRST CLAIM FOR RELIEF

### (Declaration of Invalidity of '891 Patent)

66.     Plaintiffs reallege and incorporate by reference all paragraphs 1-65 as if fully set forth herein.

67.     This claim arises under the patent laws of the United States, Title 35 of the United States Code, and the Declaratory Judgment provisions of §§ 2201 and 2202 of Title 28 of the United States Code.

68.     The Commission, as the exclusive licensee of the '891 patent, has demanded that Plaintiffs enter a license agreement to plant and harvest fruit from Sweet Scarlet grapevines.

69.     Plaintiffs have paid for and obtained a license to the '891 patent, and possess Sweet Scarlet grapevines.

70.     Plaintiffs assert that the '891 patent is invalid under at least 35 U.S.C. §102(b), and that they should not be required to license the '891 patent from the Commission..

71.     An actual case and controversy exists between Plaintiffs and the Commission concerning the invalidity of the '891 patent.

72.     Plaintiffs are entitled to declaratory judgment from this Court that the '891 patent is invalid pursuant to at least 35 U.S.C. §102(b).

**SECOND CLAIM FOR RELIEF**

**(Declaration of Invalidity of '284 Patent)**

73.     Plaintiffs reallege and incorporate by reference all paragraphs 1-72 as if fully set forth herein.

74.     This claim arises under the patent laws of the United States, Title 35 of the United States Code, and the Declaratory Judgment provisions of §§ 2201 and 2202 of Title 28 of the United States Code.

75.     The Commission, as the exclusive licensee of the '284 patent, has demanded that Plaintiffs enter a license agreement to plant and harvest fruit from Autumn King grapevines.

76.     Plaintiffs have paid for and obtained a license to the '284 patent, and possess Autumn King grapevines.

77.     Plaintiffs assert that the '284 patent is invalid under at least 35 U.S.C. §102(b), and that they should not be required to license the '284 patent from the Commission..

78.     An actual case and controversy exists between Plaintiffs and the Commission concerning the invalidity of the '284 patent.

79.     Plaintiffs are entitled to declaratory judgment from this Court that the '284 patent is invalid pursuant to at least 35 U.S.C. §102(b).

**THIRD CLAIM FOR RELIEF**

**(Declaration of Invalidity of '229 Patent)**

80.     Plaintiffs reallege and incorporate by reference all paragraphs 1-79 as if fully set forth herein.

81.     This claim arises under the patent laws of the United States, Title 35 of the United States Code, and the Declaratory Judgment provisions of §§ 2201 and 2202 of Title 28 of the United States Code.

82.     The Commission, as the exclusive licensee of the '229 patent, has demanded that Plaintiffs enter a license agreement to plant and harvest fruit from Scarlet Royal grapevines.

83.     Plaintiffs have paid for and obtained a license to the '229 patent, and possess Scarlet Royal grapevines.

84.     Plaintiffs assert that the '229 patent is invalid under at least 35 U.S.C. §102(b), and that they should not be required to license the '229 patent from the Commission..

85.     An actual case and controversy exists between Plaintiffs and the Commission concerning the invalidity of the '229 patent.

86.     Plaintiffs are entitled to judgment from this Court that the '229 patent is invalid pursuant to at least 35 U.S.C. §102(b).

**FOURTH CLAIM FOR RELIEF**

**(Unenforceability for Inequitable Conduct Regarding '891 Patent)**

87.     Plaintiffs reallege and incorporate by reference all paragraphs 1-86 as if fully set forth herein.

88.     The Sweet Scarlet variety was in public use through reproduction, and fruit from the Sweet Scarlet variety was publicly sold, prior to February 2002.

89.     The prior possession and reproduction of the Sweet Scarlet variety, particularly by growers who admitted to such possession and reproduction under the Commission's "amnesty" program, was material to the patentability of the Sweet Scarlet variety.

90.     On information and belief, the USDA and Dr. Ramming knew of the prior possession and reproduction of the Sweet Scarlet variety by growers who admitted to such possession and reproduction under the Commission's "amnesty" program.  Additionally, on information and belief, Margaret A. Conner, John D. Fado, and/or Lesley Shaw, who prosecuted the application on the Sweet Scarlet variety before the USPTO, knew of the prior possession and reproduction of the Sweet Scarlet variety by growers who admitted to such possession and reproduction under the Commission's "amnesty" program.

91.     Prior to issuance of the '891 patent, neither the USDA, nor Dr. Ramming, nor Ms. Conner, Mr. Fado, and/or Ms. Shaw notified the USPTO of the prior possession and reproduction of the Sweet Scarlet variety by growers who admitted to such possession and reproduction under the Commission's "amnesty" program.

92.     The failure of the USDA, Dr. Ramming, and Ms. Conner, Mr. Fado, and/or Ms. Shaw to disclose to the USPTO the prior possession and reproduction of the Sweet Scarlet variety

by growers who admitted to such possession and reproduction under the Commission's "amnesty" program breached the duty of candor owed to the USPTO in applying for a patent on the Sweet Scarlet variety.  This breach of the duty of candor constitutes inequitable conduct.

