1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                  EASTERN DISTRICT OF CALIFORNIA

8

9  DELANO FARMS COMPANY, FOUR STAR )      1:07-cv-1610 OWW SMS
   FRUIT, INC., and GERAWAN        )
10 FARMING, INC.,                  )      MEMORANDUM DECISION AND
                                   )      ORDER [GRANTING IN PART AND
11              Plaintiffs,         )      DENYING IN PART]
                                   )      DEFENDANT'S MOTION TO
12     v.                          )      DISMISS AND [DENYING]
                                   )      DEFENDANT'S MOTION TO
13 THE CALIFORNIA TABLE GRAPE      )      STRIKE (Doc. 19)
   COMMISSION,                     )
14                                 )
                Defendant.         )
15                                 )
                                   )
16 _____  )

17

18                  I.   INTRODUCTION

19     Defendant, The California Table Grape Commission

20 ("Commission"), moves to dismiss Plaintiffs' Delano Farms Company

21 ("Delano"), Four Star Fruit, Inc. ("Four Star"), and Gerawan

22 Farming, Inc. ("Gerawan"), entire complaint pursuant to Federal

23 Rule of Civil Procedure 19(a), claiming the United States is a

24 necessary party, and moves to dismiss pursuant to Federal Rule of

25 Civil Procedure 19(b), claiming the government is an

26 indispensable party and immune from this suit.  Defendant

27 additionally moves to dismiss Plaintiffs' remaining claims for

28 (1) Inequitable Conduct, (2) Sherman and Clayton Anti-Trust

                            1

1  violations, (3) Patent Misuse, (4) Unfair Competition, (5) Unjust

2  Enrichment and (6) Constructive Trust.  Defendant moves to strike

3  certain portions of Plaintiffs' complaint pursuant to Federal

4  Rule of Civil Procedure 12(f).  (Doc. 20, Motion to Dismiss,

5  Filed December 14, 2007).  Plaintiffs oppose the motion.  (Doc.

6  24, Opposition, filed January 9, 2008.)  Defendant filed a notice

7  of supplemental authority on June 17, 2008, (Doc. 39).  This

8  matter was heard on May 19, 2008.

9

10                    **II.   PROCEDURAL BACKGROUND**

11         Plaintiffs filed their complaint on November 5, 2007.  (Doc.

12  1, Complaint).  The Commission filed its Motion to Dismiss on

13  December 14, 2007, (Doc. 20), which Plaintiffs opposed on January

14  9, 2008.  (Doc. 24, Opposition).  On January 21, 2008, Defendant

15  filed a reply to Plaintiffs' Opposition.  (Doc. 26, Reply).

16

17                    **III.   FACTUAL BACKGROUND**

18  A.   **Parties**

19         Plaintiff Delano is a corporation duly organized and

20  existing under the laws of the State of Washington, with its

21  principal place of business at Hoquiam, Washington.  Plaintiff

22  Four Star is a corporation duly organized and existing under the

23  laws of the State of California, with its principal place of

24  business at Delano, California.  Plaintiff Gerawan is a

25  corporation duly organized and existing under the laws of the

26  State of California, with its principal place of business at

27  Sanger, California.  Plaintiffs are engaged in the business,

28  *inter alia*, of growing, harvesting and selling table grapes.

                                2

1    Defendant is a corporation of the State of California,

2    established by the 1967 Ketchum Act.   Cal. Food & Agric. Code

3    §§ 65550-65551.   Defendant's principal place of business is at

4    Fresno, California.   The stated purpose of the Commission is to

5    expand and maintain the market for California table grapes for

6    the benefit of the State of California as well as the State's

7    over five hundred California table grape growers.   The Commission

8    is funded primarily by assessments levied on each shipment of

9    California table grapes and paid by the State's table grape

10   shippers.   No general revenues of the State fund the Commission.

11   (Doc. 1, Complaint, ¶¶ 4-9).

12

13   B.   <u>USDA Research Program</u>

14   California table grape growers and shippers have funded a

15   research program under the U.S. Department of Agriculture

16   ("USDA") to develop new table grape varieties.   Growers and

17   shippers fund the USDA research program through the Commission by

18   an assessment on each box of table grapes shipped in California.

19   Prior to 2002, the USDA provided the new varieties under

20   development to area growers for evaluation of growing potential

21   and commercial marketability.   Once new varieties appeared

22   commercially viable, the USDA "released" the variety, and

23   distributed plant material of the variety to area growers free-

24   of-charge.   The USDA did not charge California growers for the

25   new varieties since California growers and shippers already paid

26   for a large portion of the development.   (Complaint, ¶ 10).

27   Accordingly, when a variety under development appeared

28   commercially successful, it was not uncommon for many growers to

3

1   have reproduced and commercially sold the variety prior to an

2   official "release" by the USDA.  (Complaint, ¶ 43).

3

4   C.   Commission Patents Grape Varieties

5        In the late 1990s, the Commission developed a scheme by

6   which it and a few select nurseries could profit from the new

7   varieties that the USDA distributed for free.  At the urging of

8   the Commission, the USDA agreed to begin patenting new table

9   grape varieties.  California shippers already funded much of the

10  development, but the USDA agreed to give the Commission an

11  exclusive license to all new patented varieties, and to allow the

12  Commission to charge royalties when growers wished to obtain the

13  new varieties.  The USDA also agreed to give the Commission

14  exclusive enforcement powers over its new patent rights.

15  (Complaint, ¶ 21).

16       Under the Commission's "patent and licensing" scheme, the

17  Commission hand-selected three nurseries to exclusively sell all

18  new patented table grape varieties ("Licensed Nurseries").

19  Unlike the prior free distribution, the nurseries would be

20  allowed to sell new varieties to growers.  (Complaint, ¶ 13).

21  The Licensed Nurseries are responsible for paying the royalty,

22  but the Licensed Nurseries are allowed to pass the royalty amount

23  on to the purchasing growers, which they do and have done.  The

24  Commission pays a portion of the royalty to the USDA.

25  (Complaint, ¶ 28).

26       When a grower seeks to obtain a new variety from a nursery,

27  it is required to enter a "Domestic Grower License Agreement" or

28  "License Agreement" with the Commission.  Under the terms of the

                                4

1  License Agreement, the grower cannot propagate the variety beyond
2  the plant purchased.  If the Commission believes the grower has
3  violated the License Agreement, it can void the License Agreement
4  and order that all purchased plants be destroyed.  (Complaint,
5  ¶ 13).

6      The first three varieties that the Commission identified to
7  the USDA for patenting had been under development for years.  At
8  least one of the varieties had been distributed to growers for
9  wide-scale commercial evaluation and sale.  (Complaint, ¶ 14).
10 Recognizing that at least one of the new varieties identified for
11 patenting (and perhaps all three) had been previously in public
12 use and/or sold commercially, the Commission created a so-called
13 "amnesty program" designed to hide the fact that valid patents
14 could not be obtained, and to extort funds from growers already
15 in possession of the varieties.  Under the amnesty program, the
16 Commission widely disseminated notices to growers and shippers
17 stating that they were in violation of the law if they possessed
18 the varieties intended for patenting.  The notices also offered
19 confidential "settlements" to any growers who, within a narrow
20 window, agreed to license the varieties, pay a "penalty" to the
21 Commission, and accept the Commission's license restrictions on
22 further propagation.  (Complaint, ¶ 15).

23     In May 2004, the commission sent a notice to all California
24 table grape growers and shippers stating that the USDA had
25 applied for a patent on the Sweet Scarlet variety.  Although no
26 enforceable patent had yet issued, the Commission offered
27 "amnesty" for any grower who had previously reproduced Sweet
28 Scarlet.  Under its so-called "amnesty" program, a grower with

**5**

1   Sweet Scarlet could keep the vines reproduced, so long as the

2   grower (i) admitted to possession prior to July 2004, (ii) paid

3   $2 per vine reproduced, (iii) paid $2 per box of Sweet Scarlet

4   grapes previously shipped, and (iv) agreed to no further

5   propagation of the Sweet Scarlet variety from the plants

6   possessed.  (Complaint, ¶ 60).

7        In July 2004, the Commission sent another notice to all

8   California table grape growers and shippers extending the

9   "amnesty" time period for one month, and extending the "amnesty"

10  to include Autumn King and Scarlet Royal varieties.  (Complaint

11  ¶ 61).  In both notices, the Commission threatened to sue growers

12  who did not come forward, and to seek money damages and

13  injunctions.  Yet, at the time of the second notice, the USDA

14  patent application on Sweet Scarlet not only remained un-issued,

15  but had been rejected by the USPTO.  Moreover, the USDA had not

16  even applied for a patent on either Autumn King or Scarlet Royal.

17  The USDA had no patent rights, and the Commission lacked any

18  enforcement rights.  (Complaint, ¶ 62).  On information and

19  belief, at the time the Commission sent the "amnesty" notices in

20  May and June, 2004, the USDA, and Dr. Ramming knew of the public

21  use and sale with respect to the Sweet Scarlet that occurred

22  prior to February 20, 2002 - more than one year prior to the

23  filing of the '512 Application on the Sweet Scarlet variety.

24  (Complaint, ¶ 63).  On information and belief, the Commission,

25  the USDA, and Dr. Ramming learned (prior to the July 25, 2005,

26  issue date for Sweet Scarlet) that at least some of the 17

27  growers who agreed to the Commission's "amnesty" program for that

28  variety had possessed and reproduced Sweet Scarlet prior to

February 2002.  On information and belief, the Commission, the USDA, and Dr. Ramming knew that such information was material to the patentability of the Sweet Scarlet variety.  (Complaint, ¶ 64).  Seventeen growers confirmed possession of the varieties and agreed to pay the penalties demanded by the Commission, confirming its expectation that varieties identified for patenting were in public use.  (Complaint, ¶ 17).

D.   <u>Patents in Prior Use</u>

The USDA and inventor of the new varieties breached their duty of candor to the United States Patent & Trademark Office ("USPTO") by not reporting these prior public uses and sales when applying for patents on the new varieties.  Under Patent Law, public use or sale of an invention more than one year prior to filing a patent application bars patentability.  Based on these facts, none of the patents on the new varieties are valid.  The USDA and inventor committed inequitable conduct before the USPTO.  The Commission demanded licenses and accepted royalties on knowingly invalid patents.

Plaintiffs seek to hold the patents invalid so the varieties can be freely distributed, to obtain the return of royalty payments illegally collected from growers and shippers, and to stop the Commission from engaging in further illegal activities through the use of patents.  (Complaint, ¶ 17).

E.   <u>Patents</u>

1.   <u>Sweet Scarlet</u>

On February 20, 2003, the USDA filed patent application No.

371,512 (the "'512 Application") on a grapevine denominated "Sweet Scarlet."  On July 26, 2005, the '512 Application issued as U.S. Patent No. PP15,891, entitled "Grapevine Denominated Sweet Scarlet" (the "'891 patent").  (Complaint, ¶ 18).  The United States of America, as represented by the Secretary of Agriculture, is the owner by assignment of the '891 patent.  (Complaint, ¶ 19).  On information and belief, the Commission is the exclusive licensee of the '891 patent pursuant to a license agreement entered into between the United States Government, as represented by the United States Department of Agriculture, Agricultural Research Services, and the Commission.  The exclusive license includes the right to license the '891 patent and to enforce the '891 patent against alleged infringers.  (Complaint, ¶ 20).

         2.   Autumn King

     On September 28, 2004, the USDA filed patent application No. 953,387 (the "'387 Application") on a grapevine denominated "Autumn King."  On February 21, 2006, the '387 Application issued as U.S. Patent No. PP16,284, entitled "Grapevine Denominated Autumn King" (the "Autumn King or '284 patent").  The United States of America, as represented by the Secretary of Agriculture, is the owner by assignment of the '284 patent.  (Complaint, ¶¶ 21, 22).  On information and belief, the Commission is the exclusive licensee of the '284 patent pursuant to a license agreement entered into between the United States Government, as represented by the United States Department of Agriculture, Agricultural Research Services, and the Commission.

**8**

1  The exclusive license includes the right to license the '284

2  patent and to enforce the '284 patent against alleged infringers.

3  (Complaint, ¶ 23).

4

5       3.   **Scarlet Royal**

6       On September 28, 2004, the USDA filed patent application No.

7  953,124 (the "'124 Application") on a grapevine denominated

8  "Scarlet Royal."  On January 31, 2006, the '124 Application

9  issued as U.S. Patent No. PP16,229, entitled "Grapevine

10 Denominated Scarlet Royal" (the "Scarlet Royal or '229 patent").

11 The United States of America, as represented by the Secretary of

12 Agriculture, is the owner by assignment of the '229 patent.

13 (Complaint, ¶¶ 24, 25).  On information and belief, the

14 Commission is the exclusive licensee of the '229 patent pursuant

15 to a License Agreement entered into between the United States

16 Government, as represented by the United States Department of

17 Agriculture, Agricultural Research Services, and the Commission.

18 The exclusive license includes the right to license the '229

19 patent and to enforce the '229 patent against alleged infringers.

20 (Complaint, ¶ 26).

21

22 E.   **Plaintiffs' License Agreements**

23      Plaintiffs are in possession of the Autumn King, Sweet

24 Scarlet and Scarlet Royal varieties, which they purchased through

25 Licensed Nurseries.  Plaintiffs paid the royalties imposed by the

26 Commission on each purchased plant.  (Complaint, ¶ 30).

27 Plaintiffs have entered into a License Agreement with the

28 Commission for each of the Patented Varieties.  In consideration

1  for this limited, nonexclusive license, Plaintiffs have paid a

2  license fee to a Licensed Nursery.  Under the terms of this

3  agreement, Plaintiffs have a limited, nonexclusive license of the

4  Patented Varieties, to grow the variety and sell the fruit

5  produced.  Plaintiffs cannot propagate the grapevines or

6  distribute the vines to third parties.  Further, Plaintiffs are

7  obligated to destroy all Patented Varieties' plant material upon

8  termination of the agreement.  (Complaint, ¶¶ 31-33).

9

10  **F.   Commission's Patent and Licensing Program**

11       The Commission requires that California grape shippers pay

12  an assessment of approximately $0.13 per box of table grapes.

13  The Commission operates at an annual surplus from these

14  assessments, but does not return any of the assessment money back

15  to the California growers or shippers.  (Complaint, ¶ 34).  Dr.

16  Ramming, the co-inventor of the patented Autumn King, Sweet

17  Scarlet and Scarlet Royal varieties, is a researcher at the

18  Agriculture Research Center ("ARC") of the USDA located in

19  Fresno, California.  For at least 20 years, Dr. Ramming has

20  operated a research program at the ARC relating to the

21  development of new table grape varieties.  Since the early 1980s,

22  the Commission has funded a portion of Dr. Ramming's grapevine

23  breeding program with funds collected through the shipper

24  assessments.  In many years, the Commission's funding has

25  amounted to over one-third of the total table grape research

26  budget at the ARC, excluding employee salaries.  (Complaint,

27  ¶ 35).  Prior to 2003, the USDA had never sought patent

28  protection for any new table grape variety developed at the ARC.

