1

2

3        UNITED STATES DISTRICT COURT

4    FOR THE EASTERN DISTRICT OF CALIFORNIA

5

6
DELANO FARMS COMPANY, FOUR
7  STAR FRUIT, INC., and          1:07-CV-1610 OWW SMS
   GERAWAN FARMING, INC.,
8                                 MEMORANDUM DECISION AND
                    Plaintiffs,   ORDER RE FEDERAL DEFENDANTS'
9                                 (DOC. 69) AND CALIFORNIA
           v.                     TABLE GRAPE COMMISSION'S
10                                (DOC. 67) MOTIONS TO
   THE CALIFORNIA TABLE GRAPE     DISMISS.
11 COMMISSION, UNITED STATES OF
   AMERICA, UNITED STATES
12 DEPARTMENT OF AGRICULTURE,
   TOM VILSACK, SECRETARY OF
13 THE UNITED STATES DEPARTMENT
   OF AGRICULGURE (IN HIS
14 OFFICIAL CAPACITY),
15
16                  Defendants.

17

18           I. <u>INTRODUCTION</u>

19      The United States, *et al.,* ("Federal Defendants") and

20  the California Table Grape Commission ("Commission"),

21  separately move to dismiss Plaintiffs', Delano Farms Company

22  ("Delano"), Four Star Fruit, Inc. ("Four Star"), and Gerawan

23  Farming, Inc. ("Gerawan"), entire First Amended Complaint

24  ("FAC") pursuant to Federal Rules of Civil Procedure 12(b)(1)

25  and 12(b)(6), and 19.  Federal Defendants argue (1) that the

26
27  court lacks subject matter jurisdiction over Plaintiffs'

28
                          1

claims because the federal government has not waived its
sovereign immunity; and, (2) alternatively, that Plaintiffs
have not stated valid claims against Federal Defendants under
the Administrative Procedure Act ("APA").  Doc. 69.  The
Commission's motion, which substantially overlaps that of the
Federal Defendants, argues (1) the United States is a
necessary and indispensable party that is immune from suit;
and (2) Plaintiffs' remaining claims fail as a matter of law.
Doc. 67.  Plaintiffs oppose both motions.  Docs. 70 & 71.
Defendants' replies, Docs. 72 & 73, the Commission's notice
of supplemental authority, Doc. 76, as well as Plaintiffs'
notice of supplemental authority, Doc. 79, and related
responses and replies, Docs. 80-83, have also been
considered.

## II. <u>FACTUAL BACKGROUND</u>

A.   <u>Parties.</u>

Plaintiff Delano is a corporation duly organized and
existing under the laws of the State of Washington, with its
principal place of business in Hoquiam, Washington.  FAC ¶4.
Plaintiff Four Star is a corporation duly organized and
existing under the laws of the State of California, with its
principal place of business in Delano, California.  FAC ¶5.
Plaintiff Gerawan is a corporation duly organized and
existing under the laws of the State of California, with its

principal place of business in Sanger, California.  FAC ¶6.
Plaintiffs are engaged in the business of growing, harvesting
and selling table grapes.  FAC ¶7.

The Commission is a corporation of the State of
California, established by the 1967 Ketchum Act.  Cal. Food &
Agric. Code §§ 65550-65551.  The Commission's principal place
of business is Fresno, California.  FAC ¶8.  The stated
purpose of the Commission is to expand and maintain the
market for California table grapes for the benefit of the
State of California as well as the State's more than five
hundred table grape growers.  The Commission is funded
primarily by assessments levied on each shipment of
California table grapes.  No general revenues of the State
fund the Commission.  FAC ¶9.

The United States Department of Agriculture ("USDA"), of
which Tom Vilsack is the Secretary, is an Executive Agency of
the United States.  Among other things, USDA sponsors
agricultural research programs to develop new varieties of
agricultural commodities, and sometimes patents those
varieties and/or issues licenses to utilize those varieties.
*See* FAC ¶¶ 15-16.

B.   USDA Research Program.

California table grape growers and shippers have funded
a USDA research program to develop new table grape varieties

3

through assessment imposed by the Commission on each box of table grapes shipped in California. FAC ¶15. Prior to 2002, the USDA provided the new varieties under development to area growers for evaluation of growing potential and commercial marketability. *Id.* Once new varieties appeared commercially viable, the USDA "released" the variety, and distributed plant material of the variety to area growers free of charge. *Id.* It is alleged that USDA did not charge California growers for the new varieties because California growers and shippers already paid for a large portion of the development. *Id.*

C.   Patenting of Grape Varieties.

In the late 1990s, at the urging of the Commission, the USDA agreed to begin patenting new table grape varieties. FAC ¶16. The first three varieties the Commission referred to the USDA for patenting, Sweet Scarlet, Autumn King, and Scarlet Royal, had been under development for years. It is alleged that at least one of the varieties, Sweet Scarlet, had been distributed to growers for wide-scale commercial evaluation and sale. FAC ¶¶ 19, 59. Patent applications for Sweet Scarlet, Autumn King, and Scarlet Royal, were filed with the United States Patent and Trademark Office ("USPTO") on February 20, 2003 (Application No. 371,512), September 28, 2004 (Application No. 953,387), and September 28, 2004,

4

(Application No. 953,124), respectively.  Patents were issued on July 26, 2005 (Patent No. PP15,891 ("891 Patent")), February 21, 2006 (Patent No. PP16,284 ("284 Patent")), and January 31, 2006 (Patent No. PP16,229 ("229 Patent")).

The USDA agreed to give the Commission an exclusive license to all newly Patented Varieties, and to allow the Commission to charge royalties when growers wished to obtain the new varieties.  *Id.*  The USDA also agreed to give the Commission exclusive enforcement powers over its new patent rights.  FAC ¶16.

The Commission then selected three nurseries to exclusively sell all new patented table grape varieties ("Licensed Nurseries").  FAC ¶17.  Unlike the prior free distribution, the nurseries would be allowed to sell new varieties to growers.  *Id.*  In accordance with the agreement between the Commission and the USDA, the Commission charges nurseries who distribute Patented Varieties a $5000.00 participation fee per patented variety and an additional $1.00 per production unit royalty.  FAC ¶45.  The Licensed Nurseries are responsible for paying the royalty, but the Licensed Nurseries are allowed to pass the royalty amount on to the purchasing growers, which they do and have done.  FAC ¶17.

When a grower seeks to obtain a new variety from a

nursery, it is required to enter into a "Domestic Grower License Agreement" ("License Agreement") with the Commission. Under the terms of the License Agreement, the grower cannot propagate the variety beyond the plant purchased.  FAC ¶18. If the Commission believes the grower has violated the License Agreement, it can void the License Agreement and order that all purchased plants be destroyed.  *Id.*

Recognizing that at least one of the new varieties identified for patenting (and perhaps all three) had been previously in public use and/or sold commercially, the Commission created a so-called "amnesty program," allegedly designed to hide the fact that valid patents could not be obtained, and to "extort" funds from growers already in possession of the varieties.  FAC ¶20.  Under the amnesty program, the Commission widely disseminated notices to growers and shippers stating that they were in violation of the law if they possessed the varieties intended for patenting.  The notices also offered confidential "settlements" to any growers who, within a narrow window, agreed to license the varieties, pay a "penalty" to the Commission, and accept the Commission's license restrictions on further propagation.  *Id.*

Under its so-called "amnesty" program, a grower with Sweet Scarlet could keep the vines reproduced, so long as the

grower (i) admitted to possession prior to July 2004, (ii) paid $2 per vine reproduced, (iii) paid $2 per box of Sweet Scarlet grapes previously shipped, and (iv) agreed to no further propagation of the Sweet Scarlet variety from the plants possessed.  FAC  ¶65.  In July 2004, the Commission sent another notice to all California table grape growers and shippers extending the "amnesty" time period for one month, and extending the "amnesty" to include Autumn King and Scarlet Royal varieties.  FAC ¶66.

In both notices, the Commission threatened to sue growers who did not come forward, and to seek money damages and injunctions.  Yet, it is alleged that at the time of the second notice, the USDA patent application on Sweet Scarlet not only remained un-issued, but had been rejected by the USPTO.  Moreover, the USDA had not even applied for a patent on either Autumn King or Scarlet Royal.  The USDA had no patent rights, and the Commission lacked any enforcement rights.  FAC ¶¶ 66-67.

D.    Prior Use.

Plaintiffs allege that USDA knew that plant material for varieties under development frequently entered the public domain prior to release and/or patenting.  See FAC ¶50-56. The varieties underwent several growing cycles before 2002, at which time the Commission recommended the release of Sweet

Scarlet.  Moreover, prior to seeking patent protection, USDA displayed and discussed the varieties at public meetings and kept two fully developed varieties at an unsecured, and easily accessible facility at California State University at Fresno.  FAC ¶56.

In early 2002, more than two years before any patent applications for Autumn King or Scarlet Royal, a grower in Delano, J&J Farms, owned by Jim and Jack Ludy, obtained "sticks" of the new varieties.  This grower in turn provided some of the plant material to their cousin, Lawrence Ludy, who owned and operated an adjacent farm.  With these sticks, both J&J Farms and Lawrence Ludy produced Autumn King and Scarlet Royal on their farms in 2002.  FAC ¶¶ 61-62.  In addition, in response to the amnesty program, seventeen growers confirmed possession of the varieties and agreed to pay the penalties demanded by the Commission.

Plaintiffs maintain that under patent law, public use or sale of an invention more than one year prior to filing a patent application bars patentability.  FAC ¶64.

E.   Plaintiffs' License Agreements

Plaintiffs are in possession of the Autumn King, Sweet Scarlet and Scarlet Royal varieties, which they purchased through Licensed Nurseries.  FAC ¶35.  Plaintiffs paid the royalties imposed by the Commission on each purchased plant.

8

*Id.*  Plaintiffs have entered into a License Agreement with the Commission for each of the Patented Varieties.  FAC ¶¶ 36-37.  In consideration for this limited, nonexclusive license, Plaintiffs have paid a license fee to a Licensed Nursery.  *Id.*  Under the terms of this agreement, Plaintiffs have a limited, nonexclusive license to grow the Patented Varieties and sell the fruit produced.  *Id.*  Plaintiffs cannot propagate the grapevines or distribute the vines to third parties.  *Id.*  Further, Plaintiffs are obligated to destroy all Patented Varieties' plant material upon termination of the agreement.  *Id.*

F.   Original Complaint and February 20, 2009 Decision.

    Plaintiffs' original complaint named only the Commission as a defendant, alleging (at claims 1-3) the patents for all three varieties should be declared invalid, Doc. 1 at ¶¶ 66-86; (at claim 4) the patent for the Sweet Scarlet variety should be declared unenforceable because neither the Commission nor USDA disclosed to the USPTO that the three varieties had been in public use prior to February 2002, *id.* at ¶¶ 87-85; (at claim 5) the Commission violated the Sherman and Clayton Acts by illegally monopolizing the market for table grapes, *id.* at ¶¶ 96-103; (at claim 6) the Commission misused the patents "in violation of antitrust laws and in a manner that attempts to extend [the] patents beyond their

lawful scope, *id.* at ¶¶ 104-109; (at claim 7) unfair competition, *id.* at ¶¶ 110-114; (at claim 8) unjust enrichment, *id.* at ¶¶ 115-117; and (at claim 9) constructive trust, *id.* at ¶¶ 118-121.  The Commission moved to dismiss, arguing the United States is a necessary and indispensable party that is immune from suit and that all of the claims in the case were without legal foundation.

As to the issue of joinder, the February 20, 2009 Decision emphasized that because Plaintiffs' substantive causes of action sought to invalidate patents held by the United States, the United States is a necessary party under Federal Rule of Civil Procedure Rule 19(a).  Doc. 42 at 22-34.  Once it has been determined that an absent party to the suit is "necessary" under Rule 19(a), the inquiry is whether that party, the United States, can be joined in the action. *Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.*, 276 F.3d 1150, 1159 (9th Cir. 2002).  "Absent a waiver, sovereign immunity shields the Federal government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).  A waiver of sovereign immunity must be unequivocally expressed. *Department of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999).  The February 20, 2009 Decision then applied this framework to the claims in the original complaint:

> A declaratory judgment seeking invalidity of a U.S.-owned patent squarely implicates sovereign immunity. Further, property owners are generally necessary

1          parties to actions that could affect their property
           interests adversely. The United States, as owner of
2          the Patented Varieties, is no exception....

