1  LAW OFFICES OF BRIAN C. LEIGHTON
   BRIAN C. LEIGHTON (SBN 090907)
2  701 Pollasky Avenue
   Clovis, CA  93612
3  Phone: (559) 297-6190
   Fax (559) 297-6194
4  bleighton@arrival.net

5  HENNIGAN, BENNETT & DORMAN LLP
   LAWRENCE M. HADLEY (SBN 157728)
6  OMER SALIK (SBN 223056)
   865 South Figueroa Street, Suite 2900
7  Los Angeles, California 90017
   Phone: (213) 694-1200
8  Fax: (213) 694-1234
   hadleyl@hbdlawyers.com;
9  saliko@hbdlawyers.com

10 THE LAW OFFICES OF RALPH B. WEGIS
   RALPH B. WEGIS (SBN 67966)
11 1930 Truxtun Avenue
   Bakersfield, CA  93301
12 Telephone:  (661) 635-2100
   Facsimile:  (661) 635-2107

13 Attorneys for Plaintiffs,
   DELANO FARMS COMPANY; FOUR STAR FRUIT, INC.;
14 GERAWAN FARMING, INC.

15

16

17              UNITED STATES DISTRICT COURT

18            EASTERN DISTRICT OF CALIFORNIA

19 DELANO FARMS COMPANY; FOUR STAR   )   CASE NO. 1:07-CV-1610 OWW (SMS)
   FRUIT, INC.; GERAWAN FARMING, INC.  )
20                                     )
              Plaintiffs,              )
21                                     )   **SECOND AMENDED COMPLAINT**
   vs.                                 )
22                                     )   **DEMAND FOR JURY TRIAL**
   THE CALIFORNIA TABLE GRAPE         )
23 COMMISSION; UNITED STATES OF        )
   AMERICA; UNITED STATES              )
24 DEPARTMENT OF AGRICULTURE; TOM      )
   VILSACK, SECRETARY OF THE UNITED    )
25 STATES DEPARTMENT OF AGRICULTURE    )
   (IN HIS OFFICIAL CAPACITY)          )
26                                     )
              Defendants.              )
27

28

767173.3

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

For their second amended complaint against Defendant The California Table Grape Commission ("the Commission") and Defendants the United States of America ("U.S."), the United States Department of Agriculture ("USDA") and Tom Vilsack, Secretary of the United States Department of Agriculture (in his official capacity) ("Secretary Vilsack"), Plaintiffs Delano Farms Company; Four Star Fruit, Inc.; and Gerawan Farming, Inc. (collectively "Plaintiffs") allege as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiffs bring this Second Amended Complaint ("SAC") challenging the USDA action in granting exclusive licenses to the Commission on certain grapevine varieties that the government has patented.  Plaintiffs contend that the terms of the exclusive licenses are unfair, anticompetitive, and violate the law under which the government can license its patents because, among other things, the government has allowed the Commission to charge significant royalties for use of the grapevines, limited distribution of the grapevines to three hand-picked nurseries (at least one with family ties to Commission board members), and prohibited the replacement of the grapevines from existing plants.  These restrictions discriminate against who may distribute the grapevines at issue and what growers can afford to produce and sell table grapes from the patented vines.  Moreover, the licensing provisions are completely unnecessary for funding to bring the patented grapevines (and fruit produced from the grapevines) to market or otherwise promote the use of the patented grapevines (and fruit produced) by the public.  To the contrary, the same farmers who must now pay significant royalties and fees to plant and reproduce the patented varieties already pay for a substantial portion of developing the patented grapevine varieties through a tax charged by the Commission on each box of table grapes sold.  For this reason, prior to licensing the grapevine patents to the Commission, and allowing the Commission to impose royalty and distribution restrictions, the USDA distributed newly-developed grapevine varieties to growers free of charge, allowing unlimited distribution and reproduction.

2.      Plaintiffs SAC further alleges that the Commission, who masterminded the patent licensing scheme for the benefit of certain farmers and nurseries, has engaged in unfair competition under California Unfair Competition Act, and seeks relief for unjust enrichment though imposition

767173.3

1  of a constructive trust.

2      3.      Plaintiffs' prior complaints further alleged that the government's table grape patents

3  are invalid, and that at least one patent was unenforceable due to inequitable conduct.  As to the

4  latter patent, Plaintiffs alleged that the government's enforcement of that patent through the

5  Commission resulted in an antitrust violation.  Plaintiffs also alleged that the license agreements

6  between the USDA and the Commission were invalid because the patents were invalid and/or

7  unenforceable.  Based on these claims, Plaintiffs sought declarations of invalidity and

8  unenforceability, declarations that the licenses were void and unenforceable, and antitrust damages

9  and an injunction against the Commission.  The Court ruled, however, that Plaintiffs could assert

10  none of the claims for declaratory relief because the government was a necessary and indispensable

11  party to such claims, but that no claims could be stated against the government due to sovereign

12  immunity.  Additionally, the Court found that Plaintiffs could not state a relevant market as defined

13  by the patent or the claimed grapevine variety for antitrust purposes.  Accordingly, Plaintiffs' SAC

14  eliminates those causes of action.  Plaintiffs reserve the right to pursue those claims on appeal.

## JURISDICTION AND VENUE

16      4.      This is a civil action arising under the Administrative Procedure Act, 5 U.S.C. §§

17  701, *et seq.* as well as provision of the Bayh-Dole Act, 35 U.S.C. § 200, *et seq.*  This Court has

18  federal jurisdiction of such federal question claims pursuant to 28 U.S.C. §§ 1331, 1337 and

19  1338(a).

20      5.      This Court has supplemental jurisdiction over the claims in this Complaint against

21  the Commission that arise under statutory and common law of the State of California pursuant to 28

22  U.S.C §1367(a), because the state law claims are so related to the federal claims that they form part

23  of the same case or controversy and derive from a common nucleus of operative facts.

24      6.      The acts and transactions complained of herein were conceived, carried out, made

25  effective, and had effect within the State of California and within this district, among other places.

26  Venue is proper under 28 U.S.C. §§1391(b) and 1391(c) in that Plaintiffs reside in this District,

27  Defendant the California Table Grape Commission resides in this District and has a regular and

28  established place of business in this District and in that a substantial part of the events or omissions

767173.3

giving rise to the claims and the threatened and actual harm to Plaintiffs occurred in this District by reason of Defendants' conduct as alleged below.

