1
2
3
4

UNITED STATES DISTRICT COURT

5

FOR THE EASTERN DISTRICT OF CALIFORNIA

6
7

8  DELANO FARMS COMPANY, FOUR
   STAR FRUIT, INC., and
9  GERAWAN FARMING, INC.,

10            Plaintiffs,

11        v.

12 THE CALIFORNIA TABLE GRAPE
   COMMISSION, UNITED STATES OF
13 AMERICA, UNITED STATES
   DEPARTMENT OF AGRICULTURE,
14 TOM VILSACK, SECRETARY OF
   THE UNITED STATES DEPARTMENT
15 OF AGRICULGURE (IN HIS
   OFFICIAL CAPACITY),
16
17            Defendants.
18

1:07-CV-1610 OWW SMS

MEMORANDUM DECISION AND
ORDER GRANTING FEDERAL
DEFENDANTS AND CALIFORNIA
TABLE GRAPE COMMISSION'S
MOTIONS TO DISMISS THE
SECOND AMENDED COMPLAINT
(DOCS. 99 & 101); AND
DENYING AS MOOT PLAINTIFFS'
MOTION FOR CERTIFICATION OF
INTERLOCUTORY APPEAL (DOC.
93).

19
20

I. **INTRODUCTION**

21        The United States, *et al.,* ("Federal Defendants") and

22 the California Table Grape Commission ("Commission"),

23 separately move to dismiss Plaintiffs', Delano Farms Company

24 ("Delano"), Four Star Fruit, Inc. ("Four Star"), and Gerawan

25 Farming, Inc. ("Gerawan"), entire Second Amended Complaint

26 ("SAC") pursuant to Federal Rules of Civil Procedure

27 12(b)(6).

28

1

Federal Defendants argue:

> (1) Plaintiffs have waived their Administrative Procedure Act ("APA") claims concerning the grant of exclusive licenses by failing to exhaust those claims at the administrative level; and

> (2) to the extent that Plaintiffs directly challenge the enforceability of the patents held by Federal Defendants, any such challenge should be rejected.

Doc. 100.

The Commission's motion argues:

> (1) the APA challenge fails for lack of exhaustion;

> (2) the unfair competition claim, Cal. Bus. & Prof. Code § 17200 et seq., against the Commission must be dismissed because it is:

>> (a) preempted by federal law;

>> (b) the Commission is not a proper defendant under § 17200; and

>> (c) the cause of action fails to state a claim; and

> (3) the unjust enrichment and constructive trust claims also fail to state valid claims.

Doc. 102.

Plaintiffs oppose both motions.  Doc. 109.  Defendants replied.  Docs. 111 & 113.  The matter came on for hearing

2

June 29, 2010.

A.   <u>USDA Research Program.</u>

California table grape growers and shippers have funded a USDA research program to develop new table grape varieties through assessment imposed by the Commission on each box of table grapes shipped in California.  SAC ¶18.  Prior to 2002, the USDA provided the new varieties under development to area growers for evaluation of growing potential and commercial marketability.  *Id.*  Once new varieties appeared commercially viable, the USDA "released" the variety, and distributed plant material of the variety to area growers free of charge.  *Id.*  It is alleged that USDA did not charge California growers for the new varieties because California growers and shippers already paid for a large portion of the development.  *Id.*

B.   <u>Patenting of Grape Varieties.</u>

In the late 1990s, at the urging of the Commission, the USDA agreed to begin patenting new table grape varieties.  SAC ¶19.  The first three varieties the Commission referred to the USDA for patenting, Sweet Scarlet, Autumn King, and Scarlet Royal, had been under development for years.  It is alleged that at least one of the varieties, Sweet Scarlet, had been distributed to growers for wide-scale commercial evaluation and sale.  SAC ¶¶ 22-23.  Patent applications for

3

Sweet Scarlet, Autumn King, and Scarlet Royal, were filed with the United States Patent and Trademark Office ("USPTO") on February 20, 2003 (Application No. 371,512), September 28, 2004 (Application No. 953,387), and September 28, 2004, (Application No. 953,124), respectively.  Patents were issued on July 26, 2005 (Patent No. PP15,891 ("891 Patent")), February 21, 2006 (Patent No. PP16,284 ("284 Patent")), and January 31, 2006 (Patent No. PP16,229 ("229 Patent")).  *See* SAC ¶¶ 25-33.

The USDA agreed to give the Commission an exclusive license to all newly Patented Varieties, and to allow the Commission to charge royalties when growers wished to obtain the new varieties.  SAC at ¶41.  The USDA also agreed to give the Commission exclusive enforcement powers over its new patent rights.  SAC ¶19.

The Commission then selected three nurseries to exclusively sell all new patented table grape varieties ("Licensed Nurseries").  SAC ¶20.  Unlike the prior free distribution, the nurseries were authorized to sell new varieties to growers.  *Id.*  In accordance with the agreement between the Commission and the USDA, the Commission charges nurseries who distribute Patented Varieties a $5000.00 participation fee per patented variety and an additional $1.00 per production unit royalty.  SAC ¶46.  The Licensed

4

Nurseries are responsible for paying the royalty, but the Licensed Nurseries may and do pass the royalty cost on to the purchasing growers.  SAC ¶¶ 20, 76.

When a grower seeks to obtain a new variety from a nursery, it is required to enter into a "Domestic Grower License Agreement" ("License Agreement") with the Commission. Under the terms of the License Agreement, the grower cannot propagate the variety beyond the plant purchased.  SAC ¶21. If the Commission believes the grower has violated the License Agreement, it can void the License Agreement and order that all purchased plants be destroyed.  *Id.*

Recognizing that at least one of the new varieties identified for patenting (and perhaps all three) had been previously in public use and/or sold commercially, the Commission created a so-called "amnesty program," allegedly designed to hide the fact that valid patents could not be obtained, and to "extort" funds from growers already in possession of the varieties.  SAC ¶23.  Under the amnesty program, the Commission widely disseminated notices to growers and shippers stating that they were in violation of the law if they possessed the varieties intended for patenting.  The notices also offered confidential "settlements" to any growers who, within a narrow time window, agreed to license the varieties, pay a "penalty" to

5

the Commission, and accept the Commission's license
restrictions on further propagation.  *Id*.

Under its so-called "amnesty" program, a grower with
Sweet Scarlet could keep the vines reproduced, so long as the
grower: (i) admitted to possession prior to July 2004, (ii)
paid $2 per vine reproduced, (iii) paid $2 per box of Sweet
Scarlet grapes previously shipped, and (iv) agreed to no
further propagation of the Sweet Scarlet variety from the
plants possessed.  SAC ¶55.  In July 2004, the Commission
sent another notice to all California table grape growers and
shippers extending the "amnesty" time period for one month,
and extending the "amnesty" to include Autumn King and
Scarlet Royal varieties.  SAC ¶56.

In both notices, the Commission threatened to sue
growers who did not come forward, and to seek money damages
and injunctions.  Plaintiffs claim that at the time of the
second notice, the USDA patent application on Sweet Scarlet
had not been issued and had been rejected by the USPTO.
Moreover, the USDA had not even applied for a patent on
either Autumn King or Scarlet Royal.  The USDA had no patent
rights, and the Commission lacked any enforcement rights in
either grape variety.  SAC ¶57.

C.  **Plaintiffs' License Agreements**

Plaintiffs are in possession of the Autumn King, Sweet

**6**

Scarlet and Scarlet Royal varieties, which they purchased through Licensed Nurseries.  SAC ¶60.  Plaintiffs paid the royalties imposed by the Commission on each purchased plant. *Id*.  Plaintiffs have entered into a License Agreement with the Commission for each of the Patented Varieties.  SAC ¶¶ 60-63.  In consideration for this limited, nonexclusive license, Plaintiffs have paid a license fee to a Licensed Nursery.  *Id*.  Under the terms of this agreement, Plaintiffs have a limited, nonexclusive license to grow the Patented Varieties and sell the fruit produced.  *Id*.  Plaintiffs cannot propagate the grapevines or distribute the vines to third parties.  *Id*.  Further, Plaintiffs are obligated to destroy all Patented Varieties' plant material upon termination of the agreement.  *Id*.

D.   <u>Original Complaint and February 20, 2009 Decision.</u>

Plaintiffs' original complaint named only the Commission as a defendant, alleging (at claims 1-3) the patents for all three varieties should be declared invalid, Doc. 1 at ¶¶ 66-86; (at claim 4) the patent for the Sweet Scarlet variety should be declared unenforceable because neither the Commission nor USDA disclosed to the USPTO that the three varieties had been in public use prior to February 2002, *id*. at ¶¶ 87-85; (at claim 5) the Commission violated the Sherman and Clayton Acts by illegally monopolizing the market for

table grapes, *id.* at ¶¶ 96-103; (at claim 6) the Commission misused the patents "in violation of antitrust laws and in a manner that attempts to extend [the] patents beyond their lawful scope, *id.* at ¶¶ 104-109; (at claim 7) unfair competition, *id.* at ¶¶ 110-114; (at claim 8) unjust enrichment, *id.* at ¶¶ 115-117; and (at claim 9) constructive trust, *id.* at ¶¶ 118-121.  The Commission moved to dismiss, arguing the United States is a necessary and indispensable party that is immune from suit and that all of the claims in the case were without legal foundation.

As to the issue of joinder, the February 20, 2009 Decision emphasized that because Plaintiffs' substantive causes of action sought to invalidate patents owned by the United States, the United States is a necessary party under Federal Rule of Civil Procedure Rule 19(a).  Doc. 42 at 22-34.  Once it has been determined that an absent party to the suit is "necessary" under Rule 19(a), the inquiry is whether that party, the United States, can be joined in the action. *Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.*, 276 F.3d 1150, 1159 (9th Cir. 2002).  "Absent a waiver, sovereign immunity shields the Federal government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).  A waiver of sovereign immunity must be unequivocally expressed.  *Department of Army v. Blue Fox, Inc.*, 525 U.S.

1    255, 261 (1999).  The February 20, 2009 Decision decided

2    sovereign immunity had not been waived:

3              A declaratory judgment seeking invalidity of a U.S.-
4              owned patent squarely implicates sovereign immunity.
               Further, property owners are generally necessary
5              parties to actions that could affect their property
               interests adversely. The United States, as owner of
6              the Patented Varieties, is no exception....

