# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANO FARMS COMPANY; FOUR STAR FRUIT, INC.; AND GERAWAN FARMING, INC., | 1:07-CV-01610-LJO-JLT |
| **Plaintiffs,** | **MEMORANDUM DECISION AND ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT (DOCS 185, 192 & 194)** |
| v. | |
| THE CALIFORNIA TABLE GRAPE COMMISSION; UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF AGRICULTURE; AND TOM VILSACK, SECRETARY OF THE UNITED STATES DEPATMENT OF AGRICULTURE (IN HIS OFFICIAL CAPACITY), | |
| **Defendants.** | |

## I. INTRODUCTION

This case concerns two varieties of table grape (i.e., grapes for fresh consumption), Autumn King and Scarlet Royal, developed and patented by the United States Department of Agriculture ("USDA") as a part of a program partially funded by the California Table Grape Commission ("Commission"). Plaintiffs, Delano Farms Company, Four Star Fruit, Inc., and Gerawan Farming, Inc., seek to invalidate the patents for these two varieties under 35 U.S.C. § 102(b) on the ground that the varieties were in "public use" more than a year before USDA sought patent protection.

This case has a long and complicated procedural history, *see* Doc. 169 at 2-5, and the parties previously have engaged in substantial litigation against one another, *see* Doc. 186 at 3 n 1. To make a long story short, after extensive proceedings in this Court (much of which took place before the previously assigned district judge) and the Ninth Circuit, the only two claims that remain seek declarations that the Autumn King and Scarlet Royal patents are invalid based upon the following alleged acts of public use: (1) Jim, Jack, and Larry Ludy's cultivation of Autumn King and Scarlet

1

Royal plant material on their own farms; and (2) cultivation of Scarlet Royal by Dr. Sayed Badr, a professor at California State University, Fresno ("Fresno State").

The parties filed cross motions for summary judgment on January 17, 2013, Docs.185 (Commission's MSJ), 192 (Federal Defendants' Joinder), 194 (Plaintiffs' MSJ), along with voluminous supporting documents. Oppositions were filed February 14, 2013. Docs. 204, 206, 211. Replies were filed February 21, 2013. Docs. 213-215. The matter was originally set for hearing on February 28, 2013, but the matter was taken under submission without oral argument pursuant to Local Rule 230(g). Doc. 212.

Judges in the Eastern District of California carry the heaviest caseload in the nation, and this Court is unable to devote inordinate time and resources to individual cases and matters. Given the shortage of district judges and staff, this Court addresses only the arguments, evidence, and matters necessary to reach the decision in this order. The parties and counsel are encouraged to contact the offices of United States Senators Feinstein and Boxer to address this Court's fast-approaching inability to accommodate the parties and this action. The parties are required to consider consent to a Magistrate Judge to conduct all further proceedings in that the Magistrate Judges' availability is far more realistic and accommodating to parties than that of U.S. District Judge Lawrence J. O'Neill, who must prioritize criminal and other civil cases.

## II. BACKGROUND[1]

A.    **The Autumn King and Scarlet Royal Patents.**

Autumn King and Scarlet Royal were developed by Dr. David Ramming, former director of USDA's grape breeding program, and his assistant, Ronald Tarailo. Joint Statement of Undisputed Fact in Support of Commission's Motion for Summary Judgment ("CJSUF"), Doc. 187,  ## 4-5. Ramming and Tarailo applied for patents on the new grape varieties on September 28, 2004. CJSUF # 3. Both

---

[1] This Background section provides only general background based upon the undisputed facts. Even if not mentioned herein, the Court has carefully reviewed and considered all of the parties' factual submissions, responses, and objections thereto.

varieties were officially released to the public on July 13, 2005. CJSUF ## 6-7. The Scarlet Royal patent (U.S. Patent PP16,229 or "the '229 patent") issued on January 31, 2006. CJSUF #2. The Autumn King patent (U.S. Patent PP16,284 or "the '284 patent") issued on February 21, 2006. CJSUF #1.[2]

The two patents are owned by the Secretary of Agriculture on behalf of the United States and are exclusively licensed to the Commission, a state entity established by the California Legislature to promote the consumption of fresh California grapes. CJSUF ## 8-9; Cal. Food & Agric. Code §§ 65550, *et seq*. The Commission in turn sublicenses Autumn King and Scarlet Royal to eligible nurseries, which pay royalties to the Commission and make the varieties available to growers. CJSUF #9. The Commission pays a portion of royalties collected from nurseries to the USDA. Plaintiffs allege the sublicensed nurseries pass royalty costs on to growers.

**B.    The *Sandrini* Lawsuit.**

On July 3, 2006, the Commission filed a patent infringement suit against a table grape grower named Richard Sandrini, who had been growing unlicensed Autumn King vines. *See generally California Table Grape Comm'n v. RB Sandrini, Inc.*, 1:06-CV-00842 OWW TAG, 2007 WL 1847631 (E.D. Cal. June 27, 2007). Following discovery, the parties filed cross-motions for summary judgment on numerous issues, including whether the Autumn King patent is invalid due to the alleged public use of the variety by three cousins, Jim, Jack, and Larry Ludy, who obtained the variety before its official release. *Id*. at *11-*17. The cross motions were denied and the case proceeded to trial. *Id*. at *28; *Sandrini*,1:06-cv-0842, Doc. 153 (Pretrial Order). After opening statements, Mr. Sandrini agreed to settle by removing all of his unauthorized Autumn King vines and dropping his claim that the Autumn King patent is invalid, in exchange for a release of the Commission's claims against him. *See Sandrini*,

---

[2] Patenting of grape varieties developed by Dr. Ramming is a relatively new practice for USDA. Dr. Ramming developed numerous new table grape varieties over a 30-year period while working for USDA. Ramming *Sandrini* Depo. at 8:15-23; 13:12-16. Until at least 1999, it was the policy of USDA not to seek patent protection for new table grape varieties, but rather to "release" plant material at no cost to growers from Dr. Ramming's Fresno State facility. *Id*. at 135-136, 155:2:8.

1   1:06-cv-0842, Doc. 201 (Stipulated Settlement and Order).[3]

2

3   **C.    The Ludys' Uses.**

4          Jim and Jack Ludy are brothers who grew grapes at J&J Ludy Farms from 1976 to 2003. CJSUF

5   # 12. Their first cousin, Larry Ludy, and his brother, Don Ludy, farmed nearby. Jim Ludy "JL" 2012

6   Depo. 142:11-13; Don Ludy ("DL") *Sandrini* Depo. 9:23-10:1, 11:22-25. In August 2001, Jim Ludy and

7   Larry Ludy attended a meeting organized by the Commission to allow growers to provide feedback to

8   the USDA on promising new selections of table grapes that were still under development. CJSUF # 14.

9   Fruit from the USDA's Scarlet Royal grapevines (then known as B34-82) and Autumn King grapevines

10  (then known as C67-120) was on display at the meeting. JL 2012 Depo., Ex. 6. Neither variety had been

11  publicly released by the USDA at that point and thus had not yet been named. *See* CFSUF ## 6-7. Jim

12  and Larry Ludy referred to Scarlet Royal as "Crimson Killer" and Autumn King as "Big White" or

13  "Late White." JL 2012 Depo. 164:15-18; Lary Ludy ("LL") 2012 Depo. at 23:9-15; CJSUF ## 18-19.

14

15         Also attending the meeting was Rodney Klassen, the tractor operator at the USDA's

16  experimental facility and a longtime acquaintance of Jim Ludy. JL 2012 Depo. 64:8-10, 93:4-21, 95:16-

17  96:11; David Ramming ("DR") 2012 Depo. 32:11-12; CJSUF ## 13, 15. As a tractor driver, Klassen

18  was not authorized to remove plant material from the USDA facility or to provide it to anyone outside

19  the USDA. CJSUF ## 9-10; Tarailo Decl. ¶¶ 6-7. Tarailo specifically instructed Klassen that he was not

20  allowed to remove plant material from the USDA facility. Tarailo Decl. ¶ 7.

21

22         Nonetheless, when Jim Ludy said at the meeting that he was impressed with "Crimson Killer"

23  and "Big White," Klassen said that he would get him some of the unreleased plant material. JL 2012

24  Depo. 101:10-22, 107:13-19; *see also* CJSUF #15. Larry Ludy was present during this conversation.

25  CJSUF #16.

26

27

28  _____
    [3] The parties have stipulated that the depositions and documents produced in the *Sandrini* case may be used in this case. *See* Doc. 163 at 2-3.

Sometime later, Jim Ludy and Klassen arranged to meet at a farm show, where Klassen provided Jim Ludy with a paper bag containing cuttings that he had taken from the USDA facility. JL 2012 Depo. 108:20-109:1; JL *Sandrini* Depo. 79:14-15. Jim Ludy knew that he was receiving unreleased USDA selections. Commission's Statement of Undisputed Facts ("CSUF") ## 29. Although Jim Ludy does not remember the exact words Klassen used, Jim recalls generally that Klassen did not want Jim to let the material "get away from" him. CSUF #31. Klassen also explained that Jim Ludy should use the cuttings only for a test plot to learn how to grow them so that he would be ready when they were officially released. JL 2012 Depo. 68:14-19, 74:19-21, 127:8-10. Klassen warned that Jim Ludy should not expand the test plot or sell the grapes commercially. JL 2012 Depo. 109:17-21.

Jim Ludy understood he should keep the plant material secret. CSUF #33. He therefore avoided telling many people about it. JL 75:14-16 ("At the time I knew we were getting it early and that, you know, not to tell too many people about it, that type of thing."); JL 76:21-22 ("I didn't go around telling everybody"); JL(S) 163:24-164:2 ("I didn't want to tell anybody. I had done a real good job of having my little test plot, and I didn't try to make it public to anybody. I was trying to keep it a little quiet.").