93.     The inequitable conduct described in the above paragraphs renders the '891 unenforceable.

94.     An actual case and controversy exists between Plaintiffs and the Commission concerning enforceability of the '891 patent.

95.     Plaintiffs are entitled to judgment from this Court that the '891 patent is unenforceable for inequitable conduct during the prosecution of the '891 patent application.

## FIFTH CLAIM FOR RELIEF

### (Sherman Act and Clayton Act)

96.     Plaintiffs reallege and incorporate by reference all paragraphs 1-95 as if fully set forth herein.

97.     On information and belief, the Commission knew that the prior uses and sales of Sweet Scarlet, particularly the uses reported to the Commission under its "amnesty" program, were not disclosed to the USPTO prior to the issuance of the '891 patent.  On information and belief, the Commission further knew that this failure to disclose material information rendered the '891 patent unenforceable once issued.

98.     On information and belief, the Commission has illegally monopolized interstate and foreign commerce in bad faith by (i) enforcing alleged patent rights and collecting royalty fees on the Patented Varieties under its "amnesty" program prior to issuance of a valid United States patents, and (ii) enforcing patent rights (including demanding the removal of Patented Varieties) and collecting royalties on the Sweet Scarlet variety while knowing that the patent on Sweet Scarlet could not be enforced due to prior public use and inequitable conduct.

99.     On information and belief, the Commission has illegally monopolized interstate and foreign commerce by misusing the Patented Varieties though its enforcement and royalty collection activities.

100.     On information and belief, the Commission is the exclusive licensee of the Patented

Varieties and has abused its patent position and attempted to extend its patent monopoly by threatening new entrants and potential new entrants into the table grape market with patent infringement litigation and injunctions.

101.    The existence and misuse of the patents on the Patented Varieties has deprived Plaintiffs of revenues and profits that it would have otherwise enjoyed absent the Commission's anticompetitive activities and patent misuse.

102.    The acts of the Commission constitute monopolization, attempts to monopolize, and a conspiracy to monopolize the world-wide market for the Patented Varieties of table grapes in violation of the Sherman and Clayton Act, and Plaintiffs have been excluded from the table grape market by the monopolistic activities of the Commission.

103.    Plaintiffs are entitled to judgment from this Court that the Commission's conduct is a violation of the Sherman Act (15 U.S.C. § 2) and that Plaintiffs are entitled to recovery, including damages, reasonable attorneys' fees, restitution, disgorgement of all royalty fees obtained by the Commission through its "patent licensing" and "amnesty" programs, and treble damages under the Clayton Act (15 U.S.C. § 15).

## SIXTH CLAIM FOR RELIEF

### (Patent Misuse)

104.    Plaintiffs reallege and incorporate by reference all paragraphs 1-103 as if fully set forth herein.

105.    The Commission has exploited the Patented Varieties in a manner that violates antitrust laws and in a manner that attempts to extend these patents beyond their lawful scope.

106.    The Commission has misused the '284, '891 and '229 patents by (i) enforcing alleged patent rights and collecting royalty fees on the Patented Varieties under its "amnesty" program prior to issuance of a valid United States patents, (ii) enforcing patent rights (including demanding the removal of Patented Varieties) and collecting royalties on the Sweet Scarlet variety while knowing that the patent on Sweet Scarlet could not be enforced due to prior public use and inequitable conduct, and (iii) imposing on growers a Domestic Growers' License Agreement, which purport to extend the Commission's rights to Patented Varieties even after sale despite the

1 exhaustion of those rights upon sale of the patented plant.

2      107.    The '284, '891 and '229 patents are unenforceable as a result of the Commission's

3 misuse of these patents.

4      108.    An actual case and controversy exists between Plaintiffs and the Commission

5 concerning the Commission's misuse of the '284, '891 and '229 patents.

6      109.    Plaintiffs are entitled to judgment from this Court that the '284, '891 and '229 patents

7 are unenforceable for misuse.

8 **SEVENTH CLAIM FOR RELIEF**

9 **(Unfair Competition Under California Business and Professions Code §17200 and**

10 **California Common Law)**

11      110.    Plaintiffs reallege and incorporate by reference all paragraphs 1-109 as if fully set

12 forth herein.

13      111.    The Commission has unlawfully and unfairly exploited the '284, '891 and '229

14 patents in a manner that violates antitrust laws and in a manner that attempts to extend these patents

15 beyond their lawful scope.  Such acts constitute unfair trade practices and unfair competition under

16 California Business and Professions Code §17200, *et seq.*, and under the common law of the State of

17 California, entitling Plaintiffs to relief.

18      112.    Pursuant to California Business and Professions Code §17203, Defendant is required

19 to disgorge and restore to Plaintiffs all profits and property acquired by means of Defendant's unfair

20 competition.