**10**

1    The USDA agreed that the Commission could serve as the
2    exclusive licensee for patented varieties in the collection of
3    royalties and enforcement against infringers.  (Complaint, ¶ 37).
4    In exchange for seeking patent protection, and providing an
5    exclusive license to the Commission, the Commission and the USDA
6    agreed that revenues from the patent licensing program would be
7    shared between the USDA and the Commission.  However, the USDA
8    indicated that it was not interested in profiting from the
9    patenting program.  Additionally, Dr. Ramming received no extra
10   compensation from the patenting of varieties he developed.
11   (Complaint, ¶ 39).

12   In accordance with the agreement between the Commission and
13   the USDA, the Commission charges nurseries that distribute
14   patented varieties a $5,000 participation fee per patented
15   variety and an additional $1 per production unit royalty.  These
16   costs are then passed on by the nurseries to the California grape
17   growers, who purchase the patented plant material from the
18   nurseries, including Plaintiffs who purchased the Patented
19   Varieties.  (Complaint, ¶ 40).  The California grape growers who
20   bear the ultimate costs of the royalty fees imposed by the
21   Commission are the same California grape growers who bear the
22   cost of the per box assessment charged by the Commission, which
23   funds much of Dr. Ramming's breeding program.  Thus, California
24   table grape growers essentially pay for the development of
25   patented varieties, then pay again to obtain the varieties.
26   (Complaint, ¶ 41).

27   The Commission's Research Committee and Board oversee and
28   administer the patent and licensing program.  Specifically, the

11

1  Board sets the royalty rates on patented plants, determines
2  penalties for infringement, and establishes enforcement policy.
3  The Research Committee oversees Dr. Ramming's breeding program
4  and makes recommendations regarding which new varieties should be
5  patented and released.  To date, the USDA has only patented new
6  varieties that the Commission has recommended for patenting, and
7  has only applied for patents once receiving a recommendation from
8  the Commission to do so.  (Complaint, ¶ 42).

9

10        1.   Prior Uses and Sales of Patented Varieties

11        Development of the Patented Varieties began in about 1993.
12  Prior to 2003, Dr. Ramming had reproduced each of the Patented
13  Varieties, Sweet Scarlet, Autumn King, and Scarlet Royal,
14  produced fruit from each of the Patented Varieties, and had
15  evaluated the potential commercialization of each Patented
16  Variety.  (Complaint, ¶ 46).

17        Dr. Ramming did not keep the development of the Patented
18  Varieties secret.  To the contrary, Dr. Ramming discussed each of
19  the Patented Varieties with the Commission over many years,
20  including between 2001 and 2003.  Dr. Ramming discussed the
21  Patented Varieties during public meetings of the Commission's
22  Research Committee.  Additionally, prior to 2003, Dr. Ramming
23  displayed fruit from the Patented Varieties at Commission
24  meetings, which area growers and shippers attended.  Attendees
25  were allowed to take samples of fruit from the three varieties.
26  (Complaint, ¶ 47).

27        By 2001, the Commission's Research Committee was actively
28  evaluating the Sweet Scarlet, Autumn King, and Scarlet Royal

                                    12

1   varieties (among others) for USDA release.  The Commission
2   recommended that Sweet Scarlet should be released in 2002.  The
3   Commission also recommended that the USDA seek patent protection
4   on Sweet Scarlet as the first variety for patenting under the
5   Commission's new patent and licensing program.  After receiving
6   the Commission's recommendation, the USDA proceeded with the
7   release of Sweet Scarlet and filed a patent application on the
8   Sweet Scarlet variety in February 2003.  (Complaint, ¶ 48).
9   Although the Commission recommended proceeding with the release
10  of Sweet Scarlet, the Commission decided to delay any release and
11  patenting of Autumn King and Scarlet Royal.  Instead, the
12  Commission recommended that Autumn King and Sweet Scarlet undergo
13  further evaluation prior to release.  Eventually, the Commission
14  recommended release of Autumn King and Scarlet Royal
15  approximately two years later, in 2004.  At that time, the
16  Commission further recommended that the USDA seek patent
17  protection for Autumn King and Scarlet Royal.  (Complaint, ¶ 49).

18          Despite waiting for the Commission's recommendations on
19  releasing new varieties to seek patent protection, Dr. Ramming
20  could have filed patent applications much earlier.  All three
21  Patented Varieties had been reproduced and undergone several
22  growing cycles well before the Commission recommended release in
23  2002 for Sweet Scarlet, and 2004 for Autumn King and Scarlet
24  Royal.  By 2001-2002 (if not before), all three varieties had
25  been developed to a point at which they were ready for patenting.
26  The Commission's recommendations regarding continued evaluation
27  of the Autumn King and Sweet Scarlet varieties prior to release
28  did not prevent the USDA from seeking patent protection on these

13

1   varieties long before receiving a recommendation regarding

2   releases.  (Complaint, ¶ 50).

3       Although the USDA delayed the decision to apply for patents

4   on Autumn King and Scarlet Royal, it made little effort to

5   prevent these varieties from entering the public domain.  The

6   USDA did not conceal the varieties.  To the contrary, prior to

7   seeking patent protection, the USDA displayed and discussed the

8   varieties at public meetings.  Moreover, the USDA kept its fully

9   developed Autumn King and Scarlet Royal plants at unsecured

10  facilities at California State University at Fresno ("Fresno

11  State"), which could be accessed through the Fresno State

12  grounds.  The USDA never made efforts to secure plant materials

13  sent to other facilities for testing.  (Complaint, ¶ 51).[1]

14      While delaying the decision to seek patent protection, and

15  failing to implement security measures at its facilities, the

16  USDA knew that public use had been made of new varieties more

17  than one year before applying for a patent would bar later filing

18  for patent protection.  Indeed, the Commission and Dr. Ramming

19  discussed the fact that public uses and sales of new varieties

20  prior to seeking patent protection could jeopardize the

21  Commission's patenting program.  (Complaint, ¶ 52).  All three

22  Patented Varieties entered the public domain more than one year

23

24      [1] The USDA considered placing a fence around its facilities

25  adjacent to the Fresno State campus, but declined to do so.
    Although the USDA purportedly told employees that they were not

26  to take or distribute plant materials from new varieties, the
    USDA made no efforts to examine materials removed from the USDA

27  facility to ensure that persons entering the facility did not

28  remove plant material for these varieties.  (Complaint, ¶ 51).

1   before the USDA sought patent protection on each respective
2   variety.   (Complaint, ¶ 53).

3        The Sweet Scarlet variety and its fruit was publicly used,
4   distributed, offered for sale and sold by growers and shippers
5   prior to February 20, 2002 - more than one year prior to the
6   filing of the '512 Application on the Sweet Scarlet variety.
7   Specifically, approximately nine growers received Sweet Scarlet
8   from Dr. Ramming for trials in 1999 and 2000.   At least three of
9   these growers sold fruit produced into commercial markets before
10  2002.   (Complaint, ¶ 54).   Additionally, at least 17 other
11  growers, who were not part of trials, received and reproduced the
12  Sweet Scarlet variety.   On information and belief, these
13  reproductions took place prior to 2002.   Neither the USDA, nor
14  Dr. Ramming oversaw or controlled the reproductions created by
15  these 17 growers.   (Complaint, ¶ 55).

16       In early 2002, more than two years before filing the patent
17  applications for Autumn King and Scarlet Royal, a grower in
18  Delano, California (J&J Farms, owned by Jim and Jack Ludy)
19  obtained "sticks" of several new varieties, including Autumn King
20  and Scarlet Royal.   Jim and Jack Ludy provided some of the plant
21  material for the new varieties (including Autumn King and Scarlet
22  Royal) to their cousin (Lawrence Ludy) who owned and operated an
23  adjacent farm ("Ludy Farms").   With these sticks, the Ludys
24  reproduced Autumn King and Scarlet Royal grapevines on their
25  farms in 2002.   Lawrence Ludy reproduced additional Autumn King
26  on his farm in mid-2003.   In total, J&J Farms and Ludy Farms
27  reproduced more than five hundred Autumn King and Scarlet Royal
28  plants before September 2003.   (Complaint, ¶ 57).   J&J Farms and

15

1  Ludy Farms received the Autumn King and Scarlet Royal plant
2  material without any written or verbal agreement or restrictions
3  on disclosure or use.  Neither the USDA, nor Dr. Ramming oversaw
4  or controlled the reproductions that occurred on the Ludy Farms.
5  Although Ludy Farms was privately owned, it placed no special
6  restrictions such as fences or gates limiting public access to
7  its fields and the location of the Autumn King and Scarlet Royal
8  plants.  Nor did Ludy Farms place any confidentiality
9  restrictions on employees who viewed the reproduced new
10  varieties.  Finally, prior to September 2003, both J&J Farms and
11  Ludy Farms showed the reproduced varieties to members of the
12  public, including neighboring farmers, without any
13  confidentiality restrictions.  (Complaint, ¶ 57).  The USDA and
14  Dr. Ramming did not disclose to the USPTO the information
15  regarding all the growers who possessed and reproduced Sweet
16  Scarlet prior to February 20, 2002, which the Commission learned
17  through its "amnesty" program.  (Complaint, ¶ 65).

18      On information and belief, both the USDA and the Commission
19  knew, before the respective patents issued on the Patented
20  Varieties, that (i) Sweet Scarlet had been in the public domain
21  since before February 2002, and (ii) either knew or suspected
22  that Autumn King and/or Scarlet Royal had been in the public
23  domain since before September 2003.  (Complaint, ¶ 58).  Because
24  the known public use and sale of the Patented Varieties, more
25  than one year before the patent application filing would prevent
26  issuance of valid patents, the Commission (with the USDA's
27  knowledge and approval), created a scheme to prevent challenges
28  to patentability based on these prior uses and sales.

**16**

1  (Complaint, ¶ 59).

2

3              IV.  REQUEST FOR JUDICIAL NOTICE

4       Defendant Commission requests judicial notice pursuant to

5  Federal Rule of Evidence Rule 201, of Defendant Party-United

6  States of America's memorandum of points and authorities filed in

7  the District Court case of *Nutrition 21 v. Thorne Research, Inc.*,

8  130 F.R.D. 671 (D.Wash. 1990) and Appellee Party-United States of

9  America's brief filed in Federal District appeal case of

10 *Nutrition 21 v. United States*, 930 F.2d 862 (Fed. Cir. 1991).

11 (Doc. 27, Commission Request for Judicial Notice, filed January

12 21, 2007, Exhibit 1 and Exhibit 2).  Plaintiffs provide no

13 objection to this request.  "A judicially noticed fact must be

14 one not subject to reasonable dispute in that it is either (1)

15 generally known within the territorial jurisdiction of the trial

16 court or (2) capable of accurate and ready determination by

17 resort to sources whose accuracy cannot reasonably be

18 questioned."  Fed. R. Evid. 201(b); *see Biggs v. Terhune*, 334

19 F.3d 910, 916, n.3 (9th Cir. 2003) ("Materials from a proceeding

20 in another tribunal are appropriate for judicial notice.")

21      Defendant's request for judicial notice is GRANTED as to the

22 documents and their existence, but not as to any disputed

23 contents of those papers.

24

25              V.  LEGAL STANDARD

26      Fed. R. Civ. P. 12(b)(6) provides that a motion to dismiss

27 may be made if the plaintiff fails "to state a claim upon which

28 relief can be granted."  However, motions to dismiss under Fed.

                                17

R. Civ. P. 12(b)(6) are disfavored and rarely granted. *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). In deciding whether to grant a motion to dismiss, the Court "accept[s] all factual allegations of the complaint as true and draw[s] all reasonable inferences" in the light most favorable to the nonmoving party. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999); *see also, Rodriguez v. Panayiotou*, 314 F.3d 979, 983 (9th Cir. 2002).  A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

The question before the court is not whether the plaintiff will ultimately prevail; rather, it is whether the plaintiff could prove any set of facts in support of his claim that would entitle him to relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  "A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Van Buskirk v. CNN, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) (citations omitted).

## VI.  ANALYSIS

### A.   Joinder of Parties

Defendant argues that the United States is not a named defendant and is a necessary and indispensable party to certain claims under Federal Rule of Civil Procedure 19.  Further, because the United States is not subject to suit under the doctrine of sovereign immunity, Plaintiffs cannot join the United

1    States to this action, and this action must be dismissed under
2    Rule 19(b).

3         Plaintiffs' first three causes of action seek a declaration
4    of the invalidity of the three U.S.-owned patents under 35 U.S.C.
5    § 102(b) ('891 Patent, '284 Patent and '229 Patent).  Defendant
6    seeks to dismiss these causes of action.  Defendant's argument
7    that the United States is a necessary and indispensable party is
8    based on the fact that the patents sought to be invalidated are
9    owned by the U.S., a sovereign entity, and Plaintiffs have failed
10   to identify a waiver of sovereign immunity.  Plaintiffs allege in
11   the Complaint that the USDA and Dr. Ramming, of the USDA,
12   knowingly did not disclose to the USPTO that the Patented
13   Varieties had been in the public domain more than one year before
14   the patent application filing dates in violation of the Patent
15   Act.  And they allegedly knew that this information would prevent
16   issuance of valid patents.  (Doc. 1, Complaint, ¶¶ 53, 58-9).
17   Plaintiffs' Complaint is brought against the Commission only.
18   Section 120 of the Patent Act states:

19        A person shall be entitled to a patent *unless*- (b) *the
          invention was* patented or described in a printed
20        publication in this or a foreign country or *in public
          use* or on sale in this country, *more than one year
21        prior to the date of the application* for patent in the
          United States...
22

23   35 U.S.C. § 120(b) (emphasis added).

24        Defendant also seeks to dismiss Plaintiffs' fourth and sixth
25   claims on the same basis as the first three claims, the U.S. is a
26   necessary and indispensable party and is a sovereign entity
27   immune from this suit.  Plaintiffs' fourth claim seeks a
28   declaration that the U.S.-owned patents are unenforceable, in

                                19

part, due to alleged "inequitable conduct" by the USDA.  This directly implicates the interests of the United States, the patent owner, as it would render the patents useless if they are found unenforceable.  Claim six is a patent misuse claim, in which Plaintiffs seek a declaration that the patent is also unenforceable due to the Commission's misuse of the patents. Defendant argues this makes the United States a necessary and indispensable party to claims one through four and six.