3                                    ***

4          Under the only patent-related waiver of sovereign
           immunity, 28 U.S.C. § 1498 permits private parties
5          to bring patent infringement suits in United States
           Federal Claims Court to seek money damages only.  28
6          U.S.C. § 1498.  "In waiving its own immunity from
           patent infringement actions in 28 U.S.C. § 1498(a)
7          (1994) ed. and Supp. III)," the United States did
           not consent to treble damages nor injunctive relief,
8          and permitted reasonable attorney's fees in a narrow
           class of specified instances.  *Florida Prepaid*
9          *Postsecondary Educ. Expense Bd. v. College Sav.*
           *Bank*, 527 U.S. 627, 648, n.11 (1999).  This suit
10         must be brought in Federal Claims Court against the
           United States and by its plain terms 28 U.S.C.
11         § 1498 does not cover declaratory judgments seeking
           to invalidate a patent.  Further, the federal
12         statute covering declaratory relief actions, the
           Declaratory Judgment Act, 28 U.S.C. §2201, standing
13         alone, does not waive sovereign immunity.  *Wyoming*
           *v. United States*, 279 F.3d 1214, 1225 (10th Cir.
14         2002) (the declaratory judgment statute, 28 U.S.C.
           §2201, itself does not confer jurisdiction on a
15         federal court where none otherwise exists).  "It is
           well settled, however, that said Act [Declaratory
16         Act] does not of itself create jurisdiction; it
           merely adds an additional remedy where the district
17         court already has jurisdiction to entertain the
           suit."  *Wells v. United States*, 280 F.2d 275, 277
18         (9th Cir. 1960).

19                                   ***

20         The United States cannot be joined absent a clear
           waiver of sovereign immunity.  Plaintiffs have not
21         shown such a waiver exists.  The United States
           cannot be joined.

22

23    Doc. 42 at 35-38.

24         Plaintiffs argued that APA section 702, 5 U.S.C. § 702,

25    constitutes a sufficient waiver of sovereign immunity.  After

26    discussing the APA's waiver of sovereign immunity and

27    relevant Ninth Circuit authority, the February 20, 2009

28
                                   11

decision concluded:

> Plaintiffs have cited no case where the APA § 702 was invoked as an asserted waiver of sovereign immunity for purposes of bringing a patent invalidity case against the United States.  However, if Plaintiff can amend the Complaint to adequately state a § 702 APA claim against the United States, it may.

Doc. 42 at 41.

Because the United States was a necessary party that could not be joined, the February 20, 2009 Decision considered whether the United States was "indispensable." *See* Fed. R. Civ. P. 19(b).  "A party is indispensable if in 'equity and good conscience,' the court should not allow the action to proceed in its absence."  *Dawavendewa,* 276 F.3d at 1161, *quoting* Fed. R. Civ. P. 19(b).  Rule 19(b) sets out four factors to determine whether a case must be dismissed:

> (1) prejudice to any party or to the absent party;
>
> (2) whether relief can be shaped to lessen prejudice;
>
> (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and
>
> (4) whether there exists an alternative forum.

*Kescoli v. Babbitt*, 101 F.3d 1304, 1310-11 (9th Cir. 1996). However, where the absent party cannot be joined in light of sovereign immunity, "there may be very little need for balancing ... because immunity itself may be viewed as the compelling factor."  *Id.* at 1311.

These factors were applied as follows:

12

1       The first factor weighs in favor of
        dismissal....Plaintiffs seek to invalidate and
2       declare unenforceable patents owned by the United
        States.  The validity of the USDA's patent has been
3       challenged.  If invalidated ... the Patents, would
        be destroyed, Patented Varieties would be freely
4       marketed, and the USDA would lose royalties.  The
        patents would be declared invalid under claims one
5       through three of the Complaint and unenforceable
        under claim four for inequitable conduct and claim
6       six for patent misuse.

7                              ***

8       The second factor, whether prejudice can be lessened
        by shaping the relief provided, also weighs in favor
9       of dismissal.  No declaratory, injunctive or
        compensatory relief would be granted under the
10      Complaint if the patent's validity were not
        challenged.  "Any measures to lessen these
11      prejudices would necessarily dilute the efficacy of
        the judgment sought."  *Messerschmitt-Boelkow-Blohm*
12      *GmgH v. Hughes Aircraft*, 483 F. Supp. 49, 53
        (S.D.N.Y. 1979).  Although the Complaint is brought
13      against the Commission alone, granting declaratory
        relief requires finding that the Commission had no
14      authority to enforce an invalid patent, that the
        patent is invalid and unenforceable, a patent which
15      is owned by the USDA, a branch of the United States.
        Here, any judgment cannot be tailored to eliminate
16      the prejudice to the United States.  A finding for
        Plaintiffs would declare invalid patents owned by
17      the United States, abrogating the United States'
        interest in the patents, not only depriving the
18      United States of royalties under the patents, but
        ending the United States' ability to license the
19      patents.

20                             ***

21      The third factor, adequacy of remedy, also favors
        dismissal.  "'[A]dequacy' refers not to satisfaction
22      of [Plaintiffs'] claims, but to the 'public stake in
        settling disputes by wholes, whenever possible.'"
23      *Republic of Philippines*, 128 S.Ct. at 2183, *citing*
        *Provident Tradesmens Bank & Trust Co. v. Patterson*,
24      390 U.S. 102, 111 (1968).  As in *Republic of*
        *Phillippines*, "[g]oing forward with the action in
25      the absence of" the United States, "would not
        further this public interest because they could not
26      be bound by a judgment to which they were not
        parties."  *Id.*  The Court held the University had
27      not waived its Eleventh Amendment immunity.

28      The fourth factor is whether there is an available
                              13

1   alternative forum.  First is the Court of Federal
    Claims, expressly authorized by statute.  Plaintiffs
2   have an opportunity to raise the defense of patent
    invalidity and unenforceability in an action brought
3   against them for patent infringement brought by the
    United States or the Commission.  *See* 35 U.S.C.
4   § 282. [Footnote] However, to require Plaintiffs to
    violate the license and wait to see whether the
5   patent owner sues for infringement creates an
    unfavorable situation as damages could be
6   exacerbated.  Where "no alternative forum exists,
    the district court should be 'extra cautious' before
7   dismissing an action."  *Kescoli v. Babbitt*, 101 F.3d
    1304, 1311 (9th Cir. 1996).  But just as the courts
8   have held in actions involving tribal immunity and
    state immunity, sovereign immunity of the United
9   States can justify dismissal for inability to join
    an indispensable party, despite the fact that no
10  alternative forum is available.  "If the necessary
    party is immune from suit, there may be very little
11  need for balancing Rule 19(b) factors because
    immunity itself may be viewed as the compelling
12  factor."  *Id.* at 1311 (internal citations and
    quotations omitted).  The latest Supreme Court case,
13  *Republic of Philippines v. Pimentel*, 128 S. Ct. 2180
    (2008), to address Rule 19, held as to immunity
14  barring an action from proceeding without the
    sovereign party:
15
16      The analysis of the joinder issue in those
        cases was somewhat perfunctory, but the
17      holdings were clear: A case may not proceed
        when a required-entity sovereign is not
18      amenable to suit.  These cases instruct us that
        where sovereign immunity is asserted, and the
19      claims of the sovereign are not frivolous,
        dismissal of the action must be ordered where
20      there is a potential for injury to the
        interests of the absent sovereign. 128 S.Ct. at
21      2190-91.  In this context, dismissal is
        appropriate even if Plaintiffs have no
22      alternative forum for their claim.  *See
        Dawavendewa*, 276 F.3d at 1162.

23      Because the proceedings in this case threaten both
        the property and sovereign immunity of the United
24      States, the United States' failure to waive its
        immunity from suit strongly supports dismissing this
25      litigation in its absence.

26  Doc. 42 at 42-47.  All of the claims relating to patent

27  invalidity, inequitable conduct, and patent misuse were

28
                              14

dismissed on the ground that the United States is a necessary and indispensable party.

The Commission's separate motion to dismiss the anti-trust claim was granted with leave to amend because Plaintiffs did not adequately allege each of the Patented Varieties constitutes its own relevant market. *Id*. at 62. The misuse claim was likewise dismissed. *Id*. Plaintiffs' misuse claim rested in part on allegations that the Commission illegally monopolized interstate and foreign commerce in bad faith by enforcing alleged patent rights, as the exclusive licensee of the patents, and collecting royalty fees on the Patented Varieties under its "amnesty" program. The amnesty program was rejected as a basis for a misuse claim:

> As to the first theory, there is no viable claim for the "amnesty program" as the Commission could not have misused patents that did not exist and at most were inventions in the pre-issuance stage. License agreements entered into after a patent application has been filed but before the patent issues are not necessarily unenforceable. *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 264-65 (1979). The "key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998). Pre-issuance, there is no patent right to impermissibly broaden. The doctrine of patent misuse could not be brought into play in *Aronson*, which concerned a license agreement entered into before issuance of the patent, but after patent application submitted. 440 U.S. at 264-65; *see also Technology Licensing Corp. v. Gennum Corp.*, No. 01-04204, 2007 WL 1319528, at *23 (N.D. Cal. May 4, 2007) ("As to Gennum's argument that TLC's interactions with Ross Video constituted misuse of

the '250 patent, it is a peculiar notion that a party could "misuse" a patent that is not in existence.  While it has been called patent misuse where a patentee seeks to collect royalties after the expiration of the patent term, it appears that in such cases the patentee and licensor have typically entered into the royalty agreement at a time when the patent is in force.  Again, to the extent a party demands royalties or demands that another cease using a product where no patent has yet issued, the other party is not put to the type of choice that patent misuse doctrine normally guards against.  The other party is free to ignore the demands.")

Doc. 42 at 65-66.

     The Commission's motion to dismiss the unfair competition claim was denied to the extent that the allegations extended beyond the dismissed anti-trust allegations.  *Id.* at 67-71.  Because the unfair competition claim survived, the claims for unjust enrichment and constructive trust, which are purely derivative of other claims in the case, survived as well.  *Id.* at 71.

G.   Claims in the FAC.

     The first cause of action, arising under the APA, 5 U.S.C. § 702, alleges Federal Defendants acted arbitrarily, capriciously, and otherwise not in accordance with applicable laws and regulations by undertaking the following "discrete and final agency action[s]":

     • "[D]eciding and agreeing to engage in a patenting program with the Commission with respect to the Patented Varieties and ... cooperating with the Commission in connection with that patenting program," FAC ¶74;

• "[D]eciding, approving and cooperating in the filing and prosecution of patent applications for the Patented Varieties," FAC ¶75;

• "[E]ngaging in inequitable conduct before the USPTO with respect to the application for the '891 patent," FAC ¶76;

• "[P]rocuring, accepting the issuance, and maintaining the '284, '891 and '229 patents," FAC ¶77;

• "[G]ranting the Commission an exclusive license in the '284, '891 and '229 patents," FAC ¶78;

• "[A]pproving, allowing and cooperating with the Commission's amnesty program, licensing program and enforcement program with respect to the Patented Varieties," FAC ¶79;

• "[A]llowing the Commission to collect royalties for the Patented Varieties from farmers who had funded the USDA's research program that led to the development of the Patented Varieties, where prior USDA policy was to allow such farmers to benefit from the USDA's research free of charge," FAC ¶80; and

• "[C]ooperating, encouraging and acting in concert with the Commission in the collection of royalties for the Patented Varieties and by receiving a portion of those royalties from the Commission," id.

The second, third, and fourth causes of action, brought against all defendants, seek to have the patents declared invalid.  FAC ¶¶ 103-138.  The fifth cause of action against all defendants, seeks a declaration that the 891 Patent is unenforceable due to Defendants' inequitable conduct.  FAC ¶¶ 139-152.  The sixth cause of action alleges that the Commission violated the Sherman and Clayton acts by monopolizing the national market for grapevine plant material.  FAC ¶¶ 153-165.  The seventh cause of action seeks

to have the exclusive license agreements between the United
States and the Commission invalidated under the patent laws
of the United States and the APA.   FAC ¶¶ 166-176.   The
eighth claim seeks to have the exclusive licenses declared
void under state law.   FAC ¶¶ 177-185.   The ninth claim,
against the Commission only, is for unfair competition in
violation of California Business and Professions Code § 17200
and California common law.   FAC ¶¶ 186-190.   Finally, the
tenth and eleventh claims are against the Commission alone
for unjust enrichment, FAC ¶¶ 191-93, and constructive trust,
FAC ¶¶ 194-97.

### III. <u>STANDARDS OF DECISION</u>

A.   <u>Rule 12(b)(1).</u>

Rule 12(b)(1) of the Federal Rules of Civil Procedure
allows a motion to dismiss for lack of subject matter
jurisdiction.   It is a fundamental precept that federal
courts are courts of limited jurisdiction.   Limits upon
federal jurisdiction must not be disregarded or evaded.
*Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374
(1978).   The plaintiff has the burden to establish that
subject matter jurisdiction is proper.   *Kokkonen v. Guardian
Life Ins. Co.,* 511 U.S. 375, 377 (1994).   This burden, at
the pleading stage, must be met by pleading sufficient
allegations to show a proper basis for the court to assert

subject matter jurisdiction over the action.  *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189 (1936); Fed. R. Civ. P. 8(a)(1).  When a defendant challenges jurisdiction *facially,* all material allegations in the complaint are assumed true, and the question for the court is whether the lack of federal jurisdiction appears from the face of the pleading itself.  *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009).