## THE PARTIES

7.      Plaintiff Delano Farms Company is a corporation duly organized and existing under the laws of the State of Washington, with its principle place of business at 815 Eighth Street, P.O. Box 240, Hoquiam, Washington 98550.

8.      Plaintiff Four Star Fruit, Inc. is a corporation duly organized and existing under the laws of the State of California, with its principle place of business at 13830 Avenue 24, Delano, California  93215.

9.      Plaintiff Gerawan Farming, Inc. is a corporation duly organized and existing under the laws of the State of California, with its principle place of business at 15749 East Ventura, Sanger, California  93657.

10.      Plaintiffs are engaged in the business, *inter alia*, of growing, harvesting and selling table grapes.

11.      Defendant The California Table Grape Commission is a corporation of the State of California, established by the 1967 Ketchum Act.  Cal. Food & Agric. Code §§65550 – 65551. Defendant's principle place of business is at 392 W. Fallbrook, Suite 101, Fresno, California 93711.

12.      The stated purpose of the Commission is to expand and maintain the market for California table grapes for the benefit of the State of California as well as the State's over five hundred California table grape growers.  The Commission is funded primarily by assessments levied on each shipment of California table grapes and paid by the State's table grape shippers.  No general revenues of the State fund the Commission.

13.      Defendant the United States of America is a sovereign nation organized and existing under the Constitution of the United States.  Pursuant to Fed. R. Civ. P. 4(i), the United States may be served through the United States Attorney for the Eastern District of California – Lawrence Brown, United States Attorney's Office, 501 I Street, Suite 10-100, Sacramento, CA 95814. Additionally, under Rule 4(i), a copy of the summons and complaint must be sent by registered or certified mail to the Attorney General of the United States, Office of the Attorney General, U.S.

Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

14.     Defendant the United States of America and its representative, the United States Department of Agriculture, reside and conduct business within the territorial jurisdiction of this Court.

15.     Defendant United States Department of Agriculture is a United States federal executive department, established by 7 U.S.C. § 2201.  Defendant USDA's headquarters are located at 1301 Independence Avenue, S.W., Washington, D.C. 20004.

16.     The stated purpose of the USDA is to provide leadership on food, agriculture, natural resources, and related issues based on sound public policy, the best available science, and efficient management.

17.     Defendant Tom Vilsack, Secretary of the United States Department of Agriculture, has overall responsibility for the United States Department of Agriculture.  He is named in his official capacity and may be served at the Department of Agriculture at 1301 Independence Avenue, S.W., Washington, D.C. 20004.

## FACTS

### Overview

18.     For years, California table grape growers and shippers have funded a research program under the USDA to develop new table grape varieties.  Growers and shippers fund the USDA research program through the Commission by an assessment on each box of table grapes shipped in California.  Prior to 2002, the USDA provided the new varieties under development to area growers for evaluation of growing potential and commercial marketability.  Once new varieties appeared commercially viable, the USDA "released" the variety, and distributed plant material of the variety to area growers free-of-charge.  The USDA did not charge California growers for the new varieties since California growers and shippers already paid for a large portion of the development.

19.     In the late 1990s, the Commission developed a secret scheme by which it and a few select nurseries could profit from the new varieties that the USDA distributed for free.  At the urging of the Commission during a series of privately-held meetings, the USDA agreed to begin patenting

SECOND AMENDED COMPLAINT

new table grape varieties.  Although California shippers already funded much of the development, the USDA secretly agreed to give the Commission an exclusive license to all new patented varieties, and to allow the Commission to charge royalties when growers wished to obtain the new varieties.  The USDA also agreed to give the Commission exclusive enforcement powers over its new patent rights.

20.     Under the Commission's "patent and licensing" scheme, the Commission hand-selected three nurseries, without public notice, to exclusively sell all new patented table grape varieties.  Unlike the prior free distribution, the hand-selected nurseries would be allowed to sell new varieties to growers at a charge.  Additionally, the nurseries would be required to pay a royalty to the Commission for each plant sold, which the nursery could pass onto the growers.  One of the hand-selected nurseries now able to profit from newly developed varieties previously distributed without charge is owned by the son of a long-standing Commission member.

21.     When a grower seeks to obtain a new variety from a nursery, it is required to enter a "Domestic Grower License Agreement" with the Commission.  Under the terms of the Agreement, the grower cannot propagate the variety beyond the plant purchased.  Accordingly, to replace any grapevine, a grower must purchase another plant from one of the three nurseries and pay a patent royalty.  If the Commission believes the grower has violated the License Agreement in any way, it can void the Agreement and order that all purchased plants be destroyed.

22.     The first three varieties that the Commission identified to the USDA for patenting had been under development for years.  Indeed, at least one of the varieties had been distributed to growers for wide-scale commercial evaluation and sale.

23.     Recognizing that at least one of the new varieties identified for patenting (and perhaps all three) had been in the public domain for years, the Commission created a so-called "amnesty program" to extort funds from growers already in possession of the varieties.  Under the amnesty program, the Commission widely disseminated notices to growers and shippers stating that they were in violation of the law if they possessed the varieties intended for patenting, even though no patents had yet been granted.  The notices also offered confidential "settlements" to any growers who, within a narrow window, agreed to license the varieties, pay a "penalty" to the Commission,

1    and accept the Commission's license restrictions on further propagation.  Growers and shippers who

2    refused the "amnesty" were threatened with lawsuits, including money damages and injunctions.

3    On information and belief, the U.S, through the USDA, knew of and authorized the amnesty

4    program.

5          24.     At least 17 growers confirmed possession of the varieties and agreed to pay the

6    penalties demanded by the Commission.

7          *The Patented Varieties*

8                *Sweet Scarlet*

9          25.     On February 20, 2003, the USDA filed patent application No. 371,512 (the "'512

10   Application") on a grapevine denominated "Sweet Scarlet."  The application listed David W.

11   Ramming and Ronald E. Tarallo as co-inventors.  On July 26, 2005, the '512 Application issued as

12   U.S. Patent No. PP15,891, entitled "Grapevine Denominated Sweet Scarlet" (the "'891 patent").

13         26.     The United States of America, as represented by the Secretary of Agriculture, is the

14   owner by assignment of the '891 patent.