7                                   ***

8              Under the only patent-related waiver of sovereign
               immunity, 28 U.S.C. § 1498 permits private parties
9              to bring patent infringement suits in United States
               Federal Claims Court to seek money damages only.  28
10             U.S.C. § 1498.  "In waiving its own immunity from
               patent infringement actions in 28 U.S.C. § 1498(a)
11             (1994) ed. and Supp. III)," the United States did
               not consent to treble damages nor injunctive relief,
12             and permitted reasonable attorney's fees in a narrow
               class of specified instances.  *Florida Prepaid*
13             *Postsecondary Educ. Expense Bd. v. College Sav.*
               *Bank*, 527 U.S. 627, 648, n.11 (1999).  This suit
14             must be brought in Federal Claims Court against the
               United States and by its plain terms 28 U.S.C.
15             § 1498 does not cover declaratory judgments seeking
               to invalidate a patent.  Further, the federal
16             statute covering declaratory relief actions, the
               Declaratory Judgment Act, 28 U.S.C. §2201, standing
17             alone, does not waive sovereign immunity.  *Wyoming*
               *v. United States*, 279 F.3d 1214, 1225 (10th Cir.
18             2002) (the declaratory judgment statute, 28 U.S.C.
               §2201, itself does not confer jurisdiction on a
19             federal court where none otherwise exists).  "It is
               well settled, however, that said Act [Declaratory
20             Act] does not of itself create jurisdiction; it
               merely adds an additional remedy where the district
21             court already has jurisdiction to entertain the
               suit."  *Wells v. United States*, 280 F.2d 275, 277
22             (9th Cir. 1960).

23                                  ***

24             The United States cannot be joined absent a clear
               waiver of sovereign immunity.  Plaintiffs have not
25             shown such a waiver exists.  The United States
               cannot be joined.

26

27   Doc. 42 at 35-38.

28        Plaintiffs argued that APA section 702, 5 U.S.C. § 702,

                                     9

constitutes a sufficient waiver of sovereign immunity.  After

discussing the APA's waiver of sovereign immunity and

relevant Ninth Circuit authority, the February 20, 2009

decision concluded:

> Plaintiffs have cited no case where the APA § 702
> was invoked as an asserted waiver of sovereign
> immunity for purposes of bringing a patent
> invalidity case against the United States.  However,
> if Plaintiff can amend the Complaint to adequately
> state a § 702 APA claim against the United States,
> it may.

Doc. 42 at 41.

Because the United States was a necessary party that

could not be joined, the February 20, 2009 Decision

considered whether the United States was "indispensable."

*See* Fed. R. Civ. P. 19(b).  "A party is indispensable if in

'equity and good conscience,' the court should not allow the

action to proceed in its absence."  *Dawavendewa,* 276 F.3d at

1161, *quoting* Fed. R. Civ. P. 19(b).  Rule 19(b) sets out

four factors to determine whether a case must be dismissed:

> (1) prejudice to any party or to the absent party;

> (2) whether relief can be shaped to lessen
> prejudice;

> (3) whether an adequate remedy, even if not
> complete, can be awarded without the absent party;
> and

> (4) whether there exists an alternative forum.

*Kescoli v. Babbitt,* 101 F.3d 1304, 1310-11 (9th Cir. 1996).

However, where the absent party cannot be joined in light of

sovereign immunity, "there may be very little need for

balancing ... because immunity itself may be viewed as the compelling factor." *Id.* at 1311.

These factors were applied as follows:

> The first factor weighs in favor of dismissal....Plaintiffs seek to invalidate and declare unenforceable patents owned by the United States.  The validity of the USDA's patent has been challenged.  If invalidated ... the Patents, would be destroyed, Patented Varieties would be freely marketed, and the USDA would lose royalties.  The patents would be declared invalid under claims one through three of the Complaint and unenforceable under claim four for inequitable conduct and claim six for patent misuse.

> ***

> The second factor, whether prejudice can be lessened by shaping the relief provided, also weighs in favor of dismissal.  No declaratory, injunctive or compensatory relief would be granted under the Complaint if the patent's validity were not challenged.  "Any measures to lessen these prejudices would necessarily dilute the efficacy of the judgment sought."  *Messerschmitt-Boelkow-Blohm GmgH v. Hughes Aircraft*, 483 F. Supp. 49, 53 (S.D.N.Y. 1979).  Although the Complaint is brought against the Commission alone, granting declaratory relief requires finding that the Commission had no authority to enforce an invalid patent, that the patent is invalid and unenforceable, a patent which is owned by the USDA, a branch of the United States. Here, any judgment cannot be tailored to eliminate the prejudice to the United States.  A finding for Plaintiffs would declare invalid patents owned by the United States, abrogating the United States' interest in the patents, not only depriving the United States of royalties under the patents, but ending the United States' ability to license the patents.

> ***

> The third factor, adequacy of remedy, also favors dismissal.  "'[A]dequacy' refers not to satisfaction of [Plaintiffs'] claims, but to the 'public stake in settling disputes by wholes, whenever possible.'" *Republic of Philippines*, 128 S.Ct. at 2183, *citing Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968).  As in *Republic of Phillipines*, "[g]oing forward with the action in

the absence of" the United States, "would not further this public interest because they could not be bound by a judgment to which they were not parties." *Id.*  The Court held the University had not waived its Eleventh Amendment immunity.

The fourth factor is whether there is an available alternative forum.  First is the Court of Federal Claims, expressly authorized by statute.  Plaintiffs have an opportunity to raise the defense of patent invalidity and unenforceability in an action brought against them for patent infringement brought by the United States or the Commission.  *See* 35 U.S.C. § 282. [Footnote] However, to require Plaintiffs to violate the license and wait to see whether the patent owner sues for infringement creates an unfavorable situation as damages could be exacerbated.  Where "no alternative forum exists, the district court should be 'extra cautious' before dismissing an action." *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996).  But just as the courts have held in actions involving tribal immunity and state immunity, sovereign immunity of the United States can justify dismissal for inability to join an indispensable party, despite the fact that no alternative forum is available.  "If the necessary party is immune from suit, there may be very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor."  *Id.* at 1311 (internal citations and quotations omitted).  The latest Supreme Court case, *Republic of Philippines v. Pimentel*, 128 S. Ct. 2180 (2008), to address Rule 19, held as to immunity barring an action from proceeding without the sovereign party:

> The analysis of the joinder issue in those cases was somewhat perfunctory, but the holdings were clear: A case may not proceed when a required-entity sovereign is not amenable to suit.  These cases instruct us that where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign. 128 S.Ct. at 2190-91.  In this context, dismissal is appropriate even if Plaintiffs have no alternative forum for their claim.  *See Dawavendewa*, 276 F.3d at 1162.

Because the proceedings in this case threaten both the property and sovereign immunity of the United States, the United States' failure to waive its immunity from suit strongly supports dismissing this

12

litigation in its absence.

Doc. 42 at 42-47.  All of the claims relating to patent invalidity, inequitable conduct, and patent misuse were dismissed on the ground that the United States is a necessary and indispensable party.

The Commission's separate motion to dismiss the anti-trust claim was granted with leave to amend because Plaintiffs did not adequately allege each of the Patented Varieties constitutes its own relevant market.  *Id*. at 62. The misuse claim was likewise dismissed.  *Id*.  Plaintiffs' misuse claim rested in part on allegations that the Commission illegally monopolized interstate and foreign commerce in bad faith by enforcing alleged patent rights, as the exclusive licensee of the patents, and collecting royalty fees on the Patented Varieties under its "amnesty" program. The amnesty program was rejected as a basis for a misuse claim:

> As to the first theory, there is no viable claim for the "amnesty program" as the Commission could not have misused patents that did not exist and at most were inventions in the pre-issuance stage.  License agreements entered into after a patent application has been filed but before the patent issues are not necessarily unenforceable.  *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 264-65 (1979).  The "key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect."  *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998).  Pre-issuance, there is no patent right to impermissibly broaden.  The doctrine of patent misuse could not be brought into play in *Aronson*,

13

which concerned a license agreement entered into
before issuance of the patent, but after patent
application submitted.  440 U.S. at 264-65; *see also
Technology Licensing Corp. v. Gennum Corp.*, No. 01-
04204, 2007 WL 1319528, at *23 (N.D. Cal. May 4,
2007) ("As to Gennum's argument that TLC's
interactions with Ross Video constituted misuse of
the '250 patent, it is a peculiar notion that a
party could "misuse" a patent that is not in
existence.  While it has been called patent misuse
where a patentee seeks to collect royalties after
the expiration of the patent term, it appears that
in such cases the patentee and licensor have
typically entered into the royalty agreement at a
time when the patent is in force.  Again, to the
extent a party demands royalties or demands that
another cease using a product where no patent has
yet issued, the other party is not put to the type
of choice that patent misuse doctrine normally
guards against.  The other party is free to ignore
the demands.")

Doc. 42 at 65-66.

     The Commission's motion to dismiss the unfair
competition claim was denied to the extent that the
allegations extended beyond the dismissed anti-trust
allegations.  *Id.* at 67-71.  Because the unfair competition
claim survived, the claims for unjust enrichment and
constructive trust, which are purely derivative of other
claims in the case, survived as well.  *Id.* at 71.


E.   First Amended Complaint and October 27, 2009 Decision.

     On March 19, 2009, Plaintiffs filed a first amended
complaint ("FAC").  The first cause of action, invoking the
APA, 5 U.S.C. § 702, alleges Federal Defendants acted
arbitrarily, capriciously, and otherwise not in accordance
with applicable laws and regulations by agreeing to engage in

14

a patenting program with the Commission and engaging in activities to pursue that program.  FAC ¶¶ 74-80.  The second, third, and fourth causes of action, brought against all defendants, sought a declaration that the patents are invalid.  FAC ¶¶ 103-138.  The fifth cause of action against all defendants, sought a declaration that the 891 Patent is unenforceable due to Defendants' inequitable conduct.  FAC ¶¶ 139-152.  The sixth cause of action alleged the Commission violated the Sherman and Clayton Acts by monopolizing the national market for grapevine plant material.  FAC ¶¶ 153-165.  The seventh cause of action sought to have the exclusive license agreements between the United States and the Commission invalidated under the patent laws of the United States and the APA.  FAC ¶¶ 166-176.  The eighth claim sought to have the exclusive licenses declared void under state law.  FAC ¶¶ 177-185.  The ninth claim, against the Commission only, was for unfair competition in violation of California Business and Professions Code § 17200 and California common law.  FAC ¶¶ 186-190.  Finally, the tenth and eleventh claims were against the Commission alone for unjust enrichment, FAC ¶¶ 191-93, and constructive trust, FAC ¶¶ 194-97.  Defendants moved to dismiss.

An October 27, 2009 Decision rejected Plaintiffs' argument that *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S.