Whether and to what extent Jim passed this desire for secrecy on to his cousin Larry is disputed. It is Defendants' position, supported by the testimony of Jim Ludy and others, that Jim provided the cuttings to Larry "in confidence," told Larry that he should not share the cuttings with others, that the cuttings were "just to experiment with," and that Larry was "not to produce a crop for sale." *See* CSUF ## 47-49, 51. On the other hand, Larry recalls only that Jim indicated he should not tell Richard Sandrini about the plant material. LL 2012 Depo. 76:14-27.

It is undisputed that no written agreements existed between USDA and any of the Ludys, between the Ludys themselves, or between the Ludys and anyone else regarding confidential treatment or limitations placed on the use of the plant material.

That both plant varieties were eventually cultivated on property owned by the Ludys is

undisputed, but the parties hotly dispute the timing of these activities; whether the areas in which Jim and Larry Ludy cultivated their "Crimson Killer" and "Late White" grapes was visible from a public road; and/or whether any other individuals saw the vines, grapes growing on those vines, or grapes produced by the vines at any point prior to the critical date.

It is undisputed that neither Jim nor Larry Ludy shared the plant material with anyone else prior to the critical date. CJSUF #22.

**D.    Dr. Badr's Use at Fresno State.**

USDA collaborated with Dr. Sayed Badr, a professor and researcher at Fresno State, on a number of occasions to run experiments on table grape varieties developed in USDA's breeding program. CSUF ## 56, 58. Dr. Badr would test varieties to determine how they responded to growth regulators and various cultural practices. CSUF # 60. He would also test how they performed after grafting onto different rootstocks. *Id.*

In 1999 USDA provided cuttings of "experimental selection B1" (later named Scarlet Royal) to Dr. Badr. CSUF # 61. Dr. Badr planted approximately 80 Scarlet Royal vines on the west side of the Fresno State campus in a field east of Cedar Avenue between E. Bullard and E. Barstow Avenues. PJSUF #6. In 2002, approximately three rows of Scarlet Royal were grafted onto rootstock in the same area. PJSUF #7. These plants were located outside the area of land leased to USDA, PJSUF #8, on the opposite side of the Fresno State campus from the USDA facility, DR 2012 Depo. 15:23-16:1.

Dr. Badr used the B1 plants to test the effect of two different training systems on vine yield and fruit quality. CSUF #61. He later grafted B1 onto various rootstocks. *Id.*

During the entire time that Dr. Badr had B1 before its official release, USDA's Ronald Tarailo regularly spoke with Dr. Badr to receive updates about his research on B1 and other experimental

selections. CSUF # 64.[4] Tarailo regularly visited Dr. Badr's test plots. CSUF # 65. The USDA also received certain data about the B1 vines growing in Dr. Badr's test plot. CSUF # 64.

It is undisputed that USDA did not make Dr. Badr sign a confidentiality agreement or any other document indicating how Dr. Badr should control his use of B1/Scarlet Royal. *See* Plaintiffs' Statement of Undisputed Fact ("PSUF") # 21. However, Mr. Tarailo indicates that Dr. Badr was not permitted to propagate additional vines for his own use or to allow others to do so. CSUF #66.[5] Based on the long-standing relationship between USDA and Dr. Badr, Ronald Tarailo had full confidence that Dr. Badr would and did comply with his responsibility to maintain control over the plant material provided to him by the USDA. *Id.*

## III. <u>STANDARD OF DECISION</u>

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). A fact is material if it could affect the outcome of the suit under the governing substantive law; "irrelevant" or "unnecessary" factual disputes will not be counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party would bear the burden of proof on an issue at trial, that party must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."

---

[4] Plaintiffs assert that this fact is disputed by pointing out that Mr. Tarailo's supervisor, Dr. Ramming, "admitted that the Scarlet Royal plants in the public areas of the Fresno State campus were not at all times under his direct supervision and control prior to the filing of the patent application on Scarlet Royal." Doc. 211-1 at 11-12. However, this does not raise a dispute as to Tarailo's declaration that he regularly spoke with Dr. Badr.
[5] Plaintiffs dispute this simply by indicating that the vines were for "Dr. Badr's own use," but provide no support for this assertion.

7

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, if the non-moving

party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that

there is an absence of evidence" to support the non-moving party's case. *Id*. When the moving party

meets its burden, the non-moving party must demonstrate that there are genuine disputes as to material

facts by either:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

In ruling on a motion for summary judgment, a court does not make credibility determinations or

weigh evidence. *See Anderson*, 477 U.S. at 255. Rather, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor." *Id*. Only admissible evidence may

be considered in deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(2). "Conclusory,

speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and

defeat summary judgment." *Soremekun*, 509 F.3d at 984.

## IV. DISCUSSION

Plant patents may be granted to "whoever invents or discovers and asexually reproduces any

distinct and new variety of plant…." 35 U.S.C. § 161. "Once issued, a patent grants certain exclusive

rights to its holder, including the exclusive right to use the invention during the patent's duration."

*Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). "One of the enumerated defenses to any

action involving the validity of a patent is "[i]nvalidity of the patent or any claim in suit on any ground

specified in part II of this title as a condition for patentability[.] 35 U.S.C. § 282. Among the so-called

"statutory bars" enumerated in part II is the "public use" bar, which is set forth in 35 U.S.C. § 102(b):

> A person shall be entitled to a patent unless--(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States…

Section 102(b) establishes a one-year grace period based on publication or public use or sale, after which an inventor is barred from access to the patent system. *Id*. The Patent Act expressly makes plant patents subject to the novelty and statutory bar provisions, including the "on-sale" and "public use" provisions of 35 U.S.C. § 102(b). 35 U.S.C. § 161; 8-24 CHISUM ON PATENTS, § 24.02[e] (2012) ("The statutory bar provisions in Sections 102(b).… fully apply to plants.").

Plaintiffs move for summary judgment that both the Autumn King and Scarlet Royal patents are invalid. The invalidity claims are based upon two independent allegations of prior public use: (1) that Jim Ludy and Lary Ludy obtained plant material from both varieties and cultivated them on their own properties prior to the critical date; and (2) that a professor from California State University at Fresno, Dr. Sayed Badr, reproduced the Scarlet Royal on campus in prior to the critical date.

Defendants oppose and cross move for judgment on the two claims of invalidity, arguing (1) that the Ludys' uses cannot constitute "public use" because (a) the plant material they cultivated was misappropriated, (b) they cultivated the plants in secrecy, and (c) in any event there are disputes over the timing and nature of the Ludys' uses. Defendants also maintain that Dr. Badr's use was for purposes of experimentation, invoking a well-established exception to the public use bar.

## A.     General Legal Framework Regarding the Public Use Bar.

In general, "public use" includes "any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Netscape Communications Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002); *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). In considering whether a particular use was a public use within the meaning of 35 U.S.C. § 102(b), a court should consider the totality of the

circumstances in conjunction with the policies underlying the public use bar, *Baxter Int'l, Inc. v. COBE Labs., Inc.*, 88 F.3d 1054, 1058 (Fed. Cir. 1996), which include:

> (1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.

*Id.* However, section 102(b) "is primarily concerned with the policy that encourages an inventor to enter the patent system promptly, while recognizing a one year period of public knowledge or use or commercial exploitation before the patent must be filed." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998). "Thus an inventor's own prior commercial use, albeit kept secret, may constitute a public use or sale under section 102(b), barring him from obtaining a patent." *Id.* However, when an asserted prior use is not that of the patent applicant, section 102(b) is not a bar when that prior use or knowledge is not available to the public. *Id.* at 1371.

A bar under section 102(b) arises when the claimed invention is in public use or on-sale before the "critical date." *Invitrogen Corp. v. Biocrest Mfg. L.P.*, 424 F.3d 1374, 1379 (Fed. Cir. 2005). The critical date is "one year prior to the date of the application for patent in the United States." *Orion IP, L.L.C. v. Hyundai Motor Am.*, 605 F.3d 967, 974 (Fed. Cir. 2010). It is undisputed that the critical date in this case is September 28, 2003, as applications for both patents were filed September 28, 2004. CJSUF #3.

Because "[a] patent shall be presumed valid…. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. A party challenging a patent's validity must carry a "heavy burden" by proving invalidity by clear and convincing evidence. *Microsoft*, 131 S. Ct. at 2246, 2250. In addition, a party asserting invalidity may not rely only on uncorroborated, self-serving oral testimony. *Woodland Trust*, 148 F.3d at 1371

("Corroboration of oral evidence ... is the general rule in patent disputes."). The corroboration

requirement is discussed in further detail below.