21      113.    Due to the conduct of Defendant, Plaintiffs have suffered irreparable harm, have

22 suffered injury in fact and have lost money or property as a result of Defendant's acts of unfair

23 business practices alleged herein.  It would be difficult to ascertain the amount of money damages

24 that would afford Plaintiffs adequate relief at law for Defendant's acts.  Plaintiffs' remedy at law is

25 not adequate to compensate Plaintiffs for the injuries inflicted by Defendant.  Accordingly, Plaintiffs

26 are entitled to preliminary and permanent injunctive relief pursuant to California Business and

27 Professions Code §17203.

28      114.    Plaintiffs are informed and believe and on that basis allege that Defendant's conduct

has been intentional and willful and in conscious disregard of Plaintiffs' rights and, therefore, Plaintiffs are entitled to its attorneys' fees.

## EIGHTH CLAIM FOR RELIEF

### (Unjust Enrichment)

115.    Plaintiffs reallege and incorporate by reference all paragraphs 1-114 as if fully set forth herein.

116.    By acquiring licensing revenue for the '891 patent, which was fraudulently procured and maintained, the Commission has received significant benefits.  In addition, by acquiring licensing revenue for the '284, '891 and '229 patents in a manner that expands these patents beyond their lawful scope, the Commission has received significant benefits.

117.    The Commission's unjust receipt and retention of such benefits has unjustly enriched them at the expense of the Plaintiffs and all California table grape growers who have paid the Commission license fees.

## NINTH CLAIM FOR RELIEF

### (Constructive Trust)

118.    Plaintiffs reallege and incorporate by reference all paragraphs 1-117 as if fully set forth herein.

119.    California table grape growers have transferred to the Commission licensing fees, being induced by fraud, duress or undue influence of the Commission.

120.    The Commission is subject to an equitable duty to convey the license fees it has received from Plaintiffs and other California table grape growers on the ground that the Commission would be unjustly enriched if the Commission were permitted to retain those license fees.

121.    The licensing fees acquired by the Commission for the Patented Varieties should be held in constructive trust for the benefit of California table grape growers who have paid the Commission license fees with respect to the Patented Varieties.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs prays for the following relief against Defendant:

A.    Declaring that the '284, '891 and '229 patents are invalid;

B.      Declaring that the '284, '891 and '229 patents are unenforceable;

C.      Declaring that the Commission committed inequitable conduct in the procurement of the '891 patent;

D.      Declaring that the Commission has misused the '284, '891 and '229 patents;

E.      That the Court adjudge and decree that the Commission has violated the Sherman and Clayton Acts;

F.      That the Court adjudge and decree that the Commission has violated the antitrust laws of the State of California;

G.      That the Court adjudge and decree that the Commission has violated California statutory and common law unfair competition laws;

H.      That the Court adjudge and decree that the Commission has been unjustly enriched;

I.      A preliminary and permanent injunction enjoining the Commission, its officers, servants, commissioners, employees, attorneys, all parent and subsidiary corporations, all assignees and successors in interest, and those persons in active concert or participation with the Commission, including distributors and nurseries from enforcing or threatening to enforce the '284, '891 and '229 patents;

J.      That the Court order the Commission to dedicate to the public patents regarding the Autumn King, Sweet Scarlet and Scarlet Royal varieties, both domestic and foreign; or alternatively grant all requesting persons royalty-free licenses to propagate, grow, harvest and sell Autumn King, Sweet Scarlet and Scarlet Royal varieties and their fruit which are claimed in the '284, '891 and '229 patents.

K.      An award of damages, together with pre-judgment and post-judgment interest;

L.      Disgorgement of all royalty fees obtained by the Commission in connection with the Patented Varieties;

M.      That the licensing fees acquired by the Commission for the Patented Varieties be held in constructive trust for the benefit of California table grape growers who have paid the Commission license fees with respect to the Patented Varieties;

N.      A trebling of said damages;

1    O.    That Plaintiffs recover the costs of this suit together with reasonable attorneys' fees;

2    P.    That Plaintiffs have such other and further relief as the nature of this case may

3 require and as the Court may deem just and proper.

4

DATED:  November 2, 2007                    HENNIGAN BENNETT & DORMAN LLP

5

6

7                                           By _____/s/ Lawrence M. Hadley_____

8                                                    Lawrence M. Hadley

9                                           Attorney for Plaintiffs
                                            DELANO FARMS COMPANY; FOUR STAR
10                                          FRUIT, INC.; GERAWAN FARMING, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiffs hereby demand a trial by jury as to all issues so triable.

3

4    DATED:  November 2, 2007                    HENNIGAN BENNETT & DORMAN LLP

5

6                                                By _____/s/ Lawrence M. Hadley_____

7                                                        Lawrence M. Hadley

8                                                Attorney for Plaintiffs
                                                 DELANO FARMS COMPANY; FOUR STAR
9                                                FRUIT, INC.; GERAWAN FARMING, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

635544\v4