"[W]here sovereign immunity is asserted, and the sovereign's claims are not frivolous, dismissal must be ordered where there is a potential for injury to the absent sovereign's interests." *Republic of Philippines v. Pimentel*, 128 S.Ct. 2180, 2182-83 (2008).  Rule 19 governs the circumstances under which persons must be joined as parties to a lawsuit.  Rule 19 provides in relevant part:

> (a)  Persons Required to Be Joined if Feasible.
>     (1)  Required Party.  A person who is subject to
>          service of process and whose joinder will not
>          deprive the court of subject-matter
>          jurisdiction must be joined as a party if:
>
>              (A)  in that person's absence, the court
>                   cannot accord complete relief among
>                   existing parties; or
>              (B)  that person claims an interest relating
>                   to the subject of the action and is so
>                   situated that disposing of the action in
>                   the person's absence may:
>
>                      (i)  as a practical matter impair or
>                           impede the person's ability to
>                           protect the interest;
>                           or
>                      (ii) leave an existing party subject to
>                           a substantial risk of incurring
>                           double, multiple, or otherwise
>                           inconsistent obligations because of
>                           the interest . . . .
>
> (b)  When Joinder Is Not Feasible.  If a person who is

20

1

2

3

4

                  required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed.  The factors for the court to consider include:

                  (1)   the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

5

6

7

                  (2)   The extent to which any prejudice could be lessened or avoided by:

8

9

                      (A)  protective provisions in the judgment;
                      (B)  shaping the relief; or
                      (C)  other measures;

10

11

                  (3)   whether a judgment rendered in the person's absence would be adequate; and

12

13

                  (4)   whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

14  Fed. R. Civ. P. 19.

15      The "[a]pplication of Rule 19 involves three successive

16  inquiries." *Wilbur v. Locke*, 423 F.3d 1101, 1111 (9th Cir.

17  2005).  "First, the court must determine whether a nonparty

18  should be joined under Rule 19(a)."  The term "necessary" is used

19  to describe those persons to be joined if feasible.  *Id.* at 1112.

20  "The inquiry is a practical one and fact specific, and is

21  designed to avoid the harsh results of rigid application."

22  *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir. 1992).

23      Second, "[i]f an absentee is a necessary party under Rule

24  19(a)," the court is to determine "whether it is feasible to

25  order that the absentee be joined." *Wilbur*, 423 F.3d at 1112.

26  "Finally, [and thirdly,] if joinder is not feasible, the court

27  must determine at the third stage whether the case can proceed

28  without the absentee, or whether the absentee is an

21

1    'indispensable party' such that the action must be dismissed."

2    *Id.; Shermoen*, 982 F.2d at 1317 (a court must determine whether

3    the absent party is "indispensable" so that in 'equity and good

4    conscience" the suit should be dismissed).   In the final

5    analysis, "[r]ule 19 uses the word 'indispensable' only in a

6    conclusory sense, that is, a person is 'regarded as

7    indispensable' when he cannot be made a party and, upon

8    consideration of the factors [in Rule 19(b)], it is determined

9    that in his absence it would be preferable to dismiss the action,

10   rather than to retain it."   *Wilbur*, 423 F.3d at 1112.[2]

11

12        1.   <u>United States is a Necessary Party Under Rule 19(a)</u>.

13        The United States has an "interest relating to the subject

14   of the action" – which is the validity and enforceability of the

15   three patents it owns and the royalties under those patents that

16   it receives.   Fed. R. Civ. P. 19(a)(1)(B)(I).   Disposition of the

17   claims without the participation of the United States will "as a

18   practical matter impair or impede" the United States' "ability to

19   protect [its] interests."   *Id.*

20

21        a.   <u>Joinder Voluntarily or Involuntarily of Patent</u>

22             <u>Owner</u>.

23

24        [2] **The terms "necessary" and "indispensable" are terms of art**

25   **in Rule 19 jurisprudence: "Necessary" refers to a party who**
     **should be "[j]oined if [f]easible."   *Disabled Rights Action Comm.***

26   ***v. Las Vegas Events, Inc.*, 375 F.3d 861, 867 n.5 (9th Cir. 2004).**
     **"'Indispensable' refers to a party whose participation is so**

27   **important to the resolution of the case that, if the joinder of**

28   **the party is not feasible, the suit must be dismissed."   *Id.***

1       The U.S. has retained substantive rights in a patent that is
2   the subject of the exclusive license and therefore is an
3   indispensable party.  *Waterman v. Mackenzie*, 138 U.S. 252, 255
4   (1890).  The Ninth Circuit case *Masa v. Jiffy Products Co.*, 240
5   F.2d 702 (9th Cir. 1957), holds that the patent owner is an
6   indispensable party in a case challenging the validity of the
7   patent.  "When ownership of the patent and the trademark in *Massa*
8   appeared from his deposition, an involuntary joinder of *Massa* as
9   a party defendant under Rule 19, Fed. R. Civ. P. became proper.
10  Massa, appearing as the registered owner of the patent and trade
11  mark, became an indispensable party in the declaratory judgment
12  action, *in order that the alleged infringer might have tried in*
13  *the one action, as to all parties, the invalidity of the patent*
14  *and the alleged improper recordation of the trade mark*."  *Id.* at
15  705 (emphasis added).  The one exception to this rule, is when a
16  licensee is transferred all "substantial rights" in the patent
17  from the patent owner.  This exception is not here applicable to
18  the License Agreements between the Commission and the United
19  States.

20      In the Federal Circuit case describing the "rule of
21  reciprocity," *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090
22  (Fed.Cir. 1998), the court held that where the non-exclusive
23  licensee did not hold an exclusive license with all "substantial
24  rights," *i.e.*, the right to bring an enforcement action without
25  joining the patent owner, there can no declaratory judgment
26  brought against the licensee, without joining the patent owner.
27  "We have accorded standing, in certain limited circumstances,
28  where all substantial rights under the patent have been

23

1   transferred in the form of an exclusive license, rendering the

2   licensee the virtual assignee." *Id.* at 1093-94, *citing Vaupel*

3   *Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870

4   (Fed.Cir. 1991).

5        The general rule in patent infringement suits, which applies

6   in declaratory relief actions seeking invalidity of a patent, is

7   that the patent owner is to be joined when fewer than all

8   substantial rights have been transferred in an exclusive license

9   to the licensee.  *Intellectual Property Development, Inc. v. TCI*

10  *Cablevision of Cal.*, 248 F.3d 1333 (Fed.Cir. 2001).  "As a

11  general rule, in accordance with *Independent Wireless*, this court

12  adheres to the principle that a patent owner should be joined,

13  either voluntarily or involuntarily, in any patent infringement

14  suit brought by an exclusive licensee having fewer than all

15  substantial patent rights."  *Id.* at 347;[3] *see also Independent*

16  *Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 468 (1926)

17  (patent owner is an indispensable party in infringement suit

18  brought by a licensee); *see also Tol-O-Matic, Inc. v. Proma*

19  *Produkt-Und Marketing Gesellschaft, m.b.H.*, 690 F.Supp. 798

20  (D.Minn. 1987).

21       There are two reasons in infringement actions for requiring

22  joinder of the patent owner when fewer than all "substantial

23  rights" have been transferred, in a suit for declaratory relief

24  _____

25       [3] "As a prudential principle, an exclusive licensee having
26  fewer than all substantial patent rights possesses standing under
    the Patent Act as long as it sues in the name of, and jointly
27  with, the patent owner and meets the Lujan requirements.  *Id.;*
    *citing Prima Tek II L.L.C. v. A-Roo Co.*, 222 F.3d 1372 (Fed.Cir.
28  2000).

1   to invalidate a patent.  First, there is the possibility that the

2   alleged infringer would be subject to multiple actions.  *Schwarz*

3   *Pharma, Inc. v. Paddock Laboratories, Inc.*, 504 F.3d 1371, 1374

4   (Fed. Cir. 2007).  Second, to ensure that the rights of the

5   patent owner are protected in a suit brought by the licensee.

6   *Id.*  Although Plaintiffs' action is not an infringement action,

7   the second reason applies where patent invalidation is sought.

8   The United States and the USDA both have an interest in whether

9   the Patents in suit are invalidated.  If the patent is declared

10  invalid, the United States loses the ownership and value of its

11  patents and any royalty derived from the patents.[4]  Second, the

12  patent owner is at risk that a licensee did not diligently defend

13  the patent in pending litigation.  The patent owner may have a

14  different perspective because the licensee's interests are

15  limited.

16      Here, the USDA did not transfer all "substantial rights" as

17  required under case law, specifically the right of assignment and

18  the ability to bring enforcement actions.  The Commission

19  ostensibly is unauthorized to defend the declaratory suit seeking

20  to invalidate the U.S.-owned patents, without the joinder of the

21  United States.  "[A] patent should not be placed at risk of

22  invalidation by the licensee without the participation of the

_____

[4] Patents have long been considered a species of property.
*See Brown v. Duchesne*, 60 U.S. 183, 197 (1856) ("For, by the laws
of the United States, the rights of a party under a patent are
his private property"); *cf., Consolidated Fruit-Jar Co. v.
Wright*, 94 U.S. 92, 96, 24 L.Ed. 68 (1876); *Florida Prepaid
Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S.
627, 642 (1999).

25

1  patentee," *Schwarz Pharma, Inc.*, 504 F.3d at 1374, especially
2  here where fewer than all "substantial rights" have been
3  transferred from patent owner to licensee.  In *Intellectual*
4  *Property Development Inc. v. TCI Cablevision of California*, 248
5  F.3d 1333, 1347 (Fed. Cir. 2001), the court gave dispositive
6  weight to the licensee's ability to only bring enforcement
7  actions in limited circumstances, and only with consent of the
8  patent owner.  The Court also noted the licensee had no
9  assignment rights.  As a result, no "substantial rights" existed
10 with the exclusive licensee.  "In light of CPL's [patent holder]
11 right to permit infringement in certain cases, the requirement
12 that CPL [patent holder] consent to certain actions and be
13 consulted in others, and the limits in IPD's right to assign its
14 interests in the '202 patent, we find that the CPL IPD agreement
15 at issue transfers fewer than all substantial rights in the '202
16 patent from CPL [patent holder] to IPD."  *Id.* at 1345; *see also*
17 *Vaupel Textilmaschinen KG v. Meccanica Euro Italia*, 944 F.2d 870,
18 875 (Fed.Cir. 1991) (The court noted the importance of having the
19 right to sue for infringement in determining whether joinder of
20 patent owner is required.)

21      In *Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128 (Fed.
22 Cir. 1995), the exclusive licensee did not have "substantial
23 rights" because it lacked full enforcement rights, and possessed
24 no assignment rights: 1) the exclusive licensee, while possessing
25 the right of first refusal to sue alleged infringers of the
26 patent, could not "indulge" or permit an infringement, which the
27 court noted normally accompanies a complete conveyance of the
28 right to sue; 2) the exclusive licensee was prevented from

1   assigning its rights under the license to any other party other

2   than a successor in business; and 3) the patent owner retained

3   the right to participate in a suit brought by the exclusive

4   licensee.

5        Here, the License Agreements specify that the Commission, as

6   licensee, cannot file an infringement suit without first

7   obtaining authorization from USDA, the patent holder:

8            In the event of [] infringement, the parties hereto
             shall confer and shall use best efforts to reach mutual
9            agreement upon the best course of action.

10       *See* Ex. 1 (Sweet Scarlet License Agreement) § 8.1; Ex. 2

11  (Autumn King License Agreement) § 8.1; & Ex. 3 (Scarlet Royal

12  License Agreement) § 8.1.5.

13       The License Agreements further provide:

14           USDA *may* grant the right of enforcement to THE
             COMMISSION, pursuant to Title 35, Section 207(a)(2) and
15           Title 35, Chapter 29, of the U.S. Code.

16  *Id.* at § 8.2 (emphasis added).

17           The granting of the right of enforcement to THE
             COMMISSION shall be given thorough consideration on a
18           *case by case basis*.

19  *Id.* (emphasis added).

20       The agreements reserve the right in the United States, to

21  forego enforcement against infringers: The United States may

22  "elect[] not to enforce the Licensed Patents or other

23  intellectual property rights for the Licensed Variety against

24  infringers."  *Id.*  There is no indication here that the

25  Commission sought or received authorization from the USDA to

26  defend this declaratory judgment suit against the USDA's patents.

27  Last, the license agreements do not provide for assignment rights

28  in the Commission:

                                27

1    This Agreement shall not be transferred or assigned by
2    THE COMMISSION to any party other than to a successor
     or assignee of the entire business interest of THE
3    COMMISSION relating to the Licensed Variety, but in no
     event shall THE COMMISSION assign or transfer this
4    Agreement to a party not a citizen, resident, or entity
     of the United States of America.  THE COMMISSION shall
5    notify USDA in writing prior to any transfer or
     assignment.

6    (EL § 12.1).

7        While Section 35 U.S.C. § 207(a)(2) provides federal

8    agencies, such as the USDA, the ability to grant exclusive

9    licenses, the USDA did not do so here:

10       (a)   Each Federal agency is authorized to-
               (2)   grant nonexclusive, exclusive, or partially
11                   exclusive licenses under federally owned
                     inventions, royalty-free or for royalties or
12                   other consideration, and on such terms and
                     conditions, *including the grant to the*
13                   *licensee of the right of enforcement* pursuant
                     to the provisions of chapter 29 of this title
14                   as determined appropriate in the public
                     interest.
15

16   35 U.S.C. § 207(a)(2) (emphasis added).  And in conjunction with

17   35 U.S.C. § 207(a)(2), Federal Regulations provide, pursuant to

18   37 C.F.R. § 404.5, licenses may contain provisions permitting the

19   right to enforce the patent by the licensee, without joining the

20   United States:

21       (b)   Licenses shall contain such terms and conditions
               as the Federal agency determines are appropriate
22             for the protection of the interests of the Federal
               Government and the public and are not in conflict
23             with law or this part.  The following terms and
               conditions apply to any license:
24             (2)   Any patent license may grant the licensee the
                     right of enforcement of the licensed patent
25                   without joining the Federal agency as a party
                     as determined appropriate in the public
26                   interest.

27   37 C.F.R. § 404.5(b)(2).

28       Plaintiffs cite to various portions of the License

                                28

Agreements to demonstrate the rights transferred to the

Commission are "substantial rights" to the Patented Varieties.[5]

But none of these rights include the "right of enforcement" or

the "right of assignment," two determinative rights defining

"substantial rights" under present case law:[6]

- The Commission has an "exclusive license" to "make, use, offer for sale, propagate, maintain, sell and otherwise exploit" the patented varieties.   (EL §2.1)

- The Commission has the exclusive right to sublicense the patented varieties.   (EL §2.2)

- The exclusive license has no expiration date.  (EL §7.1)

- The Commission is entitled to "use all commercially reasonable efforts to protect USDA's property rights in the Licensed Variety" and the USDA is required to confer with and reach mutual agreement with the Commission regarding infringement of the patents.   (EL §8.1)[7]

Under the sublicense agreements, Plaintiffs cite the

_____

[5] Plaintiffs cite *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed.Cir. 2000), which states "the proper focus is on the 'substance of what was granted.'" *Id.* at 1250.  In *Speedplay*, the licensor retained the right to bring infringement actions. Specifically, if the licensee did not halt an infringement on the patent, it had the right to bring an infringement action.  This right was found "illusory" by the court because the licensee could grant a royalty-free sublicense to an alleged infringer under the license agreement, thereby making the licensor's right to sue nugatory.  Here, the USDA does not have such an "illusory" right.