B.   <u>Rule 12(b)(6).</u>

     A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001).  To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (May 18, 2009) (quoting *Bell Atl. Corp v. Twombly,* 550 U.S. 544, 570 (2007)).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (citing *Twombly*, 550 U.S. 556-57).  Dismissal also can be

based on the lack of a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990).

In deciding whether to grant a motion to dismiss, the court "accept[s] all factual allegations of the complaint as true and draw[s] all reasonable inferences" in the light most favorable to the nonmoving party. *Rodriguez v. Panayiotou,* 314 F.3d 979, 983 (9th Cir. 2002). A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Manufactured Home Cmtys. Inc. v. City of San Jose,* 420 F.3d 1022, 1035 (9th Cir. 2005) (quoting *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001)).

## IV. <u>ANALYSIS.</u>

A.  <u>*MedImmune* Does Not Overcome the Need to Identify a Waiver of the United States' Sovereign Immunity.</u>

The February 20, 2009 Decision dismissed the original complaint on the ground that the United States is a necessary and indispensable party that is immune from suit. In the FAC, Plaintiffs suggest that a recent Supreme Court case, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), stands for the proposition that the United States' immunity does not bar declaratory relief claims against it for patent invalidity. Federal district courts have "original jurisdiction [over] any civil action arising under any Act of Congress relating to patents, plant variety protection,

copyrights and trademarks." 28 U.S.C. § 1338. This includes suits brought by patent holders against alleged patent infringers under 35 U.S.C. § 281. In response to such a suit, an alleged infringer may raise patent invalidity as a defense. § 282.

Under certain circumstances, when faced with an imminent threat that a patentholder may sue for patent infringement, the alleged infringer may preemptively seek a declaratory judgment of patent invalidity. In *MedImmune*, for example, MedImmune entered into a license agreement with Genentech, which permitted MedImmune's use of a particular, patented drug manufacturing process in exchange for the payment of royalties to Genentech. 549 U.S. at 121. Several years later, Genentech sent MedImmune a letter expressing its belief that one of MedImmune's products was covered by the licensed patent and that MedImmune owed royalties on that product under the licensing agreement. *Id*. MedImmune "considered the letter to be a clear threat to enforce the [] patent, terminate the [] license agreement, and sue for patent infringement if [MedImmune] did not make royalty payments as demanded." *Id*. at 122.

> If respondents were to prevail in a patent
> infringement action, petitioner could be ordered to
> pay treble damages and attorney's fees, and could be
> enjoined from selling [the product, which] has
> accounted for more than 80 percent of its revenue
> from sales since 1999. Unwilling to risk such

21

> serious consequences, petitioner paid the demanded royalties under protest and with reservation of all of its rights.

*Id.* (internal citations and quotations omitted).

Acknowledging that "[t]here is no dispute" that exercising jurisdiction under the declaratory judgment act would be appropriate if MedImmune "had taken the final step of refusing to make royalty payments under the [] license agreements," the Supreme Court inquired whether MedImmune's own acts, in deciding to continue making royalty payments, "causes the dispute no longer to be a case or controversy within the meaning of Article III?" *Id.* at 128. The Supreme Court concluded that, so long as the facts allege that there is a substantial controversy between the parties of "sufficient immediacy and reality," judicial review over the declaratory judgment claim is permissible. *Id.* at 127-28.

Plaintiffs argue that, just as the plaintiffs in *MedImmune* could bring a preemptive declaratory relief action for patent invalidity against a <u>private</u> patent holder where there is a sufficiently immediate and real controversy between the parties, so too can Plaintiffs bring a declaratory relief action for patent invalidity against the United States. But, this ignores the legal effect of the immunity afforded the United States as a sovereign. *MedImmune* expands the circumstances in which an Article III

1  "case or controversy" is deemed to exist, but it says nothing

2  about the United States' immunity or susceptibility to suit

3  over a U.S. owned patent.

4      Sovereign immunity shields the United States from patent

5  infringement lawsuits brought under § 281.  "Absent a waiver,

6  sovereign immunity shields the Federal government and its

7  agencies from suit."  *Hargen v. Dept. of Labor*, 569 F.3d 898,

8  904 (9th Cir. 2009) (citing *Dep't of Army v. Blue Fox, Inc.*,

9  525 U.S. 255, 260 (1999)).  "A waiver of sovereign immunity

10  must be unequivocally expressed ... and will not be implied.

11  *Id.* (citing *Lane v. Pena*, 518 U.S. 187, 192 (1996)).

12  "Further, a waiver of immunity will be strictly construed, in

13  terms of its scope, in favor of the sovereign."  *Id.*

14  (internal quotation omitted).

15      A limited waiver of sovereign immunity is found in 28

16  U.S.C. § 1498,[1] which permits private parties to bring patent

17

18

19

20  _____

[1]    28 U.S.C. § 1498 provides, in pertinent part:

Whenever an invention described in and covered by a patent of the
United States is used or manufactured by or for the United States
without license of the owner thereof or lawful right to use or
manufacture the same, the owner's remedy shall be by action against
the United States in the United States Court of Federal Claims for
the recovery of his reasonable and entire compensation for such use
and manufacture. Reasonable and entire compensation shall include
the owner's reasonable costs, including reasonable fees for expert
witnesses and attorneys, in pursuing the action if the owner is an
independent inventor, a nonprofit organization, or an entity that
had no more than 500 employees at any time during the 5-year period
preceding the use or manufacture of the patented invention by or for
the United States. Nothwithstanding the preceding sentences, unless
the action has been pending for more than 10 years from the time of
filing to the time that the owner applies for such costs and fees,
reasonable and entire compensation shall not include such costs and
fees if the court finds that the position of the United States was

infringement suits against the United States for money

damages in the United States Court of Federal Claims.  A

prior order in this case held that § 1498 did not operate as

a waiver:

> "In waiving its own immunity from patent
> infringement actions in 28 U.S.C. § 1498(a) (1994)
> ed. and Supp. III)," the United States did not
> consent to treble damages nor injunctive relief, and
> permitted reasonable attorney's fees in a narrow
> class of specified instances.  *Florida Prepaid*
> *Postsecondary Educ. Expense Bd. v. College Sav.*
> *Bank*, 527 U.S. 627, 648, n.11 (1999).  This suit
> must be brought in Federal Claims Court against the
> United States and by its plain terms 28 U.S.C. §
> 1498 does not cover declaratory judgments seeking to
> invalidate a patent.  Further, the federal statute
> covering declaratory relief actions, the Declaratory
> Judgment Act, 28 U.S.C. §2201, standing alone, does
> not waive sovereign immunity.  *Wyoming v. United*
> *States*, 279 F.3d 1214, 1225 (10th Cir. 2002) (the
> declaratory judgment statute, 28 U.S.C. §2201,
> itself does not confer jurisdiction on a federal
> court where none otherwise exists).  "It is well
> settled, however, that said Act [Declaratory Act]
> does not of itself create jurisdiction; it merely
> adds an additional remedy where the district court
> already has jurisdiction to entertain the suit."
> *Wells v. United States*, 280 F.2d 275, 277 (9th Cir.
> 1960).

Doc. 42 at 36-37.

Alternatively, the United States can waive its immunity

through affirmative action, by invoking the jurisdiction of a

particular court in a particular lawsuit.  For example, the

United States, as the holder of a patent, could sue a private

party for patent infringement under 35 U.S.C. § 281, to which

the alleged infringer may raise patent invalidity as a

defense under § 282.  However, such a waiver is limited in

---

substantially justified or that special circumstances make an award
unjust.

24

nature.  *See Tegic Communications Corp. v. Board of Regents of Univ. of Texas Sys.*, 458 F.3d 1335, 1342-43 (9th Cir. 2006)(State's filing of suit in district court waives Eleventh Amendment immunity as to that suit in that court as well as to any compulsory counterclaims filed by consumer defendants, but not as to suit in another district court by manufacturer).

Here, Plaintiffs correctly point out that as part of its "amnesty program," the Commission sent out notices in which it threatened to sue growers who did not come forward to acknowledge possession of the Patented Varieties and pay royalties.  But, the Commission's issuance of this notice is far from an unequivocal waiver of sovereign immunity by the United States.  *Hargen,* 569 F.3d at 904 ("A waiver of sovereign immunity must be unequivocally expressed ... and will not be implied.").  In the Eleventh Amendment context, for example, waiver is generally found "either when the state makes a 'clear declaration' that it intends to waive immunity, such as by statute," or "when the state voluntarily invokes federal jurisdiction" by becoming party to a suit. *Tegic*, 458 F.3d at 1341.  Here, the United States has not made a clear declaration that it intends to waive immunity, nor did it voluntarily invoke federal jurisdiction.  It did not sue any grower, nor has it invoked the jurisdiction of

any court to enforce any patent in dispute.

Plaintiffs emphasize the following passage, and cases cited, from *MedImmune*:

> Our analysis must begin with the recognition that, where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat-for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction. For example, in *Terrace v. Thompson*, 263 U.S. 197 (1923), the State threatened the plaintiff with forfeiture of his farm, fines, and penalties if he entered into a lease with an alien in violation of the State's anti-alien land law. Given this genuine threat of enforcement, we did not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action. *Id.*, at 216. *See also*, e.g., *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926); *Ex parte Young*, 209 U.S. 123 (1908). Likewise, in *Steffel v. Thompson*, 415 U.S. 452 (1974), we did not require the plaintiff to proceed to distribute handbills and risk actual prosecution before he could seek a declaratory judgment regarding the constitutionality of a state statute prohibiting such distribution. *Id.*, at 458-460. As then-Justice Rehnquist put it in his concurrence, "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." *Id.*, at 480. In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do (enter into a lease, or distribute handbills at the shopping center). That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced. *See Terrace, supra*, at 215-216, 44 S.Ct. 15; *Steffel, supra*, at 459. The dilemma posed by that coercion-putting the challenger to the choice between abandoning his rights or risking prosecution-is "a dilemma that it was the very purpose of the Declaratory Judgment Act

to ameliorate." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152 (1967).

*Id.* at 129 (parallel citations omitted).

Despite the seemingly helpful holding that "where threatened action by government is concerned," a plaintiff is not required "to expose himself to liability before bringing suit to challenge the basis for the threat...," this passage has no bearing whatsoever on the issue of sovereign immunity, as sovereign immunity was not an issue in any of the cited cases. *Ex Parte Young* carved out an exception to a State's Eleventh Amendment immunity for suits against officials acting unconstitutionally on behalf of a state. 209 U.S. 123. *Terrace* applied the *Ex Parte Young* doctrine to permit an anticipatory suit for injunctive relief against a state official who threatened to apply an allegedly unconstitutional statute. 263 U.S. 197. *Village of Euclid,* 272 U.S. 365, and *Steffel*, 415 U.S. 452, follow *Terrace,* permitting anticipatory suits for injunctive relief to challenge the threatened application of allegedly unconstitutional state and local laws. Because of *Ex Parte Young*, sovereign immunity was not an issue in either *Village of Euclid* or *Steffel*.

In sum, while *MedImmune* might support a preemptive declaratory judgment lawsuit here if the patent holder was a private party, it does not provide jurisdiction to overcome

27

the United States' sovereign immunity.

B.    **APA Claims.**

    1.    **Section 701's Limitation on Section 702's Waiver of Sovereign Immunity.**

Plaintiffs advance the APA as an alternative source for a waiver of sovereign immunity.  APA section 702 provides, in pertinent part:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States *seeking relief other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.

Congress' waiver of the federal government's sovereign immunity under APA § 702 is limited by § 701(a), which provides:

> (a) This chapter applies, according to the provisions thereof, except to the extent that--
>
>     (1) statutes preclude judicial review; or
>
>     (2) agency action is committed to agency discretion by law.

5 U.S.C. § 701(a).  *Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (before bringing a claim under § 702, "a party must first clear the hurdle of § 701(a)").

1

2

     a. **The Patent Act Precludes Judicial Review of**
**Plaintiffs' Patent-Related APA Claims.**

3

    APA § 702's waiver of sovereign immunity does not apply

4

where a particular statute "precludes judicial review."

5

§ 701(a)(1)[2]; *Heckler,* 470 U.S. at 828.  "Whether and to what

6

extent a particular statute precludes judicial review is

7

determined not only from its express language, but also from

8

the structure of the statutory scheme, its objectives, its

9

legislative history, and the nature of the administrative

10

action involved."  *Block v. Comty. Nutrition Inst.*, 467 U.S.

11

340, 345 (1984).  While "[a]ccess to judicial review should

12

be limited only upon a showing of clear and convincing

13

evidence of a contrary legislative intent," *Eisinger v. Fed.*

14

*Lab. Rel. Auth.*, 218 F.3d 1097, 1103 (9th Cir. 2000), this

15

standard is not applied in a "strict evidentiary sense," so

16

long as "congressional intent to preclude judicial review is

17

fairly discernible in the statutory scheme," *Block*, 467 at

18

351 (internal quotation omitted).