15         27.     On information and belief, the Commission is the exclusive licensee of the '891

16   patent pursuant to a license agreement entered into between the United States Government, as

17   represented by the United States Department of Agriculture, Agricultural Research Services, and the

18   Commission.  The exclusive license includes the right to license the '891 patent and to enforce the

19   '891 patent against alleged infringers.

20               *Autumn King*

21         28.     On September 28, 2004, the USDA filed patent application No. 953,387 (the "'387

22   Application") on a grapevine denominated "Autumn King."  The application listed David W.

23   Ramming and Ronald E. Tarallo as co-inventors.  On February 21, 2006, the '387 Application

24   issued as U.S. Patent No. PP16,284, entitled "Grapevine Denominated Autumn King" (the "Autumn

25   King or '284 patent").

26         29.     The United States of America, as represented by the Secretary of Agriculture, is the

27   owner by assignment of the '284 patent.

28         30.     On information and belief, the Commission is the exclusive licensee of the '284

SECOND AMENDED COMPLAINT

patent pursuant to a license agreement entered into between the United States Government, as represented by the United States Department of Agriculture, Agricultural Research Services, and the Commission.  The exclusive license includes the right to license the '284 patent and to enforce the '284 patent against alleged infringers.

### Scarlet Royal

31.     On September 28, 2004, the USDA filed patent application No. 953,124 (the "'124 Application") on a grapevine denominated "Scarlet Royal."  The application listed David W. Ramming and Ronald E. Tarallo as co-inventors.  On January 31, 2006, the '124 Application issued as U.S. Patent No. PP16,229, entitled "Grapevine Denominated Scarlet Royal" (the "Scarlet Royal or '229 patent").

32.     The United States of America, as represented by the Secretary of Agriculture, is the owner by assignment of the '229 patent.

33.     On information and belief, the Commission is the exclusive licensee of the '229 patent pursuant to a License Agreement entered into between the United States Government, as represented by the United States Department of Agriculture, Agricultural Research Services, and the Commission.  The exclusive license includes the right to license the '229 patent and to enforce the '229 patent against alleged infringers.

### The Patent and Licensing Program

34.     The Commission requires that California grape shippers pay an assessment of approximately $0.13 per box of table grapes.  The Commission operates at an annual surplus from these assessments, but does not return any of the assessment money back to the California growers or shippers.

35.     Dr. Ramming, the co-inventor of the patented Autumn King, Sweet Scarlet and Scarlet Royal varieties, is a researcher at the Agriculture Research Center ("ARC") of the USDA located in Fresno, California.  For at least 20 years, Dr. Ramming has operated a research program at the ARC relating to the development of new table grape varieties.  Since the early 1980s, the Commission has funded a significant portion of Dr. Ramming's grapevine breading program with funds collected through the shipper assessments.  In many years, the Commission's funding has

767173.3

amounted to over one-third of the total table grape research budget at the ARC, excluding employee salaries.

36.     Prior to 2003, the USDA had never sought patent protection for any new table grape variety developed at the ARC.  Instead, for nearly two decades, new grape varieties developed by the ARC with California table grape shipper assessment revenues were distributed freely to California growers by the USDA.  Specifically, once Dr. Ramming and his researchers developed a new variety that had commercial potential, a number of growers would be selected to produce the new variety as part of a "grower trial."  If the grower trials appeared successful, then the results would be made publicly available and the variety would be "released" for distribution.  Releasing a new variety was not an "official" act; rather, the USDA would announce the availability of the new variety, and any grower (or any other person) could obtain "sticks" (i.e., plant material) of the new variety without cost from the USDA ARC facility in Fresno, California.  Once a grower obtained the sticks, the grower could plant the new variety at its sole discretion, and reproduce and distribute plant material of the new variety without restriction.  In other words, the commercial risk associated with producing and selling table grapes from new USDA-developed varieties rested solely with growers (who had already funded much of the development costs).

37.     Growers participating in the "trials" were given plant material for the new variety, and allowed to reproduce the variety as needed, grow the new variety at their discretion, sell the fruit produced, and retain any profits.  While certain growers were selected for the trials, the USDA provided no mechanism for preventing other growers from accessing and reproducing the varieties as well.  Accordingly, when a variety under development appeared commercially successful, it was not uncommon for many growers to have reproduced and commercially sold the variety prior to an "release" by the USDA.  For example, when the USDA developed the "Princess" variety, it was well known that growers throughout the central valley had been reproducing Princess grapevines and selling Princess fruit for years.

38.     Neither the USDA nor the Commission had any incentive to restrict the distribution of new grapevines prior to a release, and never sought to do so.  Widespread reproduction and sales of new varieties allowed greater customer acceptance prior to release.  Additionally, growers and

shippers contributed substantially to the development of new varieties in Dr. Ramming's grapevine breeding program. Moreover, even after release, the USDA provided plant material from which growers could reproduce the variety free of charge. For years, this system allowed for the successful commercialization of grapevine varieties developed by the USDA that were funded by California growers.

39.     The USDA, Dr. Ramming, and the Commission knew that plant material for varieties under development frequently entered the public domain prior to release.

40.     In the late 1990s, the Commission formed a plan to change this procedure. Specifically, the Commission adopted a plan to request that the USDA seek patent protection on all new table grape varieties developed prior to general release. Initially, the patents were intended to control competition from foreign growers. In the past, foreign growers frequently obtained new table grape varieties developed through assessments on California growers, then competed with California growers in market for the new varieties. Under the Commission's plan, the distribution of new table grape varieties would operate as follows: (1) USDA would seek patent protection for all new varieties, (2) the USDA would grant an exclusive license to the Commission to administer the distribution of new patented varieties, (3) California table grape growers would be provided patented varieties free of charge, and (4) the new patented varieties would either be excluded from foreign growers or provided to foreign growers at high royalty rates.

41.     After several secret meetings between the Commission and the USDA, the USDA ultimately agreed to seek patent protection as requested by the Commission. The USDA further agreed that the Commission could serve as the exclusive licensee for patented varieties in the collection of royalties and enforcement against infringers. However, unknown to Plaintiffs, the USDA told the Commission that it could not, under U.S. trade agreements, refuse to provide the new patented varieties to foreign growers, block foreign growers from importing table grapes from the new patented varieties, or discriminate against foreign growers in charging royalties.