118 (2007), stands for the proposition that the United

States' immunity does not bar declaratory relief claims

against it for patent invalidity.  Doc. 84 at 20-28.  The

October 27, 2009 Decision next examined whether the APA's

waiver of sovereign immunity had been satisfied.  APA § 702's

waiver of sovereign immunity does not apply where a

particular statute "precludes judicial review."  §

701(a)(1)[1]; *Heckler v. Chaney,* 470 U.S. 821, 828 (9th Cir

1985).  The Patent Act precludes judicial review of any

direct challenges to the patents:

> The Patent Act "reveals Congress's intent to
> preclude judicial review of USPTO examination
> decisions at the behest of third parties protesting
> the issue or reissue of a patent."  *Hitachi Metals,*
> *Ltd. v. Quigg,* 776 F. Supp. 3, 7 (D.D.C. 1991).  The
> district court in *Hitachi* succinctly summarized the
> operation of the Patent Act and its judicial review
> provisions:
>
> > The Patent Statute is addressed to patent
> > owners and patent applicants. The patent
> > examination process is an *ex parte* proceeding,
> > not an adversarial one, and the Patent
> > Statute's judicial review provisions contain no
> > gaps requiring the Court to exercise its power.
> > [FN8]
> >
> > > [FN8] Congress has explicitly designated
> > > other PTO proceedings as *inter partes*,
> > > including patent interferences, 35 U.S.C. §
> > > 135(a), and trademark oppositions and
> > > cancellations, 15 U.S.C. §§ 1063, 1064,
> > > 1067. In contrast, the provisions governing
> > > the patent application and examination
> > > process prescribe an ex parte proceeding.

---

[1] Relatedly, 5 U.S.C. § 702(2) provides that nothing in the APA "confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."

35 U.S.C. §§ 131, 132, 133, 134, 141, and 145. *See also Williams Mfg. Co. v. United Shoe Machinery Corp.*, 121 F.2d 273, 277 (6th Cir.1941) ( "[T]he granting of a patent is not, except when an interference is declared, the result of an adversary proceeding."); *Godtfredsen v. Banner*, 503 F. Supp. 642, 646 (D.D.C. 1980) ("It may well be desirable as a matter of policy to permit an individual to protest the grant of a patent other than by an infringement action, ... that is a decision for the Congress.").

The Patent Statute explicitly authorizes patent owners to apply for reissue of a patent, 35 U.S.C. § 251, and confers on those applicants the right to seek administrative and judicial review of PTO examination decisions. *See* 35 U.S.C. § 131 (administrative appeal of examiner's decision to the Board of Patent Appeals and Interferences); 35 U.S.C. § 134 (direct appeal of Board decisions to the Federal Circuit); 35 U.S.C. § 145 (judicial review by civil action in this court); 35 U.S.C. § 251 (the provisions governing original patent applicants also govern reissue applicants). <u>In contrast, Title 35 contains no provision expressly authorizing administrative or judicial review of a PTO decision at the behest of a third-party protestor</u>.

*Hitachi*, 776 F. Supp. at *8.

***

Any APA claims in the FAC based upon the invalidity of the patents must be dismissed because the APA does not waive sovereign immunity where a particular statute, in this case the Patent Act, precludes judicial review. Defendants' motion to dismiss all patent-related claims (e.g., those that challenge the validity of the patent and/or the methods by which the patent was obtained) is GRANTED WITHOUT LEAVE TO AMEND.

Doc. 84 at 28-34.

The October 27, 2009 Decision next found that the Bayh-Dole Act does not completely commit licencing action to

agency discretion, finding that certain directives in that Act are enforceable:

> The FAC specifically invokes § 209(a)(4), alleging that "USDA's action in granting the Commission an exclusive license to [the Patented Varieties violates the APA] because... the exclusive license is in violation of ... [35 U.S.C.] § 209(a)(4), in that the exclusive license substantially lessens competition in the distribution, production, and reproduction of the Patented Varieties and either creates or maintains a violation of the Federal Antitrust laws as alleged in the Sixth and Ninth Claims for Relief."  FAC ¶90.  Section 209(a)(4)'s requirement that an exclusive or partially exclusive license must "not tend to substantially lessen competition or create or maintain a violation of the Federal antitrust laws," is a "clear and specific directive" that may be enforced by way of the APA's judicial review provisions.
>
> In addition, although no such violation is alleged in the FAC, at oral argument Plaintiffs invoked § 209(a)(1), arguing that granting the license was not a "reasonable and necessary incentive" to either "call forth the investment capital and expenditures needed to bring the invention to practical application"; or "otherwise promote the invention's utilization by the public."  This too is a "clear and specific directive" that may be enforced by a court.

Doc. 84 at 40-41.

The remaining APA challenges were dismissed with leave to amend based on a finding that Plaintiffs lacked prudential standing under the Bayh-Dole Act.   Doc. 84 at 45-48.

Alternatively, the APA claim was dismissed with leave to amend for failure to exhaust administrative remedies. Plaintiff was instructed to specifically allege an excuse-from-exhaustion theory in any amended complaint.  Doc. 84 at

18

59.

The Second, Third, and Fourth Claims For Relief
requesting declarations that the three patents are unlawful
and invalid under the Declaratory Judgment Act and the APA,
the Fifth Claim for Relief requesting a declaration that the
'891 patent is unenforceable because Defendants failed to
fully disclose to the USPTO that the Sweet Scarlet variety
was in the public domain prior to the filing of the patent
application, and the Seventh Claim for Relief seeking a
declaration that the Commission's exclusive license
agreements for the Patented Varieties are void and unlawful
under federal law on the ground that the patents are invalid
and/or were obtained through inequitable conduct were
dismissed because the United States is an indispensable party
to these claims that cannot be joined.  *Id.*

The Sixth Claim for Relief, alleging that the Commission
violated federal antitrust laws by "enforcing patent rights
... and collecting royalties ... while knowing that the
patent on Sweet Scarlet could not be enforced due to prior
public use and inequitable conduct," was dismissed because
Plaintiffs failed to allege facts sufficient to allege a
"*Walker Process*" violation, namely that growers -- the
consumers of grapevines -- do not regard other varieties (or
other crops) as reasonable economic substitutes for the

Patented Varieties.  *Id.* at 60-62.

The Eighth Claim for Relief against the Commission seeking a declaration that the exclusive license agreements for the Patented Varieties are void and unlawful under <u>state law</u> on the grounds that the patents are invalid and/or were obtained through inequitable conduct was dismissed because state law cannot be used to challenge a contract entered into pursuant to federal law where the government is a party.  *Id.* at 62-63.

Finally, the Commission's motion to dismiss the California Unfair Competition Claim was denied, as was their motion to dismiss the derivative unjust enrichment and constructive trust claims.  *Id.* at 63-65.

## II. <u>STANDARD OF DECISION</u>

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001).  To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (May 18, 2009) (quoting *Bell Atl. Corp v. Twombly,* 550 U.S. 544, 570 (2007)).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility

20

> standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (citing *Twombly*, 550 U.S. 556-57).  Dismissal also can be based on the lack of a cognizable legal theory.  *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990).

In deciding whether to grant a motion to dismiss, the court "accept[s] all factual allegations of the complaint as true and draw[s] all reasonable inferences" in the light most favorable to the nonmoving party.  Two Rivers v. Lewis, 174 F.3d 987, 991 (9th Cir. 1999).  A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Manufactured Home Cmtys. Inc. v. City of San Jose,* 420 F.3d 1022, 1035 (9th Cir. 2005) (quoting *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001)).

## III. <u>ANALYSIS</u>

A.   <u>Exhaustion of Administrative Remedies.</u>

Federal Defendants and the Commission move to dismiss the APA claim for failure to exhaust administrative remedies. In accordance with 35 U.S.C. § 209(e), the USDA issued a notice in the Federal Register on April 29, 2003, explaining the agency's intent to grant an exclusive license to the

Commission for the Sweet Scarlet variety.  68 Fed. Reg. 22671

(April 29, 2003).  On December 23, 2004, the USDA issued two

notices in the Federal Register of its intent to grant

exclusive licenses for the Scarlet Royal and Autumn King

varieties to the Commission.  69 Fed. Reg. 76902 (Dec. 23,

2004).  All three notices informed the public that the

proposed licenses would be granted within ninety days unless

the USDA received "written evidence and argument which

establishes that the grant of the license would not be

consistent" with the Bayh-Dole Act and applicable

regulations.  Plaintiffs failed to present any evidence or

argument during the prescribed comment period.

     The October 27, 2009 Decision discussed the relevant

legal standards and dismissed the APA claim for failure to

exhaust, but granted Plaintiffs leave to amend to allege an

excuse-from-exhaustion theory in any amended complaint:

> Defendants argue that the APA allegations should be
> dismissed because Plaintiffs' failed to raise them
> before the agency during administrative proceedings.
> Exhaustion may be imposed either by statute or the
> courts:

>> Of paramount importance to any exhaustion
>> inquiry is congressional intent."  *McCarthy v.
>> Madigan*, 503 U.S. 140, 144 (1992) (citing *Patsy
>> v. Board of Regents of Florida*, 457 U.S. 496
>> (1982) (internal quotation marks omitted)),
>> superceded by statute as stated in *Booth v.
>> Churner*, 532 U.S. 731, 732 (2001).[] "Where
>> Congress specifically mandates, exhaustion is
>> required."  *Id.* (citing *Coit Independence Joint
>> Venture v. FSLIC*, 489 U.S. 561, 579 (1989);

22

Patsy, 457 U.S. at 502 n. 4).  "But where Congress has not clearly required exhaustion, sound judicial discretion governs." *McCarthy*, 503 U.S. at 144 (citing *McGee v. United States*, 402 U.S. 479, 483 n. 6 (1971)). To discern the intent of Congress, "'[w]e look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy.'"  *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1167 (9th Cir. 2008) (quoting *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001)).

*Cassirer v. Kingdom of Spain*, 580 F.3d 1048, 1059-60 (9th Cir. 2009).

Here, although the Bayh-Dole Act does not explicitly impose an exhaustion requirement, it does provide for a notice and comment period:

> Public notice.--No exclusive or partially exclusive license may be granted under section 207(a)(2) unless public notice of the intention to grant an exclusive or partially exclusive license on a federally owned invention has been provided in an appropriate manner at least 15 days before the license is granted, and the Federal agency has considered all comments received before the end of the comment period in response to that public notice. This subsection shall not apply to the licensing of inventions made under a cooperative research and development agreement entered into under section 12 of the Stevenson-Wydler Technology Innovation Act of 1980 (15 U.S.C. 3710a).

35 U.S.C. § 209(e).

The Eleventh Circuit has read an exhaustion requirement into this notice and comment period. *Southern Research Inst. v. Griffin Corp.*, 938 F.2d 1249, 1252-53 (11th Cir. 1991).  In *Southern Research*, a company challenged the government's grant of an exclusive patent license to another entity.  The Eleventh Circuit affirmed dismissal of the action, holding that by failing to raise objections during the prescribed comment period, the company had waived its right to challenge the licensing decision.  *Id*. at 1252-53.  The court

explained that because "[t]he licensing scheme under 35 U.S.C. §§ 207 and 209 and the applicable regulations provided an avenue of administrative appeal of which [the plaintiff] failed to avail itself," judicial review of the licensing decision was precluded. *Id.* at 1253. Plaintiff offers no persuasive argument why the reasoning of *Southern Research* should not apply here to impose an exhaustion requirement on plaintiffs challenging licensing decisions under the Bayh-Dole Act.