**B.     The Ludys' Uses.**

      **1.     Misappropriation and Public Use.**

      Defendants argue that the Ludys' uses of the patented varieties fail to trigger the public use bar

as a matter of law because "the law will not recognize as a 'public use' the use of an improperly

obtained invention by someone with actual or constructive knowledge that the invention was improperly

obtained." Doc. 186 at 17. In support of this proposition, Defendants cite two Supreme Court cases from

the 1800s, *Pennock v. Dialogue*, 27 U.S. 1 (1829), and *Shaw v. Cooper*, 32 U.S. 292 (1833), as well as

an equally ancient district court decision issued by Justice Story while riding circuit, *Pierson v. Eagle

Screw Co.*, 19 F. Cas. 672, 674 (1844). This line of cases, along with several other cases of relevance,

was addressed in a June 27, 2007 decision in *Sandrini*. For the sake of efficiency, this Court will begin

its analysis with the reasoning provided therein:

      Nearly sixty years ago, the Third Circuit, in *Lorenz [v. Colgate-Palmolive-Peet Co,]*,
      invalidated a patent by reason of prior public use. [ ]167 F.2d [423,] 430 [(3d Cir. 1948)].
      In *Lorenz*, the patent in suit covered the manufacture of soap and the recovery of
      glycerine. Lorenz filed an application for his process in the Patent Office on January 24,
      1920. Shortly thereafter, Lorenz communicated the substance of the disclosures of his
      application to Ittner, who was Colgate's chief chemist, so Colgate could exploit the
      process if it so desired. Ittner claimed to be uninterested in the process. Thereafter, the
      Patent Office rejected Lorenz's application, and he abandoned its prosecution. On July
      18, 1933, patent number 1,918,603 was issued to Ittner on an application he filed on
      February 19, 1931. After learning about Ittner's '603 patent, Lorenz filed a petition in the
      Patent Office to revive his original application, which was later rejected. On November 8,
      1934, Lorenz filed a new application in which he adopted his own nineteen claims of
      Ittner's '603 patent, asserting that he disclosed the subject matter of the '603 patent to
      Ittner in 1920. The Patent Office declared an interference, which was decided in Lorenz's
      favor. The trial court in *Lorenz* found that the process of Lorenz's patent was in public
      use for more than two years prior to the application date of November 8, 1934, and
      declared Lorenz's patent invalid.

      Lorenz contended no public use existed because Congress did not intend to bar the grant
      of a valid monopoly to an inventor whose disclosures have been pirated by the person to
      whom he confided them. Colgate, on the other hand, contended its use was neither

11

fraudulent nor piratical, and the disclosures made by Lorenz to Ittner in 1920 carried no pledge, express or implied, that Ittner or Colgate should not make use of Ittner's invention.

The *Lorenz* court painstakingly analyzed several Supreme Court cases describing and explaining the history of the public use bar beginning with the seminal case of *Pennock v. Dialogue*, 27 U.S. 1 (1829). After reviewing these authorities, the *Lorenz* court held "if an inventor does not protect his discovery by an application for a patent within the period prescribed by the Act, and an intervening public use arises <u>from any source whatsoever</u>, the inventor must be barred from a patent or from the fruits of his monopoly, if a patent has issued to him." *Lorenz*, 167 F.2d at 429 (emphasis added). The court specifically noted "<u>[t]here is not a single word in the statute which would tend to put an inventor, whose disclosures have been pirated, in any different position from one who has permitted the use of his process.</u>" *Id*. In the words of the Third Circuit,

> [t]he Supreme Court in its opinion in *Andrews v. Hovey*, 124 U.S. 694 (1888) ... put the matter succinctly when, in referring to the second clause of Section 7 of the 1839 Patent Act, it said that it was the Congressional intent that the patent should be held invalid without regard to the consent or allowance of the inventor, if there had been a prior public use within the terms of the statute.

*Lorenz*, 167 F.2d at 429.

More recently in 1997, the Federal Circuit, in *Evans Cooling [Systems, Inc. v. General Motors Corp*., 125 F.3d 1448 [(Fed. Cir. 1997)], invalidated a patent when the patented invention, an aqueous reverse flow cooling system for internal combustion engines, was offered for sale more than one year prior to the critical date.

John Evans conceived the patented invention in 1984 and reduced it to practice in 1986. On July 1, 1992, Evans filed a patent application. On October 26, 1993, patent number 5,255,636 was issued to Evans for an aqueous reverse flow cooling system for internal combustion engines. In early 1994, Evans filed a lawsuit against General Motors ("GM") alleging GM infringed the '636 patent by the manufacture and sale of cars having GM's LT1 and LT99 engines. GM asserted the '636 patent was invalid because GM and its independent dealers had placed the patented invention on sale prior to the critical date with the introduction of the 1992 Corvette. GM sent an order guide to its dealers in late April or early May of 1991. Several of the dealers offered the 1992 Corvette for sale to customers.

Evans asserted GM should not be permitted to invalidate the '636 patent because GM stole the invention from him. Specifically, GM allegedly requested that Evans demonstrate its aqueous reverse flow cooling system at GM's test facility in the spring of 1989. Evans alleged that GM stole the invention during this demonstration. The district court granted summary judgment in favor of GM because the record established GM and its dealers placed the 1992 Corvette with the LT1 engine on sale prior to the critical date.

In affirming the district court, the Federal Circuit held the ′636 patent invalid because the patented invention was on sale one month prior to the critical date when a customer ordered a 1992 Corvette from a Chevrolet dealership.

Evans also urged the Federal Circuit to create a new exception to the on sale bar. Specifically, Evans sought an exception that an otherwise invalidating offer for sale does not invalidate a patent "where a third party surreptitiously steals an invention while it is a trade secret and then, unbeknownst to the inventor, allegedly puts the invention on sale [more than one year] before the inventor files a patent application covering the stolen invention." *Evans Cooling*, 125 F.3d 1452 (brackets in original).

In support of its argument, Evans cited and relied on three Supreme Court cases from the 1800s-*Pennock v. Dialogue*, 27 U.S. 1 (1829), *Shaw v. Cooper*, 32 U.S. 292 (1833), and *Kendall v. Winsor*, 62 U.S. 322 (1859). The Federal Circuit, however, found none of these cases dispositive of the issue raised by Evans noting *Pennock* was a public use case where the use at issue was undertaken with the patentee's knowledge, the statements Evans relied on in *Shaw* were dicta, and *Kendall* addressed the issue of whether the defendant had the right to continue to use an invention after a patent had issued. The court did, however, rely on *Lorenz,* []167 F.2d 423[], noting the Third Circuit rejected arguments similar to Evans's arguments. The *Evans Cooling* court specifically cited the following analysis in *Lorenz* by which the Third Circuit declined to create an exception to the statutory bar:

> The prior-public-use proviso ... contains no qualification or exception which limits the nature of the public use. We think that Congress intended that if an inventor does not protect his discovery by an application for a patent within the period prescribed by the Act, and an intervening public use arises from any source whatsoever, the inventor must be barred from a patent or from the fruits of his monopoly, if a patent has issued to him. There is not a single word in the statute which would tend to put an inventor, whose disclosures have been pirated, in any different position from one who has permitted the use of his process .... [I]solated instances of injustice may result if the law be strictly applied, but the inventor's remedy is sure. He is master of the situation and by prompt action [in filing a patent application] can protect himself fully and render the defense of prior public use impossible.

> *Evans Cooling*, 125 F.3d 1453 (alterations in original). While the *Evans Cooling* court did empathize with the harshness of the result to Evans, it noted he would not be without recourse if GM in fact misappropriated his invention-"Evans would have an appropriate remedy in state court for misappropriation of a trade secret." *Evans Cooling*, 125 F.3d 1454.

*Sandrini*, 2007 WL 1847631 at *13-15 (footnotes and parallel citations omitted)(emphasis added).

In *Sandrini*, the district court initially defined the relevant question to be "whether the public use bar invalidates a patent due to third party misappropriation and surreptitious or secret use of an invention

13

prior to the critical date." 2007 WL 1847631 at *13. This initial formulation did not separate the topic of "misappropriation" from "secret use." After analyzing the relevant authorities, including *Evans Cooling*, which clearly addresses the "misappropriation" issue as an independent matter, *Sandrini* interpreted the caselaw as rejecting the creation of an exception to the public use bar for misappropriated uses. Instead, the *Sandrini* decision re-focused the inquiry on the question of whether the use was performed in secret, summarizing the authorities by re-formulating the issue as follows: "Public use before the critical date is determined by whether the Autumn King variety was publicly used by the Ludys or Sandrini under no limitation, restriction, or obligation of secrecy to Ramming, Tarailo, and the USDA." *Sandrini,* 2007 WL 1847631 at *16 (citing *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1384 (Fed. Cir. 2007)). Finding factual disputes existed regarding whether the Ludys "secretly used or tried to hide" their use, the parties' cross motions for summary judgment were denied. *Id.* at *17.

Here, Defendants attempt once again to argue that a "misappropriation" exception should apply. The thrust of their argument appears to be that the holding of *Evans Cooling*, upon which *Sandrini* relied heavily, is limited only to situations in which a misappropriated patented item was sold or used by an innocent third party. Defendants correctly point out that in *Evans Cooling* an "innocent" independent dealer sold the Corvette containing the allegedly pirated invention to an "innocent" customer prior to the critical date. 125 F.3d at 1453-54. Defendants are also correct that the Federal Circuit found this fact to be "dispositive" to at least one aspect of its reasoning. Building upon this reasoning, Defendants maintain that because the Ludys were aware that the plant cuttings they obtained were taken without USDA's permission, they were not "innocent" third parties and should not be permitted to take advantage of the public use bar. Essentially, Defendants <u>still</u> want to create an exception to the public use bar.

This Court declines Defendants' invitation because the bulk of the available authority, including *Evans Cooling*, suggests creating such an exception would be inappropriate. First, the language from

14

*Evans Cooling* upon which Defendants rely is contained within the Federal Circuit's analysis of an

alternative argument. Specifically, in *Evans Cooling* the Federal Circuit adopted the Third Circuit's

reasoning in *Lorenz* that an intervening public use may arise "from any source whatsoever," concluding

that, while the Third Circuit's reasoning was "not binding," it was "persuasive." 125 F.3d at 1453.