[6] "EL" refers to the exclusive licenses for the Patented Varieties, attached as Exhibits 1-3 to the Commission's Motion to Dismiss.  "DGL" refers to the Domestic Grower License Agreements for the Patented Varieties, attached as Exhibits 1-3 to Plaintiffs' Opposition.

[7] Plaintiffs' also cite sections: EL §1.1; EL §1.2; EL §1.3; EL §2.2.

following:[8]

- right to terminate the sub-license.  (DGL §8.2)
- **Right to force grower to destroy all wood of the Patented Variety.  (DGL §8.4)**

Plaintiffs cite *Dow Chemical Co. v. Exxon Corp.*, 139 F.3d 1470 (Fed.Cir. 1998).  But the *Dow Chemical* court, in affirming the district court's decision that joinder of the patent owner was not required, noted first that the patent owner was a wholly-owned subsidiary of the licensee defendant, and was thus not required because its interests were adequately protected, and second, because the licensee had been granted the right to sue for infringement and defend the patent owner in litigation:

> [J]oinder was not required because, "as a practical matter, "Exxon [Corp.] has both the duty and the capability of protecting ECPI's interests." [citation] Although ECPI remains the owner of the '783 patent, it has granted certain significant rights in the patent to Exxon Chemical Company ("ECC"), an unincorporated division of Exxon Corp.  These rights include the right to sue for infringement of the patent, the right to defend ECPI in litigation concerning the patent, and the right to sublicense the patent without notifying ECPI.

*Id.* at 1479 (citation omitted).  The facts differ here.

Plaintiffs also cite Eastern District of Pennsylvania, *Pennsalt Chemicals Corp. v. Dravo Corp.*, 240 F.Supp. 837 (E.D. Pa. 1965).  The Court held in a declaratory suit seeking to invalidate a patent, that the patent owner was not an indispensable party even though the licensee did not have specific right to sue infringers.  The court permitted the suit

---

[8] Plaintiffs also cite sections DGL §5.1 and DGL §8.4.

30

1  to proceed against a licensee who had no enforcement rights.[9]

2  The Court noted that intervention was an option if further

3  protection was sought by the patent owner.  Despite this holding,

4  the overall weight of the cases heavily favors evaluating license

5  agreements on whether substantial rights are granted to the

6  licensee.  Here, the USDA did not provide the Commission, as the

7  licensee, with the right of enforcement, nor the right of

8  assignment, "substantial rights" in licensing the Patented

9  Varieties.

10       Plaintiffs argue that Defendant overlooks case law where

11  courts have applied a different standard in determining necessary

12  and indispensable defendants in actions for declaratory judgment

13  seeking invalidity.  They argue that courts have allowed

14  declaratory judgment actions for invalidity to proceed against

15  exclusive licensees without joining the patent owner.  Plaintiffs

16  cite *A.L. Smith Iron Co. v. Dickson*, 141 F.2d 3, 6-7 (2d Cir.

17  1944) and *Capri Jewelry Inc. v. Hattie Carnegie Jewelry*

18  *Enterprises, Ltd.*, 539 F.2d 846, 847 (2d Cir. 1976) (Friendly,

19  J.).

20       *Capri Jewelry*, however, is not applicable, as it was a case

21  of shared counsel, and the facts here are not similar.  Counsel

22  in *Capri Jewelry* represented both the patent owner and the

23  licensee and a 19(b) dismissal was reversed because the patent

24  owner's interest was determined to be adequately protected.

25

26       [9] "The fact that the agreement does not specifically
27  authorize defendant to sue alleged infringers does not preclude a
   finding that defendant is the substantial owner of the patent for
28  purposes of this declaratory judgment action."  *Id.* at 839.

1  "Counsel representing [the licensee], Hattie Carnegie in this
2  suit are *acting both for it [licensee] and for [the patent*
3  *owner,] James* in the infringement suit [brought against another
4  jewelry distributor]."  *Id.* at 853 (emphasis added); *see also*
5  *Parkson Corp. v. Andritz Sprout-Bauer, Inc.*, 866 F.Supp. 773, 775
6  (S.D.N.Y. 1994) (highlighting *shared counsel* as critical fact in
7  *Capri Jewelry*).   The United States is not represented by the
8  Commission's counsel.

9       *A.L. Smith Iron Co. v. Dickson*, 141 F.2d 3, 6-7 (2d Cir.
10  1944) ("Dickson"), Plaintiffs' second cite, a Second Circuit
11  decision, does not comport with the more general and recent case
12  law in this area.   *Dickson* first noted the patent owner has an
13  interest in deciding the forum and was a factor to be weighed:

14       [I]ts only interest in the dismissal of the complaint
         is the interest of every patent owner in the choice of
15       the forum in which, and the time at which, he will
         assert his rights.  That too is an interest proper to
16       be weighed against the plaintiff's interest in settling
         its present controversy with [licensee] Dickson...
17       Indeed, the owner may have granted a number of
         licenses, and it would be exceedingly oppressive to
18       subject him to the will of all his licensees.

19  *Id.* at 6.  But due to the unique facts of the case, the court
20  held that the patent owner did not need to be joined to proceed
21  with the case:

22       The Court however, found that the patent owner had
         "plainly" used the licensee to enforce its right, and
23       though it may not have surrendered its choice of forum,
         it had permitted the licensee to license, thus the
24       court found it clearly had dwindled its right to choose
         a forum.
25
    *Id.* (emphasis added).
26
         Case law after *Dickson*, recognizes that it is an outlier
27
28  case with its unique set of facts:  "Recent case law has tended

                              32

1   to articulate the implicit denominator in the *Dickson* case.   The

2   emphasis today is upon the ability to bring suit to protect the

3   patent against infringement; and, as a manifestation of that

4   power, to be free to select the forum in which the question of

5   infringement should be tried.   Instead of predicating the right

6   to sue upon the semantic categorization of litigants as

7   'licensees' or 'assignees,' the more recent cases have tended to

8   place reliance upon the right to bring suit in affirmance of the

9   patent.   Then, assuming that right exists in the licensee, the

10  licensee may be sued to test the validity of the licensed patent

11  without the licensor-patentees being joined as a party

12  defendant." *Caldwell Mfg. Co. v. Unique Balance Co.*, 18 F.R.D.

13  258, 263-264 (S.D.N.Y. 1955); *see also Alamo Refining Co. v.*

14  *Shell Development Co.*, 99 F.Supp. 790, 800 (D.Del. 1951);

15  *Messerschmitt-Boelkow-Blohm v. Hughes Aircraft Co.*, 483 F.Supp.

16  49, 52 (S.D.N.Y. 1979); *Alamo Refining Co. v. Shell Dev. Co.*, 99

17  F.Supp. 790, 800 (D. Del. 1951).   "The rationale of the general

18  rule is that, whether the exclusive license is considered an

19  assignment of all the patentee's rights or not, the owner suffers

20  no prejudice from a judgment of invalidity in his absence if by

21  agreement he has entrusted the licensee with the right to protect

22  his interests by suing for infringement." *Messerschmitt-Boeklow-*

23  *Blohm*, 483 F.Supp. at 52.   "A patent owner has a property right

24  which ought not to be adjudicated in his absence.   This is a

25  salutary principle which the courts have long recognized."

26  *Technical Tape Corp. v. Minnesota Min. & Mfg. Co.*, 135 F.Supp.

27  505, 508 (S.D.N.Y. 1955).

28      Because the United States, as patent owner, owns and

33

1  controls enforcement of the patents and assignability rights of

2  the patents, and insufficient enforcement rights, without

3  consent, were transferred to the Commission, the United States is

4  a necessary party to this action under Rule 19.

5

6      2.   <u>Sovereign Immunity: Joinder Not Possible</u>.

7      When it has been determined that an absent party to the suit

8  is "necessary" under Rule 19(a), the inquiry is whether that

9  party, the United States, can be joined in the action.

10 *Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.*, 276

11 F.3d 1150, 1159 (9th Cir. 2002) ("Having determined that the

12 Nation is thrice over a necessary party to the instant

13 litigation, we next consider whether it can feasibly be joined as

14 a party.")  Here, unless it is clearly shown that the United

15 States has waived its sovereign immunity, it cannot be joined.

16      "Absent a waiver, sovereign immunity shields the Federal

17 government and its agencies from suit."  *F.D.I.C. v. Meyer*, 510

18 U.S. 471, 475 (1994).  "It is axiomatic that the United States

19 may not be sued without its consent and that the existence of

20 consent is a prerequisite for jurisdiction."  *United States v.*

21 *Mitchell*, 463 U.S. 206, 212 (1983).  "It long has been

22 established, of course, that the United States, as sovereign, 'is

23 immune from suit save as it consents to be sued . . . and the

24 terms of its consent to be sued in any court define that court's

25 jurisdiction to entertain the suit.'"  *United States v. Testan*,

26 424 U.S. 392, 399 (1976) (internal quotation marks omitted,

27 omission in original).  Absent a waiver, sovereign immunity bars

28 any proceeding against property in which the United States has an

interest.  *See United States v. Alabama*, 313 U.S. 274, 282

(1941).  If the United States is immune from suit and no waiver

is available, the United States cannot be joined under Rule

19(a), and is an indispensable party under Rule 19(b).  *See e.g.,*

*Dawavendewa*, 276 F.3d at 1161 (because tribe enjoys tribal

sovereign immunity, it cannot be joined).

A waiver of sovereign immunity must be unequivocally

expressed.  *Department of Army v. Blue Fox, Inc.*, 525 U.S. 255,

256 (1999).  The Government's consent to be sued must be

construed strictly, in favor of the sovereign.  *Id.*  Whether

sovereign immunity has been waived depends on the language of a

federal statute.  *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402,

409 (1993) ("The starting point in interpreting a statute is its

language, for '[i]f the intent of Congress is clear, that is the

end of the matter.'"); *United States v. Turkette*, 452 U.S. 576,

580 (1981) ("In determining the scope of a statute, we look first

to its language.")  This suit is against a United States' agency,

USDA.  Any suit against a federal agency is a suit against the

United States for the purposes of sovereign immunity.  *United*

*States v. Mitchell*, 463 U.S. 206, 212 (1983).

A declaratory judgment seeking invalidity of a U.S.-owned

patent squarely implicates sovereign immunity.  Further, property

owners are generally necessary parties to actions that could

affect their property interests adversely.[10]  The United States,

as owner of the Patented Varieties, is no exception.  In *Tegic*

_____

[10] *McShan v. Sherrill*, 283 F.2d 462, 463 (9th Cir. 1960);
*Stewart v. United States*, 242 F.3d 49, 51 (5th Cir. 1957).

1   *Communications Corp. v. Board of Regents of the University of*

2   *Texas System*, 458 F.3d 1335 (Fed. Cir. 2006), Eleventh Amendment

3   immunity barred a suit against a state University.  Plaintiffs

4   sought a declaratory judgment to invalidate the University-owned

5   patent.  As a result, the patent owner, the University, was

6   dismissed.  *Id.* at 1345; *see also Xechem Intern., Inc. v.*

7   *University of Tex. M.D. Anderson Cancer Center*, 382 F.3d 1324

8   (Fed. Cir. 2004) (parties and court accepted that absent waiver

9   or abrogation, state sovereign immunity precluded litigation

10   against the state university in a suit seeking to correct

11   inventorship of patents owned by the university).

12       Plaintiffs argue that Defendant's Eleventh Amendment state

13   sovereignty cases are not applicable here, because they concern

14   state immunity.  However, the state immunity cases demonstrate

15   the importance of adhering to an entity's sovereign immunity, and

16   absent a waiver of sovereign immunity, suits to invalidate a

17   patent, owned by a sovereign, federal or state, are barred.  If

18   there is uncertainty, case law concludes that sovereign immunity

19   applies.  If ambiguity about waiver of sovereign immunity

20   remains, that ambiguity must be interpreted to preserve sovereign

21   immunity of the United States.  "[A] waiver of the Government's

22   sovereign immunity will be strictly construed, in terms of its

23   scope, in favor of the sovereign."  *Lane v. Pena*, 518 U.S. 187,

24   192 (1996).

25       Under the only patent-related waiver of sovereign immunity,

26   28 U.S.C. § 1498 permits private parties to bring patent

27   infringement suits in United States Federal Claims Court to seek

28   money damages only.  28 U.S.C. § 1498.  "In waiving its own

immunity from patent infringement actions in 28 U.S.C. § 1498(a) (1994) ed. and Supp. III)," the United States did not consent to treble damages nor injunctive relief, and permitted reasonable attorney's fees in a narrow class of specified instances. *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 648, n.11 (1999).  This suit must be brought in Federal Claims Court against the United States and by its plain terms 28 U.S.C. § 1498 does not cover declaratory judgments seeking to invalidate a patent.  Further, the federal statute covering declaratory relief actions, the Declaratory Judgment Act, 28 U.S.C. §2201, standing alone, does not waive sovereign immunity.  *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002) (the declaratory judgment statute, 28 U.S.C. §2201, itself does not confer jurisdiction on a federal court where none otherwise exists).  "It is well settled, however, that said Act [Declaratory Act] does not of itself create jurisdiction; it merely adds an additional remedy where the district court already has jurisdiction to entertain the suit."  *Wells v. United States*, 280 F.2d 275, 277 (9th Cir. 1960).

There are limited waivers of sovereign immunity enacted by Congress for suits involving property interests of the United States, but such statutes do not address a waiver for patent-property interests of the U.S.[11]  Generally property owners are

─────────────────────

[11] For example, actions brought under the Quiet Title Act, 28 U.S.C. § 2409a, waiving immunity for actions brought against the United States involving "real property" in which the United States claims an interest, and Section 2410, Title 28, waiving immunity for certain actions involving "real or personal property on which the United States has or claims a mortgage or other

1    necessary parties to actions that could adversely affect their

2    property interests and the United States is no exception, as a

3    patent owner.[12]   The United States cannot be joined absent a

4    clear waiver of sovereign immunity.   Plaintiffs have not shown

5    such a waiver exists.   The United States cannot be joined.

6         Plaintiffs argue § 702 of the Administrative Procedure Act

7    ("APA"), Title 5 United States Code, eliminates in almost every

8    circumstance, the defense of sovereign immunity to actions

9    seeking non-monetary relief against unlawful action by government

10   agencies and officials.   Section 702 of the APA states:

11        A person *suffering legal wrong because of agency
          action*, or adversely affected or aggrieved by agency
12        action within the meaning of a relevant statute, is
          entitled to judicial review thereof.   An action is a
13        court of the United States *seeking relief other than
          money damages* and stating a claim that an agency or an
14        officer or employee *thereof acted or failed to act in
          an official capacity or under color of legal authority*
15        shall not be dismissed nor relief therein be denied on
          the ground that it is against the United States or that
16        the United States is an indispensable party.   The
          United States may be named as a defendant in any such
17        action, and a judgment or decree may be entered against

18

19   lien."   28 U.S.C. § 2410.   The Tucker Act, 28 U.S.C. § 1491,
     permits monetary suits brought against the United States based on
20   an alleged violation of a constitutional provision, statute, or
     regulation, if brought in the Federal Claims Court.   28 U.S.C.
21   § 1498(a).   It authorizes suits against the United States for
22   patent infringement by the Untied States, but limits the patent
     owner's recovery to monetary damages in the Federal Claims Court.
23   35 U.S.C. § 282 provides affirmative defenses that can be
24   asserted by the federal government in suits brought under 28
     U.S.C. § 1498.