19

    In a complex statutory scheme, the provision of judicial

20

21

review for a particular class of plaintiffs may evidence

22

Congressional intent to foreclose others from participating.

23

*Block*, 467 U.S. at 347-49 ("[W]hen a statute provides a

24

detailed mechanism for judicial consideration of particular

25

26

---

[2] Relatedly, 5 U.S.C. § 702(2) provides that nothing in the APA "confers
authority to grant relief if any other statute that grants consent to
suit expressly or impliedly forbids the relief which is sought."

27

28

issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded.").  This is the case even where the statute generally alludes to the excluded class' interests.  *Id*. at 347.  Whether judicial review is precluded for certain classes of plaintiffs "turns ultimately on whether Congress intended for that class to be relied upon to challenge agency disregard of the law." *Id*.  "Preclusion of such suits does not pose any threat to realization of the statutory objectives; it means only that those objectives must be realized through the specific remedies provided by Congress and at the behest of the parties directly affected by the statutory scheme."  *Id*. at 352-53.

The Patent Act "reveals Congress's intent to preclude judicial review of USPTO examination decisions at the behest of third parties protesting the issue or reissue of a patent." *Hitachi Metals, Ltd. v. Quigg*, 776 F. Supp. 3, 7 (D.D.C. 1991).  The district court in *Hitachi* succinctly summarized the operation of the Patent Act and its judicial review provisions:

> The Patent Statute is addressed to patent owners and patent applicants. The patent examination process is an *ex parte* proceeding, not an adversarial one, and the Patent Statute's judicial review provisions contain no gaps requiring the Court to exercise its power.  [FN8]
>
> [FN8] Congress has explicitly designated other PTO proceedings as *inter partes*, including

patent interferences, 35 U.S.C. § 135(a), and trademark oppositions and cancellations, 15 U.S.C. §§ 1063, 1064, 1067. In contrast, the provisions governing the patent application and examination process prescribe an ex parte proceeding. 35 U.S.C. §§ 131, 132, 133, 134, 141, and 145. *See also Williams Mfg. Co. v. United Shoe Machinery Corp.*, 121 F.2d 273, 277 (6th Cir.1941) ( "[T]he granting of a patent is not, except when an interference is declared, the result of an adversary proceeding."); *Godtfredsen v. Banner*, 503 F. Supp. 642, 646 (D.D.C. 1980) ("It may well be desirable as a matter of policy to permit an individual to protest the grant of a patent other than by an infringement action, ... that is a decision for the Congress.").

The Patent Statute explicitly authorizes patent owners to apply for reissue of a patent, 35 U.S.C. § 251, and confers on those applicants the right to seek administrative and judicial review of PTO examination decisions. *See* 35 U.S.C. § 131 (administrative appeal of examiner's decision to the Board of Patent Appeals and Interferences); 35 U.S.C. § 134 (direct appeal of Board decisions to the Federal Circuit); 35 U.S.C. § 145 (judicial review by civil action in this court); 35 U.S.C. § 251 (the provisions governing original patent applicants also govern reissue applicants). In contrast, Title 35 contains no provision expressly authorizing administrative or judicial review of a PTO decision at the behest of a third-party protestor.

*Hitachi*, 776 F. Supp. at *8.  *Hitachi* rejected plaintiff's argument that its suit only challenged the procedure used by the USPTO, and was not an action to review the validity or enforceability of the patent:

[P]laintiff's distinction is a superficial one. Plaintiff's suit is precluded by the Patent Statute, because plaintiff's action, a suit brought by a third-party protestor, seeks to overturn the PTO's decision to grant a reissue patent to [defendant]. Although plaintiff states "that plaintiff does not here seek a determination of the validity or enforceability of the patent," in the same memorandum plaintiff also requests an injunction

> requiring [defendant] to surrender its reissue
> patent... Furthermore, the ultimate source of
> Hitachi's alleged injuries is not the alleged
> procedural violation by the Commissioner, but the
> existence of [defendant's] reissue patent.

*Id*. at *9.  *See also Syntex v. U.S. Patent and Trademark Office*, 882 F.2d 1570, 1573-74 (Fed. Cir. 1989) (affirming dismissal of complaint, including APA claim, for lack of jurisdiction because third-party requester of reexamination could not collaterally attack the USPTO's reexamined decision in favor of patent owner, as the Patent Act does not provide for such a challenge); *Hallmark Cards Inc., v. Lehman*, 959 F. Supp 539, 542-43 (D.D.C. 1997)(rejecting third party's attempt to directly challenge the USPTO's decision to issue a certificate of correction because the Patent Act precludes judicial review of such an action unless issue is raised as defense to an infringement suit).

Plaintiffs attempt to distinguish these cases on the ground that they involved causes of action against the USPTO, and not directly against the patent owner.  But, whether a cause of action operates as a collateral attack does not turn upon the parties named to the lawsuit.  For example, *Heck v. Humphrey*, 512 U.S. 477, 486 (1994), bars civil rights claims for damages that would operate to collaterally attack an underlying criminal conviction, even though the parties to the underlying criminal case may not be the same as those

involved in the civil rights action.  *See, e.g., Anderson v. Smith*, 2009 WL 2139311 (E.D. Cal. Jul. 10, 2009).

Plaintiffs assert that the USDA's reliance on *Hitachi* and its assertion that Plaintiffs claims are collateral attacks "defies logic" because "if the USDA's definition of a 'collateral attack' were accepted, all invalidity claims would constitute 'collateral attacks on the PTO's decision to grant the patents,' even those between private parties or those raised as counterclaims in an infringement suit brought by the government."  Doc. 70 at 8.  But, the law permits patents to be attacked in certain suits between private parties and in counterclaims brought against infringement suits initiated by the government.  Such attacks, where permitted by law, are, by their very nature, <u>not</u> impermissible "collateral" attacks.  This does not address the United States' argument that the APA cannot be used to <u>create</u> new ways to attack a patent where such mechanisms are <u>not</u> otherwise permitted by law.  That is the purpose of section 701(a)(1) and *Block's* prohibition against using the APA to carve out new avenues for judicial review where a comprehensive statutory scheme already exists.[3]

---

[3] Plaintiffs argue that their claims are not "collateral attacks," but, instead, amount to "direct action against the patent owner under the APA for acting contrary to law in obtaining, maintaining, licensing, and enforcing the grapevine patents."  Doc. 70 at 8.  There is little practical difference between a collateral attack on the patent itself and a claim that the patent was obtained unlawfully

Here, many of Plaintiffs allegations are direct attacks on the validity of the patents themselves.  Plaintiffs' allege that the USDA acted unlawfully by: "deciding and agreeing to engage in a patenting program with the Commission with respect to the Patented Varieties and ... cooperating with the Commission in connection with that patenting program," FAC ¶74; "deciding, approving and cooperating in the filing and prosecution of patent applications for the Patented Varieties," FAC ¶75; "engaging in inequitable conduct before the USPTO with respect to the application for the '891 patent," FAC ¶76; and "procuring, accepting the issuance, and maintaining the '284, '891 and '229 patents," FAC ¶77.  These APA claims are barred under § 701 because the Patent Act precludes judicial review of such claims.

Plaintiffs also allege that USDA acted unlawfully by: "granting the Commission an exclusive license in the '284, '891 and '229 patents," FAC ¶78; "approving, allowing and cooperating with the Commission's amnesty program, licensing program and enforcement program with respect to the Patented Varieties," FAC ¶79; "allowing the Commission to collect royalties for the Patented Varieties from farmers who had funded the USDA's research program that led to the development of the Patented Varieties, where prior USDA policy was to allow such farmers to benefit from the USDA's

research free of charge," FAC ¶80; and "cooperating, encouraging and acting in concert with the Commission in the collection of royalties for the Patented Varieties and by receiving a portion of those royalties from the Commission," *id*. In part, these license-related claims depend on Plaintiffs' assertion that the patents are unenforceable, *see, e.g.,* FAC ¶91 (USDA's "action in granting the Commission an exclusive license to the '891 patent is arbitrary, capricious, and otherwise not in accordance with laws and regulations, because the patent is unenforceable.").

Any APA claims in the FAC based upon the invalidity of the patents must be dismissed because the APA does not waive sovereign immunity where a particular statute, in this case the Patent Act, precludes judicial review.[4]  Defendants' motion to dismiss all patent-related claims (e.g., those that

---

[4] To the extent that Plaintiffs' challenge the United States' title to the patents, the Quiet Title Act also impliedly forbids Plaintiffs' Claims.  5 U.S.C. § 702(2) provides that nothing in the APA "confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought. Plaintiffs' claims, which challenge the United States' interest in property, implicate the Quiet Title Act, 28 U.S.C. § 2409a(a), which waives sovereign immunity for claims disputing the United States' title to real property.  A related waiver applies to certain claims involving "real or personal property on which the United States has or claims a mortgage or lien."  28 U.S.C. § 2410(a).  Patents, however, "have the attributes of personal property."  35 U.S.C. § 261.  The United States has not waived its sovereign immunity with respect to personal property in which the United States claims a title interest, as opposed to a lien interest.  *Dunn & Black, P.S. v. United States*, 492 F.2d 291, 292 (9th Cir. 1973).  The absence of any waiver of sovereign immunity with respect to challenges to a federal agency's rights to personal property impliedly forbids similar relief under the APA.  To the extent that Plaintiffs' APA claims challenge the United States' right to possess, manage, and dispose of the patents, such challenges are barred.

challenge the validity of the patent and/or the methods by which the patent was obtained) is GRANTED WITHOUT LEAVE TO AMEND.

   b.   **The Bayh-Dole Act Does not Commit Action With Respect to Licensing to Agency Discretion.**

In addition to challenging the validity of the Patents themselves, Plaintiffs allege that the USDA's licensing activities violate provisions of the Bayh-Dole Act, 35 U.S.C. § 200 *et seq*. Defendants argue that these licensing claims are barred by Section 701(a)(2) of the APA, which precludes application of the APA to any "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Defendants maintain that the Bayh-Dole act commits the acts of licensing to agency discretion.

Agency action is committed to agency discretion by law when the statute which authorizes the agency's action is "drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971), overruled on other grounds, *see Califano v. Sanders*, 430 U.S. 99 (1977); *see also Webster v. Doe*, 486 U.S. 592, 600 (1988). Applying § 701(a)(2) "requires careful examination of the statute on which the claim of agency illegality is based." *Webster*, 486 U.S. at 600.

In *Heckler v. Chaney,* 470 U.S. 821, 828 (1985), the Food

and Drug Administration's ("FDA") decision not to undertake an enforcement proceeding against the use of certain drugs in administering the death penalty was not subject to judicial review under the APA because the statute conferring power on the FDA to prohibit the unlawful misbranding or misuse of drugs provided no substantive standards on which a court could base a review of the challenged conduct.  "The Act's enforcement provisions thus commit complete discretion to the [FDA] to decide how and when they should be exercised."  *Id.* at 835.

In contrast, in *Overton Park*, APA § 701(a)(2) did not bar judicial review of the Department of Transportation's ("DOT") release of federal funds to complete a segment of expressway that ran through ha city park.  401 U.S. at 413-14.  The relevant statutes, which provided that DOT "shall not approve any program or project that requires the use of any public parkland unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park ...," provided "clear and specific directives." *Id.*

In general, the Bayh-Dole Act authorizes federal agencies to apply for, obtain, and maintain patents:

> Each Federal agency is authorized to apply for, obtain, and maintain patents ... in the United States . . . on inventions in which the Federal

Government owns a right, title, or interest. 35 U.S.C. § 207(a)(1).

Many of Plaintiffs' APA allegations directly implicate the authorization granted by the Bayh-Dole Act.  Plaintiffs' allege that the USDA acted unlawfully by "deciding and agreeing to engage in a <u>patenting program</u> with the Commission...," FAC ¶74; "filing and prosecut[ing] of patent applications for the Patented Varieties," FAC ¶75; "engaging in inequitable conduct before the USPTO...," FAC ¶76; and "procuring, accepting the issuance, and maintaining the '284, '891 and '229 patents," FAC ¶77.  Other allegations indirectly implicate the Bayh Dole Act's authorization, such as those involving USDA's "granting the Commission an exclusive license in the '284, '891 and '229 patents," FAC ¶78; "approving, allowing and cooperating with the Commission's amnesty program, licensing program and enforcement program with respect to the Patented Varieties," FAC ¶79; "allowing the Commission to collect royalties for the Patented Varieties...," FAC ¶80; and "cooperating, encouraging and acting in concert with the Commission in the collection of royalties for the Patented Varieties and by receiving a portion of those royalties from the Commission," *id*.