42.     Even though the USDA barred the Commission from implementing the original goals behind the patenting program – namely, to control foreign competition – the Commission decided to proceed with a patent and licensing plan. The Commission secretly decided that it could effectively

767173.3

increase its powers without any action from the California State Legislature, if the USDA would patent all new varieties, and give the Commission exclusive control over how the varieties were distributed.  In effect, such a plan would give the Commission a new source of revenue beyond that allowed under California law, and would place with the Commission complete power over the sale, reproduction, and distribution of new table grape varieties – powers that the Commission lacked under the USDA's prior distribution program.  For example, the Commission recognized that if it charged royalties to all growers of the new patented varieties, the Commission could effectively collect an additional tax on table grape growers beyond the $0.13 per box of table grapes allowed under California law.  Further, the Commission, which is controlled by a number of large growers, recognized that it could limit access to new varieties, particularly by smaller growers, through the amount of royalties it charged for obtaining the patented varieties, and through the terms of its sublicense agreements.  Finally, the Commission recognized that it could control the reproduction and distribution of new patented varieties by granting distribution rights to a few entities that it would hand-select.

43.     In or about August 2001, the Commission entered into a secret Memorandum of Understanding ("MOU") with the USDA, outlining the framework under which the USDA would seek patent protection for new grapevine varieties and grant exclusive licenses to the Commission. The MOU made clear that the Commission would be obligated to grant rights to foreign growers. Neither the USDA nor the Commission provided notice of the MOU, and the existence and terms of the MOU were not published in the Federal Register for notice and comment.

44.     Separate from the MOU, the Commission and the USDA secretly agreed that, in exchange for seeking patent protection, and providing an exclusive license to the Commission, the Commission would limit the number of entities licensed to distribute, reproduce, and sell the new patented varieties.  Although the USDA indicated that it was not interested in obtaining payments for, or profiting from, any patents on new varieties, the USDA agreed that the Commission could collect royalties on the sale of each patented grapevine plant and that the Commission would share the royalty revenue with the USDA.  The USDA further agreed to eliminate "grower trials" and place stricter controls on the access to new varieties prior to an official "release."  These "side"

1   terms were not disclosed publicly or published in the Federal Register for notice and comment.

2   ***The Commission's Licenses to Nurseries and Plaintiffs***

3   45.     Ultimately, the Commission, with permission from the USDA, hand-select three

4   nurseries to reproduce, distribute and sell the patented varieties.  The section of these nurseries was

5   not disclosed publicly or published in the Federal Register for notice and comment.  The three

6   selected nurseries are: Sunridge Nurseries, Vintage Nurseries, and Casa Crystal Nurseries (the

7   "Licensed Nurseries").  Casa Crystal Nursery is owned by Andrew Zaninovich.  Andrew's father is

8   Marco Zaninovich, who has been a long-time and active board member of the Commission.

9   46.     Each Licensed Nursery is authorized to sell Autumn King, Sweet Scarlet and Scarlet

10   Royal vines to growers who execute a "Domestic Grower License Agreement" with the

11   Commission.   In accordance with the agreement between the Commission and the USDA, the

12   Commission charges nurseries who distribute patented varieties a $5,000 participation fee per

13   patented variety and an additional $1 per production unit royalty.  These costs are then passed on by

14   the nurseries to the California grape growers who purchase the patented plant material from the

15   nurseries, including Plaintiffs who purchased the Patented Varieties.  These payment terms,

16   including the permission to allow the nurseries to charge the royalties to growers, who must also

17   purchase the plant material, were not disclosed publicly or published in the Federal Register for

18   notice and comment prior to their adoption.

19   47.     The Domestic Grower Agreements prohibit growers who purchase the Patented

20   Varieties from propagating the vines or distributing the vines to third parties.  Under the Domestic

21   Grower Agreements, the Commission may revoke the patent sub-license of any grower who violates

22   the terms, and require the grower to destroy all Patented Varieties purchased.  The terms of the

23   Domestic Grower Agreements, created by the Commission with the approval of the USDA, were not

24   disclosed publicly or published in the Federal Register for notice and comment prior to their

25   adoption.

26   48.     All royalties are paid to the Commission.  On information and belief, the

27   Commission pays approximately one-half of the collected royalties to the USDA.

28   49.     The California table grape growers who bear the ultimate costs of the royalty fees

767173.3

1   imposed by the Commission are the same California table grape growers who bear the cost of the

2   per box assessment charged by the Commission, which funds much of Dr. Ramming's breeding

3   program.  Thus, California table grape growers essentially pay for the development of patented

4   varieties, then pay again to obtain the varieties.

5     50. The Commission's Research Committee and Board oversee and administer the patent

6   and licensing program.  Specifically, the Board sets the royalty rates on patented plants, determines

7   penalties for infringement, and establishes enforcement policy.  The Research Committee oversees

8   Dr. Ramming's breeding program and makes recommendations regarding which new varieties

9   should be patented and released.  To date, the USDA has only patented new varieties that the

10   Commission has recommended for patenting, and has only applied for patents after receiving a

11   recommendation from the Commission to do so.

12     ***Release of the Patented Varieties***

13     51. Development of the Patented Varieties began in about 1993.  Prior to 2003, the Dr.

14   Ramming had reproduced each of the Patented Varieties, produced fruit from each of the Patent

15   Varieties, and had evaluated the potential commercialization of each Patented Variety.

16     52. By 2001, the Commission's Research Committee was actively evaluating the Sweet

17   Scarlet, Autumn King, and Scarlet Royal varieties (among others) for USDA release.  In 2002, the

18   Commission recommended that Sweet Scarlet be released.  The Commission also recommended that

19   the USDA seek patent protection on Sweet Scarlet as the first variety for patenting under the

20   Commission's new patent and licensing program.  After receiving the Commission's

21   recommendation, the UDSA proceeded with the release of Sweet Scarlet and filed a patent

22   application on the Sweet Scarlet variety in February 2003.

23     53. Although the Commission recommended proceeding with the release of Sweet

24   Scarlet, the Commission decided to delay any release and patenting of Autumn King and Scarlet

25   Royal.  Instead, the Commission recommended that Autumn King and Sweet Scarlet undergo

26   further evaluation prior to release.  Approximately two years later, in 2004, the Commission finally

27   recommended release of Autumn King and Scarlet Royal.  At that time, the Commission further

28   recommended that the UDSA seek patent protection for Autumn King and Scarlet Royal.