Here, in accordance with 35 U.S.C. § 209(e), the USDA issued a notice in the Federal Register on April 29, 2003, explaining the agency's intent to grant an exclusive license to the Commission for the Sweet Scarlet variety. 68 Fed. Reg. 22671 (April 29, 2003). On December 23, 2004, the USDA issued two notices in the Federal Register of its intent to grant exclusive licenses for the Scarlet Royal and Autumn King varieties to the Commission. 69 Fed. Reg. 76902 (Dec. 23, 2004). All three notices informed the public that the proposed licenses would be granted within ninety days unless the USDA received "written evidence and argument which establishes that the grant of the license would not be consistent" with the Bayh-Dole Act and applicable regulations. Plaintiffs failed to present any evidence or argument during the prescribed comment period.

The Ninth Circuit recognizes a number of exceptions to judicially imposed exhaustion requirements. For example, a court "may decide an issue not raised in an agency action if the agency lacked either the power or the jurisdiction to decide it." *Reid v. Engen*, 765 F.2d 1457, 1461 (9th Cir. 1985) (internal citations and quotations omitted). Another exception permits a court to "decide issues over which an agency has power and jurisdiction when exceptional circumstances warrant such review, notwithstanding the petitioner's failure to present them to the agency." *Id.* at 1461-62.

Plaintiffs argue for the application of one or more of these exceptions, asserting that they could not have been aware of certain facts necessary to object to the USDA's Federal Register notices. Specifically, Plaintiffs argue:

24

> At the time of the notice and comment periods,
> Plaintiffs could not have known that (1) the
> USDA obtained a patent on Sweet Scarlet through
> inequitable conduct; (2) the Patented Varieties
> had already been in public use and on sale more
> than a year prior to the filing of the patent
> applications; (3) the USDA and the Commission
> would seek to enforce, license, and collect
> royalties on invalid and unenforceable patents,
> and (4) the USDA would allow the Commission to
> limit distribution to a small number of
> nurseries, including nurseries with family ties
> to Commission board members. Indeed, nothing in
> the notices regarding the USDA's intent to
> exclusively license the Patented Varieties to
> the Commission provided the details regarding
> the planned royalty program.

Doc. 70 at 19-20.

> The first three purportedly unknown facts all
> concern the validity of the patents.  Although these
> arguably implicate the exception for matters outside
> of the agency's power or jurisdiction, these patent-
> related arguments cannot be adjudicated here because
> of sovereign immunity.  The fourth purportedly
> unknown fact -- that the USDA would allow the
> Commission to limit distribution to a small number
> of nurseries, including nurseries with family ties
> to Commission board members -- is arguably relevant
> to a claim that the Commission failed to comply with
> 35 U.S.C. § 209(a), but it is not clear why this
> fact alone, in light of all other known facts, would
> have caused Plaintiffs to comment on the licensing
> proceeding.  Plaintiffs have not demonstrated that
> exhaustion should be excused in this case.

> Defendants' motion to dismiss for failure to exhaust
> is GRANTED WITH LEAVE TO AMEND.  Plaintiffs shall be
> afforded the opportunity to amend on this issue and
> shall allege their excuse-from-exhaustion theory in
> any amended complaint.

Doc. 84 at 54-59 (footnote omitted).

The October 27, 2009 Decision found that plaintiffs

25

offered "no persuasive argument" why the reasoning of
*Southern Research Institute v. Griffin Corp.*, 938 F.2d 1249
(11th Cir. 1991), which imposed an exhaustion requirement on
challenges to licensing decisions under the Bayh-Dole act,
should not apply here.  Plaintiffs attempt to re-argue this
point, citing a number of cases for the proposition that
exhaustion is "discretionary."  For example, Plaintiffs cite
*Marathon Oil Co v. United States*, 807 F.2d 759, 767 (9th Cir.
1986), which re-affirmed the general rule that a court "will
not consider issues not presented before an administrative
proceeding at the appropriate time."  *Marathon* described
several exceptions to this rule:

> We have recognized, however, a number of exceptions
> to the general rule. "We may decide an issue not
> raised in an agency action if the agency lacked
> either the power or the jurisdiction to decide it."
> *Reid*, 765 F.2d at 1461; *see Reese Sales Co. v.
> Hardin*, 458 F.2d 183, 187 (9th Cir.1972). This type
> of issue typically implicates the constitutionality
> of a statute or regulation where the agency does not
> have power to correct a claimed grievance. Reid, 765
> F.2d at 1461; *see, e.g., Bagues-Valles v. INS*, 779
> F.2d 483, 484 (9th Cir. 1985)....
>
> Another exception permits us to "decide issues over
> which an agency has power and jurisdiction when
> 'exceptional circumstances' warrant such review,
> notwithstanding the petitioner's failure to present
> them to the agency." *Reid*, 765 F.2d at 1461; *see
> Page v. Donovan*, 727 F.2d 866, 868 (9th Cir.1984);
> *Getty Oil Co. v. Andrus*, 607 F.2d 253, 255-56 (9th
> Cir.1979). We have previously distinguished between
> administrative exhaustion requirements that are
> based on a statutory directive and those that are
> judicially imposed. *Reid*, 765 F.2d at 1462;
> *Montgomery v. Rumsfeld*, 572 F.2d 250, 252-53 (9th

1

2

3

4

5

6

Cir.1978)[]. Statutory exhaustion requirements implicate concerns of separation of powers and, therefore, the failure to comply with the requirements deprives us of jurisdiction. *Reid*, 765 F.2d at 1462; Montgomery, 572 F.2d at 252-53. We are unaware of any statutory exhaustion requirements that apply here. Thus, we may review Marathon's contention that the Service waived authority to administer one of the leases if exceptional circumstances exist.

7

8

9

10

11

12

13

<u>In determining whether exceptional circumstances exist, we balance "the agency's interests 'in applying its expertise, correcting its own errors, making a proper record, enjoying appropriate independence of decision and maintaining an administrative process free from deliberate flouting, and the interests of private parties in finding adequate redress for their grievances.'"</u> *Litton Industries, Inc. v. FTC*, 676 F.2d 364, 369-70 (9th Cir. 1982), quoting Montgomery, 572 F.2d at 253.

14

*Id*. at 768.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Invoking the exceptional circumstances balancing test, Plaintiffs argue that Defendants "have completely failed to explain how the lack of objection in any way prejudices the USDA in this litigation." Doc. 109 at 7. This ignores the purpose of exhaustion, which is to afford the agency an opportunity to address the issues raised in comments. If Plaintiffs had raised their objections, the Commission could have evaluated the licensing program in view of Plaintiffs' concerns. In *Marathon*, the Ninth Circuit reasoned that Marathon had presented "no reasons why it did not raise the questions it had concerning the alleged waiver during the agency proceedings," and that this "failure to raise the

issue precluded the Service from interpreting its own regulation, particularly with respect to the timeliness, form, and other requirements of the Secretary's finding." *Id*. Likewise, here, the USDA has an interest in applying its expertise to the efficacy of the patents and licensing program, and in having an opportunity to independently correct its own errors, if any are found to exist.

Plaintiffs maintain that dismissing the APA claim will deprive Plaintiffs of any review of the USDA's actions in this case. Doc. 109 at 7. This is not true. As previous decisions in this case have discussed in great detail, Plaintiffs have an opportunity to raise the defense of patent invalidity and unenforceability in an action brought against them for patent infringement brought by the United States or the Commission. *See* 35 U.S.C. § 282. Even though Plaintiffs would have to violate the license and wait to see whether the patent owner sues for infringement creates, thereby risking higher damages, they are not totally without legal recourse. The United States' sovereign immunity precludes any other form of action against the patents directly. Plaintiffs have failed to cite any analogous cases in which "exceptional circumstances" have been found.[2]

---

[2] Plaintiffs cite *Sims v. Apfel*, 530 U.S. 103, 112 (2000), for the proposition that judicially-imposed exhaustion is appropriate only in limited circumstances involving adversarial proceedings. But, *Sims* concerns issue exhaustion, "an analogy to the rule that appellate courts

1.   **Futility.**

Exceptional circumstances warranting excuse from the exhaustion requirement may be present where "objective and undisputed evidence of administrative bias would render pursuit of an administrative remedy futile." *Anderson v. Babbitt*, 230 F.3d 1158, 1164 (9th Cir. 2000) (internal citations and quotation omitted).  Plaintiffs attempt to invoke this exception, arguing that the USDA had "predetermined that it would grant the Commission an exclusive license to the patented varieties regardless of the objections received."  Doc. 109 at 17.  Plaintiffs' argument continues:

> The Commission admits that prior to the comment
> period for the patented varieties, the USDA had
> already decided to give the Commission an exclusive
> license to Sweet Scarlet and other patented
> varieties to be chosen by the Commission. This is
> demonstrated by the Memorandum of Understanding
> between the USDA and the Commission and the private
> meetings between the Commission and USDA that took
> place before the comment period for Sweet Scarlet,
> during which the Commission and the USDA decided
> several issues relating to the patent licensing
> program.
>
> Moreover, Plaintiffs allege that Commission
> effectively controlled the patenting licensing
> program with the USDA. Specifically, the Commission
> selected which plant varieties would be patented and
> licensed to the Commission, and the USDA

will not consider arguments not raised before trial courts," which is wholly separate from the general requirement of exhaustion of administrative remedies.  While it may only be appropriate to impose issue exhaustion where the parties could fully develop the issues in an adversarial proceeding, there is no such restriction on the more general requirement of exhaustion of administrative remedies.

29

consistently acquiesced to the Commission's decisions. (SAC at ¶¶51-53.) Further, the USDA received a significant portion of its research funding for grape varieties from the Commission. Under these circumstances, the USDA had a clear bias towards granting the Commission an exclusive license to the patented varieties and had predetermined that the Commission would receive the exclusive licenses. No objection by Plaintiffs would have changed that result. Tellingly, Defendants do not even allege that any objections would have altered the USDA's decision-making process or that the absence of objections in anyway prejudices the USDA in this litigation.

Doc. 109 at 17-18.

This is not "objective and undisputed evidence of bias." The Memorandum of Understanding upon which Plaintiffs rely states only that the USDA would "[r]eview ... any license application obtained from The Commission." *See* Doc. 111-1, Ex. 14 at 2.  *See United States v. Litton Industries, Inc.*, 462 F.2d 14, 18 (9th Cir. 1972) (administrative review not futile because plaintiff's allegations of bias are purely speculative).

Plaintiffs have not alleged facts that suggest that exhaustion should be excused on the basis of futility.