Nevertheless, as an alternative basis for its holding, the Federal Circuit evaluated the "innocent party"

argument raised by GM based upon *In re Martin*, 74 F.2d 951 (Fed. Cir. 1935):

> Even if we were to create an exception to the on sale bar such that third parties accused of misappropriating an invention could not invalidate a patent based upon sales by the guilty third party, GM correctly asserts that *Martin* squarely holds that activities of third parties uninvolved in the alleged misappropriation raise the statutory bar, even if those activities are instigated by the one who allegedly misappropriated the invention. In *Martin*, Martin's employer stole Martin's invention and filed an application on it and disclosed it to a third party. 74 F.2d at 952-53. After learning of his employer's activities, Martin filed his own application. After an interference was declared, the employer argued Martin's application was barred based on the activities of the third party. Martin conceded his invention had been in public use, but argued that the bar should not apply because the third party's use was "instigated by [his] employer and was a surreptitious and fraudulent public use against him" *Id.* at 953. After reviewing the Supreme Court and other relevant case law, the Court of Customs and Patent Appeals noted it had "been unable to find any authoritative decisions upon the question of whether a fraudulent public use of an invention ... prior to the filing of an application ..., or such public use of an invention instigated by fraud, bars the issuance of a patent...." *Id.* at 955. Although the Court of Customs and Patent Appeals did not address that precise issue, the Court of Customs and Patent Appeals did hold that allowance of the application was barred because the third party's public use had been innocent, even though it had obtained the technology from the employer. *Id.* As discussed below, this holding is dispositive here because, although Evans has charged GM with misappropriation, it has never contended that the independent dealers had any participation in or knowledge of the alleged theft; nor is there any indication that Mr. Najarian had such knowledge. Thus, the independent dealers are innocent users who put the invention on sale by placing orders for innocent retail customers like Najarian.

*Id.* at 1453-54. That this was an alternative basis for the Federal Circuit's affirmance in *Evans Cooling* is

further supported by the opinion's second sentence, which summarizes the decision:

> Because there were no materially disputed questions of fact regarding whether the patented invention was offered for sale more than one year prior to the critical date and because we decline to create an exception to the on sale bar for those instances in which a third party misappropriates the invention and later places the invention on sale or causes an innocent third party to place the invention on sale, we affirm.

15

*Id*. at 1449 (emphasis added).[6]

*Sandrini*, which is indisputably factually analogous to this case (as it <u>is</u>, in many respects, this case), did not treat the "innocent party" issue, but clearly rejected creating an exception to the public use bar for misappropriated inventions as a general matter. This rejection is further supported by *Lorenz* which, in evaluating the statutory text, correctly emphasized that "[t]he prior-public-use proviso ... contains no qualification or exception which limits the nature of the public use," indicating that "if an inventor does not protect his discovery by an application for a patent within the period prescribed by the Act, and an intervening public use arises from any source whatsoever, the inventor must be barred from a patent or from the fruits of his monopoly, if a patent has issued to him." 167 F.2d at 429.

Defendants' motion for summary judgment that the Ludys' uses cannot constitute invalidating public uses because the Ludys were not innocent users is DENIED.

### 2.   Public Use v. Secret Use.

As the *Sandrini* court recognized, the key issue in this case is whether the Ludys' uses qualify as "public uses" under 35 U.S.C. § 102(b). Plaintiffs maintain that the undisputed evidence entitles them to judgment that the Ludys' uses were "public uses." Defendants argue that the undisputed evidence proves the Ludys cultivated Autumn King and Sweet Scarlet in secret.

A recent district court decision succinctly and accurately summarized the complex lattice of relevant authorities defining "public use":

> Generally, public use includes " 'any use of the claimed invention by a person other than the inventor who was under no limitation, restriction or obligation of secrecy to the inventor.'" *Petrolite Corp.* v. *Baker Fuse, Inc.*, 96 F.3d 1423, 1425 (Fed. Cir. 1996)

---

[6] It is of little moment that in a later ruling the Federal Circuit described *Evans Cooling* as holding "that even if a thief 'stole' the claimed invention and passed it on to an innocent buyer, the innocent buyer's subsequent offer to sell triggered the plain language of the on-sale bar." *Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353, 1355 (Fed. Cir. 2001). *Special Devices* addressed whether a transaction between a patent-holder and a supplier could trigger the on-sale bar; the issue of whether a any party to the transaction was innocent was not presented. Finding it inappropriate to create a "supplier" exception to the on-sale bar, *Special Devices* relied on the fact that *Evans Cooling* declined to create a misappropriation exception to the on sale, "which has no basis in the language of the statute." *Id.* (citing *Evans Cooling*, 125 F. 3d at 1453-54).

(citations omitted). An invention is in public use when it is (1) publicly accessible or (2) commercially exploited. [*Invitrogen Corp. v. Biocrest Mfg.*, L.P., 424 F.3d 1374, 1380 (Fed. Cir. 2005)]. ***

The Federal Circuit has identified several factors to determine whether an invention is publicly accessible, including: evidence of experimentation, the nature of the activity that occurred in public, public access to the use, and confidentiality obligations imposed on observers. *Id.* Despite these factors, the determination of whether there is a public use often turns on whether there was an expectation or assurance of confidentiality or steps taken to conceal the claimed invention. *Dey, Inc. v. Sepracor*, Inc., 847 F. Supp. 2d 541, 550 (S.D.N.Y. 2012); *see also Advanceme Inc. v. RapidPay, LLC*, 509 F. Supp. 2d 593, 608–09 (E.D. Tex. 2007) (collecting and comparing cases).

"For a method or system to be in 'public use' within the meaning of 35 U.S.C. § 102(a) or (b), the method or system must be used in the ordinary course of business without active efforts to conceal its operation." *Advanceme*, 509 F. Supp. 2d at 608–09 (citing *New Railhead Mfg. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1298–1300 (Fed. Cir. 2002) (finding that performance of the claimed method of drilling in rock at a commercial jobsite under public land, hidden from view, constituted public use); *Lockwood v. Am. Airlines*, 107 F.3d 1565, 1570 (Fed. Cir. 1997) (finding that the defendant's use of the high-level aspects of its computer reservation system was a prior public use of a means-plus-function claim for a computer system); *Baxter Int'l v. COBE Labs.*, 88 F.3d 1054 (Fed. Cir. 1996) (finding that a scientist's use of a machine implementing the claimed method in a laboratory at the National Institute of Health, without the public's awareness of the method employed by the machine, was a prior public use); *Elec. Battery Co. v. Shimadzu*, 307 U.S. 5, 20 (1939) ("The ordinary use of a machine or the practise [sic] of a process in a factory in the usual course of producing articles for commercial purposes is a public use")). "Cases in which courts find that a prior use was not a 'public use' within the meaning of 35 U.S.C. § 102 have found active concealment of the method or system by the prior user, typically by contractual agreements to maintain secrecy." *Advanceme*, 509 F. Supp. 2d at 608–09. (citing *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983) (finding that company told all employees that the prior art machine was confidential and required them to sign confidentiality agreements, thus concealing the machine); *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376 (Fed. Cir. 2007) (finding that the prior art user was required to sign a non-disclosure agreement related to the prior art, thus concealing the prior art)).

When a party asserts prior public use based on the actions of a third party, section 102(b) is not a bar when the prior use is not available to the public. *Woodland Trust*, 148 F.3d at 1371. Indeed, "secret activity" by a third party who "elects to avoid the patent system" does not constitute public use. *W.L. Gore*, 721 F.2d at 1550.

*Seed Research Equip. Solutions v. Gary W. Clem, Inc.*, 2012 WL 6650873 *6-*7 (D. Kan. Dec. 20, 2012) modified on reconsideration on other grounds 2013 WL 823379 (D. Kan. Mar. 6, 2013) (citations in footnotes inserted into text).

17

The parties discuss at length *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983), which involved a patent for a process permitting production of Teflon tape, commonly used to keep pipe joints from leaking. The inventor, W.L. Gore, sued a producer of a similar product (Garlock) for patent infringement. *Id*. at 1545-46. Garlock claimed that Gore's patent was invalid in part because a third manufacturer (Budd) used a machine employing a similar process to produce similar tape before the critical date. *Id*. at 1546. The Federal Circuit refused to find Budd's use "public" for several reasons. First, although the a former Budd employee testified Budd "made no effort to keep the secret," Budd told all of its employees that the machine in question was confidential and required them to sign confidentiality agreements. *Id*. at 1549 ("That Budd did not keep the machine hidden from employees legally bound to keep their knowledge confidential does not evidence a failure to maintain the secret."). In addition, although employees from another company visiting the Budd plant were shown the machine to see if they could help increase its speed, there was "no evidence that a viewer of the machine could thereby learn anything of which process, among all possible processes, the machine is being used to practice." *Id*. This viewing did not make "knowledge of the claimed process <u>accessible to the public</u>." *Id*. (emphasis added).[7]

---

[7] Plaintiffs cite *In re Elsner*, 381 F.3d 1125, 1129 (Fed. Cir. 2004), for the proposition that mere possession of information that "enables a person of skill in the art to practice asexual reproduction of the plant in a manner consistent with the statute can ...act as a §102(b) bar." Doc. 195 at 12. Plaintiffs suggest that the Ludys' mere possession of the Autumn King and Scarlet Royal plant material, because that possession enabled them to asexually reproduce the varieties, was therefore sufficient on its own to operate as a §102(b) bar. Doc. 195 at 17. This is an over-expansive reading of *Elsner*, which was primarily concerned with alternative language in § 102(b) creating a bar where an invention "was described in a printed publication in this or a foreign country..." more than one year prior to the critical date. *Elsner*, 381 F.3d at 1127-28. There, the Federal Circuit was concerned with whether a "non-enabling" publication describing a patented plant (i.e., a publication that did not permit the reader to create the patented plant without undue experimentation) coupled with a foreign sale of that plant would operate as a § 102 bar. Ordinarily, because each would not operate on its own, both in conjunction would still not operate as a §102 bar, because this would "circumvent the established rules that neither non-enabling publications nor foreign sales can bar one's right to a patent." *Id*. at 1128-29. However, the Federal Circuit carved out a narrow exception for certain foreign sales of plants coupled with non-enabling publications. Because the "touchstone of the statutory subject matter [patentable plants] is asexual reproduction of a unique biological organism," they key was whether the foreign sales of the plants placed the claimed invention in the hands of the public. Because the patented plant in *Elsner* could be reproduced from those sold to the foreign public, this, in effect "enabled" the publications, which themselves created the § 102(b) bar. *Id*. at 1129. However, *Elsner* was not concerned with and did not discuss the "public use" bar and therefore did not address whether mere possession of a patented plant variety would satisfy that bar. In light of the extensive authority discussed above suggesting secret possession does not satisfy the bar, this Court declines to extend *Elsner* in this manner.