25

26        [12] *See McShan v. Sherrill*, 283 F.2d 462, 463 (9th Cir. 1960)
     (Any order that would affect title to property requires all
27   parties interested in the title and that will be directly
     affected by the judgment, be before the court); *Stewart v. United
28   States*, 242 F.3d 49, 51 (5th Cir. 1957).

the United States: Provided, that any mandatory or
injunctive decree shall specify the Federal officer or
officers (by name or by title), and their successors in
office, personally responsible for compliance.

5 U.S.C. § 702 (emphasis added).

The one limitation to this waiver of sovereign immunity for
non-monetary actions against the United States is if "any other
statute that grants consent to suit expressly or *impliedly*
forbids the relief which is sought."  5 U.S.C. § 702(2) (emphasis
added).  Defendant refers to the text of § 702 to argue that it
forecloses Plaintiffs' argument concerning the APA as a waiver of
sovereign immunity because Plaintiffs are not seeking a review of
agency "action" or "inaction," as the suit is brought against the
Commission only, the state agency and seeks, based on the actions
of the Commission, a declaration of invalidity of the U.S.-owned
patents.

In addition, Defendant for the first time in its Reply,
discusses the split in the Ninth Circuit on whether final agency
action is required to seek review under § 702 of the APA.
Plaintiffs were not afforded an opportunity to respond.  However,
in the later case, *Gallo Cattle Co. v. U.S. Dept. of Agriculture*,
159 F.3d 1194 (9th Cir. 1998), the Court held that review of
agency action under the APA, only is available if it constitutes
"final agency action" for which there is no other adequate remedy
in a court or agency action that is made reviewable by statute.
5 U.S.C. § 704.  However, in an earlier Ninth Circuit Court
decision, *The Presbyterian Church (U.S.A.) v. U.S.*, 870 F.2d 518
(9th Cir. 1989), which involved an injunctive suit brought
against the Immigration and Naturalization Service ("INS"), for

39

1   violation of First and Fourteenth Amendment rights, the court did

2   not limit § 702's sovereign immunity waiver to "agency action" as

3   is technically defined in § 551(13) of the APA: "'agency action'

4   includes the whole or a part of an agency <u>rule</u>, <u>order</u>, <u>license</u>,

5   <u>sanction</u>, <u>relief</u>, or the equivalent or denial thereof, <u>or failure</u>

6   <u>to act</u>."  5 U.S.C. § 551(13).

> Nothing in the language of the amendment suggests that
> the waiver of sovereign immunity is limited to claims
> challenging conduct falling in the narrow definition of
> "agency action"...Moreover, nothing in the legislative
> history of the 1978 amendment of § 702 suggests that
> Congress intended to limit the waiver of sovereign
> immunity to the specific forms of "agency action"
> enumerated in § 551(13).  On the contrary, Congress
> stated that "the time [has] now come to eliminate the
> sovereign immunity defense in all equitable actions for
> specific relief against a Federal agency or officer
> acting in an official capacity."  H.Rep. No. 1656, 94th
> Cong., 2d Sess. 9, reprinted in 1976 U.S.Code Cong. &
> Admin.News 6121, 6129 (emphasis supplied).  Congress
> singled out types of government conduct similar to the
> alleged INS conduct in this case-"tax investigations"
> and "control of subversive activities"-as appropriate
> for judicial review under the amended version of
> § 702....This waiver was clearly intended to cover the
> full spectrum of agency conduct, regardless of whether
> it fell within the technical definition of "agency
> action" contained in § 551(13).

19  870 F.2d at 525.  A later Ninth Circuit decision, *Gros Ventre*

20  *Tribe v. United States*, 469 F.3d 801, 808-809 (9th Cir. 2006)

21  recognized the split, but provided no further guidance.  "The

22  parties go to great pains to argue the issue whether the APA's

23  waiver of sovereign immunity under 5 U.S.C. § 702 for non-

24  monetary actions against the government is conditioned upon the

25  parties challenging a 'final agency action' as set forth in 5

26  U.S.C. § 704.  We now recognize that there is a conflict in our

27  caselaw regarding this issue; however, we need not resolve it as

28  we affirm the district court on its alternative."  *Id.* at 808.

1   While the *Gros Ventre Tribe* court did not provide any further

2   guidance, it discussed the issue of § 702's waiver of sovereign

3   immunity, at length:

> 4   Under *The Presbyterian Church*, § 702's waiver is not
> conditioned on the APA's "agency action" requirement.
> 5   Therefore, it follows that § 702's waiver cannot then
> be conditioned on the APA's "final agency action"
> 6   requirement.   *See Reno v. Am-Arab Anti-Discrimination
> Comm.*, 525 U.S. 471, 510 n.4, 119 S.Ct. 936, 142
> 7   L.Ed.2d 940 (1999) (Souter, J., dissenting) ("[The
> waiver of sovereign immunity found in 5 U.S.C. § 702]
> 8   is not restricted by the requirement of final agency
> action that applies to suits under the [APA]." (citing
> 9   *The Presbyterian Church*, 870 F.2d at 523-26)).   But
> that is directly contrary to the holding in *Gallo
> 10  Cattle* where we stated that "the APA's waiver of
> sovereign immunity contains several limitations,"
> 11  including § 704's final agency action requirement...
> Nevertheless, we need not make a sua sponte en banc
> 12  call to resolve this conflict...

13  469 F.3d at 809.   Plaintiffs have cited no case where the APA

14  § 702 was invoked as an asserted waiver of sovereign immunity for

15  purposes of bringing a patent invalidity case against the United

16  States.   However, if Plaintiff can amend the Complaint to

17  adequately state a § 702 APA claim against the United States, it

18  may.

19

20          3.   <u>United States is an Indispensable Party and the</u>

21               <u>Disputed Claims Must be Dismissed</u>.

22          If a necessary party cannot be joined, a court must consider

23  whether the party is indispensable.   *See* Fed. R. Civ. P. 19(b).

24  "A party is indispensable if in 'equity and good conscience,' the

25  court should not allow the action to proceed in its absence."

26  *Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.*, 276

27  F.3d 1150, 1161 (9th Cir. 2002), *quoting* Fed. R. Civ. P. 19(b).

28          Rule 19(b) sets out four factors to determine whether a case

1   must be dismissed.  However, where the absent party cannot be

2   joined in light of sovereign immunity, "there may be very little

3   need for balancing . . . because immunity itself may be viewed as

4   the compelling factor."  *Kescoli v. Babbitt*, 101 F.3d 1304, 1311

5   (9th Cir. 1996).[13]

6        The four factors are:

7        (1)   prejudice to any party or to the absent party;
         (2)   whether relief can be shaped to lessen prejudice;
8        (3)   whether an adequate remedy, even if not complete, can
               be awarded without the absent party; and
9        (4)   whether there exists an alternative forum.

10  *Id.* at 1310-11.

11       The first factor weighs in favor of dismissal.  "The first

12  factor directs the court to consider, in determining whether the

13  action may proceed, the prejudice to absent entities and present

14  parties in the event judgment is rendered without joinder."

15  *Republic of Philippines*, 128 S.Ct. at 2182.  Plaintiffs seek to

16  invalidate and declare unenforceable patents owned by the United

17  States.  The validity of the USDA's patent has been challenged.

18  If invalidated, the USDA's assets, the Patents, would be

19  destroyed, Patented Varieties would be freely marketed, and the

20  USDA would lose royalties.  The patents would be declared invalid

21

22       [13]  In regard to challenges to real property interests, i.e.,
23  interests in federal land, implicating sovereign immunity, the
    Supreme Court and Appeals Courts have consistently held that the
24  United States is an indispensable party.  *See e.g. United States
    v. Alabama*, 313 U.S. 274, 282-83 (1941) (invalidating tax sale of
25  federal land.  "A proceeding against property in which the United
    States has an interest in a suit against the United States.");
26  *Stewart v. U.S.*, 242 F.2d 49, 51 (1957) (affirming dismissal of
    quiet title action against United States); *Lambert v. R.F.C.*, 71
27  F.Supp. 509, 513 (E.D.N.Y. 1947) (dismissing suit to cancel lease
28  and force sale of government land).

1    under claims one through three of the Complaint and unenforceable
2    under claim four for inequitable conduct and claim six for patent
3    misuse.

4         Plaintiffs, however, argue that the Commission can and will
5    adequately protect the USDA's interest in preserving the validity
6    of the patents-in-suit.  The Commission conceived of the
7    patenting programs that resulted in the Patented Varieties and
8    lobbied for its acceptance by the USDA.  There is a Memorandum of
9    Understanding between the Commission and the USDA that recognizes
10   that their interests in the patenting program are aligned.  The
11   Commission has aggressively enforced and litigated the patents-
12   in-suit in the past.  If its interests are prejudiced, Plaintiffs
13   argue the United States could intervene.

14        Plaintiffs cite *Dainippon Screen Mfg. Co., Ltd. v. CFMT*, 142
15   F.3d 1266 (Fed. Cir. 1998), to support their argument that in an
16   action challenging the validity of a patent, the action can
17   proceed without the patent owner.  Here, however, unlike in
18   *Dainippon*, there is no unity of ownership or interest between the
19   patent owner and licensee.  The facts of *Dainippon* are
20   instructive.  The patent owner in the suit was not an
21   indispensable party because the suit was brought by a competitor
22   against the parent company, who held an exclusive license from
23   its wholly-owned subsidiary.  *Dainippon* found no indispensability
24   in part because the patent holder was the parent company's
25   holding company for patents and held an identity of interest and
26   ownership with the subsidiary.  *Id.* at 1273.  As to the first
27   19(b) factor, there was an adequacy of protection of the
28   subsidiary's interests, the patent owner, by the parent company,

1  the licensee.   Further, the patent owner could intervene at any

2  time.   *Id.* at 1272.

3      The second factor, whether prejudice can be lessened by

4  shaping the relief provided, also weighs in favor of dismissal.

5  No declaratory, injunctive or compensatory relief would be

6  granted under the Complaint if the patent's validity were not

7  challenged.   "Any measures to lessen these prejudices would

8  necessarily dilute the efficacy of the judgment sought."

9  *Messerschmitt-Boelkow-Blohm GmgH v. Hughes Aircraft*, 483 F.Supp.

10  49, 53 (S.D.N.Y. 1979).   Although the Complaint is brought

11  against the Commission alone, granting declaratory relief

12  requires finding that the Commission had no authority to enforce

13  an invalid patent, that the patent is invalid and unenforceable,

14  a patent which is owned by the USDA, a branch of the United

15  States.   Here, any judgment cannot be tailored to eliminate the

16  prejudice to the United States.   A finding for Plaintiffs would

17  declare invalid patents owned by the United States, abrogating

18  the United States' interest in the patents, not only depriving

19  the United States of royalties under the patents, but ending the

20  United States' ability to license the patents.   In a Western

21  District of Pennsylvania case, *Suprex Corp. v. Lee Scientific,*

22  *Inc.*, 660 F.Supp. 89 (W.D. Pa. 1987), the court addressed similar

23  facts relating to a university, stated:

24      Because the university [patent owner] is a necessary
       party, we must consider whether the action can proceed
25      in its absence.   First, a judgment of patent invalidity
       in the university's absence would be prejudicial.   Such
26      a judgment would devalue the university's asset, reduce
       royalties now accruing and severely restrict or even
27      destroy the university's ability to develop and market
       the chromatography technology.   Second, the prejudice
28      to the absent patent owner cannot be lessened through

the "shaping of relief" because no declaratory,
injunctive or compensatory relief would be granted
under the existing complaint if the patent's validity
were not questioned...such relief requires a finding
that Lee Scientific has no authority to enforce an
invalid patent owned by the university.

*Id.* at 93.

The third factor, adequacy of remedy, also favors dismissal.
"'[A]dequcy' refers not to satisfaction of [Plaintiffs'] claims,
but to the 'public stake in settling disputes by wholes, whenever
possible.'" *Republic of Philippines*, 128 S.Ct. at 2183, *citing
Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102,
111 (1968). As in *Republic of Phillippines*, "[g]oing forward
with the action in the absence of" the United States, "would not
further this public interest because they could not be bound by a
judgment to which they were not parties." *Id.* The Court held
the University had not waived its Eleventh Amendment immunity.

The fourth factor is whether there is an available
alternative forum. First is the Court of Federal Claims,
expressly authorized by statute. Plaintiffs have an opportunity
to raise the defense of patent invalidity and unenforceability in
an action brought against them for patent infringement brought by
the United States or the Commission. *See* 35 U.S.C. § 282.[14]

_____

[14] The following shall be defenses in any action involving
the validity or infringement of a patent and shall be pleaded:
   (1)   Noninfringement, absence of liability for infringement
         or unenforceability,
   (2)   Invalidity of the patent or any claim in suit on any
         ground specified in part II of this title as a
         condition for patentability.
   (3)   Invalidity of the patent or any claim in suit for
         failure to comply with any requirement of sections 112

45

However, to require Plaintiffs to violate the license and wait to see whether the patent owner sues for infringement creates an unfavorable situation as damages could be exacerbated.  Where "no alternative forum exists, the district court should be 'extra cautious' before dismissing an action."  *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996).  But just as the courts have held in actions involving tribal immunity and state immunity, sovereign immunity of the Untied States can justify dismissal for inability to join an indispensable party, despite the fact that no alternative forum is available.  "If the necessary party is immune from suit, there may be very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor."  *Id.* at 1311 (internal citations and quotations omitted).  The latest Supreme Court case, *Republic of Philippines v. Pimentel*, 128 S.Ct. 2180 (2008), to address Rule 19, held as to immunity barring an action from proceeding without the sovereign party:

> The analysis of the joinder issue in those cases was somewhat perfunctory, but the holdings were clear: A case may not proceed when a required-entity sovereign is not amenable to suit.  These cases instruct us that where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign.

128 S.Ct. at 2190-91.  In this context, dismissal is appropriate even if Plaintiffs have no alternative forum for their claim.  *See Dawavendewa*, 276 F.3d at 1162.

---

or 251 of this title,
(4)   Any other fact or act made a defense by this title.

35 U.S.C. § 282.

46

1    Because the proceedings in this case threaten both the

2  property and sovereign immunity of the United States, the United

3  States' failure to waive its immunity from suit strongly supports

4  dismissing this litigation in its absence.