As to all these patenting activities, Plaintiffs

identify no "clear and specific directives" contained in the Bayh-Dole Act (or any other statute or regulation) against which USDA's conduct can be measured.  Plaintiffs assert that the Bayh-Dole act in fact "contains a comprehensive statutory scheme for government agencies to follow when seeking to patent inventions, grant exclusive licenses, and collect royalties" and "leaves virtually nothing in these areas to agency discretion."  Doc. 70 at 11.  To support this assertion, Plaintiffs note only that the Bayh-Dole Act expressly limits the government's ability to seek patent protection to "inventions in which the Federal Government owns a right, title, or interest."  35 U.S.C. § 207(a)(1).  "Inventions" is defined as "any invention or discovery which is or may be patentable." § 201(d).  Plaintiffs argue "the Bayh-Dole Act expressly limits a government agency's discretion to seek patent protection to subject matter that meets the conditions of patentability set forth elsewhere in the Patent Act."  Doc. 70 at 11.  The Patent Act is the source of substantive law that underpins any such Bayh-Dole act claim, but the latter contains no substantive standards to aid judicial review of the disputed patenting activities.

Plaintiffs note that UDSA's licensing activities are subject to "clear and specific directives" contained in section 209(a), which provides:

Authority.--A Federal agency may grant an exclusive
or partially exclusive license on a federally owned
invention under section 207(a)(2) only if--

(1) Granting the license is a reasonable and
necessary incentive to--

(A) call forth the investment capital and
expenditures needed to bring the invention to
practical application; or

(B) otherwise promote the invention's
utilization by the public;

(2) the Federal agency finds that the public will be
served by the granting of the license, as indicated
by the applicant's intentions, plans, and ability to
bring the invention to practical application or
otherwise promote the invention's utilization by the
public, and that the proposed scope of exclusivity
is not greater than reasonably necessary to provide
the incentive for bringing the invention to
practical application, as proposed by the applicant,
or otherwise to promote the invention's utilization
by the public;

(3) the applicant makes a commitment to achieve
practical application of the invention within a
reasonable time, which time may be extended by the
agency upon the applicant's request and the
applicant's demonstration that the refusal of such
extension would be unreasonable;

(4) granting the license will not tend to
substantially lessen competition or create or
maintain a violation of the Federal antitrust laws;
and

(5) in the case of an invention covered by a foreign
patent application or patent, the interests of the
Federal Government or United States industry in
foreign commerce will be enhanced.

35 U.S.C. § 209(a).

The FAC specifically invokes § 209(a)(4), alleging that
"USDA's action in granting the Commission an exclusive

40

license to [the Patented Varieties violates the APA] because... the exclusive license is in violation of ... [35 U.S.C.] § 209(a)(4), in that the exclusive license substantially lessens competition in the distribution, production, and reproduction of the Patented Varieties and either creates or maintains a violation of the Federal Antitrust laws as alleged in the Sixth and Ninth Claims for Relief." FAC ¶90. Section 209(a)(4)'s requirement that an exclusive or partially exclusive license must "not tend to substantially lessen competition or create or maintain a violation of the Federal antitrust laws," is a "clear and specific directive" that may be enforced by way of the APA's judicial review provisions.

In addition, although no such violation is alleged in the FAC, at oral argument Plaintiffs invoked § 209(a)(1), arguing that granting the license was not a "reasonable and necessary incentive" to either "call forth the investment capital and expenditures needed to bring the invention to practical application"; or "otherwise promote the invention's utilization by the public." This too is a "clear and specific directive" that may be enforced by a court.

Defendants' motion to dismiss Plaintiffs' license-related APA claims pursuant to section 701(a)(2)'s limitation on section 702's waiver of sovereign immunity is DENIED. As

to these remaining licensing claims brought under section 209(a) of the Bayh-Dole Act, Defendants advance a number of alternative arguments for dismissal.

### 2. <u>Standing.</u>

Defendants argue that Plaintiffs do not have standing to bring APA licensing claims against the Federal Defendants. To maintain an action in federal court, Plaintiffs must have Article III standing. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 872 (1990). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1)[he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). In addition to the Article III requirements, plaintiffs bringing suit under the APA, 5 U.S.C. § 706, must establish that they fall within the "zone of interest" of the statute under which they bring their lawsuit. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, at 1199 (9th Cir.2004).

The burden of establishing the elements of standing falls upon the party asserting federal jurisdiction. *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  "[E]ach element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (quoting *Lujan*, 504 U.S. at 561).

    a.   <u>Injury in Fact; Causation; Redressibility.</u>

To satisfy the "injury in fact" requirement, Plaintiffs must provide evidence of either actual or threatened injury. See *United States v. Ensig*n, 491 F.3d 1109, 1116-17 (9th Cir. 2007). Causation requires that the injury be "fairly traceable" to the challenged action of the defendant, and not be "the result of the independent action of some third party not before the court." *Tyler v. Cuomo*, 236 F.3d 1124, 1132 (9th Cir. 2000).  The causation element is lacking where an "injury caused by a third party is too tenuously connected to the acts of the defendant." *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 975 (9th Cir. 2003). Finally, redressibility requires that plaintiff show it is "likely that a favorable court decision will redress the injury to the plaintiff." *Lujan*, 504 U.S. at 560. "Redressibility requires an analysis of whether the court has the power to right or to prevent the claimed injury."

43

*Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982).

The United States does not challenge plaintiffs' ability to satisfy the Article III requirements.  However, the Commission maintains that, with respect to the allegations that the licenses granted to the Commission by the USDA should be declared void, Plaintiffs "have not, and cannot allege, any injury fairly traceable to the challenged action of the USDA."  Doc. 67 at 20 (internal quotation omitted).  Specifically, the Commission asserts that "[f]ar from injuring plaintiffs, the USDA's decision to license the use of its patented grape varieties presents an opportunity to plaintiffs that would not otherwise exist.  Indeed, if the Court were to invalidate the licenses, which provide the authority for plaintiffs' sub-licenses, then plaintiffs would have no way to use the Patented Varieties short of infringing the USDA's patents."  *Id*.  Plaintiffs do not respond to this argument.

The Commission's view of causation and redress is too narrow.  If, for example, the entire licensing program was declared invalid because the USDA failed to satisfy the terms of section 209(a) of the Bayh-Dole Act, the licensing program would likely be remanded to USDA and the Commission for further consideration and/or findings.  In that event, in order to comply with 209(a), the licensing program might have

to be redesigned in ways that would benefit Plaintiffs.

Plaintiffs have satisfied the Article III standing requirements with respect to their licensing-related APA claims.

b.   Zone of Interest.

"For a plaintiff to have prudential standing under the APA, the interest sought to be protected by the complainant must be arguably within the zone of interests to be protected or regulated by the statute in question." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998) (citation omitted).  In determining whether a plaintiff has asserted an interest within the "zone of interests" protected by a statute, the relevant provision is the "statutory provision whose violation forms the legal basis for [the plaintiffs'] complaint." *Lujan,* 497 U.S. at 883.  A court is permitted to look beyond the individual statutory provision on which the complaint is based and may focus on the objective of the entire statute in order to better understand its purpose. *See Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 401 (1987) (stating that a court is "not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress's overall purposes" behind the relevant statute); *Air Courier Conference v. Am. Postal*

45

*Workers Union*, 498 U.S. 517, 528 (1991) (citing *Clarke*);
*Westlands Water Dist. v. U.S. Dep't of Interior*, 850 F. Supp.
1388, 1425 (E.D. Cal. 1994) (same).

Plaintiffs remaining APA claims arise under the Bayh-Dole Act.  In *Service Engineering Corporation v. U.S. Dep't of Agriculture*, 1999 U.S. Dist. LEXIS 21952 (D. Md. March 30, 1999), corporate plaintiffs were denied a patent license because the federal government issued an exclusive license to another corporation.  The district court concluded that plaintiffs lacked prudential standing under the Bayh-Dole Act, because "Congress's primary policy and objective in adopting the Act was to promote the utilization of inventions arising from federally supported research and development." *Id*. at *13-14 (quoting 35 U.S.C. § 200).

> The court does not agree with Plaintiffs' position
> that the Act was intended to protect individuals,
> including corporations, from the anticompetitive
> effects of government licensing policies.  Indeed,
> the Act clearly anticipates, even encourages, such
> anticompetitive effects since it permits the
> exclusive licensing of patented government
> inventions.  While it is true that Congress directed
> federal agencies not to grant exclusive or partially
> exclusive licenses where doing so would be
> inconsistent with the antitrust laws, nothing in the
> Act indicates that Congress intended to protect the
> specific economic interests of parties in
> competition with government licensees.

*Id*. at * 14-15 (citations omitted).  The *Service Engineering* plaintiffs had no prudential standing to challenge the USDA's grant of an exclusive license to another entity because their "interests [fell] outside the zone of interests protected by

the Bayh-Dole Act." *Id*. at *16.

The reasoning of *Service Engineering* on the issue of the anticompetitive effects of licensing is not persuasive. Section 209(a)(4)'s prohibition of granting exclusive or partially exclusive licenses that will "tend to substantially lessen competition or create or maintain a violation of the Federal antitrust laws..." is a direct expression of Congressional intent to control the anticompetitive effects of exclusive licensing programs.  Who else but parties in competition with government licensees would have the incentive to ensure that this provision is enforced?  The connection between Plaintiffs' alleged injury -- that they are restricted from freely growing, selling, distributing, reproducing, propagating or otherwise freely using plant material and the fruit from the Patented Varieties without acquiring a license and paying royalties to the Commission -- and this protection against anticompetitive licensing programs is less clear.  Plaintiffs allege that some growers lawfully acquired the Patented Varieties before they were patented.  If an invention is known or used by the public before it was patented, the patent may be void, 35 U.S.C § 102(b), but Plaintiffs cannot challenge the patent in this lawsuit.  It is not clear whether and to what extent Plaintiffs can frame a cause of action under the Bayh-Dole

47

Act based on anticompetitive effect of the licensing program without challenging the underlying Patent.  Plaintiffs will be afforded an opportunity to amend their complaint, to state such a claim, although it seems doubtful an amendment can be made consistent with Rule 11.

Plaintiffs' also invoke 35 U.S.C. § 209(a)(1), which requires that any exclusive or partially exclusive license be a "reasonable and necessary incentive to-- (A) call forth the investment capital and expenditures needed to bring the invention to practical application; or (B) otherwise promote the invention's utilization by the public."  Again, it is not clear how Plaintiffs have been harmed in any way that implicates this provision.  Do Plaintiffs assert that the licensing program was a not "reasonable and necessary" incentive to call forth investment capital and/or otherwise promote the invention's utilization by the public because growers were already contributing to research and development programs without the existence of the licensing program?  It is not possible to fully evaluate Plaintiffs' claim under the zone of interest test because Plaintiffs' complaint does not include sufficient allegations.

Defendants' motion to dismiss the licensing-related claims for lack of standing is GRANTED WITH LEAVE TO AMEND.

3.    **Section 704's Final Agency Action Requirement.**

Alternatively, Defendants assert that Plaintiffs' APA claims fail to satisfy the "final agency action" requirement. The Supreme Court held that "agency action" is a prerequisite to bringing a claim under § 702:

> This provision contains two separate requirements. First, the person claing a right to sue must identify some "agency action" that affects him in the specified fashion; it is judicial review "thereof" to which he is entitled. The meaning of "agency action" for purposes of § 702 is set forth in 5 U.S.C. § 551(13), *see* 5 U.S.C. § 701(b)(2) ("For the purpose of this chapter ... 'agency action' ha[s] the meanin[g] given ... by section 551 of this title"), which defines the term as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13).

*Lujan*, 497 U.S. at 882.  "When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'"  *Id.* (*citing* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.")).

Plaintiffs cite a number of cases, including *Jaffe v. United States*, 592 F.2d 712 (3d Cir. 1979) and *Guerrero v. Stone*, 970 F.2d 626, 627-28 (9th Cir. 1992), for the proposition that APA § 702 waives sovereign immunity for <u>any</u>

49

equitable civil action invoking a district court's federal question jurisdiction.  But, Supreme Court precedent, such as *Lujan*, 497 U.S. at 882, and *Heckler v. Chaney*, 470 U.S. at 828, make it clear that § 702's waiver is conditioned upon overcoming § 701 and 704's requirements.[5]

     a.  **Agency Action.**

The APA offers a right of judicial review for equitable relief for "[a] person suffering legal wrong because of

_____

[5] The Ninth Circuit still recognizes the existence of an intra-circuit split concerning the relationship of § 704 to § 702's waiver of sovereign immunity.  For example, *The Presbyterian Church (U.S.A.) v. U.S.*, 870 F.2d 518, 525 (9th Cir. 1989), held that Congress did not limit § 702's sovereign immunity waiver to those acts listed in § 551(13), which defines agency action to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

However, shortly after *The Presbyterian Church* was decided, *Lujan*, 497 U.S. at 882, held that "agency action" is a requirement of § 702; *see also Rattlesnake Coalition v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007); *Gallo Cattle Co. v. U.S. Dept. of Agriculture*, 159 F.3d 1194 (9th Cir. 1998).  It is not at all clear how any aspect of *The Presbyterian Church's* "agency action" holding survives *Lujan* and related Ninth Circuit precedent.  *See Veterans for Common Sense v Peake*, 563 F. Supp. 2d 1049, 1058 (N.D. Cal. 2008) (noting that *Lujan* "made clear that waiver of sovereign immunity under § 702 is constrained by the provisions contained in § 704").