SECOND AMENDED COMPLAINT

54.     On information and belief, the Sweet Scarlet, Autumn King, and Scarlet Royal varieties were already in the public domain prior to the time the USDA applied for patent protection on each respective variety.

55.     For example, the Sweet Scarlet variety and its fruit was used, distributed, offered for sale and sold by growers and shippers prior to February 20, 2002, including uses by growers who were not part of grower trials.  Both the Commission and USDA knew of at least some non-grower-trial uses.  In May 2004, the Commission sent a notice to all California table grape growers and shippers stating that the UDSA had applied for a patent on the Sweet Scarlet variety.  Although no enforceable patent had yet issued, the Commission offered "amnesty" for any grower who had previously reproduced Sweet Scarlet.   Under its so-called "amnesty" program, a grower with Sweet Scarlet could keep the vines reproduced, so long as the grower (i) admitted to possession prior to July 2004, (ii) paid $2 per vine reproduced, (iii) paid $2 per box of Sweet Scarlet grapes previously shipped, and (iv) agreed to no further propagation of the Sweet Scarlet variety from the plants possessed.

56.     In July 2004, the Commission sent another notice to all California table grape growers and shippers extending the "amnesty" time period for one month, and extending the "amnesty" to include Autumn King and Scarlet Royal varieties.

57.     In both notices, the Commission threatened to sue growers who did not come forward, and to seek money damages and injunctions.  Yet, at the time of the second notice, the USDA patent application on Sweet Scarlet not only remained un-issued, but had been rejected by the USPTO.  Moreover, the USDA had not even applied for a patent on either Autumn King or Scarlet Royal.

58.     On April 29, 2003, the USDA published notice in the Federal Register of its intent to grant an exclusive license to the Commission for the Sweet Scarlet patent.  The Federal Register notice did not state the terms of the license, and provided no information on whether growers would be authorized to reproduce or distribute the Sweet Scarlet variety, whether growers would incur any costs to obtain the Sweet Scarlet variety, or whether growers would incur any royalty expenses for the Sweet Scarlet variety.  Indeed, the Federal Register notice contained no information whatsoever

1  regarding the exclusive licensing terms and conditions that the Commission had secretly negotiated

2  with the USDA.  In or about 2003, the USDA entered into an exclusive license with the Commission

3  for the Sweet Scarlet patent.

4     59. On December 23, 2004, the USDA published notice in the Federal Register of its

5  intent to grant an exclusive license to the Commission for the Autumn King and Scarlet Royal

6  patents.  The Federal Register notice did not state the terms of the license, and provided no

7  information on whether growers would be authorized to reproduce or distribute the Autumn King

8  and Scarlet Royal varieties, whether growers would incur any costs to obtain the Autumn King and

9  Scarlet Royal varieties, or whether growers would incur any royalty expenses for the Autumn King

10  and Scarlet Royal varieties.  Indeed, the Federal Register notice contained no information

11  whatsoever regarding the exclusive licensing terms and conditions that the Commission had secretly

12  negotiated with the USDA.  In or about June, 2005, the USDA entered into an exclusive license with

13  the Commission for the Autumn King and Scarlet Royal patents.

14       ***Plaintiffs' Purchase of the Patented Varieties***

15     60. Plaintiffs are in possession of the Autumn King, Sweet Scarlet and Scarlet Royal

16  varieties, which they purchased through Licensed Nurseries.  Plaintiffs paid the royalties on each

17  purchased plant imposed by the Commission.

18     61. Plaintiffs have entered into a Domestic Grower License Agreement with the

19  Commission for the '891 patent.  In consideration for this limited, nonexclusive license, Plaintiffs

20  have paid a license fee to a Licensed Nursery.  Under the terms of this Agreement, Plaintiffs have a

21  limited, nonexclusive license to the '891 patent to grow the Sweet Scarlet variety plants that they

22  purchased, and sell the fruit produced from those plants.  Plaintiffs cannot propagate the grapevines

23  or distribute the vines to third parties.  Furthermore, Plaintiffs are obligated to destroy all Sweet

24  Scarlet plant material upon termination of the agreement.

25     62. Plaintiffs have entered into a Domestic Grower License Agreement with respect to

26  the '284 patent.  In consideration for this limited, nonexclusive license, Plaintiffs have paid a license

27  fee to a Licensed Nursery.  Under the terms of this Agreement, Plaintiffs have a limited,

28  nonexclusive license to the '284 patent to grow the Autumn King variety plants that they purchased,

1   and sell the fruit produced from those plants.  Plaintiffs cannot propagate the grapevines or distribute

2   the vines to third parties.  Furthermore, Plaintiffs are obligated to destroy all Autumn King plant

3   material upon termination of the agreement.

4          63.     Plaintiffs have entered into a Domestic Grower License Agreement with respect to

5   the '229 patent.  In consideration for this limited, nonexclusive license, Plaintiffs have paid a license

6   fee to a Licensed Nursery.  Under the terms of this Agreement, Plaintiffs have a limited,

7   nonexclusive license to the '229 patent to grow the Scarlet Royal variety that they purchased, and

8   sell the fruit produced from those plants.  Plaintiffs cannot propagate the grapevines or distribute the

9   vines to third parties.  Furthermore, Plaintiffs are obligated to destroy all Scarlet Royal plant

10   material upon termination of the agreement.

11   **FIRST CLAIM FOR RELIEF**

12   **(Violation of the Bayh-Dole Act Under APA**

13   **Against Defendants U.S., USDA and Secretary Vilsack)**

14          64.     Plaintiffs reallege and incorporate by reference all paragraph 1-63 as if fully set forth

15   herein.

16          65.     This is an action for declaratory and injunctive relief brought, in part, under the

17   Administrative Procedure Act, 5 U.S.C. §§701, *et seq.* with respect to final agency actions of the

18   USDA and its officers.  The discrete acts complained of herein constitute "agency action" as defined

19   by 5 U.S.C. §551(13) and are reviewable by this Court pursuant to 5 U.S.C. §704.