2.  **Lack of Standing.**

Plaintiffs next argue that exhaustion should be excused because they lacked standing at the time of the comment period.  Plaintiffs maintain "at the time of each of the comment periods for the patented varieties, no patent had issued and no patent application had been published," and

that as a result, "Plaintiffs could not have been injured by the USDA's granting the Commission a patent license." Doc. 109 at 9. Plaintiffs point out that the regulations implementing the Bayh-Dole Act provide for administrative appeal from licensing decisions if the party appealing can "demonstrate to the satisfaction of the Federal agency that such person may be damaged by the agency action." 37 C.F.R. § 404.11(a)(3). But, the Commission correctly rejoins that restrictions on the opportunity for administrative appeal did not limit Plaintiffs' ability to file comments during the notice and comment period. *See* 35 U.S.C. § 209(e); 37 C.F.R. § 404.7.

 3.   <u>Knowledge.</u>

Plaintiffs also argue that exhaustion should be excused because they lacked actual or constructive knowledge of any violations of the Bayh-Dole Act during the comment period, at least for Sweet Scarlet. The SAC contains the following relevant allegations:

> 78. On April 29, 2003, the USDA published notice in the Federal Register of its intent to grant an exclusive license to the Commission for the Sweet Scarlet patent. The Federal Register notice did not state the terms of the license, and provided no information on whether growers would be authorized to reproduce or distribute the Sweet Scarlet variety, whether growers would incur any costs to obtain the Sweet Scarlet variety, or whether growers would incur any royalty expenses for the Sweet Scarlet variety. Indeed, the Federal Register notice contained no information whatsoever regarding the

31

exclusive licensing terms and conditions that the
Commission had secretly negotiated with the USDA. In
or about 2003, the USDA entered into an exclusive
license with the Commission for the Sweet Scarlet
patent. On December 23, 2004, the USDA published
notice in the Federal Register of its intent to
grant an exclusive license to the Commission for the
Autumn King and Scarlet Royal patents. The Federal
Register notice did not state the terms of the
license, and provided no information on whether
growers would be authorized to reproduce or
distribute the Autumn King and Scarlet Royal
varieties, whether growers would incur any costs to
obtain the Autumn King and Scarlet Royal varieties,
or whether growers would incur any royalty expenses
for the Autumn King and Scarlet Royal varieties.
Indeed, the Federal Register notice contained no
information whatsoever regarding the exclusive
licensing terms and conditions that the Commission
had secretly negotiated with the USDA. In or about
June, 2005, the USDA entered into an exclusive
license with the Commission for the Autumn King and
Scarlet Royal patents.

79.  At the time of these notices, Plaintiffs did
not know and could not have known that the USDA
authorized and that the Commission intended to
charge patent licensing royalties for the
distribution of the Patented Varieties from the same
grower who already paid for a significant portion of
their development costs. Plaintiffs also did not
know and could not have known that the Commission
intended to only allow three nurseries to distribute
plant material for the Patented Varieties.
Plaintiffs also did not know and could not have
known that the Commission intended include
restrictions on the distribution and propagation of
plant material by growers who obtained the Patented
Varieties. At the time of the notices, Plaintiffs
had every reason to believe that the distribution of
the Patented Varieties would continue to be free of
charge and restrictions to local growers (including
Plaintiffs), as had been the case for over a decade
with prior USDA-developed grapevine varieties.
Indeed, at the time of the notices, Plaintiffs
expected that the Patent Licensing program would be
used for its original intended purpose – to protect
Plaintiffs and other growers from foreign

32

competition. Plaintiffs did not know, and the USDA did not advice [sic] in the Federal Register notices, the USDA had agreed to allow the Commission to use the Patent Licensing program and a way to extract an additional tax from growers, and to effectively usurp complete control over the reproduction and distribution of new grapevine varieties.

80. As such, Plaintiffs lacked information necessary and sufficient to raise any objections to the noticed licenses, including objections to the licenses under the terms of the Bayh-Dole Act raised in this SAC. Specifially [sic], at the time of the notices, Plaintiffs did not have sufficient information to determine or believe that the exclusive license between the USDA and the Commission for the Patented Varieties violated any provisions of the Bayh-Dole Act. Because Plaintiffs lacked the information needed to raise objections to the exclusive license granted to the Commission for the Patented Varieties at the time of the Federal Register Notices, and because the Federal Register notices lacked any information from which Plaintiffs could have concluded that the exclusive licenses violated provisions of the Bayh-Dole Act, any exhaustion of Plaintiffs' rights resulting from a purported failure to raise those objections at that time of the Federal Register notices should be excused.

Essentially, Plaintiffs allege that their exhaustion should be excused because, although the Notices did announce the USDA's intention to grant exclusive licenses to the Commission, they did not contain the specific terms of those exclusive licenses and specifically did not explain that the Commission "intended to charge patent licensing royalties for the distribution of the Patented Varieties from the same grower who already paid for a significant portion of their development costs."  Rather, Plaintiffs allege that they "had

every reason to believe that the distribution of the Patented

Varieties would continue to be free of charge and

restrictions to local growers (including Plaintiffs), as had

been the case for over a decade with prior USDA-developed

grapevine varieties."   SAC ¶79.   This conflicts with the

record.

    Plaintiffs are presumed as a matter of law to have been

aware of the content of the relevant Federal Register

Notices.   *See* 44 U.S.C. § 1507.   The entire Sweet Scarlet

Notice was approximately one page in length and provided:

> ACTION: Notice of availability and intent.
>
> SUMMARY: Notice is hereby given that the table grape variety designated "Sweet Scarlet" is available for licensing and that the U.S. Department of Agriculture, Agricultural Research Service, intends to grant to the California Table Grape Commission of Fresno, California, an exclusive license to this variety.
>
> DATES: Comments must be received within ninety (90) calendar days of the date of publication of this notice in the Federal Register.
>
> ADDRESSES: Send comments to: USDA, ARS, Office of Technology Transfer, 5601 Sunnyside Avenue, Room 4-1174, Beltsville, Maryland 20705-5131.
>
> FOR FURTHER INFORMATION CONTACT: June Blalock of the Office of Technology Transfer at the Beltsville address given above; telephone: 301-504-5989.
>
> SUPPLEMENTARY INFORMATION: The Federal Government's patent rights to this invention are assigned to the United States of America, as represented by the Secretary of Agriculture. It is in the public interest to so license this invention as the California Table Grape Commission of Fresno,

California, has submitted a complete and sufficient application for a license. <u>The prospective exclusive license will be royalty-bearing</u> and will comply with the terms and conditions of 35 U.S.C. 209 and 37 CFR 404.7. The prospective exclusive license may be granted unless, within ninety (90) days from the date of this published Notice, the Agricultural Research Service receives written evidence and argument which establishes that the grant of the license would not be consistent with the requirements of 35 U.S.C. 209 and 37 CFR 404.7.

Michael D. Ruff,

Assistant Administrator.

68 Fed. Reg. 22,671-01.  The Notices for Autumn King and Scarlet Royale were substantially the same.  69 Fed. Reg. 76,902.  These notices were short, concise, and clearly stated that it was the USDA's intent to grant the Commission an exclusive "royalty bearing" license.  This alone was enough to put Plaintiffs on notice that they no longer "had every reason to believe that the distribution of the Patented Varieties would continue to be free of charge and restrictions to local growers (including Plaintiffs), as had been the case for over a decade with prior USDA-developed grapevine varieties."  It was incumbent upon Plaintiffs to request information from the Commission about the terms of the proposed licenses.  They have proved themselves capable of objecting to every revenue-producing activity of the Commission for more than a decade.

These same Plaintiffs demonstrated their awareness of

the relevant facts by filing a lawsuit on February 10, 2005, more than five weeks before the deadline for submission of comments regarding the exclusive licenses for Autumn King and Scarlet Royale, containing factual allegations describing the royalty program in detail.  Doc. 102, Ex. 11 ("2005 Compl.").[3]  For example, that complaint alleges that "nurseries who wish to be sublicensees [must] pay and annual $5000.00 'participation fee' per variety and a one dollar 'per production unit royalty' to the Commission."  *Id*. at ¶14.  It was also alleged that "the nurseries will charge ... growers their regular nursery fees plus at least the $1.00 fee per vine that said nurseries must pay to the Commission.  *Id*. at ¶16.  At least with respect to Autumn King and Scarlet Royale, this lawsuit affirmatively demonstrates Plaintiffs' actual knowledge of the nature and terms of the royalty program prior to the close of the comment periods for those varietals.

The lawsuit post-dated the close of the comment period for Sweet Scarlet.  With respect to Sweet Scarlet, Plaintiffs' claim that, although they may have imputed knowledge that the license would be "royalty bearing" from the Federal Register Notice prior to the close of the comment period for Sweet Scarlett, they were ignorant of the nature

_____

[3] This Complaint is a matter of public record, judicially noticeable for its existence and content under Federal Rule of Evidence 201.

36

of the licensing program and therefore did not know that the licensing program might harm their interests.

In response, the Commission points out that detailed information about the licensing program was provided at open meetings of the Commission before expiration of any of the comment deadlines. *See* Doc. 102, Ex. 5 (Commission Executive Committee Meeting, April 1, 2003) (explaining that state-certified nurseries would distribute the stock, those nurseries would be required to pay a $5,000 per variety fee and a $1 per production unit royalty, and "growers would be required to sign an agreement acknowledging that they are not allowed to self-propagate, self-graft, sell, trade, or give plant material away.")  The meetings and agenda were posted on the Commission's web site. *Id.*, Ex. 5 & 6.  In addition, on May 7, 2004, the Commission sent a letter to all California growers and shippers about its patenting and licensing program, explaining that there would be a plant royalty to be paid upon purchase. *See* Doc. 102, Ex. 7.

Plaintiffs rejoin that the law does not impute knowledge to Plaintiffs of the Commissions' meetings and that the evidence offered by Defendants cannot be considered on a motion to dismiss.  This is, again, incorrect.  In *Wyatt v. Terhune*, 315 F.3d 1108, 1119-20 (9th Cir. 2003), the Ninth Circuit held that in ruling on a dismissal motion based on

failure to exhaust nonjudicial remedies, the district court "may look beyond the pleadings and decide disputed issues of fact."  Plaintiffs suggest that the Supreme Court's 2007 decision in *Jones v. Bock*, 549 U.S. 199 (2007), decided January 22, 2007, undermines the reasoning of *Wyatt*.  *Jones* held that, under the Prison Litigation Reform Act of 1995, failure to exhaust is an affirmative defense which defendant has the burden of pleading and proving.  *Id*. at 212.  Relying on *Jones*, an unpublished decision by Magistrate Judge Brennan of this District, not binding authority on a district court, concluded that, where a motion to dismiss for failure to exhaust requires consideration of affidavits and exhibits, it should be decided on summary judgment.  *See Bryant v. Sacramento County Jail*, 2008 U.S. Dist. LEXIS 10273, 6-7 (E.D. Cal. Feb. 12, 2008).  However, numerous Ninth Circuit decisions post-dating *Jones* have reaffirmed *Wyatt's* holding that a court may look beyond the pleadings to decide a motion to dismiss for failure to exhaust non-judicial remedies. *See, e.g., O'Guinn v. Lovelock Correctional Center*, 502 F.3d 1056, 1059 (9th Cir. 2007) (decided in September 2007, more than eight months after Jones)(applying the approach articulated in Wyatt to a case brought under the PLRA); *Battle v. Holly*, 2010 WL 737656, *1 (9th Cir. 2010)(same); *Smith v. Hernandez*, 333 Fed. Appx. 309 (9th Cir. 2009)(same

as to claim brought under 42 U.S.C. § 1983).  *Jones* has no authoritative effect.