*Gore's* discussion of whether visitors able to view the patented machine could learn anything about the patented process somewhat confuses the legal landscape here, where the parties dispute at length whether the Ludys' plantings were located in areas accessible by the public, whether individuals outside of the Ludy family saw the grapes growing on Ludy property, and whether any of those individuals could identify the grapes as being one of the patented varieties in dispute. *Gore* held that where a third party took active steps to maintain confidentiality regarding a use, the incidental exposure of the patented item to visitors not subject to any confidentiality obligation did not render the use "public" where the visitors could not learn about the patented process by simply observing the machine. But, does *Gore* stand for the corollary proposition that even in the absence of active efforts to conceal a use, a public use does not occur unless observers are able to identify the patented item (the rule impliedly suggested by Defendants' efforts to demonstrate that Plaintiffs' third-party witnesses could not identify the grapes)? Or, does it support the alternative proposition that even in the presence of some efforts to conceal a use, that use might nevertheless be rendered public if the use was observed by a visitor and that visitor was able to identify the patented item being used? Neither of these propositions is directly supported by *Gore*, and expanding *Gore* beyond its facts to encompass either proposition would not be faithful to the overwhelming focus of the "public use" authority not on whether and to what extent a use can be "observed" but rather on whether the user was required to or did engage in active efforts to conceal that use.[8] *Gore* itself emphasized the primacy of secrecy and concealment. In concluding its discussion on the applicability of the § 102 bar, *Gore* reasoned:

> Early public disclosure is a linchpin of the patent system. As between a prior inventor who benefits from a process by selling its product but suppresses, conceals, or otherwise keeps the process from the public, and a later inventor who promptly files a patent application from which the public will gain a disclosure of the process, the law favors the latter.

---

[8] This is not to say that observations by others are irrelevant, as such observations might tend to indicate a lack of secrecy. The weight given to such observations will depend in part on the nature of the observation relative to the patented object being observed.

721 F.2d 1550 (internal citations omitted).

Secrecy and confidentiality are the lynchpins of numerous other cases. In *Baxter*, for example, a third party scientist's use of patented centrifuge in public building without any effort to conceal it, coupled with the "free flow into his laboratory of people, including visitors [], who observed the centrifuge in operation and who were under no duty of confidentiality" supported "only one conclusion: that the centrifuge was in public use." 88 F.3d at 1058-59; *see also Eolas Technologies Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1335 (Fed. Cir. 2005) (third party inventor of anticipatory technology showing invention to others without any attempt at maintaining confidentiality erected a third party public use bar). The district court decision in *Advanceme*, relied upon in *Seed Research*, recognized the key issues to be decided in a public use inquiry:

> For a method or system to be in "public use" within the meaning of 35 U.S.C. § 102(a) or (b), the method or system must be used in the ordinary course of business without active efforts to conceal its operation.... [¶] Cases in which courts find that a prior use was not a "public use" within the meaning of 35 U.S.C. § 102 have found active concealment of the method or system by the prior user, typically by contractual agreements to maintain secrecy.

*Advanceme Inc.*, 509 F. Supp. 2d at 608-09 (internal citations provided in *Seed Research* quotation above).[9]

*Seed Research* applied this framework to a patented seed planter that makes use of a GPS system to keep track of seed research plots.  2012 WL 6650873, *1. An unrelated third party allegedly created a similar planting system, the "HarvestMaster," which also used GPS to track research plot plantings, and which was used by a major agribusiness company to plant research fields prior to the critical date. *Id.* at

---

[9] This rule is not inconsistent with *Bourne v. Jones*, 114 F. Supp. 413 (S.D. Fla. 1951), cited by Plaintiffs. In that case, a patented sugar cane variety was distributed by a co-worker of the inventor, without the inventor's authorization, to commercial growers prior to the critical date. *Id.* The district court found that the patent invalid because of prior public use by the commercial growers, none of which were subject to the inventor's control or aware of any restrictions on the use of the cane, because they reproduced the sugar cane and put it to "definite commercial use." *Id.* at 420. There, the district court acknowledged that a public use must be "non-secret," *id.* at 419, but never discussed the issue of secrecy, presumably because the commercial growers were given the cane without any restrictions. Contrary to Plaintiffs' suggestion, the holding in *Bourne* is not dispositive of these motions, as the <u>total</u> absence of evidence of secrecy regarding or restriction on the commercial growers' uses in *Bourne* plainly distinguishes it from the present case.

*3, *7. Because there was no evidence that the HarvestMaster planting was performed in secret or that either the inventor of the HarvestMaster, its purchaser, or manufacturer took any "steps to conceal the planting," the HarvestMaster planting constituted a "public use" barring patenting of the patented system. *Id*. at *7. The *Seed Research* court also noted that the inventor of the HarvestMaster testified that his work to develop the system was well known throughout the industry well before the critical date. *Id*. In addition, the fact that the HarvestMaster planting was described in a public brochure and presentation demonstrated that the planting was not conducted in secret. *Id*. The fact that a video of the HarvestMaster planting was designated "Confidential"; the planting was conducted on private rather than public land, and the general industry expectation that new devices or processes and seed research planting were considered confidential did not overcome the other evidence suggesting the use was public. *Id*. at *8*.

The above-described authorities raise several questions regarding the facts of this case:

- Did the Ludys cultivate Autumn King and/or Scarlet Royal at all before the critical date?

- If so, did the Ludys cultivate Autumn King and/or Scarlet Royal under any limitation, restriction or obligation of secrecy to the inventor?

- Did the Ludys engage in any active efforts to conceal the cultivation of Autumn King and/or Scarlet Royal?

### a.   **Corroboration.**

In examining these factual questions, the Court must keep in mind the corroboration requirement. "Throughout the history of the determination of patent rights, oral testimony by an alleged inventor asserting priority over a patentee's rights is regarded with skepticism, and as a result, such inventor testimony must be supported by some type of corroborating evidence." *Woodland Trust,* 148 F.3d at 1371. The same rule applies where the testimony is from an accused infringer concerning the

sale or public use of an invention before the critical date. *Id*.[10] In assessing corroboration, the Federal

Circuit has endorsed consideration of the following factors:

(1) the relationship between the corroborating witness and the alleged prior user,

(2) the time period between the event and trial,

(3) the interest of the corroborating witness in the subject matter in suit,

(4) contradiction or impeachment of the witness' testimony,

(5) the extent and details of the corroborating testimony,

(6) the witness' familiarity with the subject matter of the patented invention and the prior use,

(7) probability that a prior use could occur considering the state of the art at the time,

(8) impact of the invention on the industry, and the commercial value of its practice.

*Id*. While applying these factors, "an evaluation of all pertinent evidence must be made...." *Lacks*

*Industries Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1349 (Fed. Cir.

2003)(internal citation and quotation omitted). "[A] 'rule of reason' analysis is applied to determine

whether ... testimony ... has been corroborated." *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264

*F.3d 1344, 1350* (Fed. Cir. 2001).

      Oral testimony of an interested witness may not be corroborated by oral testimony of another

interested witness. *See id*. at 1350 (testimony of employee of alleged infringing company could not be

corroborated by testimony of other employees of the same company). *Id*. Rather, documentary evidence

and/or the testimony of uninterested witnesses[11] must be presented as corroboration, all of which must

---

[10] Although Jim, Jack & Lary Ludy are not accused infringers, they are hardly disinterested witnesses, having farmed the patented grapes for a number of years. All parties appear to concede that their testimony requires corroboration.

[11] Defendants suggest, incorrectly, that Plaintiffs cannot use any oral testimony to corroborate the oral testimony of an interested witness. In support of this proposition, Defendants cite *Finnigan Corp. v. Int'l Trade Com'n*, 180 F.3d 1354, 1368 (Fed. Cir. 1999), which established that even uninterested witnesses testifying on behalf of an interested party are subject to the corroboration requirement. *Finnigan* cited *Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.*, 143 U.S. 275, 284 (1892), for the proposition that witnesses whose memories are "prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information." In *Barbed-Wire*, more than twenty witnesses testified on behalf of the accused infringer that they had seen the patented fence exhibited by a third party at a county fair prior to the critical date. That these witnesses were not themselves interested did not immunize their testimony

be viewed together when determining whether the clear and convincing evidence burden has been met. *See id*.; *see also Juicy Whip, Inc. v. Orange Bang, Inc.,* 292 F.3d 728, 743 (Fed. Cir. 2002) ("Reliable evidence of corroboration preferably comes in the form of physical records that were made contemporaneously with the alleged prior invention."); *Sandt*, 264 F.3d at 1350-51 ("Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated.").