5    Defendant also seeks to dismiss claims four and six, for

6  inequitable conduct and patent misuse on the same grounds that

7  the United States is a necessary and indispensable party.

8  Plaintiffs' fourth claim alleges inequitable conduct against

9  Defendant Commission.  In the fourth claim for inequitable

10 conduct, Plaintiffs allege actions by the USDA and Mr. Ramming,

11 and actions of the patent prosecuting attorneys ("Margaret A.

12 Conner, John D. Fado, and/or Lesley Shaw, who prosecuted the

13 application Sweet Scarlet variety") amount to inequitable

14 conduct.  (Doc. 1, Complaint ¶¶ 90, 91).  The United States was

15 not a named Defendant in this claim, although its rights will

16 clearly be implicated if there is a finding in Plaintiffs' favor.

17 Claim six is a patent misuse claim, seeking a judgment that the

18 patents are unenforceable.  Again, the United States is not a

19 named party, although this claim, if decided for Plaintiffs, will

20 adversely effect the rights of the United States.  Because

21 Plaintiffs are seeking a judgment that the '284, '891 and '229

22 patents are unenforceable for misuse, the United States is a

23 necessary party and indispensable party under Rule 19 to this

24 claim.  (Complaint, ¶ 109).

25    Defendant's motion to dismiss pursuant to Rule 19(b) is

26 GRANTED WITHOUT LEAVE TO AMEND, except if Plaintiffs amend to

27 name the united States and consent to transfer of the case to the

28 Federal Court of Claims.

1  **B.    INEQUITABLE CONDUCT.**

2      Defendant seeks, separately from its Rule 19 motion, to

3  dismiss Plaintiffs' fourth claim for inequitable conduct on other

4  grounds.  Defendant's motion to dismiss on Rule 19 grounds has

5  been granted with conditional leave to amend.  The other grounds

6  on which Defendant argues for dismissal of the fourth claim are

7  briefly addressed here.  Defendant moves to dismiss Plaintiffs'

8  fourth claim for inequitable conduct, which seeks a judgment that

9  the '891 Patent for Sweet Scarlet is unenforceable.  Defendant

10  argues that Plaintiffs fail to allege an intent by USDA, and by

11  Dr. Ramming, to deceive the PTO.  Defendant also claims that

12  Plaintiffs fail to allege their claim with the specificity

13  required under Rule 9(b).  Plaintiffs rejoin that although the

14  Complaint does not allege the specific words "fraudulent intent,"

15  all the allegations pled by Plaintiffs regarding inequitable

16  conduct are more than sufficient to state such a claim and comply

17  with Rule 9(b).

18      A claim for inequitable conduct requires proof that

19  Defendant, one, affirmatively failed to disclose material

20  information, or submitted false material information, and two,

21  did so with an intent to deceive.  "To be guilty of inequitable

22  conduct, one must have intended to act inequitably."  *FMC Corp.*

23  *v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987).

24  "Materiality and intent to deceive are distinct factual

25  inquiries, and each must be shown by clear and convincing

26  evidence."  *Life Technologies, Inc. v. Clontech Laboratories*, 224

27  F.3d 1320, 1324 (Fed. Cir. 2000).  Inequitable conduct must be

28  pled with particularity.  *See Central Admixture Pharmacy Servs.,*

**48**

*v. Advanced Cardiac Solutions*, 482 F.3d 1347, 1356 (Fed. Cir. 2007) (inequitable conduct must be pled with particularity). "Inequitable conduct encompasses deception, fraud, or failure to disclose material information." *Chiron Corp. v. Abbott Laboratories*, 156 F.R.D. 219 (N.D. Cal. 1994); *Multimedia Patent Trust v. Microsoft Corp.*, 525 F.Supp.2d 1200 (S.D. Cal. 2007). (Inequitable conduct is a breach of the patentee's duties to the PTO of candor, good faith, and honesty, may be stricken pursuant to Rule 12(f) for failure to plead with particularity).

The Ninth Circuit has described the requirements of sufficiently pleading the facts to meet the requirements of Rule 9(b):

> We have held that Rule 9(b) "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Bosse v. Crowell Collier & MacMillan*, 565 F.2d 602, 611 (9th Cir. 1977); *see also Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir. 1973).
>
> We have interpreted Rule 9(b) to mean that the pleader must state the *time, place, and specific content of the false representations* as well as the *identities of the parties* to the misrepresentation.

*Schreiber Distributing Co. v. Serv-Well Furniture*, 806 F.2d 1393, 1400-01 (9th Cir. 1986) (RICO suit) (emphasis added).

Plaintiffs in their Complaint allege that the '891 patent for Sweet Scarlet is unenforceable because of the inequitable conduct by the USDA and Dr. Ramming, co-inventor of Sweet Scarlet, who "knew of prior possession and reproduction under the Commission's 'amnesty program' and the group of individuals who "prosecuted the application on the Sweet Scarlet Variety before the USPTO, [who] knew of the prior possession and reproduction of

49

1   the Sweet Scarlet variety by growers who admitted to such

2   possession and reproduction under the Commission's 'amnesty

3   program.'" (Doc. 1, Complaint, ¶ 90, IV. Claim, Inequitable

4   Conduct).  Plaintiffs allege in their Complaint, that prior to

5   the issuance of the '891 patent, neither the USDA, nor Dr.

6   Ramming, nor Ms. Conner, Mr. Fado and/or Mr. Shaw notified the

7   USPTO of the prior possession and reproduction by the growers and

8   this breached the duty of candor owed to the USPTO.  The "breach

9   of the duty of candor constitutes inequitable conduct."  (*Id.* at

10  ¶¶ 91-92).

11      Plaintiffs state:

12      Specifically, approximately nine growers received Sweet
        Scarlet from Dr. Ramming for trials in 1999 and 2000.
13      At least three of these growers sold fruit produced
        into commercial markets before 2002.  Additionally, at
14      least 17 other growers, who were not part of trials,
        received and reproduced the Sweet Scarlet variety.  On
15      information and belief, these reproductions took place
        prior to 2002.  Neither the USDA nor Dr. Ramming
16      oversaw or controlled the reproductions created by
        these 17 growers.

17

18  (Doc. 1, Complaint, ¶¶ 54-55).  The totality of these assertions

19  provide sufficient specificity for Plaintiffs have sufficiently

20  pled a claim for inequitable conduct.  This Rule 9(b) motion to

21  dismiss is DENIED.

22

23  C.   <u>ANTI-TRUST</u>

24      Defendant moves to dismiss Plaintiffs' fifth claim for anti-

25  trust violations, specifically, Plaintiffs' claim under Section 2

26  of the Sherman Act, 15 U.S.C. § 2.  Defendant argues that

27  Plaintiffs' anti-trust claim fails on three bases: (1) Plaintiffs

28  have failed to allege a <u>cognizable relevant market</u> that the

1   Commission could have monopolized; (2) Plaintiffs have failed to

2   allege that the Commission even participates in the alleged

3   market for the Patented Varieties; (3) and last, Defendant argues

4   that Plaintiffs are indirect purchasers and therefore lack

5   standing to seek damages under the anti-trust laws.  Plaintiffs

6   rejoin that they have identified a relevant market, "the

7   worldwide market," for table grapes of these varieties; they have

8   also alleged active participation by the Commission in the

9   worldwide market; and they have standing to seek damages.

10       "Fraud in the procurement of intellectual property rights

11  can, upon a proper showing, give rise to antitrust liability."  4

12  J. von Kalinowski, Antitrust Laws and Trade Regulation § 73.03

13  (2007).  The seminal Supreme Court case on this claim is *Walker*

14  *Process Equip., Inc. v. Food Machinery & Chem. Corp. 5*, 382 U.S.

15  172 (1965).  *Walker* established that a claim for "the enforcement

16  of a patent procured by fraud on the Patent Office may be

17  violative of § 2 of the Sherman Act provided the other elements

18  necessary to a § 2 case are present."  *Id.* at 174.  Antitrust

19  liability may arise when a patent has been procured by knowing

20  and willful fraud and the patentee gaining market power in the

21  relevant market through the use of its fraudulently obtained

22  patent to restrain competition.  *C.R. Bard, Inc. v. M3 Sys.,*

23  *Inc.*, 157 F.3d 1340, 1367 (Fed. Cir. 1998).

24       Section 2 of the Sherman Act provides:

25       Every person who shall monopolize, or attempt to
         monopolize, or combine or conspire with any other
26       person or persons, to monopolize any part of the trade
         or commerce among the several States . . . shall be
27       deemed guilty of a felony . . ."

28  15 U.S.C. § 2.

In a Walker Process fraud, the antitrust claimant must show:

> (1)   that the asserted patent was obtained by knowingly and willfully misrepresenting the facts to the PTO;
>
> (2)   that the party enforcing the patent was aware of the fraud when bringing suit;
>
> (3)   independent and clear evidence of deceptive intent;
>
> (4)   a clear showing of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission; and
>
> (5)   the necessary additional elements of an underlying violation of the antitrust laws.

*In re Netflix Antitrust Litigation*, 506 F.Supp.2d 308, 314 (N.D. Cal. 2007), *citing Nobelpharma, Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068-71 (Fed. Cir. 1998).[15]

Plaintiffs' § 2 claim rests on allegations that Defendant illegally monopolized interstate and foreign commerce in bad faith by enforcing alleged patent rights, as the exclusive licensee of the patents and collecting royalty fees on the Patented Varieties under its "amnesty" program, prior to issuance of a valid U.S. patent.  It then enforced patent rights and collected royalties on the Sweet Scarlet variety knowing that the patent could not be enforced due to prior public use.

---

[15] The law of the circuit in which the district court sits governs the antitrust law issues.  "[W]hether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law." *Nobelpharma*, 141 F.3d at 1068. "When...the courts consider a patentee's behavior under Federal Circuit law and determine that it involved either an inappropriate attempt to procure a patent or an inappropriate attempt to enforce a patent, the remainder of the antitrust inquiry must proceed under the law of the regional circuit."

1    In *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
2    382 U.S. 172, 177 (1965), the Court clarified that "knowing and
3    willful" fraud must be shown, and is a predicate to a potential
4    antitrust violation.  "Fraud in the procurement of a patent
5    requires proof of the elements of common law fraud: (1) that a
6    false representation of a material fact was made, (2) with the
7    intent to deceive, (3) which induced the deceived party to act in
8    justifiable reliance on the misrepresentation, and (4) which
9    caused injury that would not otherwise have occurred."  *C.R.*
10   *Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1364 (Fed. Cir.
11   1998).  "To establish fraud for purposes of antitrust violation,
12   the defendant 'must make a greater showing of scienter and
13   materiality' than when seeking unenforceability based on conduct
14   before the Patent Office."  *Id.* (*Bard*).

16        1.   <u>Indirect Purchasers</u>.

17        Defendant argues that Plaintiffs cannot sue for anti-trust
18   damages as indirect purchasers under the *Illinois Brick* doctrine,
19   which denies standing to indirect purchasers affected by
20   allegedly anti-competitive activity - that is, plaintiffs
21   purchasing products indirectly or through intermediaries.
22   *Illinois Brick v. Illinois*, 431 U.S. 720 (1977).  Defendant
23   contends that Plaintiffs cannot seek damages by claiming that the
24   prices of the grape vines they bought from the nurseries were
25   inflated because of the royalties the Commission impermissibly
26   charged the nurseries.

27        Defendant cites a Fourth Circuit case decision in *Kloth v.*
28   *Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006).  In *Kloth*, the

53

1  Court dismissed a monopolization claim against manufacturers
2  brought by purchasers of computers with pre-installed software.
3  The purchasers bought the computers from and paid intermediaries
4  and retailers, not the manufacturer.  The Court held that
5  Plaintiffs who purchased Microsoft licenses from intermediaries
6  and retailers when they purchased their pre-installed software
7  computers fit the *Illinois Brick* paradigm.  They were indirect
8  purchasers prohibited from asserting a claim against the
9  manufacturer.  *Id.* at 323.

10      Plaintiff's antitrust claim is not however solely premised
11  on inflated prices by indirect purchasers.  Rather, Plaintiffs'
12  antitrust claim is more broadly based on the enforcement of a
13  patent, knowingly procured through fraud, by an exclusive
14  licensee.  Plaintiffs allege that the Commission's threat of
15  enforcement and enforcement of a fraudulently obtained patent
16  caused Plaintiffs to obtain a license it would not have otherwise
17  been required to obtain.  Under that license, Plaintiffs must
18  comply with a number of anticompetitive clauses.  (Doc. 24,
19  Opposition, p. 23:22-24 - 24:1-4).  Plaintiffs state that
20  "[b]ecause [it's] antitrust claim is not based on an inflated
21  price paid by an indirect purchaser, *Illinois Brick* is wholly
22  inapplicable."  (*Id.* at p. 24:10-12).

23      In *Walker Process Equipment, Inc. v. Food Machinery &*
24  *Chemical Corp.*, 382 U.S. 172 (1965), the Supreme Court held that
25  "the enforcement of a patent procured by fraud on the Patent
26  Office may be violative of §2 of the Sherman Act..."  *Id.* at 174.
27  As the Supreme Court explained, obtaining a patent "by knowing
28  and willfully misrepresenting facts to the Patent Office...would

1  be sufficient to strip [the patentee] of its exemption from the

2  antitrust laws." *Id.* at 177.  "This conclusion applies with

3  equal force to an assignee who maintains and enforces the patent

4  with knowledge of the patent's infirmity." *Id.* at 177 n.5.

5       Defendant also argues that Plaintiffs have not alleged that

6  they have suffered compensable damages from having been unable to

7  propagate their own vines or distribute vines to other

8  distributors.  However, Plaintiffs' Complaint makes a general

9  allegation in paragraph 101 of their anti-trust claim that "[t]he

10  existence and misuse of the patents on the Patented Varieties has

11  deprived Plaintiffs of revenues and profits that it would have

12  otherwise enjoyed absent the Commission's anticompetitive

13  activities and patent misuse."  (Complaint, ¶ 101).  Although

14  Plaintiffs do not specify what is the basis for such lost

15  revenues and profits, they are alleging a basic *Walker Process*

16  claim, but must add these necessary facts.

17

18       1.   **Active Participation**.

19       Defendant also contends that the Commission does not

20  participate in the market, because the Commission's only

21  involvement is the hand-selecting three nurseries to exclusively

22  sell all new patented table grape varieties.  Plaintiffs do not

23  allege that the Commission itself sells the Patented Varieties,

24  rather the three nurseries are marketers and their firms are not

25  named parties in this litigation.

26       Plaintiffs claim the Commission has been an active

27  participant with direct and significant anti-competitive

28  activities in the relevant market, sufficient to uphold an

antitrust claim for:

> (1) the Commission was the party that collected on-going royalties for each sale of the Patented Varieties;
> (2) the Commission threatened enforcement of the patents for the Patented Varieties;
> (3) the Commission threatened and sought removal of plant material for the Patented Varieties from growers' land, including growers who have licensed the Patented Varieties;
> (4) the Commission required growers to pay for and obtain new licenses in order to expand existing crops of the Patents Varieties;
> (5) the Commission granted "amnesty" to growers in exchange for royalty fees for the Patented Varieties under the threat of enforcement of fraudulently procured patent(s); and
> (6) the Commission granted licenses to a limited number of nurseries to distribute the plant material for the Patented Varieties to the exclusion of other nurseries and on terms dictated by the Commission.