Nevertheless, the Ninth Circuit continues to recognize an "intra-circuit" split.  *Gros Ventre Tribe v. United States*, 469 F.3d 801, 808-809 (9th Cir. 2006), noted without resolving the conflict between *Gallo Cattle*, 159 F.3d at 1198, which specifically stated that "the APA's waiver of sovereign immunity contains several limitations," including § 704's "final agency action" requirement, and *The Presbyterian Church*, which held that § 702's waiver is not conditioned on the APA's "agency action" requirement.  *See also Siskiyou Regional Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 554 n.8 (2009) ("In light of our determination that [plaintiff] challenges final agency action, we need not address the 'intra-circuit split' that we have recognized exists on the question whether the 'final agency action' requirement of the APA is jurisdictional.).

*Siskiyou* suggests that one way to reconcile *The Presbyterian Church* and *Lujan* may be to recognize that there is an intra-circuit split as to whether or not the "agency action" requirement is <u>jurisdictional</u>, or merely <u>an element of</u> an APA claim.  In this case, this is a distinction without a difference.  After *Lujan* it cannot seriously be argued that an APA claim can survive unless "agency action," as that term is defined in 5 U.S.C. 551(13), is alleged.

agency action, or adversely affected or aggrieved by agency

action within the meaning of a relevant statute....″

5 U.S.C. § 702.  APA § 551(13) defines agency action to

"include[] the whole or a part of an agency _rule_, _order_,

_license_, _sanction_, _relief_, or the equivalent or denial

thereof, _or failure to act_."  5 U.S.C. § 551(13)(emphasis

added).  "All of those categories involve circumscribed,

discrete agency actions, as their definitions make clear: ʻan

agency statement of future effect designed to implement,

interpret, or prescribe law or policy' (rule); ʻa final

disposition in a matter other than rule making' (order); a

ʻpermit or other form of permission' (license); a

ʻprohibition or taking of other compulsory or restrict

action' (sanction); or a ʻgrant of money, assistance,

license, authority,' etc., or ʻrecognition of a claim, right,

immunity,' etc., or ʻtaking of other action on the

application or petition of, and beneficial to a person'

(relief).  _Norton v. S. Utah Wilderness Alliance_, 542 U.S.

55, 62 (2004)(citing 5 U.S.C. §§ 551(4), (6), (8), (10),

(11)).

　　USDA's decision to grant exclusive licenses to the

Commission is the only action about which plaintiffs complain

that even arguably falls with the definition of "agency

action." USDA's decisions to engage in or cooperate in a

patenting program with the Commission, to file and prosecute patent applications, and to procure, accept, and maintain issued patents do not qualify.

    b. **Final Agency Action.**

  By its terms, the APA permits review only of "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court...." 5 U.S.C. § 704.  Where, as here, no specific statutory judicial review provision exists, the APA only applies to "final agency action."  *Id.*; *Lujan,* 497 U.S. at 882.  An agency action is deemed "final" for purposes of APA when it meets the following two criteria:

     (1)  The action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature; and

     (2)  The action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

  The USDA's acts of pursuing patent protection for the Patented Varieties, as well as its efforts to cooperate with the Commission in a patenting program, do not constitute "final" agency action.  Until the USPTO grants a patent, the application for the patent and its prosecution no not determine any rights or obligations from which legal consequences will flow.  There appears to be no dispute that

52

the USDA's decision to engage in the licensing program was a "final agency action."

With the exception of the issuance of exclusive licenses to the Commission, all of Plaintiffs' APA allegations fail to state a claim under the APA because they are not "final agency actions."  Defendants' motion to dismiss the APA claims because an adequate alternative remedy exists is DENIED as to the exclusive license claims and GRANTED as to all other claims.

4.   Section 704's No Adequate Alternative Remedy Requirement.

Additionally, "[s]ection 704 of the Administrative Procedure Act bars review of agency action by the district court when there is an adequate remedy in another forum." *Marshall Leasing, Inc. v. United States*, 893 F.2d 1096, 1100 (9th Cir. 1990).

Defendants assert that Plaintiffs have an adequate alternative forum for review of the validity and enforceability of the government's patents in response to any infringement suit brought by the government or authorized to be brought by the Commission against the Plaintiffs.  *See Hallmark*, 959 F. Supp. at 543 (finding "the "Congressional framework [of the Patent Act] precludes the right of third parties to file a civil action in the case of the issuance of a Certificate of Correction; the third party's recourse for

the alleged errors made by the PTO is to raise the issue as a defense in an infringement suit."); *Hitachi*, 776 F. Supp. at 10 ("Instead of providing third-party protestors with the right to judicial review of examination proceedings, Congress authorized them to raise allegations of patent invalidity as a defense to an infringement action.").

In response, Plaintiffs again invoke *MedImmune,* which arguably recognizes that the remedy of a counterclaim to an infringement suit is not always adequate, holding that where a plaintiff is threatened with government action, Plaintiff is not required "to expose himself to liability before bringing suit to challenge the basis for the threat...." 549 U.S. at 128-29. Because *MedImmune* does not, of its own accord, permit anticipatory suit by Plaintiffs against the United States, Plaintiffs lack an adequate alternative remedy with respect to the patent related claims, but these have been dismissed on other grounds.

As to the license-related claims, Defendants point to no alternative remedy. Defendants' motion to dismiss the licensing-related claims because an adequate alternative remedy exists is DENIED.

5. <u>Exhaustion of Administrative Remedies.</u>

Defendants argue that the APA allegations should be dismissed because Plaintiffs' failed to raise them before the

agency during administrative proceedings.   Exhaustion may be
imposed either by statute or the courts:

> Of paramount importance to any exhaustion inquiry is
> congressional intent." *McCarthy v. Madigan*, 503
> U.S. 140, 144 (1992) (citing *Patsy v. Board of
> Regents of Florida*, 457 U.S. 496 (1982) (internal
> quotation marks omitted)), superceded by statute as
> stated in *Booth v. Churner*, 532 U.S. 731, 732
> (2001).[]   "Where Congress specifically mandates,
> exhaustion is required."   *Id.* (citing *Coit
> Independence Joint Venture v. FSLIC*, 489 U.S. 561,
> 579 (1989); Patsy, 457 U.S. at 502 n. 4).   "But
> where Congress has not clearly required exhaustion,
> sound judicial discretion governs." *McCarthy*, 503
> U.S. at 144 (citing *McGee v. United States*, 402 U.S.
> 479, 483 n. 6 (1971)). To discern the intent of
> Congress, "'[w]e look first to the plain language of
> the statute, construing the provisions of the entire
> law, including its object and policy.'" *United
> States v. $493,850.00 in U.S. Currency*, 518 F.3d
> 1159, 1167 (9th Cir. 2008) (quoting *Carson Harbor
> Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th
> Cir. 2001)).

*Cassirer v. Kingdom of Spain*, 580 F.3d 1048, 1059-60 (9th
Cir. 2009).

     Here, although the Bayh-Dole Act does not explicitly
impose an exhaustion requirement, it does provide for a
notice and comment period:

> Public notice.--No exclusive or partially exclusive
> license may be granted under section 207(a)(2)
> unless public notice of the intention to grant an
> exclusive or partially exclusive license on a
> federally owned invention has been provided in an
> appropriate manner at least 15 days before the
> license is granted, and the Federal agency has
> considered all comments received before the end of
> the comment period in response to that public
> notice. This subsection shall not apply to the
> licensing of inventions made under a cooperative
> research and development agreement entered into
> under section 12 of the Stevenson-Wydler Technology
> Innovation Act of 1980 (15 U.S.C. 3710a).

55

35 U.S.C. § 209(e).

The Eleventh Circuit has read an exhaustion requirement into this notice and comment period. *Southern Research Inst. v. Griffin Corp.*, 938 F.2d 1249, 1252-53 (11th Cir. 1991). In *Southern Research*, a company challenged the government's grant of an exclusive patent license to another entity. The Eleventh Circuit affirmed dismissal of the action, holding that by failing to raise objections during the prescribed comment period, the company had waived its right to challenge the licensing decision. *Id*. at 1252-53. The court explained that because "[t]he licensing scheme under 35 U.S.C. §§ 207 and 209 and the applicable regulations provided an avenue of administrative appeal of which [the plaintiff] failed to avail itself," judicial review of the licensing decision was precluded. *Id*. at 1253. Plaintiff offers no persuasive argument why the reasoning *of Southern Research* should not apply here to impose an exhaustion requirement on plaintiffs challenging licensing decisions under the Bayh-Dole Act.

Here, in accordance with 35 U.S.C. § 209(e), the USDA issued a notice in the Federal Register on April 29, 2003, explaining the agency's intent to grant an exclusive license to the Commission for the Sweet Scarlet variety. 68 Fed. Reg. 22671 (April 29, 2003).[6]  On December 23, 2004, the USDA

_____

[6]  Plaintiffs argue that the USDA improperly offers evidence

issued two notices in the Federal Register of its intent to grant exclusive licenses for the Scarlet Royal and Autumn King varieties to the Commission. 69 Fed. Reg. 76902 (Dec. 23, 2004). All three notices informed the public that the proposed licenses would be granted within ninety days unless the USDA received "written evidence and argument which establishes that the grant of the license would not be consistent" with the Bayh-Dole Act and applicable regulations. Plaintiffs failed to present any evidence or argument during the prescribed comment period.

The Ninth Circuit recognizes a number of exceptions to judicially imposed exhaustion requirements. For example, a court "may decide an issue not raised in an agency action if the agency lacked either the power or the jurisdiction to decide it." *Reid v. Engen*, 765 F.2d 1457, 1461 (9th Cir. 1985) (internal citations and quotations omitted). Another exception permits a court to "decide issues over which an agency has power and jurisdiction when exceptional circumstances warrant such review, notwithstanding the petitioner's failure to present them to the agency." *Id*. at 1461-62.

---

regarding its compliance with the notice and comment requirements. These notices, published in the Federal Register, are properly the subject of judicial notice. *See* 44 U.S.C. § 1507 (contents of the Federal Register shall be judicially noticed). Moreover, 44 U.S.C. § 1507 provides that, unless otherwise prohibited by statute, publication of notice in the Federal Register creates a rebuttable presumption that proper notice was issued.

Plaintiffs argue for the application of one or more of these exceptions, asserting that they could not have been aware of certain facts necessary to object to the USDA's Federal Register notices.  Specifically, Plaintiffs argue:

> At the time of the notice and comment periods, Plaintiffs could not have known that (1) the USDA obtained a patent on Sweet Scarlet through inequitable conduct; (2) the Patented Varieties had already been in public use and on sale more than a year prior to the filing of the patent applications; (3) the USDA and the Commission would seek to enforce, license, and collect royalties on invalid and unenforceable patents, and (4) the USDA would allow the Commission to limit distribution to a small number of nurseries, including nurseries with family ties to Commission board members. Indeed, nothing in the notices regarding the USDA's intent to exclusively license the Patented Varieties to the Commission provided the details regarding the planned royalty program.

Doc. 70 at 19-20.

The first three purportedly unknown facts all concern the validity of the patents.  Although these arguably implicate the exception for matters outside of the agency's power or jurisdiction, these patent-related arguments cannot be adjudicated here because of sovereign immunity.  The fourth purportedly unknown fact -- that the USDA would allow the Commission to limit distribution to a small number of nurseries, including nurseries with family ties to Commission board members -- is arguably relevant to a claim that the Commission failed to comply with 35 U.S.C. § 209(a), but it is not clear why this fact alone, in light of all other known

facts, would have caused Plaintiffs to comment on the

licensing proceeding.  Plaintiffs have not demonstrated that

exhaustion should be excused in this case.  Defendants'

motion to dismiss for failure to exhaust is GRANTED WITH

LEAVE TO AMEND.  Plaintiffs shall be afforded the opportunity

to amend on this issue and shall allege their excuse-from-

exhaustion theory in any amended complaint.

C.   **Patent Invalidity Claims (Second, Third, & Fourth Claims
     for Relief).**

       The Second, Third, and Fourth Claims For Relief against

all Defendants request declarations that the three patents

are unlawful and invalid under the Declaratory Judgment Act

and the APA.  These claims fail for the same reasons that the

APA claims fail.  The United States is an indispensable party

to these claims that cannot be joined.

D.   **Declaration of Unenforceability for Inequitable Conduct
     Regarding the '891 Patent (Fifth Claim For Relief).**

       The Fifth Claim for Relief against all Defendants

requests a declaration that the '891 patent is unenforceable

because Defendants failed to fully disclose to the USPTO that

the Sweet Scarlet variety was in the public domain prior to

the filing of the patent application.  Because this claim

concerns the enforceability of a patent held by the United

States, this claim must be DISMISSED WITH PREJUDICE because

the United States cannot be joined as a party.