20          66.     The U.S.'s, USDA's and Secretary Vilsack's actions with respect to licensing the

21   Patented Varieties to the Commission is subject to the procedural requirements of the

22   Administrative Procedure Act ("APA"), at 5 U.S.C. §§ 551, *et seq.*

23          67.     The USDA engaged in a discrete and final agency actions under 5 U.S.C. §702 by

24   granting exclusive licenses to the Commission for each of the three Patented Varieties in accordance

25   with the terms and conditions set forth in the exclusive licenses and the terms, as well as the "side"

26   terms and conditions separately negotiated between the USDA and Commission, including the terms

27   that allowed the Commission to select licensees who would be exclusively allowed to reproduce,

28   distribute, and sell the Patented Varieties, and the terms allowing for establishment and collection of

royalties on the Patented Varieties.

68.     The acts complained of herein constitute final agency actions by the U.S., USDA and Secretary Vilsack subject to review under the APA.

69.     The acts complained of herein mark the consummation of the U.S.'s, USDA's and Secretary Vilsack's decision-making process.

70.     The acts complained of herein are not interlocutory, interim or tentative in nature.

71.     The acts complained of herein are acts by which rights or obligations have been determined and from which legal consequences have flowed, continue to flow and will flow. Specifically, the acts complained of herein have directly determined the rights and obligations of Plaintiffs and the Commission with respect to the growing, distribution, sale, propagation, reproduction, and otherwise free use of the plant material of the Patented Varieties, and the right to collect royalties and the right to exclude thereof.

72.     The acts complained of herein by the U.S., USDA and Secretary Vilsack – in particular, the action in granting the Commission exclusive licenses to the Patented Varieties under the terms and conditional described in this SAC – are arbitrary, capricious, and otherwise not in accordance with applicable laws and regulations.  These actions violate the provision of the Bayh-Dole Act codified at 35 U.S.C § 209(a), which provides authority for a federal agency to grant exclusive or partially exclusive licenses on federally-owned inventions only in four limited circumstances.  Among other things, the exclusive licenses, along with terms and conditional agreed to between the Commission and the USDA, violate the Bayh-Dole Act in the following ways:

a.     The exclusive licenses were not a reasonable and necessary incentive to call forth the investment capital and expenditures needed to bring the invention to practical application or otherwise promote the invention's utilization by the public as required by 35 U.S.C. § 209(a)(1).  No exclusive license to the Commission was required to promote the utilization of the Patented Varieties by the public.  To the contrary, the growers already provided the capital and expenditures needed to bring newly-developed USDA grapevine varieties to practical application.  Moreover, the Patented Varieties were already in the

1  public domain and had been reproduced, distributed, and had produced fruit

2  sold commercially to the public prior to the grant of any exclusive licenses to

3  the Commission.  Had the USDA distributed the Patented Varieties directly to

4  growers in accordance with their prior procedure, without the exclusive

5  license and terms imposed by the Commission, the new grapevine varieties

6  would achieve even greater public utilization.

7  b.  The USDA made no finding that the public would be served by the granting

8  of the exclusive licenses as required by 35 U.S.C. § 209(a)(2), or if it did

9  make such a finding, the USDA did so in an arbitrary and capricious manner.

10  In fact, the exclusive licenses, including the terms and conditions imposed by

11  the Commission, limits the number of distributors of the Patented Varieties

12  and imposes significant additional costs on growers.  These additional costs

13  disserve the public interest by limiting the availability of the Patented

14  Varieties and raising consumer costs for the Patented Varieties.

15  c.  The exclusive licenses, including the terms and conditions imposed by the

16  Commission, tend to substantially lessen competition in violation of 35

17  U.S.C. § 209(a)(4).  First, under the terms and conditions imposed by the

18  Commission, growers lacking substantial financial resources cannot incur the

19  costs of purchasing the Patented Varieties and paying royalties on the

20  Patented Varieties.  Thus, competition among growers of the Patented

21  Varieties is lessened.  Second, by limiting the right to reproduce, distribute,

22  and sell the Patented Varieties to three hand-picked nurseries, competition for

23  the sale of the Patented Varieties is reduced, resulting in an increase in the

24  cost of purchasing the Patented Varieties.  Without the exclusive licenses,

25  each grower could effectively act as its own reproducer and distributor,

26  without incurring significant additional costs.  Considering the costs and risk

27  associated with growing table grapevines, and bringing fruit to market, the

28  additional costs imposed though the USDA's and Commission's exclusive

licensing program effectively limit competition to only certain growers – some of which effectively control the Commission.

73.     Plaintiffs have been harmed directly by the Commission's, the U.S.'s, USDA's and Secretary Vilsack's actions, have suffered a legal wrong because of the Commission's, the U.S.'s, USDA's and Secretary Vilsack's actions, and have been adversely affected and aggrieved by the Commission's, the U.S.'s, USDA's and Secretary Vilsack's actions.  The Commission's, the U.S.'s, USDA's and Secretary Vilsack's actions have directly impacted Plaintiffs' day-to day business, including Plaintiffs' ability to sell, grow, distribute, propagate and use the Patented Varieties.

74.     Plaintiffs have been harmed directly by the exclusive licenses that the USDA granted to the Commission and have suffered a legal wrong and have been adversely affected and aggrieved as a result of those exclusive licenses.  Because the exclusive licenses were not a reasonable and necessary incentive to call forth the investment capital and expenditures needed to bring the invention to practical application or otherwise promote the invention's utilization by the public as required by 35 U.S.C. § 209(a)(1), Plaintiffs have been directly harmed by an increase an their business costs.  Prior to the exclusive licenses, Plaintiffs along with other growers provided the capital and expenditures needed to bring newly-developed USDA grapevine varieties to practical application and in exchange received plan material for promising new varieties free of charge and commercialized those varieties to the public.  The exclusive license between the USDA and the Commission increases Plaintiffs' costs for commercializing the Patented Varieties, because Plaintiffs are required to pay an additional royalty for the plant material needed to grow the Patented Varieties.  Moreover, the exclusive license between the USDA and the Commission restricts Plaintiffs' ability to expand its commercialization of the Patented Varieties, by restricting Plaintiffs' ability to use plant material grown by Plaintiffs to propagate new plants and by restricting Plaintiffs from distributing plant material for the Patented Varieties to other growers that could commercially benefit Plaintiffs' experience and expertise, thereby resulting in the increased commercialization of the Patented Varieties.  Moreover, on information and belief, the exclusive licenses' negative impact on the commercialization of the Patented Varieties harms Plaintiffs by reducing the public acceptance and availability of the Patented Varieties, and by increasing the costs to consumers of the

767173.3

1  Patented Varieties, thereby reducing the market demand for the fruit of the Patented Varieties sold

2  by Plaintiffs.