It is unnecessary to look to this extra record evidence because the Federal Register Notice was sufficient. Ignorance of the specific facts giving rise to injury does not excuse exhaustion, if Plaintiffs were on notice of the general terms of the of the licenses and the potential for harm.  *See Bicycle Trails Council of Marin v. Babbitt*, 1994 WL 508892 (N.D. Cal. Sept. 1, 1994).  That case concerned a rule promulgated by the National Park Service banning the use of bicycles on all off-road areas within National Parks. Plaintiffs claimed that they did not object to the rule during the administrative process because they "did not realize how detrimental it would be to their interests until a [subsequent] trail plan was promulgated."  *Id*. at *4.  This argument was rejected because the rule "clearly banned bicycle access to all off-road areas as the baseline condition.  Plaintiffs' failure to realize that the rule as applied might harm their interests does not excuse their failure to participate."  *Id*.

As in *Bicycle Trails*, the Federal Register notice stated there would be royalties to be paid as the "baseline condition."  Plaintiffs had no basis to assume they would be exempted and could not defer further inquiry based upon that

assumption.  Although the impact of the Federal Register in this case was slightly less obvious, it was sufficient notice that royalties had to be paid, absent some exception to the baseline rule.

Plaintiffs cite *Niagra Mohawk Corp. v. Federal Energy Regulatory Commission*, 452 F.3d 822, 827 (D.C. Cir. 2006), for the proposition that a party need not seek administrative review of an agency action unless and until they are on notice that the action will damage their interests.

*Niagra Mohawk* does not stand for the proposition that administrative exhaustion is only required after a party "feels the pinch" of a regulation.  In *Niagra Mohawk*, FERC issued a series of orders concerning the electric power market in New York.  A 1996 order enunciated certain principles that laid the groundwork for certain practices in the region, including an industry practice called "netting." *Id*. at 824-25.  Niagra Mohawk was not dissatisfied with the "practical impact" of the 1996 order, and did not challenge it, either administratively or in court.  *See id*. at 827. Subsequently, FERC entered certain other orders, expanding the 1996 framework.  FERC argued that Niagra Mohawk should not be permitted to challenge the subsequent orders on the ground that regulation of "netting" was beyond FERC's statutory authority.  *Id*.  The D.C. Circuit held that Niagra

Mohawk did not "forfeit[] their right to challenge the principle of netting by not petitioning for review earlier." *Id*. A party "need not seek review if it is satisfied with the practical impact of the order" and failure to do so "does not foreclose its ability to challenge the principle as beyond the agency's statutory authority when the agency later utilizes [the principle] to cause substantial injury."  *Id*.

The present circumstances are not analogous.  At best, Niagra Mohawk stands for the proposition that failure to seek administrative review of a previous administrative action does not bar a party from seeking review of a subsequent administrative action that builds upon the initial administrative action.  Here, Plaintiffs seek to challenge in court the only particular administrative action that they failed to challenge at the administrative level. *Niagra Mohawk* is simply inapplicable to the present circumstances.

In the final analysis, the Federal Register Notice was sufficient to put Plaintiff on actual and inquiry notice of the general thrust of the regulation and the potential for harm.  Plaintiffs' failure to raise any of their concerns with the agency, when it would have enabled the agency to remedy Plaintiffs' concerns, precludes judicial review. Plaintiffs have had several opportunities to state a valid claim against Defendants and have not stated an alternative

excuse-from-exhaustion theory.  State Defendants' motion to
dismiss the APA claim is GRANTED WITHOUT LEAVE TO AMEND.

B.   **Plaintiffs' Concede that their APA Claims Do Not Seek to Challenge the Patents.**

    USDA argues that to the extent the APA claims actually
challenge the government's right to enforce its patent
rights, such challenges should be dismissed because
Plaintiffs have failed to identify a valid waiver of the
United States' sovereign immunity as to such claims.  Doc.
100 at 10.  In response, Plaintiffs concede that they do not
challenge the USDA's right to obtain and enforce patents;
they challenge only the legality of the Commission's
licensing scheme.  Doc. 109 at 19.  Any such claim is
DISMISSED WITHOUT LEAVE TO AMEND.

C.   **Unfair Competition Claim.**

    The California Unfair Competition Law ("UCL"), Cal. Bus.
& Prof. Code §§ 17200 et seq., prohibits any "person" from
engaging in "unlawful, unfair or fraudulent business act[s]
or practice[s]."  *Id.* §§ 17201, 17203.  Plaintiffs' UCL claim
was previously dismissed, with the exception of their "double
payment" theory, which alleges that the Commission engaged in
unfair competition by using assessments collected from
California growers to help fund the USDA's breeding program
and then indirectly charged growers a licensing fee to use

42

the patented varieties that the USDA develops.  *See* Doc. No.

84, at 63-65.  Recognizing that the UCL claim was not the

central focus of the Commission's prior motions, the

Commission's motion was denied as to the UCL claim "without

prejudice."  *Id.* at 65.

The Commission now moves to dismiss the UCL for a third

time, arguing (1) the claim is preempted by federal law; (2)

the Commission is not a proper defendant under § 17200; and

(3) Plaintiffs fail to state a claim under the statute.

    1.   **Preemption.**

        a.   **Preemption by the Patent Act.**

The Commission maintains that federal patent law

preempts this UCL claim.  The same argument was raised and

rejected in *California Table Grape Com'n v. RB Sandrini,*

*Inc.,* 2007 WL 1847631, 26-27  (E.D. Cal. 2007), in which the

Commission was the plaintiff:

> **Federal patent law may preempt state law if it**
> **"stands as an obstacle to the accomplishment and**
> **execution of the full purposes and objectives of**
> **Congress."**  *Kewanee Oil Co. v. Bicron Corp.*, 416
> **U.S. 470, 479 (1974).  "When state law touches upon**
> **the area of federal statutes enacted pursuant to**
> **constitutional authority, it is familiar doctrine**
> **that the federal policy may not be set at naught, or**
> **its benefits denied by the state law."**  *Id.* at 479-
> **80.**
>
> **Patent law will not preempt state law claims if such**
> **claims "include additional elements not found in the**
> **federal patent law cause of action and if they are**
> **not an impermissible attempt to offer patent-like**
> **protection to subject matter addressed by federal**
> **law."**  *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d
> **1294, 1306 (Fed. Cir. 1999).**

***

> Unfair competition requires a plaintiff to prove the
> defendant "engaged in an unfair business practice,
> that is, a business practice that is immoral,
> unethical, oppressive, unscrupulous, or
> substantially injurious." *Id.* (citing *People v.
> Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App.
> 3d 509, 206 (Cal. Ct. App. 1984)).  "Unfair
> competition prevents unethical and oppressive
> business practices." *Rodime*, 174 F.3d at 1306.
>
> In *Rodime*, the Federal Circuit addressed whether,
> under California law, tortious interference with
> prospective economic relations and unfair
> competition were preempted by federal patent law.
> The court held that "these state law causes of
> action do not constitute an impermissible attempt to
> offer patent-like protection to subject matter
> addressed by federal law." *Id.*  The court held
> "because these state law causes of action protect
> interests different from federal patent law, federal
> law does not preempt [the plaintiff's] state law
> claims." *Id.*
>
> The Commission's state law claims are not foreclosed
> as a matter of law because they have different
> elements and do not constitute an impermissible
> attempt to offer patent-like protection.  Sandrini's
> motion for summary judgment as to the Commission's
> state law claims is DENIED.

At issue in *Sandrini* were the Commission's claims that

Sandrini was liable for "unfair competition" under the UCL

because he "unlawfully and unfairly used misappropriated USDA

property for his own gain at the expense of other growers,

and ... unlawfully and unfairly concealed his actions." *Id.*

at *25.  The Commission also alleged that Sandrini

intentionally interfered with the Commission's prospective

economic advantage and was unjustly enriched by virtue of

Sandrini's alleged possession of Autumn King plant material

without a license from the Commission.  *Id.* at *26.

44

The Commission suggests that *Sandrini* is distinguishable, because that case concerned whether the state could go further in protecting patent rights, while, here, the issue is whether the UCL claim undermines the purposes of the Patent Act.  The Commission cites *Biotechnology Industry Organization v. District of Columbia*, 496 F. 3d 1362, 1371-75 (Fed. Cir. 2007) ("*BIO*"), which concerned legislation passed by the D.C. City Council which prohibited any patented drug from being sold in the District at an "excessive price."  *Id*.  Plaintiffs alleged that the legislation was preempted by federal Patent law because it stood as an obstacle to the accomplishment and execution of the federal patent scheme.  The Federal Circuit reviewed the purposes of the federal patent laws vis-à-vis price controls:

> We have noted that "the essential criteria" for determining whether a state law is preempted are "the objectives of the federal patent laws."  *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1333 (1998). The fundamental goal of the patent law is spelled out in the Constitution: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Inventors are impelled to invest in creative effort by the expectation that, through procurement of a patent, they will obtain a federally protected "exclusive right" to exclude others from making, using, or selling embodiments of their invention. Patentees value the right to exclude in part because the ability to foreclose competitors from making, using, and selling the invention may allow them an opportunity to obtain above-market profits during the patent's term.

45

This court has repeatedly recognized as important the pecuniary rewards stemming from the patent right:

> We have long acknowledged the importance of the patent system in encouraging innovation. Indeed, "the encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude." ... Importantly, the patent system provides incentive to the innovative drug companies to continue costly development efforts.

*Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed.Cir.2006) (quoting *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 599 (Fed.Cir.1985)).

> [T]he Patent Act creates an incentive for innovation. The economic rewards during the period of exclusivity are the carrot. The patent owner expends resources in expectation of receiving this reward. Upon grant of the patent, the only limitation on the size of the carrot should be the dictates of the marketplace.

*King Instruments Corp. v. Perego*, 65 F.3d 941, 950 (Fed.Cir.1995).

....Congress, too, has acknowledged the central role of enhanced profits in the statutory incentive scheme it has developed. In the legislative history of the Drug Price Competition and Patent Term Restoration Act of 1984 (popularly known as the "Hatch-Waxman Act"), the House Committee on Energy and Commerce observed:

> Patents are designed to promote innovation by providing the right to exclude others from making, using, or selling an invention. They enable innovators to obtain greater profits than could have been obtained if direct competition existed. These profits act as incentives for innovative activities.