In the context of cross-motions for summary judgment, the clear and convincing evidence standard creates a somewhat uneven playing field. In order for Plaintiffs to establish entitlement to judgment as a matter of law that the Autumn King and Scarlet Royal patents are <u>invalid</u>, the <u>undisputed</u> facts must amount to clear and convincing evidence of public (as opposed to secret) use. Defendants may defeat such a motion by establishing that there are disputes as to whether the facts meet the clear and convincing evidence standard. Alternatively, they may demonstrate that Plaintiffs have failed to provide undisputed corroboration of material facts requiring corroboration.

On the other side of the equation, Defendants have the advantage of the presumption that a patent is valid. 35 U.S.C. § 282. To defeat Defendants' motion for summary judgment on the issue of validity, Plaintiffs must present evidence that, if accepted as true, would permit a reasonable finder of fact to conclude that they have met their burden to establish by clear and convincing evidence that the Ludys' uses were "public" as opposed to "secret." In addition, if evidence material to this determination requires corroboration, such corroborating evidence must be presented and must permit a reasonable finder of fact to conclude it would qualify as corroboration.

---

from the corroboration requirement. *Id*. Yet, the testimony of these witnesses was not rejected because of its testimonial nature. Rather, the *Barbed Wire* court concluded their evidence simply did not show that the fence exhibited was constructed according to the patented design. *Id*. at 288-89. All this establishes is the obvious fact that if testimonial evidence by uninterested persons testifying on behalf of a party is used to corroborate, it must actually corroborate the material facts. No case holds that testimonial evidence is *per se* ineligible to serve as corroboration. *Cf. CNET Networks, Inc. v. Etilize, Inc.,* 584 F. Supp. 2d 1260, 1272-73 (N.D. Cal. 2008) ("a potential myriad of witnesses may testify as to a 102(b) date and corroboration thus generally goes to the issue of credibility").

23

### b.    The *Sandrini* Decision.

It cannot be ignored that the district court in *Sandrini* denied cross motions for summary

judgment on the very issue presented here, based on a very similar record, albeit focused only on the

Autumn King variety. After reviewing the relevant caselaw, the district court reasoned:

> There is a factual dispute whether the Ludys publicly used the Autumn King variety by allegedly misappropriating and then using the Autumn King variety in a hidden or secret manner, and whether the Ludys attempted to misdesignate the true origin or identity of their grapes. Based on which version of the facts the trier of facts finds true, the legal decision will be made whether such actions rise to the level of public use.
>
> The Commission asserts Larry Ludy and Jim Ludy knew the "Big White" variety was an unreleased USDA variety, they were not authorized to have it, it might be patented, and they needed to keep their possession of the grape variety secret. Sandrini, on the other hand, asserts the Ludys did not keep their possession of the variety secret.
>
> The Commission offers to prove that Larry Ludy obtained Autumn King plant material from his cousin Jim Ludy, who in turn obtained it from an "unidentified contact," ostensibly associated with the USDA, whom Jim Ludy believed had access to the USDA test plot. The Commission claims that Jim Ludy's intent in possessing the Autumn King plant material was to "keep it quiet" and "it was just to experiment with." Sandrini asserts the unidentified contact who supplied Jim Ludy with Autumn King sticks said nothing specific, and it was Jim Ludy's "general impression" he should not advertise the use of the new variety.
>
> The Commission asserts that when Jim Ludy shared a small amount of the Autumn King plant material with his cousin Larry, Jim repeated the warning to Larry that the material was unreleased, had to be kept secret, and "was just to experiment with." Jim Ludy also told Larry Ludy, both before and after giving Larry plant material, not to share the material with anyone else or tell anyone else he had the material. Sandrini, on the other hand, asserts Jim Ludy imposed no express confidentiality restrictions on Larry Ludy's use of the Autumn King plant materials.
>
> Sandrini rejoins that Jim Ludy did not impose any restrictions on Larry Ludy's use or ability to display the Autumn King vines. Sandrini further asserts public access to Larry Ludy's Autumn King vines was not limited in any way. The Commission denies these factual allegations. Sandrini also testified that the Autumn King vines growing on Jim Ludy's land were seen by several people without any confidentiality agreement, and Jim Ludy did not prevent the public from viewing Jim's Autumn King vines. Mr. Sandrini saw Autumn King vines bearing fruit, growing on Jim Ludy's and Larry Ludy's farms.
>
> The parties vigorously dispute whether Jim Ludy and Larry Ludy secretly used or tried to hide the use of the Autumn King variety or did so openly and notoriously. The Commission contends the Ludys' use was surreptitious and secret, while Sandrini contends the Ludys' use was open and available for all the public to see. Further dispute

24

exists whether Jim Ludy was under any obligation to Ramming, Tarailo, and the USDA to keep his possession of the Autumn King plant material secret and hidden from others. These factual disputes cannot be resolved on summary judgment.

Sandrini has not demonstrated by undisputed, clear and convincing evidence, as a matter of law, that the ′284 Patent was in public use prior to the critical date and is therefore not entitled to summary judgment. Nor has the Commission demonstrated as a matter of law that the validity of the ′284 Patent can[] withstand a § 102(b) public use challenge.

*Sandrini*, 2007 WL 1847631, at *16-*17.

### c.   Plaintiffs' Motion for Summary Judgment.

"A moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001). As in *Sandrini*, in light of the relevant standards, Plaintiffs' motion for summary judgment on the issue of invalidity based upon the Ludys' uses of both varieties must be denied. As discussed above, the crux of the public use inquiry is whether the users engaged in any active efforts to conceal their use. Plaintiffs bear the burden of demonstrating that their use was public (i.e., non-secret) by clear and convincing evidence.

Viewing the undisputed evidence and any disputed evidence in a light most favorable to Defendants, both Jim and Larry Ludy engaged in some effort to conceal their use of the plant material.[12] It is undisputed that Jim Ludy obtained the plant material from Rodney Klassen knowing that he was obtaining material that "had not been released." CSUF # 29.[13] It was Jim Ludy's understanding that he should keep his possession of the plant material "quiet." CSUF #33. Jim Ludy further operated with the understanding that the cuttings were "just to experiment with" and they were not to be used to produce a crop for sale. CSUF #32.

---

[12] Much of the evidence cited in this section is derived from the testimony of members of the Ludy family. Such evidence would arguably be subject to the corroboration requirement if cited to support Plaintiffs' position that it is entitled to summary judgment that the patents are invalid. Because, however, this testimony is being cited here to establish that Plaintiffs' motion for should be <u>denied</u> because there are material factual disputes, the corroboration requirement is not relevant.

[13] Jim Ludy testified that at the time he received the plant material he didn't know whether Klassen was authorized to give it to him. JL 2012 Depo. 74-75. But, as discussed supra in Part IV.B.1, this is not dispositive of public use.

Jim provided his cousin Larry with some of the plant material obtained from Klassen, but informed Larry that the cuttings were just to experiment with and that he should not produce a crop for sale using the cuttings. CSUF #47. Other evidence supports a finding that Larry Ludy knew that plant material had not yet been released and that it shouldn't be transferred to others. CSUF ## 45-46.

It was Jim Ludy's intent not to use the varieties in the open. CSUF #50. Again, Jim Ludy believed, based on his conversations with Larry, that Larry Ludy would keep the varieties "confidential." CSUF #51.

It is undisputed that the Ludys never entered into a written arrangement with anyone at USDA regarding confidentiality of the plant material. Yet, nothing in the caselaw suggests a confidentiality "agreement," let alone a written one, is absolutely required. *See Nat'l Research Dev. Corp. v. Varian Associates, Inc*., 17 F.3d 1444, *2 (Fed. Cir. 1994) (finding "the presence or absence of [an express confidentiality] agreement is not determinative of the public use issue," in light of general rule that "[a] conclusion that the public use bar invalidates a patent must be ... drawn in light of the totality of the circumstances)(internal quotation omitted). In fact, *Varian* closely examined whether the individual who allegedly engaged in the prior public use of an invention was subject to a confidentiality agreement based in part on an unwritten "understanding" among scientists in his research community, eventually finding that the totality of the evidence simply did not support a finding that such an understanding existed. *Id*. at *3; *Nat'l Research Dev. Corp. v. Varian Associates, Inc.,* 822 F. Supp. 1121, 1130 (D.N.J. 1993) aff'd in part, vacated in part on other grounds, 17 F.3d 1444 (Fed. Cir. 1994).

Here, for purposes of evaluating Plaintiffs' motion for summary judgment, a finder of fact could reasonably conclude that both Jim and Larry Ludy operated according to an understanding that the plant material was subject to limitations on its use and should be treated as confidential.

Plaintiffs' motion for summary judgment that the patents are invalid because of the Ludys' uses is DENIED.

26

### d.   Defendants' Motion for Summary Judgment.

"[A] moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent." *Eli Lilly & Co.,* 251 F.3d at 962. To defeat summary judgment, the nonmoving party must then come forward with evidence sufficient to establish a genuine issue of material fact regarding that essential element. *Freedman Seating Co. v. Am. Seating Co.,* 420 F.3d 1350, 1363 (Fed. Cir. 2005).  Although the ultimate evidentiary burden of showing clear and convincing evidence does not change on summary judgment, Plaintiffs may defeat summary judgment by showing a genuine issue of material fact, which, if believed by the finder of fact, could provide clear and convincing evidence that the patent is invalid. *See Duramed Pharmaceuticals, Inc. v. Watson Laboratories, Inc.*, 413 F. App'x 289, 295 (Fed. Cir. 2011) (citing *Freedman Seating,* 420 F.3d at 1364; *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 881 (Fed. Cir. 1998)).

It is not necessary or possible to discuss all of the evidence presented, to what extent all of the evidence requires corroboration, and whether sufficient corroboration has been provided. It is sufficient, under the circumstances, to focus only on the testimony of Larry Ludy, because his testimony, standing alone, is sufficient to defeat Defendants' motion.