(Doc. 24, Opposition, p. 23).

"The gravamen of a section 2 claim is the deliberate use of market power by a competitor to control price or exclude competition." *Mercy-Peninsula Ambulance, Inc. v. County of San Mateo*, 791 F.2d 755, 758 (9th Cir. 1986). If the Commission does not compete in the relevant market, then it cannot be liable for monopolizing a business in which it does not compete. *Id.* at 759. In *Mercy-Peninsula*, an ambulance company sued San Mateo County for a monopolization claim, claiming the county wrongfully excluded it from a health care provision market by refusing to grant it a contract to provide such services. *Id.* In its decision, the Ninth Circuit noted that the County, during the brief period prior to the enactment of the EMS Act, which provided it state immunity under antitrust laws, the County was not a competitor in the health care provision market, the relevant market. *Id.* The Court provided no discussion, nor cited to relevant law on the issue. But it is clear from case

1  law that Plaintiffs must allege that Defendant has monopoly power
2  in the relevant market, that is, the power to control prices and
3  exclude competition.  *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570
4  (1966).  Here, the Commission sub-licenses the patented grape
5  stock to the nurseries and the nurseries sell grape stock to
6  Plaintiffs, with restrictions, imposed and monitored by the
7  Commission, on use, re-sale ability and propagation.  The
8  Commission sets the prices.  It is the primary party enforcing
9  the licenses.  The nurseries do not have the power to lessen or
10 destroy competition, they only sell the Patented Varieties based
11 on the restrictions placed by the Commission and the USDA.  The
12 Commission remains the primary actor dictating terms of marketing
13 and use for the varieties in-suit.

14

15      3.   Relevant Market.

16      Monopoly power is defined as "'the power to control prices
17 or exclude competition.'  The existence of such power ordinarily
18 may be inferred from the predominant share of the market."  *Id.*
19 at 571.  To determine if a monopoly exists, it is first necessary
20 to determine the market, both in terms of geography and product,
21 that is being monopolized, that is the "relevant market."
22 *Thurman Industries, Inc. v. Pay 'n Pak Stores*, 875 F.2d 1369,
23 1373 (9th Cir. 1989).  "[T]he definition of the relevant market
24 is a factual inquiry for the jury, and the court may not weigh
25 evidence or judge witness credibility."  *Rebel Oil*, 51 F.3d at
26 1435.  "A submarket exists if it is sufficiently insulated from
27 the larger market so that supply and demand are inelastic with
28 the larger market."  *Morgan, Strand, Wheeler & Biggs v.*

1  *Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991).

2      Defendant cites *Tanaka v. University of Southern California*,

3  252 F.3d 1059 (9th Cir. 2001) and *Apani Southwest, Inc. v. Coca-*

4  *Cola Enterprises, Inc.*, 300 F.3d 620 (5th Cir. 2002).  In *Tanaka*,

5  a college soccer player seeking to play for a college program in

6  Los Angeles made a conclusory allegation that the "UCLA women's

7  soccer program" constituted its own relevant product market.

8  *Tanaka*, 252 F.3d at 1063.  The court rejected such a limited

9  definition of the relevant market and held that women's college

10  soccer programs "compete in the recruiting of student-athletes

11  and, hence, are interchangeable with each other for antitrust

12  purposes."  *Id.* at 1064.  In *Apani*, the Court stated: "where the

13  plaintiff fails to define its proposed relevant market with

14  reference to the rule of reasonable interchangeability and cross-

15  elasticity of demand, or alleges a proposed relevant market that

16  clearly does not encompass all interchangeable substitute

17  products even when all factual inferences are granted in

18  plaintiff's favor, the relevant market is legally insufficient,

19  and a motion to dismiss may be granted."  *Apani*, 300 F.3d at 628.

20  Defendant argues that just as in *Tanaka* and *Apani*, the instant

21  Complaint should be dismissed because it fails to allege any

22  facts even remotely suggesting that the Patented Varieties are

23  not interchangeable with a host of other varieties.

24      "The relevant market is 'the narrowest market which is wide

25  enough so that products from adjacent areas or from other

26  producers in the same area cannot compete on substantial parity

27  with those included in the market.'  Sullivan, Antitrust 41

28  (1977)."  *Home Placement Service, Inc. v. Providence Journal Co.*,

1  682 F.2d 274, 280 (1st Cir. 1982).  "[T]he term 'relevant market'

2  encompasses notions of geography as well as product use, quality,

3  and description.  The geographic market extends to the 'area of

4  effective competition'...where buyers can turn for alternative

5  sources of supply.'  The product market includes the pool of

6  goods or services that enjoy reasonable interchangeability of use

7  and cross-elasticity of demand."  *Tanaka v. University of*

8  *Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001), *quoting*

9  *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir.

10  1988).

11      The Supreme Court in *Eastman Kodak Co. v. Image Technical*

12  *Services, Inc.*, 504 U.S. 451, 482 (1992), stated: "The proper

13  market definition in this case can be determined only after a

14  factual inquiry into the 'commercial realities' faced by

15  consumers."  504 U.S. at 482.  "The purpose of market definitions

16  is not to frustrate anti-trust plaintiffs by requiring the proof

17  of bright lines which do not exist, but is to help identify

18  monopoly power, that is, 'the power to control prices or exclude

19  competition.'"  *Home Placement Service, Inc. v. Providence Journal*

20  *Co.*, 682 F.2d 274, 280 (1st Cir. 1982), *quoting United States v.*

21  *E. I. DuPont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

22      Motions to dismiss are not the place to delve into a factual

23  inquiry on whether, in the market, local, regional, national, or

24  international, for table grapes, if other varieties of table

25  grapes are effective substitutes.  As the Second Circuit court

26  case discussed, *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d

27  Cir. 2001), "[b]ecause market definition is a deeply fact-

28  intensive inquiry, courts hesitate to grant motions to dismiss

1  for failure to plead a relevant product market."  "To survive a

2  Rule 12(b)(6) motion to dismiss, an alleged product market must

3  bear a 'rational relation to the methodology courts prescribe to

4  define a market for antitrust purposes--analysis of the

5  interchangeability of use or the cross-elasticity of demand...

6  and it must be 'plausible.'"  *Id.* at 200 (citations omitted).

7  The court further explained: dismissals in such cases on the

8  pleadings typically occur in matters involving (1) a failure to

9  attempt to limit a product market to a single brand, franchise,

10  institution, or comparable entity that competes with potential

11  substitutes or (2) a failure to attempt a plausible explanation

12  as to why a market should be limited in a particular way.  *Id.*

13  (citations omitted).  "[A] complaint may be dismissed under Rule

14  12(b)(6) if the complaint's 'relevant market' definition is

15  facially unsustainable."  *Newcal Indus., Inc. v. Ikon Office*

16  *Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).

17  *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) set

18  forth the standards for defining relevant product markets and

19  submarkets and demonstrates the fact-intensive considerations:

20  The outer boundaries of a product market are determined
    by the reasonable interchangeability of use or the

21  cross-elasticity of demand between the product itself
    and substitutes for it.  However, within this broad

22  market, well-defined submarkets may exist which, in
    themselves, constitute product markets for antitrust

23  purposes.  *United States v. E.I. du Pont de Nemours &*
    *Co.*, 353 U.S. 586, 593-595, 57 S.Ct. 872, 877, 1

24  L.Ed.2d 1057.  The boundaries of such a submarket may
    be determined by examining such practical indicia as

25  industry or public recognition of the submarket as a
    separate economic entity, the product's peculiar

26  characteristics and uses, unique production facilities,
    distinct customers, distinct prices, sensitivity to

27  price changes, and specialized vendors.

28  370 U.S. at 325.

1    "This Court's prior cases support the proposition that in
2    some instances one brand of a product can constitute a separate
3    market." *Eastman Kodak Co. v. Image Technical Services, Inc.*,
4    504 U.S. 451, 482 (1992).  Plaintiffs' Complaint alleges that the
5    Commission conspires to "monopolize the world-wide market for the
6    four Patented Varieties of table grapes..."  (Complaint, ¶ 102).
7    Plaintiffs' claim the geographic market is the "world-wide
8    market" and the relevant product market is each Patented Variety,
9    the existence of the plant patents limits the myriad of other
10   varieties of table grapes from being substitutes for the Patented
11   Varieties in the world-wide market.  This does not follow
12   logically or legally without further definition and description
13   of the table grape market, such as unique characteristics that
14   set the three varieties apart in sub-markets.

15   If there are effective substitutes, they must be considered
16   part of the relevant market.  Plaintiffs do not allege in the
17   Complaint that no other substitutes for each Patented Variety
18   exist, but state for the first time in their opposition papers,
19   that there are submarkets and that each Patented Variety, Sweet
20   Scarlet, Autumn King and Scarlet Royal, are inherently unique as
21   each grapevine and fruit must derive from the single parent
22   plant.  Although dubious, it is not impossible that each Patented
23   Variety constitutes a relevant market.  *See Walker*, 382 U.S. at
24   177-178 ("To establish monopolization or attempt to monopolize a
25   part of trade or commerce under § 2 of the Sherman Act, it would
26   then be necessary to appraise the exclusionary power of the
27   illegal patent claim in terms of the relevant market for the
28   product involved.  Without a definition of that market there is

1  no way to measure Food Machinery's ability to lessen or destroy

2  competition.  It may be that the device-knee-action swing

3  diffusers - used in sewage treatment systems, does not comprise a

4  relevant market.  There may be effective substitutes for the

5  device, which do not infringe the patent.  This is a matter of

6  proof, as is the amount of damages suffered by Walker.")

7        The market must include all economic substitutes, "...it is

8  legally permissible to premise antitrust allegations on a

9  submarket.  That is, an antitrust claim may, under certain

10 circumstances, allege restraints of trade within or

11 monopolization of a small part of the general market of

12 substitutable products.  In order to establish the existence of a

13 legally cognizable submarket, the plaintiff must be able to show

14 (but need not necessarily establish in the complaint) that the

15 alleged submarket is economically distinct from the general

16 product market."  *Newcal Industries, Inc. v. Ikon Office*

17 *Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).

18       Because Plaintiffs allege for the first time in their

19 Opposition to these Motions that each Patented Variety is a

20 distinct product market within the table grape market, and do not

21 allege that the Commission holds market power in each Patented

22 Variety market or the scope of that market, they are GRANTED

23 LEAVE TO AMEND to allege the relevant market.

24

25 D.    Patent Misuse.

26       Defendant seeks, on separate grounds from its Rule 19

27 motion, to dismiss Plaintiffs' sixth claim for patent misuse.

28 Defendant's motion to dismiss on Rule 19 grounds has been

granted.   Nonetheless, the other grounds Defendant advances for
dismissal of the sixth claim are briefly addressed.  "The concept
of patent misuse arose to restrain practices that did not in
themselves violate any law, but that drew anticompetitive
strength from the patent right, and thus were deemed to be
contrary to public policy.  The policy purpose was to prevent a
patentee from using the patent to obtain market benefit beyond
that which inheres in the statutory patent right." *Mallinckrodt,
Inc. v. Medipart, Inc.*, 976 F.2d 700, 705 (Fed. Cir. 1992).
"Patent misuse is viewed as a broader wrong than antitrust
violation because of the economic power that may be derived from
the patentee's right to exclude.  Thus misuse may arise when the
conditions of antitrust violation are not met."  *C.R. Bard, Inc.
v. M3 Systems, Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998).

     A court's inquiry into a misuse claim is whether, by
imposing conditions that derive their force from the patent, the
patentee has impermissibly broadened the scope of the patent
grant with anticompetitive effect.  *Id.*  Since patent misuse
arises in equity, if found to be patent misuse, the patent is
rendered unenforceable.  And remains unenforceable until the
misuse ends, the patent however is not invalidated.  *Id.*

     "When a practice alleged to constitute patent misuse is
neither per se patent misuse [e.g. tying arrangements or post-
expiration royalties] nor specifically excluded from a misuse
analysis by § 271(d) [Patent Misuse Reform Act, 35 U.S.C.
§ 271(d)], a court must determine if that practice is 'reasonably
within the patent grant, *i.e.*, that it relates to subject matter
within the scope of the patent claims.' [citation.]  If so, the

1  practice does not have the effect of broadening the scope of the

2  patent claims and thus cannot constitute patent misuse.

3  [citation.]  If, on the other hand, the practice has the effect

4  of extending the patentee's statutory rights and does so with an

5  anti-competitive effect, that practice must then be analyzed in

6  accordance with the 'rule of reason.' [citation].  Under the rule

7  of reason, 'the finder of fact must decide whether the questioned

8  practice imposes an unreasonable restraint on competition, taking

9  into account a variety of factors, including specific information

10  about the relevant business, its condition before and after the

11  restraint was imposed, and the restraint's history, nature, and

12  effect.'"  *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860,

13  869 (Fed. Cir. 1997) (citations omitted).

14      Defendant claims that two of Plaintiffs' theories do not

15  constitute patent misuse: collecting royalties before a patent

16  issues, and imposing post-sale restrictions on propagation of new

17  vines and distributions to third parties.  Plaintiffs' third

18  theory also fails because Plaintiffs have failed to identify a

19  cognizable market required for this type of patent misuse claim.

20  This last argument has already been addressed for the anti-trust

21  claim and need not be repeated.

22      Plaintiffs' complaint alleges the following three theories

23  of patent misuse:

24      (i)   enforcing alleged patent rights and collecting royalty
            fees on the Patented Varieties under its "amnesty"
25          program prior to issuance of a valid United States
            patent,
26
27      (ii)  enforcing patent rights (including demanding the
            removal of Patented Varieties) and collecting royalties
            on the Sweet Scarlet variety while knowing that the
28          patent on Sweet Scarlet could not be enforced due to

1          prior public use and inequitable conduct, and

2    (iii)   imposing on growers a Domestic Growers' License
3            Agreement, which purport to extend the Commission's
             rights to Patented Varieties even after sale despite
4            the exhaustion of those rights upon sale of the
             patented plant.

5    (Complaint, ¶ 106).