**E.   Antitrust Claim (Sixth Claim For Relief).**

Plaintiffs allege that the Commission violated federal antitrust laws by "enforcing patent rights ... and collecting royalties ... while knowing that the patent on Sweet Scarlet could not be enforced due to prior public use and inequitable conduct."  FAC ¶155.  This claim would require plaintiffs to demonstrate the unenforceability of the Sweet Scarlet patent. Accordingly, the antitrust claim must be dismissed under Rule 19 as well.  Plaintiffs' argument that their antitrust claim "do[es] not request that the Court enter any judgment regarding the validity or enforceability of any government property," Doc. 71 at 9, is unpersuasive, as the claim explicitly depends on the allegation that the "patent on Sweet Scarlet could not be enforced due to prior public use and inequitable conduct."  FAC ¶155.

Moreover, to establish the type of monopoly Plaintiffs allege, a "*Walker Process*" violation, it is "necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved." *See Walker Process*, 382 U.S. at 177-78.  It has previously been recognized that it is "dubious" whether each of the Patented Varieties could constitute its own relevant market, Doc. 42 at 61, but plaintiffs were afforded leave to amend to attempt to adequately allege "that no other substitutes for

each Patented Variety exist," *id*. at 61-62.  The FAC contains no such allegations; instead it asserts the relevant markets can be defined by the attributes for each patented variety described in the relevant patent.  The FAC also alleges that each patented variety has "unique characteristics" and other varieties are not "reasonably interchangeable" with and do not provide "effective substitutes to" the Patented Varieties.  FAC ¶¶ 159-61.

The Commission argues that Plaintiffs' allegations are inadequate to satisfy evolving pleading standards.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).  Courts define markets based on "interchangeability of use or the cross-elasticity of demand*." Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001); *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).  The relevant inquiry is whether growers -- the consumers of grapevines -- regard other varieties (or other crops) as reasonable economic substitutes for the Patented Varieties.  *Newcal*, 513 F.3d at 1045; *Apple, Inc. v. Psystar Corp.,* 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008).

Plaintiffs allege no plausible basis to conclude that

growers regard the Patented Varieties as irreplaceable, nor do they allege that growers would not substitute other crops for the Patented Varieties. *See, e.g., United States v. E.I. DuPont de Nemours*, Inc., 351 U.S. 377, 394 (1956) (rejecting argument cellophane was in different market from other wrapping materials even though "each of these wrapping materials is distinguishable").

Plaintiffs have twice been granted leave to amend this claim. The Commission's motion to dismiss the antitrust claim is GRANTED WITH PREJUDICE.

F.   Exclusive License Claims (Seventh & Eighth Claims For Relief).

The Seventh Claim for Relief seeks a declaration that the Commission's exclusive license agreements for the Patented Varieties are void and unlawful under federal law on the ground that the patents are invalid and/or were obtained through inequitable conduct. This claim must be dismissed pursuant to Rule 19, as it challenges the validity of a patent held by the United States, which cannot be joined to the lawsuit.

The Eighth Claim for Relief against the Commission seeks a declaration that the exclusive license agreements for the Patented Varieties are void and unlawful under state law on the grounds that the patents are invalid and/or were obtained through inequitable conduct. The Commission argues that this

state law challenge to the license agreements between the Commission and the USDA is preempted by federal law.  It is unnecessary to engage in a preemption analysis because, state law cannot be used to challenge a contract entered into pursuant to federal law where the government is a party.  *See O'Neill v. United States*, 50 F.3d 677, 682 (9th Cir. 1995) ("Federal law governs the interpretation of contracts entered into pursuant to federal law where the government is a party.").

Defendants' motions to dismiss the Seventh and Eighth Claims for Relief are GRANTED WITHOUT LEAVE TO AMEND.

G.   Unfair Competition Claim.

The Commission initially sought dismissal of Plaintiffs' § 17200 claim in light of plaintiffs' inability to state a predicate antitrust claim.  Doc. 20 at 27-28.  The February 20, 2009 Decision rejected this argument, concluding that the unfair competition claim also encompassed the allegation that the Commission "collect[ed] patent royalties from growers who paid for the research and development of the Patented Varieties through assessment fees."  Doc. 42 at 69-71.

As a threshold matter, the portion of the Unfair Competition claim that relies upon the Commission's enforcement of an allegedly "fraudulently" procured patent must be dismissed under Rule 19.

The Commission also argues that Plaintiffs' alternative, "double payment" theory finds no support in the law, as there is no authority for the proposition that it is unlawful or unfair under § 17200 for an entity created under state law to require growers to both fund research into the development of new grapevine varieties, and then force those same growers to pay again for their use.  But, California's Unfair Competition law is meant to permit judicial review of a "broad" and "sweeping" range of business activities.  *McKell v. Wash. Mut. Inc.,* 142 Cal. App. 4th 1457, 1471 (2006); *Cal-Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co*, 20 Cal. 4th 163, 180 (1999).  The "unlawful" criteria encompasses the violation of "any law, civil or criminal, statutory or judicially made, federal, state or local."  *McKell*, 142 Cal. App. 4th at 1474.  The "unfair" prong is satisfied "even if not specifically proscribed by some other law" so long as it "offends an established public policy or ... is immoral, unethical, oppressive, unscrupulus or substantially injurious to consumers."  *Korea Supply Co v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003); *Heighly v. J.C. Penny Life Ins. Co.*, 257 F. Supp. 2d 1241, 1259 (C.D. Cal. 2003).  Plaintiffs' allegations concerning the "double payment" requirement arguably meet the definition of "unfair," at least for pleading purposes.

64

The Commission suggests, in the alternative, that the Unfair Competition claim is preempted by federal law, as it would take away the Commission's and USDA's federal right to assert patents against any California table grape grower. Doc. 67 at 25.  But, the Commission does not develop this argument or address any of the requirements for federal preemption.

The Commission's motion to dismiss the Unfair Competition claim is DENIED WITHOUT PREJUDICE.

H.   Unjust Enrichment & Constructive Trust Claims.

Plaintiffs' unjust enrichment and constructive trust claims are "dependent upon Plaintiffs' substantive ... antitrust claims and unfair competition claims."  Doc 42 at 71; *see also McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004); *PCO Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 398 (2007).  If either survives, so do the unjust enrichment and constructive trust claims.

I.   Reconsideration of Determination that United States is an Indispensable Party Under Rule 19.

Plaintiffs also seek reconsideration of the determination that the United States is an indispensable party under Rule 19(b).  Plaintiffs cite a recent unpublished decision from the Northern District of Illinois, *SourceOne*

*Global Partners, LLC v. KGK Synergize, Inc.*, 2009 WL 1346250
(N.D. Ill. May 13, 2009).[7]  *SourceOne* considered whether
plaintiffs could challenge the validity of a government-owned
patent in a declaratory relief suit against the patent's co-
owner and exclusive licensee without joining the United
States.  The court concluded that it had subject matter
jurisdiction over plaintiffs' declaratory relief claim under
*MedImmune*, because the named defendant sent plaintiff a cease
and desist letter claiming that plaintiff's product infringed
on the patent held jointly by the named defendant and the
United States.  *Id.* at *3-4.  The parties agreed that the
government had not waived its sovereign immunity and
therefore that joinder was not feasible.  *Id.* at *4.  The
district court then turned to the question of whether
dismissal was required under Rule 19(b).

    Examining the first Rule 19(b) factor, "the extent to
which a judgment rendered in the party's absence might
prejudice that person or the existing parties," *SourceOne*
considered "whether the interests of the absent party are
'adequately protected by those who are present.'"  *Id.* at *6.
*SourceOne* relied heavily on *Dainippon Screen Mfg. Co. v.
CFMT, Inc.*, 142 F.3d 1266, 1272 (Fed. Cir. 1998):

>        In *Dainippon*, plaintiff sued CFMT and CFM for a
>     declaratory judgment of noninfringement and

---

[7] A district court decision from another circuit has no binding effect on
another district court.

1

2

3

4

5

              invalidity of a patent that CFMT owned and licensed on an exclusive basis to its parent, CFM. That license reserved to CFMT the exclusive right to further sublicense the patent, and to take legal action in the event of infringement. The trial court dismissed CFMT for lack of personal jurisdiction, and then dismissed the claim against CFM on the ground that under Rule 19 the case could not proceed in the absence of CFMT.

6

7

8

9

10

11

12

13

              On appeal, the Federal Circuit reversed. The appeals court held that the trial court erred in concluding that it lacked jurisdiction over CFMT, and further held that even if CFMT could not be sued, the trial court abused its discretion in concluding that CFMT was an indispensable party. <u>The Federal Circuit found that CFMT's owners[h]ip interest would be adequately protected by CFM, "a party that owns CFMT in its entirety ... and that has manifested its obvious concern over the maintenance of CFMT's patents."</u> *Dainippon*, 142 F.3d at 1272. <u>The court reasoned that even in its absence, CFMT's interests would be protected because CFMT and CFM "share the common goal of assuring that the [ ] patent not be held invalid or be infringed by Dainippon ...."</u> *Id*.

14

2009 WL 1346250 at *6 (footnote omitted)(emphasis added).

15

16

17

18

19

The *SourceOne* court then reasoned, "[a]s in *Dainippon*, the Rule 19(b)(1) factor weighs strongly in favor of allowing the claims on the '125 Patent to proceed in the absence of the Government":

20

21

22

23

24

25

26

27

28

              The Government argues that it will suffer prejudice if its rights under the '125 Patent are adjudicated in its absence because if the patent is declared invalid, the Government will have "lost substantive rights without an opportunity to defend its rights to t h e claimed inventions of the patent" (Gov't Stmt. at 4-5). However, we have been offered no evidence that KGK and the Government have any conflicting interests with respect to the '125 Patent, and no reason to believe that KGK is unable to vigorously assert and protect its mutual interest with the Government in asserting the validity of the '125 Patent and challenging any alleged infringement of it. To the contrary, KGK has demonstrated its willingness to champion the validity of the '125 Patent and to attack any alleged infringement of it, as shown by the cease and desist letters it sent to

1
2
3
4

> SourceOne and its customers and associates. The
> Government has not asserted any dissatisfaction with
> SourceOne's actions in doing so. KGK's defense of
> its commercial interests based in the '125 Patent
> will adequately protect the Government's interests
> as well.

5
6
7
8
9
10

> We also consider this factor to be of special
> importance in this case, due to the fact that the
> absent party is the Government. In Pimental, the
> Supreme Court stated that under Rule 19, "dismissal
> of the action must be ordered where there is a
> potential for injury to the interests of the absent
> sovereign." 128 S.Ct. at 2191. Conversely, the
> absence of prejudice to the Government in this case,
> due to the ability of KGK to protect the
> Government's interests, weighs strongly in favor of
> allowing the case to proceed.

11

*Id.* (footnote omitted).

12
13
14
15

  The principal case relied upon in *SourceOne*, *Dainippon Screen Manufacturing Co. v. CMFT, Inc.*, 142 F.3d 1266 (Fed. Cir. 1998), was extensively discussed and distinguished by the February 20, 2009 Decision.

16
17
18
19
20
21
22
23
24
25
26

> Plaintiffs cite *Dainippon Screen Mfg. Co., Ltd. v.
> CFMT*, 142 F.3d 1266 (Fed. Cir. 1998), to support
> their argument that in an action challenging the
> validity of a patent, the action can proceed without
> the patent owner. <u>Here, however, unlike in
> *Dainippon*, there is no unity of ownership or
> interest between the patent owner and licensee.</u> The
> facts of *Dainippon* are instructive. The patent owner
> in the suit was not an indispensable party because
> the suit was brought by a competitor against the
> parent company, who held an exclusive license from
> its wholly-owned subsidiary. Dainippon found no
> indispensability in part because the patent holder
> was the parent company's holding company for patents
> and held an identity of interest and ownership with
> the subsidiary. Id. at 1273. As to the first 19(b)
> factor, there was an adequacy of protection of the
> subsidiary's interests, the patent owner, by the
> parent company, the licensee. Further, the patent
> owner could intervene at any time. Id. at 1272.

27
28

Doc. 42 at 43-44.  As in *Dainippon*, where there was unity of ownership between the patent owner and licensee, the named

defendant in *SourceOne* was a <u>co-owner</u> of the patent with the United States.  Here, in contrast, there is no such unity of ownership, and no guarantee that the Commission would fully protect the government's interests.  There is no way to assure that the government and the Commission's interests and objectives coincide in implementing and continuing the licensing program and related uses of the patents.

On the second factor, *SourceOne* reasoned:

> Turning to the second consideration set forth in Rule 19(b), the Court does not see how it would be able to lessen any alleged prejudice to the Government through protective provisions in the judgment, shaping relief, or other measures. However, that factor carries little weight in this case for two reasons. First, as we have explained, the potential prejudice to the Government is already adequately addressed by the ability of KGK to fully advocate and protect the Government's interests. Second, the Federal Circuit has held that "the court's ability to shape relief to avoid prejudice[ ] is of little relevance in the context of a patent declaratory judgment suit because the relief sought in such a suit does not depend on the patentee's presence in court." Dainippon, 142 F.3d at 1272-73.