3       75.    Plaintiffs have been directly harmed by the USDA's failure to find that the exclusive

4  licenses would serve the public as required by 35 U.S.C. § 209(a)(2) (which the USDA cannot do).

5  Plaintiffs have been directly harmed by this failure as members of the public.  In addition, Plaintiffs

6  have been directly harmed, because exclusive licenses and the terms and conditions imposed by the

7  Commission limits the number of distributors of the Patented Varieties and imposes significant

8  additional costs on growers, including Plaintiffs.  This also increases the costs and reduces the

9  availability of the Patented Varieties to the public.  On information and belief, these acts also harm

10  Plaintiffs by reducing the public acceptance and corresponding demand for the Patented Varieties,

11  which, on information and belief, further reduces Plaintiffs' ability to realize a return on their

12  substantial investment of obtaining and growing the Patented Varieties.  On information and belief,

13  had the USDA undertaken a study of the Patent Licensing program as required by section 209(a)(2),

14  the USDA would have found that the program as implemented by the Commission would not

15  benefit the public (and possibly disserve the public), and would have continued to grant all growers

16  non-royalty-bearing licenses and allowed unlimited reproduction and distribution as it did under the

17  prior distribution procedure.

18       76.    Plaintiffs have also been directly harmed by the exclusive licenses, because

19  competition has been reduced in violation of 35 U.S.C. § 209(a)(4).  Plaintiffs have been directly

20  harmed, because by limiting the right to reproduce, distribute, and sell the Patented Varieties to three

21  hand-picked nurseries, on information and belief, the cost of purchasing plant material for the

22  Patented Varieties is greater than if the right to reproduce, distribute, and sell the Patented Varieties

23  were open to more than three nurseries hand-picked by the Commission.  Indeed, without the

24  exclusive licenses, Plaintiffs could act as their own reproducer and distributor, without incurring

25  significant additional costs.  Moreover, as a result of the exclusive license, Plaintiffs have been

26  barred from the market for distributing plant material for the Patented Varieties.  In addition, under

27  the terms and conditions imposed by the Commission, growers without substantial financial

28  resources cannot incur the costs of purchasing the Patented Varieties and paying royalties on the

767173.3

1   Patented Varieties.  As a result, on information and belief, the Patented Varieties are not as widely

2   distributed as they would have been without barrier to growers lacking substantial financial

3   resources, thereby resulting in reduced public acceptance for the Patented Varieties as well as a

4   reduced demand for the fruit of the Patented Varieties grown by Plaintiffs.

5        77.    As a result of the U.S.'s, USDA's and Secretary Vilsack's actions, Plaintiffs have

6   been (1) restricted from growing, selling, distributing, reproducing, propagating or otherwise freely

7   using plant material for Patented Varieties, (2) restricted from growing, selling, reproducing,

8   distributing, propagating or otherwise freely using the fruit for the Patented Varieties, and (3) forced

9   to license and pay royalties to the Commission and its agents with respect to the Patented Varieties.

10  This has harmed and damaged Plaintiffs directly.

11       78.    On April 29, 2003, the USDA published notice in the Federal Register of its intent to

12  grant an exclusive license to the Commission for the Sweet Scarlet patent.  The Federal Register

13  notice did not state the terms of the license, and provided no information on whether growers would

14  be authorized to reproduce or distribute the Sweet Scarlet variety, whether growers would incur any

15  costs to obtain the Sweet Scarlet variety, or whether growers would incur any royalty expenses for

16  the Sweet Scarlet variety.  Indeed, the Federal Register notice contained no information whatsoever

17  regarding the exclusive licensing terms and conditions that the Commission had secretly negotiated

18  with the USDA.  In or about 2003, the USDA entered into an exclusive license with the Commission

19  for the Sweet Scarlet patent.  On December 23, 2004, the USDA published notice in the Federal

20  Register of its intent to grant an exclusive license to the Commission for the Autumn King and

21  Scarlet Royal patents.  The Federal Register notice did not state the terms of the license, and

22  provided no information on whether growers would be authorized to reproduce or distribute the

23  Autumn King and Scarlet Royal varieties, whether growers would incur any costs to obtain the

24  Autumn King and Scarlet Royal varieties, or whether growers would incur any royalty expenses for

25  the Autumn King and Scarlet Royal varieties.  Indeed, the Federal Register notice contained no

26  information whatsoever regarding the exclusive licensing terms and conditions that the Commission

27  had secretly negotiated with the USDA.  In or about June, 2005, the USDA entered into an exclusive

28  license with the Commission for the Autumn King and Scarlet Royal patents.

767173.3

79.     At the time of these notices, Plaintiffs did not know and could not have known that the USDA authorized and that the Commission intended to charge patent licensing royalties for the distribution of the Patented Varieties from the same grower who already paid for a significant portion of their development costs.  Plaintiffs also did not know and could not have known that the Commission intended to only allow three nurseries to distribute plant material for the Patented Varieties.  Plaintiffs also did not know and could not have known that the Commission intended include restrictions on the distribution and propagation of plant material by growers who obtained the Patented Varieties.  At the time of the notices, Plaintiffs had every reason to believe that the distribution of the Patented Varieties would continue to be free of charge and restrictions to local growers (including Plaintiffs), as had been the case for over a decade with prior USDA-developed grapevine varieties.  Indeed, at the time of the notices, Plaintiffs expected that the Patent Licensing program would be used for its original intended purpose – to protect Plaintiffs and other growers from foreign competition.  Plaintiffs did not know, and the USDA did not advice in the Federal Register notices, the USDA had agreed to allow the Commission to use the Patent Licensing program and a way to extract an additional tax from growers, and to effectively usurp complete control over the reproduction and distribution of new grapevine varieties.