H.R.Rep. No. 98-857, at 17 (1984), U.S.Code Cong. &

Admin.News 1984, pp. 2647, 2650; *see also id.* at 15, U.S.Code Cong. & Admin.News 1984, pp. 2647, 2648 ("The purpose of Title II of the bill is to create a new incentive for increased expenditures for research and development.").

Of course, the patent laws are not intended merely to shift wealth from the public to inventors. Their purpose is to "promote the Progress of ... useful Arts," U.S. Const. art. I, § 8, cl. 8, ultimately providing the public with the benefit of lower price through unfettered competition. That goal is underscored by the Constitutional command that periods of exclusivity be for "limited Times." *Id.* Once the patent expires and the inventor's exclusive rights terminate, others may enter the market with products based on the teachings of the patent, which must "enable any person skilled in the art ... to make and use the [invention]." 35 U.S.C. § 112 ¶ 1. If the market functions properly, this new participation will bring down the formerly elevated price of the patented product to competitive levels. These two objectives-to reward innovators with higher profits and to keep prices reasonable for consumers-are in dialectic tension. The Supreme Court has noted that "[t]he tension between the desire to freely exploit the full potential of our inventive resources and the need to create an incentive to deploy those resources is constant." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989); *see also Hunter Douglas*, 153 F.3d at 1333 ("[T]he objectives of the federal patent laws .... are in some tension with one another, and Congress struck a balance between them."). Congress, as the promulgator of patent policy, is charged with balancing these disparate goals. The present patent system reflects the result of Congress's deliberations. Congress has decided that patentees' present amount of exclusionary power, the present length of patent terms, and the present conditions for patentability represent the best balance between exclusion and free use.

*Id.* at 1372-73.  The Federal Circuit then examined whether the District's legislation was in conflict with and preempted by federal patent law.

47

It is unquestioned that the District has general police power within its borders and that "[w]hatever rights are secured to inventors must be enjoyed in subordination to this general authority of the State over all property within its limits," *Webber v. Virginia*, 103 U.S. 344, 348 (1880). But general state power must yield to specific Congressional enactment: "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138 (1988) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). Furthermore, this Act is in no way general, affecting only patented products. The Act's operation stands largely-indeed, exclusively-within the scope of the patent laws, and its effect is to shift the benefits of a patented invention from inventors to consumers.

By penalizing high prices-and thus limiting the full exercise of the exclusionary power that derives from a patent-the District has chosen to re-balance the statutory framework of rewards and incentives insofar as it relates to inventive new drugs. In the District's judgment, patents enable pharmaceutical companies to wield too much exclusionary power, charging prices that are "excessive" for patented drugs. The Act is a clear attempt to restrain those excessive prices, in effect diminishing the reward to patentees in order to provide greater benefit to District drug consumers. This may be a worthy undertaking on the part of the District government, but it is contrary to the goals established by Congress in the patent laws. The fact that the Act is targeted at the patent right is apparent on its face. It applies only to patented drugs. D.C. Code § 28-4553. The District has thus seen fit to change federal patent policy within its borders. The underlying determination about the proper balance between innovators' profit and consumer access to medication, though, is exclusively one for Congress to make. As the Supreme Court has noted, "[w]here it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess." *Bonito Boats*, 489 U.S. at 152; *see also Webber*, 103 U.S. at 347 (noting that sale of patented articles "cannot be forbidden by the State, nor can the sale of the article or machine produced be restricted except as the

48

> production and sale of other articles, for the
> manufacture of which no invention or discovery is
> patented or claimed, may be forbidden or
> restricted").

> The Act stands as an obstacle to the federal patent
> law's balance of objectives as established by
> Congress. Accordingly, we conclude that it is
> preempted by federal patent law.

*Id.* at 1373-74.

Here, Plaintiffs' UCL claim alleges:

> The Commission has unlawfully and unfairly exploited
> the '284, '891 and '229 patents in a manner that
> violates antitrust laws and in a manner that
> attempts to extend these patents beyond their lawful
> scope. Such acts constitute unfair trade practices
> and unfair competition under California Business and
> Professions Code §17200, et seq., and under the
> common law of the State of California, entitling
> Plaintiffs to relief.

SAC ¶85.

Plaintiffs' allegation that the Commission violated the

UCL because it was utilizing the patents in a manner that

violates antitrust laws by alleged exploitation of patent law

rights to monopolize and profit was dismissed by the October

27, 2009 Decision, Plaintiffs' underlying antitrust claims

were rejected, as was the UCL claim, with the exception of

any UCL claim based on a "double payment" theory (i.e., that

the Commission collected patent royalties from growers who

already paid for the research and development of the Patented

Varieties through assessment fees).  Doc. 84 at 63-65.  Any

such UCL allegation based on a "double payment" theory

implicates the scope of the license agreement, not the scope of the patents.  The Bayh Dole Act, rather than the Patent Act, governs patent licensing.  Whether any such claim is preempted by the Bayh Dole Act is addressed below.

To the extent Plaintiffs allege that the Commission is unfairly using a patented product this too arguably implicates the nature and scope of their exclusive license. Alternatively, if Plaintiffs are alleging that the Commission's actions are exceeding the scope of the patent, this implicates the nature and scope of the patent itself. This is unlike *Sandrini*, where the allegation was that Sandrini was unfairly misusing a patented product.  Any state law challenge that implicates the scope of the patent is preempted by federal patent law, which governs the scope of patents.  *See* 35 U.S.C. § 112 (defining the content of a specification to include "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."); *Reiffin v. Microsoft Corp*., 214 F.3d 1342, 1345 (Fed Cir. 2000)(explaining that the purpose of § 112  is "to ensure

50

that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification."). "Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess." *Bonito Boats*, 489 U.S. at 152. In particular, where a state law cause of action hinges on a finding that implicates federal patent law (such as the scope of a patent), the state law must yield. *See Univ. of Colo. Found. Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1373-74 (Fed. Cir. 1999)(patent law preempts state law causes of action that "hinge" on finding of inventorship under the Patent Act). That the Patent Act permits inventors to realize such profits in the marketplace is not illegal.

> b. <u>Preemption by the Bayh-Dole Act.</u>

The Commission also agues that Plaintiffs' double-payment theory conflicts with the purposes and provisions of the Bayh-Dole Act. Congress enacted the Bayh-Dole Act to facilitate the patenting and licensing of inventions produced by the federal government or with federal support. The Act authorizes each federal agency to "apply for, obtain, and maintain patents or other forms of protection ... on inventions in which the Federal Government owns a right, title, or interest." 35 U.S.C. § 207(a)(1). It also

authorizes agencies to "grant nonexclusive, exclusive, or partially exclusive licenses under federally owned inventions, royalty-free or for royalties or other consideration, and on such terms and conditions ... as determined appropriate in the public interest." *Id.* § 207(a)(2) (emphasis added).

The Bayh-Dole act embodies Congress' intent to create a system in which federal agencies could patent their inventions, grant exclusive licenses, administer their rights through third parties, and charge royalties. The Commission correctly points out that:

> Government patents are funded in whole or in part by tax revenue and can be supported by entities working in partnership with the government. Yet, the Bayh-Dole Act permits the government to collect royalties from all licensees, including taxpayers and any others who support the development of an invention. The same is true when businesses and nonprofit organizations obtain patents based on federally funded research.

Doc. 102 at 18.

A plaintiff cannot use state law to "interfere[] with the 'methods by which the federal statute was designed to reach [its] goal.'" *Ting v. AT&T*, 319 F.3d 1126, 1137 (9th Cir. 2003) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)). Here, the Bayh-Dole Act sets forth a "method" by which exclusive licenses are issued, specifically precluding the issuance of exclusive licenses unless the issuing Federal agency has determined that:

> (A) The public will be served by the granting of the license, in view of the applicant's intentions, plans and ability to bring the invention to the point of practical application or otherwise promote the invention's utilization by the public.
>
> (B) Exclusive, co-exclusive or partially exclusive licensing is a reasonable and necessary incentive to call forth the investment capital and expenditures needed to bring the invention to practical application or otherwise promote the invention's utilization by the public; and
>
> (C) The proposed scope of exclusivity is not greater than reasonably necessary to provide the incentive for bringing the invention to practical application, as proposed by the applicant, or otherwise to promote the invention's utilization by the public;

37 U.S.C. § 404.7.  This requires USDA to assess the "reasonableness" of the license terms, an exercise of discretion that would be substantially impeded if Plaintiffs could challenge the license terms as "unfair" under the UCL. Plaintiffs' UCL claim is preempted by the Bayh-Dole Act.

Even if the Bayh-Dole Act did not preempt the UCL claim as a matter of law, the Federal Government is a party to the exclusive license being challenged by the UCL claim.  As the October 27, 2009 Decision concluded:

> It is unnecessary to engage in a preemption analysis because, state law cannot be used to challenge a contract entered into pursuant to federal law where the government is a party. *See O'Neill v. United States*, 50 F.3d 677, 682 (9th Cir. 1995) ("Federal law governs the interpretation of contracts entered into pursuant to federal law where the government is a party.").

Plaintiffs argue that they "do no seek a sweeping prohibition on the Commission's and the USDA's right to

license patented inventions and charge royalties for those

patents when doing so complies with the law and is fair."

Doc. 109 at 21.  Rather, they maintain that their UCL claims

> are based on the specific facts and licensing scheme
> alleged, namely the charging of royalties where the
> exclusive license to the Commission was invalid and
> unlawful for failing to meet the requirements of the
> Bayh-Dole Act, particularly where the licensees paid
> for the development of the patented varieties. An
> adjudication of that particular scheme's fairness
> would in no way interfere or impair the Commission's
> or the USDA's general patent rights. Nor would
> adjudication of Plaintiffs' claims undermine the
> Commission's or the USDA's patent rights. To the
> contrary, an adjudication of Plaintiffs claim would
> seek, in part, to adjudicate whether the
> Commission's and the USDA's actions are consistent
> with the controlling patent law of the Bayh-Dole
> Act.

*Id.*  This is unpersuasive.  An adjudication of the licenses'

fairness would certainly interfere with the methods by which

the Bayh-Dole Act was designed to reach its goals.  This is

not done on a case-by-case basis where the United States'

objectives are capable of being thwarted by State law.

     To the extent the UCL claim directly challenges the

fairness of the licenses issued under the Bayh-Dole Act, it

is preempted by the Bayh-Dole Act.

     At oral argument, Plaintiffs attempted to redefine their

claim once again, asserting that they are not challenging the

licenses themselves as "unfair" under the UCL.  Rather, they

claim the licensing was unfairly administered by the

Commission, because, for example, "it went about limiting the

licenses to three nurseries, one with family ties to the

Commission."  6/28/10, Rough Tr. at 30:17-19.

Plaintiffs' counsel summarized his UCL claim as follows:

> MR. HADLEY: It is that the commission has taken the licenses, the exclusive licenses that it was granted, which we do not contest were improperly granted, and it has applied them in a discriminatory, unfair, and capricious manner in several regards among which is limiting the sub-licenses in an anti-competitive way to three nurseries, one of which is owned by the son of a commission member.