### (1)   Larry Ludy's Testimony.

Viewed in a light most favorable to Plaintiffs, Larry Ludy testified as follows:

- He referred to Scarlet Royal and Autumn King as "Crimson Killer" and "Big White" or "Late White," respectively. LL 2012 Depo. 23:9:15.

- He obtained "Crimson Killer" and "Big White" or "Late White" plant materials from Jim and Jack Ludy and propagated both varieties on his property in the spring of 2002. LL 2012 Depo. 18-22, 68-69; LL *Sandrini* Depo 85:7-13.

27

- Larry Ludy's "Late Whites" bore fruit in late 2002. Larry Ludy ate some of that fruit and showed some to Richard Sandrini. LL *Sandrini* Depo 38:5-15.

- Although the "Crimson Killer" did not produce good fruit the first year, Larry Ludy grafted more of it in March 2003. LL 2012 Depo. 83:21-84:7, 143:14-17.[14]

- Larry Ludy did know that the "Crimson Killer" and "Big White" varieties he received from Jim Ludy had not yet been released to the public by USDA. CSUF #45.

- However, at the time Larry Ludy received the plant material, he does not recall Jim or Jack Ludy placing any specific restrictions on his use of the material, other than that they did not want him to give any plant material to Richard Sandrini. LL 2012 Depo. 76:14-27.[15]

- When he planted the Late Whites in 2002, Larry Ludy took no precautions to shield the grapes or otherwise hide them and was not told to grow the grapes solely for experimental purposes. LL *Sandrini* Depo 179:23-180:12.

Larry Ludy's testimony about the timing of his initial grafting activities in 2002 is corroborated by his own contemporaneous grafting notes, Doc. 211-12, which are, in turn, corroborated by two checks issued for grafting activities in the March 2003 timeframe, Doc. 211-13. *See Sandt*, 264 F.3d at 1350-51 ("Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated.").[16]

---

[14] Defendants object to lines page 143, lines 14-23 of Larry Ludy's 2012 Deposition, identifying his testimony that he grafted Crimson Killer for the second time in the spring of 2003 as "speculation." *See* Doc. 207 at #19. While there is some additional testimony calling this assertion into doubt, Larry Ludy has personal knowledge of the matter. The additional testimony goes to weight, not admissibility. This objection is OVERRULED.

[15] This fact is, of course, hotly disputed. Jim Ludy testified that he told Larry to keep the plant material confidential and not to sell any of the resulting fruit. CSUF #74. But, Jim never made Larry promise not to do so and certainly never made Larry sign a confidentiality agreement. JL *Sandrini* Depo. 149-150, 154-55. It is also indisputable that Larry Ludy's memory appears to have faded considerably between his original 2006 deposition in the *Sandrini* case and his 2012 deposition. But, a finder of fact may choose to credit Larry Ludy's later testimony.

[16] Plaintiffs also seek to corroborate other aspects of Larry Ludy's testimony with the testimony of other witnesses. For example, they offer the testimony of Richard Sandrini and Gerry Chua, Mr. Sandrini's sales manager, both of whom are also arguably interested witnesses. Regardless, their testimony is also subject to the corroboration requirement under *Finnigan*,

28

Even assuming there is no evidence to independently corroborate Larry Ludy's specific assertion that he was never asked to restrict his own use of the plant material in any way, the "rule of reason" "does not impose an impossible standard of independence on corroborative evidence by requiring every point necessary to prove invalidity be corroborated by evidence having a source totally independent of the [witness]." *Freedman*, 180 F.3d at 1369 (internal citation and quotation omitted). The key is whether under the totality of the circumstances, the offered corroborating evidence is sufficiently corroborating of otherwise uncorroborated testimony of invalidating activities. *Id*. Under the circumstances of this case, the Court believes a finder of fact could conclude that Larry Ludy's grafting notes and related financial documents are the only reasonably available documentary evidence a farmer could produce to corroborate the kind of testimony presented here.

In sum, Plaintiffs have met their burden to resist Defendants' summary judgment motion by demonstrating that if the facts are viewed in their favor a finder of fact could conclude that they have demonstrated by clear and convincing evidence that Larry Ludy publicly used both varieties before the critical date of September 28, 2002. His testimony, if believed, establishes that he used the varieties openly and in the ordinary course of business without an attempt to conceal the use is sufficient to find the work public. *See 3M Unitek Corp. v. Ormco Co.*, 96 F. Supp. 2d 1042, 1049 (C.D. Cal. 2000).

Defendants' motion for summary judgment that the patents are not invalid based on the Ludys' uses is DENIED.

## C.      Experimental Use.

Plaintiffs also claim that the Scarlet Royal patent is invalid because of Dr. Badr's cultivation of that variety at Fresno State. Defendants do not dispute the timing of the use; rather they claim the use does not trigger the "public use" bar because it was an "experimental use." Evaluation of an alleged

---

180 F.3d 1354, 1368, as they are testifying on behalf of an interested witness. The parties have not addressed whether these witnesses' testimony can be corroborated by the written evidence discussed above, by one another, or by other evidence in the record. Accordingly, the Court will not consider this corroborating evidence at this time.

experimental use begins with the general rule that "in order to invalidate a patent based on prior knowledge or use, that knowledge or use must have been available to the public." *Woodland Trust*, 148 F.3d at 1370. "Nevertheless, an inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention-even if such testing occurs in the public eye. The law has long recognized the distinction between inventions put to experimental use and products sold commercially." *Pfaff v Wells Electronics, Inc*., 525 U.S. 55, 64 (1998). Experimentation may include "tests needed to convince [the inventor] that the invention is capable of performing its intended purpose in its intended environment." *EZ Dock v. Schafer Sys., Inc*., 276 F.3d 1347, 1352 (Fed. Cir. 2002) (internal citation and quotation omitted); *see also Kolmes v. World Fibers Corp*., 107 F.3d 1534, 1540 (Fed. Cir. 1997) ("testing was ... required in such an environment in order to ensure that the invention would work for its intended purpose"). An inventor does not inappropriately delay filing "by a bona fide effort to bring his invention to perfection, or to ascertain whether it will answer the purpose intended." *Pfaff*, 525 U.S. at 64-65.

The Federal Circuit "has repeatedly stressed that evidence of experimental use does not give rise to a free-standing doctrinal exception to statutory bars, but instead operates to negate application of section 102(b)." *EZ Dock*, 276 F.3d at 1351.

> [I]t is incorrect to impose on the patent owner... the burden of proving that a "public use" was "experimental." These are not two separable issues. It is incorrect to ask: "Was it a public use?" and then "Was it experimental?" Rather the court is faced with a single issue: Was it a public use under 102(b)?

*Id*. (internal citation omitted). Therefore the burden remains on Plaintiffs to prove the use was <u>not</u> experimental. "[T]he question posed by the experimental use doctrine, .... [is] whether the primary purpose of the inventor at the time of the [use], as determined from an objective evaluation of the facts surrounding the transaction, was to conduct experimentation." *Allen Eng'g Corp. v. Bartell Indus., Inc*., 299 F.3d 1336, 1354 (Fed. Cir. 2002).

In assessing experimentation, the Federal Circuit considers a number of factors, not all of which may apply in any particular case:

> (1) the necessity for public testing, (2) the amount of control over the experiment retained by the inventor, (3) the nature of the invention, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment, ... (9) the degree of commercial exploitation during testing[,] ... (10) whether the invention reasonably requires evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers.

*EZ Dock*, 276 F.3d at 1357 (Linn, J., concurring). More generally, "[a] use may be experimental only if it is designed to (1) test claimed features of the invention or (2) to determine whether an invention will work for its intended purpose—itself a requirement of patentability." *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1327 (Fed. Cir. 2009) (internal citation omitted). "In other words, an invention may not be ready for patenting if claimed features or overall workability are being tested. But, there is no experimental use unless claimed features or overall workability are being tested for purposes of the filing of a patent application." *Id*. "Indeed, the experimental use negation of the § 102(b) bar only exists to allow an inventor to perfect his discovery through testing without losing his right to obtain a patent for his invention." *Id*.

### 1.    Facts Related to Dr. Badr's Use.

The undisputed facts indicate that USDA leased space at Fresno State, but had limited space there. CSUF # 59. USDA collaborated with Dr. Sayed Badr, a professor and researcher at Fresno State, on a number of occasions to run experiments on table grape varieties developed in USDA's breeding program. CSUF ## 56, 58. Dr. Badr would test varieties to determine how they responded to growth regulators and various cultural practices. CSUF # 60. He would also test how they performed after grafting onto different rootstocks. *Id*.

In 1999 USDA provided cuttings of "experimental selection B1" (later named Scarlet Royal) to Dr. Badr. CSUF # 61. Dr. Badr planted approximately 80 Scarlet Royal vines on the west side of the Fresno State campus. PJSUF #6. In 2002, approximately three rows of Scarlet Royal were grafted onto rootstock in the same area. PJSUF #7. These plants were located outside the area of land leased to USDA, PJSUF #8, on the opposite side of the Fresno State campus from the USDA facility, DR 2012 Depo. 15:23-16:1.

Dr. Badr used the B1 plants to test the effect of two different training systems on vine yield and fruit quality. CSUF #61. He later grafted B1 onto various rootstocks. *Id.*

During the entire time that Dr. Badr had B1 before its official release, USDA's Ronald Tarailo regularly spoke with Dr. Badr to receive updates about his research on B1 and other experimental selections. CSUF # 64. Tarailo regularly visited Dr. Badr's test plots. CSUF # 65. The USDA also received certain data about the B1 vines growing in Dr. Badr's test plot. CSUF # 64.