6         As to the first theory, there is no viable claim for the

7    "amnesty program" as the Commission could not have misused

8    patents that did not exist and at most were inventions in the

9    pre-issuance stage.  License agreements entered into after a

10   patent application has been filed but before the patent issues

11   are not necessarily unenforceable.  *Aronson v. Quick Point Pencil*

12   *Co.*, 440 U.S. 257, 264-65 (1979).  The "key inquiry is whether,

13   by imposing conditions that derive their force from the patent,

14   the patentee has impermissibly broadened the scope of the patent

15   grant with anticompetitive effect."  *C.R. Bard, Inc. v. M3 Sys.,*

16   *Inc.*, 157 F.3d 1340, 1372 (Fed.Cir. 1998).  Pre-issuance, there

17   is no patent right to impermissibly broaden.  The doctrine of

18   patent misuse could not be brought into play in *Aronson*, which

19   concerned a license agreement entered into before issuance of the

20   patent, but after patent application submitted.  440 U.S. at 264-

21   65; *see also Technology Licensing Corp. v. Gennum Corp.*, No. 01-

22   04204, 2007 WL 1319528, at *23 (N.D. Cal. May 4, 2007) ("As to

23   Gennum's argument that TLC's interactions with Ross Video

24   constituted misuse of the '250 patent, it is a peculiar notion

25   that a party could "misuse" a patent that is not in existence.

26   While it has been called patent misuse where a patentee seeks to

27   collect royalties after the expiration of the patent term, it

28   appears that in such cases the patentee and licensor have

65

1  typically entered into the royalty agreement at a time when the

2  patent is in force.  Again, to the extent a party demands

3  royalties or demands that another cease using a product where no

4  patent has yet issued, the other party is not put to the type of

5  choice that patent misuse doctrine normally guards against.  The

6  other party is free to ignore the demands.")[16]

7       The motion to dismiss the pre-issuance claim of misuse is

8  GRANTED WITHOUT LEAVE TO AMEND.

9       Defendant also seeks to dismiss Plaintiffs' claim about the

10  restrictions imposed through the License Agreements prohibiting

11  the propagation of the grapevines or distribution of the vines to

12  third parties (Plaintiffs' third theory - extending "the

13  Commission's rights to Patented Varieties even after sale despite

14  the exhaustion of those rights upon sale of the patented

15  varieties.") (Complaint, ¶ 27).  Plaintiffs appear to concede in

16  their Opposition that they cannot assert a patent misuse claim on

17  the basis that the Commission has allegedly attempted to extend

18  patent rights by prohibiting "growers who purchased the Patented

19  Varieties from propagating the grapevines or distributing the

20  vines to third parties."  (*Id.*)  "Second, the Commission contends

21  that its restrictions on propagation of new vines and

22  distribution to third parties do not constitute misuse.  While

23

24       [16] Plaintiffs cite several cases which do not support a
25  patent misuse claim pre-issuance patent, including a Texas Court
    of Appeals case, *Reich v. Reed Tool Co.*, 582 S.W.2d 549 (Tex.App.
26  1970), which is not applicable in the Ninth Circuit.  And none of
    these cases addresses whether collecting royalties per-issuance
27  of patent on its own constitutes a "rule of reason" patent misuse
28  claim.

1  this may be true, the Commissions licensing agreements do not

2  simply limit growers from distributing new vines."  (Opposition,

3  p. 26);[17] *see Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700,

4  708 (Fed. Cir. 1992) (a patent holder may lawfully restrict a

5  licensee's right to use or sell a patented invention, so long as

6  the restriction is "reasonably within the patent grant," but not

7  if "the patentee has ventured beyond the patent grant and into

8  behavior having an anticompetitive effect not justifiable under

9  the rule of reason."); *Monsanto Co. v. McFarling*, 363 F.3d 1336,

10  1341 (Fed.Cir. 2004) ("In the cases in which the restriction is

11  reasonably within the patent grant, the patent misuse defense can

12  never succeed."); *B. Braun Med. v. Abbott Labs.*, 124 F.3d 1419,

13  1426 (Fed.Cir. 1997) ("[E]xpress conditions accompanying the ...

14  license of a patented product are generally upheld.")  Here, it

15  is not misuse of a plant patent to prevent the plant's disclosure

16  to prevent its reproduction.

17       Defendant's motion to dismiss Plaintiffs' sixth claim as to

18  theories one and portions of three is GRANTED WITHOUT LEAVE TO

19  AMEND.

20

21  E.    Unfair Competition.

22       Defendant moves to dismiss Plaintiffs' seventh claim for

23

24       [17] Plaintiffs also argue in response to Defendant's motion
25  to dismiss its' sixth claim that the Commission restricts third
     party distribution that extends into foreign territories and cite
26  *Extractol Process v. Hiram Walker & Sons*, 153 F.2d 264 (7th Cir.
     1946).   *Extractol* is an older Seventh Circuit decision that does
27  not address patent misuse.  Neither party fully briefed this
     issue, which cannot be resolved as the arguments are unclear.
28

67

unfair competition under California Business and Professional Code § 17200 and California Common Law.  Defendant contends that Plaintiffs have not alleged unlawful conduct because Plaintiffs' only allegation of violation of another law is Section 2 of the Sherman Act.  Absent a Section 2 violation, Defendant argues Plaintiffs fail to state a claim under the "unlawful" prong of § 17200.

The purpose of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq., "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.  [Citation.]"  *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 949, 119 Cal.Rptr.2d 296 (2002).  It "defines 'unfair competition' to mean and include 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500 et seq.)].'  (§ 17200.)."  *Id.* at 949. The scope of the UCL has been viewed by California Courts as "quite broad."  *McKell v. Washington Mut., Inc.*, 142 Cal.App.4th 1457, 1471, 49 Cal.Rptr.3d 227 (2006).  "Because the statute is framed in the disjunctive, a business practice need only meet one of the three criteria to be considered unfair competition."  *Id.* Such a claim can cover anticompetitive business practices and injuries to consumers.  It can encompass violations of other laws, treating them as unlawful practices, that are independently actionable under the unfair competition law, but a practice can be deemed unfair even if not specifically proscribed by some other law.  *Cel-Tech Communications, Inc. v. Los Angeles*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548 (1999).

1    The seventh claim states: "The Commission has unlawfully and
2    unfairly exploited the '284, '891 and '229 patents in a manner
3    that violates antitrust laws and in a manner that attempts to
4    extend these patents beyond their lawful scope.  Such acts
5    constitute unfair trade practices and unfair competition under
6    California Business and Professions Code §17200, *et seq.*, and
7    under the common law of the State of California, entitling
8    Plaintiffs to relief."  (Complaint, ¶ 111).

9    To state an UCL claim under the "unlawful" prong, Plaintiffs
10   are required to allege a violation of another law.  "The
11   'unlawful' practices prohibited by section 17200 are any
12   practices forbidden by law, be it civil or *839 criminal,
13   federal, state, or municipal, statutory, regulatory, or court-
14   made."  *Saunders v. Superior Court*, 27 Cal.App.4th 832, 839, 33
15   Cal.Rptr.2d 438 (1994).  Defendant moves to dismiss this portion
16   of the Unfair Competition claim.

17   Plaintiffs argue that they have stated a cognizable
18   antitrust claim for relief under *Walker Process*, including the
19   allegation of a relevant market.  Defendant contends that
20   Plaintiffs have failed to state a claim under the "unfair" prong,
21   because the anticompetitive acts Plaintiffs allege for an unfair
22   practice claim are based primarily on the same conduct as their
23   antitrust claim.  Plaintiffs rejoin that their allegations of the
24   Commission's unfair actions go beyond antitrust complaints and
25   that California's unfair competition law is "broad" and
26   "sweeping" and may include a vast range of unfair conduct.  An
27   unfair act under § 17200 is defined as one that "offends an
28   established public policy or...is immoral, unethical, oppressive,

1  unscrupulous or substantially injurious to consumers." *Heighly*

2  *v. J.C. Penny Life Ins. Co.*, 257 F.Supp.2d 1241, 1259 (C.D. Cal.

3  2003); *quoting Walker v. Countrywide Home Loans, Inc.*, 98

4  Cal.App.4th 1158, 1170 (2002). "'Unfair' simply means any

5  practice whose harm to the victim outweighs its benefits."

6  *Saunders v. Superior Court*, 27 Cal.App.4th 832, 839, 33

7  Cal.Rptr.2d 438 (1994).

8       Plaintiffs argue they have satisfied the "broad and

9  sweeping" "unfair" competition claim requirement because they

10 have alleged that the Commission has engaged in a broad range of

11 unlawful and unfair activities, including the enforcement of a

12 patent known to be fraudulently procured, improperly seeking to

13 extend the scope of the patent monopoly, and collecting patent

14 royalties from growers who paid for the research and development

15 of the patented varieties through assessment fees.

16      Defendant disputes Plaintiffs' contention that they alleged

17 the Commission was "collecting royalties from grower" who already

18 paid assessments.  Defendant asserts that the theory is not

19 alleged in Plaintiffs' Complaint.  Plaintiffs' Complaint provides

20 adequate notice to Defendant by the allegations:

21          For years, California table grape growers and shippers
            have funded a research program under the U.S.
22          Department of Agriculture ("USDA") to develop new table
            grape varieties.  Growers and shippers fund the USDA
23          research program through the Commission by an
            assessment on each box of table grapes shipped in
24          California.  Prior to 2002, the USDA provided the new
            varieties under development to area growers for
25          evaluation of growing potential and commercial
            marketability.  Once new varieties appeared
26          commercially viable, the USDA "released" the variety,
            and distributed plant material of the variety to area
27          growers free-of-charge.  The USDA did not charge
            California growers for the new varieties since
28          California growers and shippers already paid for a

1    large portion of the development.

2    In the late 1990s, the Commission developed a scheme by
3    which it and a few select nurseries could profit from
     the new varieties that the USDA distributed for free.
4    At the urging of the Commission, the USDA agreed to
     begin patenting new table grape varieties.  Although
5    California shippers already funded much of the
     development, the USDA agreed to give the Commission an
6    exclusive license to all new patented varieties, and to
     allow the Commission to charge royalties when growers
7    wished to obtain the new varieties.  The USDA also
     agreed to give the Commission exclusive enforcement
8    powers over its new patent rights.

9    (Complaint, ¶¶ 10-11).  This alleged "double payment scheme" is

10   entirely premised on the patent laws and the monopoly effect

11   resulting from a valid patent.  This claim is entirely derivative

12   of the patent claim, which cannot proceed in this Court.

13       Defendant's motion to dismiss Plaintiffs' seventh claim is

14   DENIED.

15

16   F.   Unjust Enrichment and Constructive Trust

17       Defendant moves to dismiss Plaintiffs' eighth and ninth

18   causes of action for unjust enrichment and constructive trust,

19   respectively.   These claims are dependent upon Plaintiffs'

20   substantive claims seeking monetary relief, the antitrust claims

21   and unfair competition claims.  Defendant's motion to dismiss the

22   eighth and ninth causes of action is based on the argument that

23   they have proved that the substantive claims must be dismissed,

24   therefore the unjust enrichment and constructive trust claims

25   must also be dismissed as well.  Plaintiffs' substantive claim

26   for unfair competition has not been dismissed.

27       Defendant's motion to dismiss Plaintiffs' eighth and ninth

28   causes of action is DENIED.

**G.    Motion to Strike**.

Defendant moves to strike certain portions of the Complaint. Rule 12(f) provides that "redundant, immaterial, impertinent, or scandalous matters" may be "stricken from any pleading."  Fed. R. Civ. P. 12(f) (emphasis added).  A motion to strike is limited to pleadings.  *See Sidney Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).  However, a "motion to strike" materials that are not part of the pleadings may be regarded as an "invitation" by the movant "to consider whether [proffered material] may properly be relied upon."  *United States v. Crisp*, 190 F.R.D. 546, 551 (E.D. Cal. 1999); *quoting Monroe v. Board of Educ.*, 65 F.R.D. 641, 645 (D. Con. 1975).  A motion to strike has sometimes been used to call to courts' attention questions about the admissibility of proffered material in ruling on motions. *Id.*

Defendant moves to strike allegations in Plaintiffs' antitrust claim regarding the Commission's "amnesty" program because Plaintiffs have not alleged they participated in the program nor that they suffered any injury in fact as a result of the amnesty program.  Plaintiffs rejoin that these allegations are highly relevant to their claim and not stated simply for antitrust damages suffered by Plaintiffs.  The allegations regarding the "amnesty" program are that 17 growers were in possession of Sweet Scarlet prior to February 2002 and show: (1) the Commission's knowledge that the patent on Sweet Scarlet was fraudulently procured; (2) the Commission's attempts to avoid invalidity challenges to the Sweet Scarlet Patent, knowing it was fraudulently procured; (3) the Commission's threat of enforcement

72

1  and enforcement of patents known to be fraudulently procured; and
2  (4) the Commission's attempt to extend the scope of its patents
3  beyond their legal bounds.

4      Motions to strike are however disfavored and infrequently
5  granted.  *See Pease & Curran Refining, Inc. v. Spectrolab, Inc.*,
6  744 F.Supp. 945, 947 (C.D. Cal. 1990), *abrogated on other grounds*
7  *by Stanton Road Ass'n v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir.
8  1993).  Such motions should be granted only where it can be shown
9  that none of the evidence in support of an allegation is
10 admissible.  *See id.*

11     Defendant's motion to strike the "amnesty program"
12 allegations is DENIED.

13     Defendant also moves to strike portions of Plaintiffs'
14 prayer for relief sections.  Plaintiffs respond that striking
15 certain prayers for relief is not the proper subject of a motion
16 to strike and cite to a Massachusetts District Court case,
17 *Massachusetts v. Russell Stover Candies, Inc.*, 541 F.Supp. 143,
18 145 (D. Ma. 1982) which denied a motion to strike prayers for
19 relief, finding it did not fall within any of the categories
20 referred to in Rule 12(f).  Rule 12(f) states "The court may
21 strike from a pleading an insufficient defense or any redundant,
22 immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P.
23 12(f).  There does not appear to be any Ninth Circuit law
24 addressing the striking of the prayer for relief sections.
25 However, the prayer for relief section is not a substantive part
26 of the pleading and is irrelevant if not supported by evidence.
27 The relief provided for the various claims will be determined if
28 any entitlement to remedies is proved.

1    Defendant's request to strike various portions of the prayer

2    for relief sections is DENIED.

3

4                          VI.   CONCLUSION

5    For all the reasons stated above:

6    1.    Defendant's motion to dismiss Plaintiffs' declaratory

7    relief claims pursuant to Rule 19 is GRANTED WITH LEAVE TO AMEND

8    to transfer the case to the Federal Court of Claims;

9    2.    Defendant's motion to dismiss Plaintiffs' inequitable

10   conduct claim is DENIED;

11   3.    Defendant's motion to dismiss Plaintiffs' antitrust

12   claim is GRANTED WITH LEAVE TO AMEND;

13   4.    Defendant's motion to dismiss all Plaintiffs' patent

14   misuse claims is GRANTED WITHOUT LEAVE TO AMEND;

15   5.    Defendant's motion to dismiss Plaintiffs' unfair

16   competition claim is DENIED;

17   6.    Defendant's motion to dismiss Plaintiffs' claims for

18   constructive trust and disgorgement is DENIED; and

19   7.    Defendant's motion to strike is DENIED.

20

21   IT IS SO ORDERED.

22   Dated:   February 18, 2009          /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE
23

24

25

26

27

28

                                 74