2009 WL 1346250 at *7.  This reasoning depends on the ability of the present defendant to represent the absent defendants' interests.  In the absence of unity of ownership, there is no guarantee that the potential prejudice to the government would be adequately addressed by the Commission's ability to advocate and protect the government's interests.

*SourceOne* determined that the third factor favored maintaining the suit:

1
2
3
4
5
6
7

> The third factor set forth in Rule 19(b), whether a judgment rendered in the absence of the missing party would be adequate, "refers to the public stake in settling disputes by wholes, whenever possible." Pimentel, 128 S.Ct. at 2193 (internal quotations and citations omitted)....[T]he Federal Circuit noted, the third factor may favor maintenance of a declaratory judgment suit because it does not require an affirmative act by the absent party. *Dainippon*, 142 F.3d at 1273. A declaration of invalidity or noninfringement would resolve the case as a whole as to SourceOne and the '125 Patent. Id.

8
9
10
11
12

2009 WL 1346250 at *7 (emphasis added).  Plaintiffs do not

explain why this reasoning, which relies on *Dainippon*, a case

already considered by the February 20, 2009 Decision,

justifies reconsideration:

13
14
15
16
17
18
19

> The third factor, adequacy of remedy, also favors dismissal.  "'[A]dequacy' refers not to satisfaction of [Plaintiffs'] claims, but to the 'public stake in settling disputes by wholes, whenever possible.'" *Republic of Philippines*, 128 S.Ct. at 2183, *citing Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968).  As in *Republic of Phillippines*, "[g]oing forward with the action in the absence of" the United States, "would not further this public interest because they could not be bound by a judgment to which they were not parties."  Id.  The Court held the University had not waived its Eleventh Amendment immunity.

20

Doc. 42 at 45.

21
22

    *SourceOne* differs from the February 20,2009 Decision's

evaluation of the alternative forum factor:

23
24
25
26
27
28

> ... Rule 19(b)(4) ... requires us to consider whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder. This factor favors dismissal if there exists another forum in which all parties could be joined in the suit. *Dainippon,* 142 F.3d at 1273. Here, KGK's only suggestion for an alternative forum is the Court of Federal Claims (KGK Mem. at 3). However, 28 U.S.C. § 1498(a) permits private parties to bring patent

70

infringement suits against the United States in the Court of Federal Claims for certain money damages only, and thus it would not provide an adequate forum for SourceOne's declaratory judgment claims.

Thus, KGK and the Government are unable to point to any adequate remedy that SourceOne would have, if Counts V and VI are dismissed, to receive judicial guidance on whether the '125 Patent blocks its efforts to market and sell Cholesstrinol. That factor weighs heavily in favor of allowing Counts V and VI to proceed.

KGK and the Government are therefore reduced to arguing, at bottom, that those are the breaks for SourceOne: that this absence of any other remedy for SourceOne is simply "the inevitable effect" of the United States' ability to assert sovereign immunity (KGK Mem. at 6; Gov't Stmt. at 8). Apparently, KGK and the Government see no unfairness in requiring SourceOne to wait until they together decide to sue SourceOne for infringement before SourceOne can raise its invalidity and noninfringement defenses (KGK Mem. at 6), while KGK is left free to continue threatening SourceOne or its business associates and customers with suit for infringement of the '125 Patent.

We do not share KGK's and the Government's comfort with that approach. We view the Rule 19(b) factors through the prism of "equity and good conscience." In so doing, we cannot dismiss as lightly as do KGK and the Government the prejudice that SourceOne would suffer if its declaratory judgment claims against KGK were dismissed. The approach urged by KGK (and the Government) would allow KGK to threaten legal action against SourceOne (or others) with impunity. For those who gave into those threats, KGK would receive the benefit of the patent (a cessation of the alleged infringing conduct and perhaps compensation) without the need to do anything more. For those who might rear up and seek a judicial resolution, KGK could retreat behind the Government's cloak of immunity and prevent the infringement or validity of the '125 Patent from ever being tested in court. That result not only would create prejudice to SourceOne in this case, but also would disserve the broader public. We fail

71

1

2

      to see how the public interest is advanced by
      allowing a private patentee such as KGK that kind of
      unreviewable sway in exercising its patent rights.

3

WL 1346250 at *7-8.

4

5

   In contrast, the February 20, 2009 Decision relied on

6

Ninth Circuit and Supreme Court authority suggesting that

7

immunity alone may be viewed as a compelling factor in the

8

Rule 19 balance:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

      The fourth factor is whether there is an available
      alternative forum.  First is the Court of Federal
      Claims, expressly authorized by statute.  Plaintiffs
      have an opportunity to raise the defense of patent
      invalidity and unenforceability in an action brought
      against them for patent infringement brought by the
      United States or the Commission.  *See* 35 U.S.C.
      § 282. [Footnote] However, to require Plaintiffs to
      violate the license and wait to see whether the
      patent owner sues for infringement creates an
      unfavorable situation as damages could be
      exacerbated.  Where "no alternative forum exists,
      the district court should be 'extra cautious' before
      dismissing an action." *Kescoli v. Babbitt*, 101 F.3d
      1304, 1311 (9th Cir. 1996).  But just as the courts
      have held in actions involving tribal immunity and
      state immunity, sovereign immunity of the Untied
      States can justify dismissal for inability to join
      an indispensable party, despite the fact that no
      alternative forum is available.  "If the necessary
      party is immune from suit, there may be very little
      need for balancing Rule 19(b) factors because
      immunity itself may be viewed as the compelling
      factor." *Id.* at 1311 (internal citations and
      quotations omitted).  The latest Supreme Court case,
      *Republic of Philippines v. Pimentel*, 128 S.Ct. 2180
      (2008), to address Rule 19, held as to immunity
      barring an action from proceeding without the
      sovereign party:

24

25

26

27

28

          The analysis of the joinder issue in those
          cases was somewhat perfunctory, but the
          holdings were clear: A case may not proceed
          when a required-entity sovereign is not
          amenable to suit.  These cases instruct us that
          where sovereign immunity is asserted, and the
          claims of the sovereign are not frivolous,
          dismissal of the action must be ordered where

72

there is a potential for injury to the
interests of the absent sovereign.128 S.Ct. at
2190-91.  In this context, dismissal is
appropriate even if Plaintiffs have no
alternative forum for their claim.  *See
Dawavendewa*, 276 F.3d at 1162.

Because the proceedings in this case threaten both
the property and sovereign immunity of the United
States, the United States' failure to waive its
immunity from suit strongly supports dismissing this
litigation in its absence.

Doc. 42 at 42-47.

*SourceOne* distinguished *Pimentel*:

We disagree with KGK and the Government that
*Pimentel* requires a different result. In that case,
Merrill Lynch filed an interpleader action to
determine the ownership of some $35 million in funds
stemming from property allegedly stolen by Ferdinand
Marcos when he was President of the Republic of the
Philippines. Among the parties named in the
interpleader action were the Republic of the
Philippines and the Philippine Presidential
Commission on Good Governance. Both the Republic of
the Philippines and the Commission were dismissed
from the case based on their assertion of foreign
sovereign immunity. The trial court held, and the
appeals court agreed, that the case could proceed in
their absence. The trial court ultimately awarded
the funds to the Pimental class, and the appeals
court affirmed. Employing a Rule 19(b) analysis, the
Supreme Court reversed. 128 S.Ct. at 2191-94.
However, there are important factors that
distinguish this case from the situation that the
Supreme Court addressed in *Pimental.*

*First,* the Supreme Court found that the Republic of
the Philippines and the Commission would suffer real
prejudice from the adjudication in their absence.
128 S.Ct. at 2191-92. However, in that case, no
other party was aligned with the interests of the
Republic of the Philippines and the Commission, and
thus no other party had the ability or incentive to
protect their interests. Indeed, the interests of
the foreign sovereigns and the other claimants were
antagonistic: they all asserted competing claims to
the funds. By contrast, in this case, KGK has a

73

common interest with the Government in protecting
the '125 Patent and has the ability and incentive to
fully protect their mutual interest.

*Second,* in *Pimental,* the Supreme Court explained
that the fourth factor of Rule 19(b), whether the
plaintiff would have an adequate remedy if the case
were dismissed, weighed in favor of dismissal, In
reaching that conclusion, the Supreme Court held
that the plaintiff to consider under that factor was
Merrill Lynch, the stakeholder which had initiated
the action, and not the claimants to the funds. 128
S.Ct. at 2193. The Supreme Court stated that
dismissal would not cause prejudice to Merrill
Lynch, but in fact would serve some of the goals of
interpleader and would "protect Merrill Lynch in
some respects." *Id.* By contrast, the prejudice in
this case to SourceOne if Counts V and VI are
dismissed is real, and is significant.

*Third,* the Supreme Court found significant the
interests of the foreign sovereigns in "comity and
dignity," which in that case took the form of
"allowing a foreign state to use its own courts for
a dispute if it has a right to do so. The dignity of
a foreign state is not enhanced if other nations
bypass its courts without right or good cause." 128
S. Ct. at 2190. Those considerations are not present
in this case.

2009 WL 1346250 at *8-9 (emphasis added). *SourceOne* is not

persuasive here, because there is no unity of ownership

between the Commission and the United States, and, although

the two parties possess overlapping interests, the United

States' interests will not be sufficiently protected by the

Commission, which has parochial interests in its oversight of

the California table grape industry implicating a myriad of

interests not of concern to the United States.

74

*SourceOne* does not warrant reconsideration of the February 20, 2009 ruling on the indispensability of the United States.

**J.   Rule 19 Indispensability Must Be Evaluated on a Claim-by-Claim Basis.**

Plaintiffs' rely on *E.E.O.C. v. Peabody Western Coal Co.,* 400 F.3d 774, 781-82 (9th Cir. 2005), to argue a district court may declare patents held by the United States to be invalid without implicating sovereign immunity "so long as Plaintiffs have properly joined the United States to this case in any manner." Doc. 70 at 6. *Peabody* does not support Plaintiffs' assertion.  There, the Ninth Circuit held the Navajo Nation was a necessary party, properly joined because its tribal sovereign immunity did not apply in an suit brought by the EEOC.  400 F.3d at 780-81.  Even if the government had no direct cause of action against the Navajo Nation and was seeking no relief from the Navajo Nation, the Nation may still be joined under Rule 19 because the effectiveness of the relief would be impaired in its absence. *Id.* at 783-84.  Here, by contrast, the government has not waived its sovereign immunity as to the patent claims, and plaintiffs seek relief that would directly impair government property interests.

Questions of joinder under Rule 19 must be decided on a claim by claim basis.  *See Bassett v. Mashantucket Pequot*

*Tribe*, 204 F.3d 343, 358-59 (2d Cir. 2000)(evaluating Rule 19 indispensability on a claim-by-claim basis); *Makah Indian Tribe v. Verity*, 910 F.2d 555 (9th Cir. 1990)(finding absent party necessary to some claims but not others).  The motion to reconsider the joinder decision on this ground is DENIED.

### V. CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss:

(1) the patent-related APA claims is GRANTED WITHOUT LEAVE TO AMEND on sovereign immunity grounds;

(2) the license-related APA claims is GRANTED WITH LEAVE TO AMEND;

(3) the Third, Fourth, and Fifth Claims For Relief (patent invalidity) is GRANTED WITHOUT LEAVE TO AMEND, because the United States is an indispensable party to these claims and cannot be joined due to its sovereign immunity;

(4) the Fifth Claim for Relief (unenforceability and inequitable conduct) is GRANTED WITHOUT LEAVE TO AMEND, because the United States is an indispensable party to these claims and cannot be joined due to sovereign immunity;

(5) the Sixth Claim for Relief under the Antitrust laws against the Commission, is GRANTED WITHOUT LEAVE TO

AMEND for failure to state a claim;

(6) the Seventh Claim for Relief (exclusive license agreements void under federal law) is GRANTED WITHOUT LEAVE TO AMEND because the United States is an indispensable party to these claims and cannot be joined due to sovereign immunity;

(7) the Eighth Claim for Relief (exclusive license agreements void under state law) is GRANTED WITHOUT LEAVE TO AMEND because the licenses between the Commission and the United States are not subject to state law regulation;

(8) the Unfair Competition Claim is DENIED; and

(9) the Unjust Enrichment and Constructive Trust claims is DENIED.

In addition, Plaintiffs, motion for reconsideration of the district court's prior determination that the United States is an indispensable party under Rule 19 with respect to the patent-related claims is DENIED.

Plaintiffs shall have twenty (20) days from electronic service of this order to amend their complaint in conformity with this memorandum decision and Rule 11.


SO ORDERED
Dated:  October 27, 2009

                              /s/ Oliver W. Wanger
                              Oliver W. Wanger
                              United States District Judge