80.     As such, Plaintiffs lacked information necessary and sufficient to raise any objections to the noticed licenses, including objections to the licenses under the terms of the Bayh-Dole Act raised in this SAC.  Specifially, at the time of the notices, Plaintiffs did not have sufficient information to determine or believe that the exclusive license between the USDA and the Commission for the Patented Varieties violated any provisions of the Bayh-Dole Act.  Because Plaintiffs lacked the information needed to raise objections to the exclusive license granted to the Commission for the Patented Varieties at the time of the Federal Register Notices, and because the Federal Register notices lacked any information from which Plaintiffs could have concluded that the exclusive licenses violated provisions of the Bayh-Dole Act, any exhaustion of Plaintiffs' rights resulting from a purported failure to raise those objections at that time of the Federal Register notices should be excused.

81.     Plaintiffs are entitled to a declaration from the Court that the U.S.'s, USDA's and

Secretary Vilsack's granting of an exclusive license to the Commission in the Patented Varieties was unlawful and invalid.

82.     This Court may and should hold unlawful and set aside the U.S's, USDA's and Secretary Vilsack's actions giving rise to this First Claim for Relief pursuant to 5 U.S.C. §706(2)(A), (C), and (D).

83.     This Court may and should compel the U.S., USDA and Secretary Vilsack to comply with their obligations under the Patent Act pursuant to 5 U.S.C. §706(1).

## SECOND CLAIM FOR RELIEF

**(Unfair Competition Under California Business and Professions Code §17200 and California Common Law Against The Commission)**

84.     Plaintiffs reallege and incorporate by reference all paragraphs 1-83 as if fully set forth herein.

85.     The Commission has unlawfully and unfairly exploited the '284, '891 and '229 patents in a manner that violates antitrust laws and in a manner that attempts to extend these patents beyond their lawful scope.  Such acts constitute unfair trade practices and unfair competition under California Business and Professions Code §17200, *et seq.*, and under the common law of the State of California, entitling Plaintiffs to relief.

86.     Pursuant to California Business and Professions Code §17203, Defendant is required to disgorge and restore to Plaintiffs all profits and property acquired by means of Defendant's unfair competition.

87.     Due to the conduct of Defendant, Plaintiffs have suffered irreparable harm, have suffered injury in fact and have lost money or property as a result of Defendant's acts of unfair business practices alleged herein.  It would be difficult to ascertain the amount of money damages that would afford Plaintiffs adequate relief at law for Defendant's acts.  Plaintiffs' remedy at law is not adequate to compensate Plaintiffs for the injuries inflicted by Defendant.  Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief pursuant to California Business and Professions Code §17203.

88.     Plaintiffs are informed and believe and on that basis allege that Defendant's conduct

1   has been intentional and willful and in conscious disregard of Plaintiffs' rights and, therefore,

2   Plaintiffs are entitled to its attorneys' fees.

3   **THIRD CLAIM FOR RELIEF**

4   **(Unjust Enrichment Against The Commission)**

5         89.     Plaintiffs reallege and incorporate by reference all paragraphs 1-190 as if fully set

6   forth herein.

7         90.     By acquiring licensing revenue for the '891 patent, which was fraudulently procured

8   and maintained, the Commission has received significant benefits.  In addition, by acquiring

9   licensing revenue for the '284, '891 and '229 patents in a manner that expands these patents beyond

10   their lawful scope, the Commission has received significant benefits.

11         91.     The Commission's unjust receipt and retention of such benefits has unjustly enriched

12   them at the expense of the Plaintiffs and all California table grape growers who have paid the

13   Commission license fees.

14   **FOURTH CLAIM FOR RELIEF**

15   **(Constructive Trust Against The Commission)**

16         92.     Plaintiffs reallege and incorporate by reference all paragraphs 1-193 as if fully set

17   forth herein.

18         93.     California table grape growers have transferred to the Commission licensing fees,

19   being induced by fraud, duress or undue influence of the Commission.

20         94.     The Commission is subject to an equitable duty to convey the license fees it has

21   received from Plaintiffs and other California table grape growers on the ground that the Commission

22   would be unjustly enriched if the Commission were permitted to retain those license fees.

23         95.     The licensing fees acquired by the Commission for the Patented Varieties should be

24   held in constructive trust for the benefit of California table grape growers who have paid the

25   Commission license fees with respect to the Patented Varieties.

26   **PRAYER FOR RELIEF**

27        Wherefore, Plaintiffs prays for the following relief against Defendants:

28         A.     Declaring that the U.S., USDA and Secretary Vilsack acted arbitrarily, capriciously,

and not in accordance with law under the APA by granting the Commission an exclusive license to the '294, '891 and '229 patents and by allowing the Commission to impose the terms and conditions adopted for the Patent Licensing program;

B.   That the Court adjudge and decree that the Commission has violated California statutory and common law unfair competition laws;

C.   That the Court adjudge and decree that the Commission has been unjustly enriched;

D.   That pursuant to 5 U.S.C. §706, the Court compel the U.S., USDA and Secretary Vilsack to act in accordance with law, including 35 U.S.C. §209(a);

E.   That the Court set aside the agency actions complained of herein:

F.   An award of damages against the Commission, together with pre-judgment and post-judgment interest;

G.   Disgorgement of all royalty fees obtained by the Commission in connection with the Patented Varieties;

H.   That the licensing fees acquired by the Commission for the Patented Varieties be held in constructive trust for the benefit of California table grape growers who have paid the Commission license fees with respect to the Patented Varieties;

I.   That Plaintiffs recover the costs of this suit together with reasonable attorneys' fees;

J.   That Plaintiffs have such other and further relief as the nature of this case may require and as the Court may deem just and proper.

DATED:  November 16, 2009                    HENNIGAN BENNETT & DORMAN LLP


                                             By _____/s/ Lawrence M. Hadley_____

                                                  Lawrence M. Hadley

                                             Attorney for Plaintiffs
                                             DELANO FARMS COMPANY; FOUR STAR
                                             FRUIT, INC.; GERAWAN FARMING, INC.

1

**DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a trial by jury as to all issues so triable.

3

DATED: November 16, 2009                    HENNIGAN BENNETT & DORMAN LLP

4

5

6                                                  By _____/s/ Lawrence M. Hadley_____

7                                                          Lawrence M. Hadley

8                                                  Attorney for Plaintiffs
                                                   DELANO FARMS COMPANY; FOUR STAR
9                                                  FRUIT, INC.; GERAWAN FARMING, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

767173.3