*Id.* at 33:17-23.  This appears, again, to be an attempt to invoke the anti-trust laws.  Any such claim has been dismissed with prejudice.  *See* Doc. 84 at 63-65.  The only claim for which Plaintiffs were granted leave to amend after the October 27, 2010 Decision, Doc. 84, was their "double payment" theory.  Plaintiffs cannot have endless bites at the apple.

     In the final analysis, Plaintiffs UCL claim based upon a "double payment" theory arising from implementation of the license is preempted by the Bayh-Dole Act.

     2.   <u>Is the Commission a Proper Defendant?</u>

     Alternatively, the Commission next argues that it is not a proper defendant under the UCL, which applies only to "person[s]" that "engage in unfair competition."  Cal. Bus. & Prof. Code § 17203.  The statute defines "person" to mean "natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of

persons." *Id.* § 17201.  It is well established that public
entities "are not included in this definition of person."
*Janis v. California State Lottery Comm'n*, 68 Cal. App. 4th
824, 831 (1998); *see also PETA, Inc. v. California Milk
Prods. Advisory Bd.*, 125 Cal. App. 4th 871, 877-879 (2005);
*California Med. Ass'n, Inc. v. Regents of Univ. of Cal.*, 79
Cal. App. 4th 542, 551 (2000); *Trinkle v. California State
Lottery*, 71 Cal. App. 4th 1198, 1203-1204 (1999); *Community
Mem'l Hosp. v. County of Ventura*, 50 Cal. App. 4th 199, 208-
210 (1996).

The Commission argues that it qualifies as a public
entity for purposes of § 17200.  The Legislature created the
Commission "in the exercise of the police power" to perform
functions "affected with the public interest" that advance
the declared "policy" of the State and enhance the "welfare,
public economy and health" of its people.  Cal. Food & Agric.
Code § 65500.  The Secretary of Food and Agriculture appoints
and may remove every member of the Commission. *See id.* §
65550.  Anyone aggrieved by an action of the Commission may
appeal to the Secretary to reverse the Commission's decision.
*Id.* § 65650.5.  "In addition, like other entities in the
state government, the Commission is subject to transparency,
auditing, and ethics regulations that aim to promote public
accountability." *Delano Farms Co. v. California Table Grape*

*Comm'n*, 586 F.3d 1219, 1221 (9th Cir. 2009) (holding the Commission to be the government for purposes of the First Amendment).

The Commission maintains that the fact that the Legislature declared the Commission to be "a corporate body" and to "possess all the powers of a corporation," Cal. Food & Agric. Code § 65551, does not make it a proper defendant under the UCL.  California courts have long recognized that public corporations are <u>not</u> among the "corporations" included in § 17201's definition of "person."  For example, The Regents of the University of California operates as a "corporation," Cal. Const. art. IX, § 9(a), but cannot be sued under the UCL, *California Med. Ass'n*, 79 Cal. App. 4th at 551.

The Commission argues that the Legislature's intent to exclude public corporations from the UCL's definition of "person" is evident when the UCL is compared to the Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17000 et seq., which defines "person" to include any "company, corporation or municipal or other public corporation."  *Id.* § 17021 (emphasis added).  Had the Legislature wished to include a public entity such as the Commission within the meaning of "person" under § 17201, the Commission argues "it would have done so by using language similar to that in section 17021."

*PETA*, 125 Cal. App. 4th at 879 (advisory board created

pursuant to marketing order immune from claim under § 17200).

In response, Plaintiffs first complain that the

Commission failed to raise this argument in the first two

rounds of motions to dismiss, but cite no authority that it

is improper for the Commission to raise the issue now, in

response to the SAC.  There is no such procedural rule, as

Plaintiffs chose to amend their complaint, subjecting it to

scrutiny on any and every applicable legal ground under Rule

12.

Plaintiffs next argue that the Commission's argument

should fail because the Commission "took the exact opposite

position before this Court in arguing that it was a 'person'

under § 17200 for purposes of asserting an unfair competition

claim."  Doc. 109 at 21.  It is true that a prior ruling was

made that the Commission constituted a "person" that could

<u>bring</u> suit under § 17200:

> Sandrini contends the Commission is not a "person"
> with standing to sue under § 17200. The Commission,
> on the other hand, agrees that it is a governmental
> entity, but that fact is not determinative of
> whether it may bring suit under §17200. In support
> of its argument, the Commission contends § 17204
> authorizes corporations to <u>bring</u> suit under § 17200,
> and the Ketchum Act, in turn, provides the
> Commission shall "have and possess all of the powers
> of a corporation."  The Ketchum Act specifically
> provides "[t]he California Table Grape Commission
> shall be and is hereby declared a corporate body."
> Cal. Food & Agric. Code § 65551...The Ketchum Act
> further provides the Commission "shall have the
> power to sue and be sued, to contract and be
> contracted with, and to have and possess all of the

powers of a corporation." *Id.*...The Ketchum Act specifically declares the Commission a "corporate body," which "possesses all of the powers of a corporation." As § 17204 specifically provides a "person" may sue under § 17200, and § 17201 defines "person" as including corporations, the Commission has standing to sue under § 17200 as a corporation.

*Sandrini*, 2007, WL 1847631, at *26 (emphasis added).  In essence, *Sandrini* held that the Commission, although it is a governmental entity, possesses all the powers of a corporation and could bring suit under § 17200.

The Commission now argues that it cannot be sued under § 17200 because public entities are not persons under § 17200. The Commission wants to have it both ways.  There is support for their position insofar as the Regents of the University of California are considered a corporation with the power to sue and be sued, see Cal. Const. art. IX, § 9(f), yet the are not a proper § 17200 defendant.  *See California Med. Ass'n, Inc. v. Regents of Univ. of Cal.*, 79 Cal. App. 4th 542, 551 (2000).  California seems to have made the unique choice to exempt its public entities from UCL liability.  However, it is not necessary for a federal court to further extend this unique aspect of state law to the Commission, as this case can be decided on other grounds.

3.  <u>Failure to State a Claim.</u>

The Commission also argues that the UCL claim fails to state a claim.  "A business practice is unfair within the meaning of the UCL if it violates established public policy

or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *McKell v. Washington Mut., Inc.,* 142 Cal. App. 4th 1457, 1473 (2006).  The Commission maintains that

> Imposing a user fee on those who benefit most directly from using the government's property is none of these things.  It is what happens every time someone pays a toll to cross a public bridge or pays a fee to camp in a national park.  That person may well have helped pay for the construction of the bridge or the upkeep of the park, but the user fee recoups some of the cost borne by the public at large and frees up public resources for other priorities.

Doc. 102 at 22.

*Sandrini* held that the Commission has authority to "engage in its patenting and licensing program" and to "generate revenues through the collection of patent royalties." *Sandrini*, 2007 WL 1847631, at *9.  But, this is not dispositive, as Plaintiffs' claim is more nuanced, alleging that it is unfair to double-charge Plaintiffs by requiring them to pay for research costs and then again for the "fruit" of that research.  Section 17200 allows for judicial review of a "broad" and "sweeping" range of business activities. Cal. Bus. & Prof. Code § 17200; *McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 1471 (2006); *Cal-Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  The "unfair" criteria may be met "even if not specifically proscribed by some other law" so

long as it "offends an established public policy or...is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003); *Heighly v. J.C. Penny Life Ins. Co.*, 257 F. Supp. 2d 1241, 1259 (C.D. Cal. 2003). While the Commission may dispute that the double-payment scheme is "unfair" as a factual matter, that is not a determination that can be made on a motion to dismiss. *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir. 1997); *TwoRivers*, 174 F.3d at 991.

    4.  <u>Failure to Exhaust State Administrative Remedies.</u>

Finally, the Commission argues that California's Ketchum Act requires Plaintiffs to exhaust state administrative remedies before commencing state-law claims against the Commission. The Ketchum Act provides that a person "aggrieved by any action of the Commission" must file a grievance with the Commission before bringing suit. *See* Cal. Food & Agric. Code §§ 65650.5 & 65651. Any adverse decision may then be appealed to the Secretary of the California Department of Food and Agriculture ("CDFA"). *See id.* § 65650.5. On appeal, the Secretary "shall review the record of the proceedings before the commission" and "may reverse the action of the commission" if he finds that it "is not substantially sustained by the record, was an abuse of

discretion, or illegal," or was "arbitrary or without evidentiary support." *Id*.  The Secretary's decision is then "subject to judicial review upon petition of the commission or any party aggrieved by the decision." *Id*.  Plaintiffs are well aware of this provision: In 2005, the Superior Court of California, Fresno County, relied upon it to dismiss their earlier lawsuit challenging the Commission's patenting and licensing program.  *See* Order Sustaining Demurrer of Defendant, *Delano Farms Co. v. California Table Grape Comm'n*, No. 05CECG02073 (Cal. Super. Ct. Nov. 4, 2005), Doc. 102, Ex. 13.

At oral argument, Plaintiffs asserted that they in fact did exhaust their state administrative remedies after the Fresno County dismissal by filing a grievance with the Commission and then taking an appeal to the CDFA.  6/28/10 Rough Tr. 32:2-12; 38:7-14.  This is not alleged in the amended complaint and the argument was not raised in Plaintiffs' opposition.  In the absence of any other basis for dismissal, such an assertion might warrant granting Plaintiffs leave to amend.  However, because Plaintiffs' UCL claims are preempted by federal law, amendment would be futile.[4]

_____

[4] Plaintiffs also argue that state administrative exhaustion under the Ketchum Act was not required because the Ketchum Act does not provide for the same forms of relief sought in this case, citing for the first time in oral argument *Andal v. City of Stockton*, 137 Cal. App. 4th 86, 93-94

D.   <u>Unjust Enrichment and Constructive Trust Claims.</u>

"Plaintiffs' unjust enrichment and constructive trust claims are 'dependent upon Plaintiffs' substantive ... antitrust claims and unfair competition claims.'"  Doc. 84 at 65 (quoting Doc. 42 at 71); *see also McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004); *PCO Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 398 (2007).  Because no other claims in this case survive, the Commission's motion to dismiss the unjust enrichment and constructive trust claims is GRANTED.

IV. <u>CONCLUSION</u>

For the reasons set forth above, Federal Defendants and the Commissions' motions to dismiss all claims of the complaint are GRANTED WITHOUT LEAVE TO AMEND.  Plaintiffs motion for leave to file an interlocutory appeal, Doc. 93, is DENIED AS MOOT.  Defendants shall submit a form of order consistent with this memorandum decision within five (5) days of electronic service.

SO ORDERED
DATED:  July 26, 2010
                              /s/ Oliver W. Wanger
                              Oliver W. Wanger
                        United States District Judge

---

(2006).  It is not necessary to resolve this untimely argument, as this claim can be disposed of on other grounds.