It is undisputed that USDA did not make Dr. Badr sign a confidentiality agreement or any other document indicating how Dr. Badr should control his use of B1/Scarlet Royal. *See* PSUF # 21. However, Mr. Tarailo indicates that Dr. Badr was not permitted to propagate additional vines for his own use or to allow others to do so. CSUF #66. Based on the long-standing relationship between USDA and Dr. Badr, Ronald Tarailo had full confidence that Dr. Badr would and did comply with his responsibility to maintain control over the plant material provided to him by the USDA. *Id.*

Plaintiffs point to portions of Dr. Ramming's 2012 Deposition, in which Dr. Ramming indicated that the purpose of Dr. Badr's experiments with the initial 80 Scarlet Royal plants was to "evaluate the commercial potential" of the variety. DR 2012 Depo. 26:2-4. He elaborated on his conception of "commercial potential":

> Q. Scarlet Royal was released approximately when?
>
> A. The release notice, I think, was signed in 2006.

Q. And the information you said that you would have needed to prepare a patent application would have been available to you by the end of 2002. Why did you wait from the end of 2002 until 2006 to release Scarlet Royal?

A. We were still trying to determine if the Scarlet Royal selection was good enough from a commercial standpoint. Because we're always comparing with standard varieties in the industry to make sure that what we release is better than the existing varieties so that the growers will have better varieties than what they already have.

Q. And what did you do between, say, the end of 2002 until the release date to determine how Scarlet Royal would perform commercially?

A. We would have done different treatments of gibberellic acid for bloom sprays, sizing sprays. We would have done girdling trials, which is taking a strip of bark out of the trunk. And we were also in the process of trying to determine if cane pruned or spur pruning would be the most appropriate.

Q. And where did you do those types of – where did you do that type of work?

A. At our leased plots at Fresno State.

DR 2012 Depo. 42:5-43:7.

## 2. Plaintiffs' Motion for Summary Judgment.

Focusing only on the nature and purpose of the testing, there are disputes requiring denial of Plaintiffs' motion for summary judgment on whether Dr. Badr's use invalidated the patent for Scarlet Royal. On the one hand, Dr. Badr's experiments will qualify as "experimental uses" if they were designed to "determine whether [the] invention will work for its intended purpose." Tests designed to see if the product is better than previous variations can count as experimental uses. *See TP Laboratories, Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 972 (Fed. Cir. 1984) ("[T]he test for success of the improvement was not whether it could be used at all, but whether it could be said to work better [than a different variation].""). On the other hand, market testing and/or commercial testing do not qualify as "experimental uses." *See Allen*, 299 F.3d at 1353-55 (finding, in on sale bar case, even though product was still in "experimental stage" and under constant modification, sale to customers who received a guarantee of repair or replacement was not necessarily an "experimental sale," even though it was

33

necessary to test the devices outside the factory environment; court must consider whether sales were "commercial in nature and not incidental to the primary purpose of experimentation"). Viewing the facts in a light most favorable to Defendants, a finder of fact could conclude that, despite Dr. Ramming's use of the term "commercial" in reference to Dr. Badr's testing, the experiments conducted were in fact designed to determine whether and to what extent Scarlet Royal would out-perform other varieties if it was released, a permissible "experimental use."

Plaintiffs have not presented undisputed evidence as to any of the other experimental use factors that would overshadow the existence of a dispute related to the nature and purpose of the experiments themselves. Although it is undisputed that there was no written agreement between USDA and Dr. Badr, this is not dispositive, *Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1315 (Fed. Cir. 2005) (jury's verdict regarding experimental use supported even in absence of formal confidentiality agreement), and Defendants have presented undisputed evidence that some form of understanding of confidentiality existed between USDA and Professor Badr. Moreover, even though Dr. Ramming indicated the vines were not "under his direct supervision and control" at all times, Defendants have presented undisputed evidence that Mr. Tarailo regularly inspected the research site, regularly communicated with Dr. Badr about the experiments, and that USDA received data about the experiments from Dr. Badr.[17]

Plaintiffs' motion for summary judgment that the Scarlet Royal patent is invalid due to Dr. Badr's use at Fresno State is DENIED.

### 3.   **Defendants' Motion for Summary Judgment.**

It is worth reiterating that although the ultimate evidentiary burden of showing clear and convincing evidence does not change on summary judgment, Plaintiffs may defeat summary judgment

---

[17] Plaintiffs also assert that some of the fruit from Dr. Badr's experiments with B1/Scarlet Royal may have been sold at the Fresno State Campus store prior to the critical date. But, this assertion is arguably unsupported and is at the very least disputed. DR 2012 Depo. at 17:15-17; 18:21-25; 57:25-58-5. Moreover, even if some sales did occur, Plaintiffs have presented absolutely no evidence that the "degree of commercial exploitation" was anything other than *de minimis* effort to avoid wasting any grapes produced during Dr. Badr's experiments.

by showing a genuine issue of material fact, which, if believed by the finder of fact, could provide clear and convincing evidence that the patent is invalid. *See Duramed*, 413 F. App'x at 295 (citing *Freedman*, 420 F.3d at 1364; *Monarch Knitting,* 139 F.3d at 881). Although numerous factors come into play in evaluating whether a use qualifies as "experimental," *EZ Dock*, 276 F.3d at 1357 (Linn, J., concurring) (enumerating 13 factors), "[a] use may be experimental only if it is designed to (1) test claimed features of the invention or (2) to determine whether an invention will work for its intended purpose—itself a requirement of patentability." *Clock Spring*, 560 F.3d at 1327. A patentable item may be subject to a period of experimental use to determine if it is capable of performing its intended purpose in its intended environment. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 550-51 (Fed. Cir. 1990) (device designed to withstand year-round weather may be subjected to experimental testing in the winter environment). However, once the basic purpose of an invention has been realized, further experiments to test additional uses do not qualify as "experimental uses." *Baxter Int'l, Inc. v. COBE Laboratories, Inc.*, 88 F.3d 1054, 1060 (Fed. Cir. 1996) (finding no experimental use where medical device previously proven to perform its intended purpose was subjected to further tests designed to prove it could be modified to work for a different purpose).

The Court believes the crux of the inquiry in this case is the nature and purpose of the experiments conducted by Dr. Badr. Although the Court is no expert in grape cultivation, Dr. Ramming's testimony clearly indicates that the experiments were performed to assess how Scarlet Royal would respond to different growing practices after its release:

> Q. And what did you do between, say, the end of 2002 until the release date to determine how Scarlet Royal would perform commercially?
>
> A. We would have done different treatments of gibberellic acid for bloom sprays, sizing sprays. We would have done girdling trials, which is taking a strip of bark out of the trunk. And we were also in the process of trying to determine if cane pruned or spur pruning would be the most appropriate.

DR 2012 Depo. 42:21-43:4. Dr. Ramming explained in his declaration that once a genetically distinct

grape variety is developed this is just the "beginning rather than the end of the development process." Doc. 189 at ¶12. He further explained:

> [N]umerous factors in addition to genetics ... influence the observable characteristics of the grapevine and its fruit. Those factors include the environment in which the plant is grown (weather; access to sunlight, water, and nutrients; soil characteristics; pests; disease; etc.), the treatments applied to the plant (growth regulators like gibberellic acid; pesticides; etc.), other cultural practices (type of rootstock; spur vs. cane pruning; trellis configuration; hand thinning; girdling; etc.), and other factors (vine age; etc.)
>
> Many years of experimentation are required to determine whether the observed characteristics of a new grapevine are traits that are consistently expressed as characteristics of the selection or greatly influenced by the environment. Extensive experimentation is also required to determine whether a selection responds in a systematic and predictable way to environmental factors, treatments, cultural practices, and other factors.

*Id*. at ¶¶ 14-15. In light of this information, the experiments conducted by Dr. Badr fall squarely within the category of "experimental uses" intended determine if the invention is "capable of performing its intended purpose in its intended environment." *EZ Dock*, 276 F.3d at 1352. Notwithstanding Dr. Ramming's passing use of the word "commercial," no reasonable finder of fact could conclude that Plaintiffs have met the burden of proving by "clear and convincing evidence" that the purpose of Dr. Badr's experiments fall outside the proper scope of the experimental use doctrine.

   Nor have Plaintiffs raised disputes over any of the other experimental use factors that would overcome this failure. Again, although it is undisputed that there was no written agreement between USDA and Dr. Badr, this is not dispositive, *Lisle*, 398 F.3d at 1315, and Defendants have presented undisputed evidence that some form of understanding of confidentiality existed between USDA and Professor Badr. Moreover, even though Dr. Ramming indicated the vines were not "under his direct supervision and control" at all times, Defendants have presented undisputed evidence that Mr. Tarailo regularly inspected the research site, regularly communicated with Dr. Badr about the experiments, and that USDA received data about the experiments from Dr. Badr.

   On summary judgment, even viewing the evidence in the light most favorable to Plaintiffs, a

finder of fact could not reasonably conclude that Plaintiffs could meet their burden to establish by clear and convincing evidence that Dr. Badr's experiments were "commercial" not "experimental" in nature. Defendants' motion for summary judgment on that the Scarlet Royal patent is invalid due to Dr. Badr's use is GRANTED.

## V. CONCLUSION AND ORDER

For the reasons set forth above:

(1) The parties' cross motions for summary judgment as to the Ludys' uses are DENIED;

(2) Plaintiffs' motion for summary judgment as to Dr. Badr's use is DENIED; Defendants' cross-motion is GRANTED.

**SO ORDERED**
**Dated: March 25, 2013**

                                        **/s/ Lawrence J. O'Neill**
                                        **United States District Judge**