1    **LAWRENCE M. HADLEY (SBN 157728)**
     lhadley@mckoolsmithhennigan.com
2    **MCKOOL SMITH HENNIGAN, P.C.**
     **865 South Figueroa Street, Suite 2900**
3    **Los Angeles, California 90017**
     **Telephone: (213) 694-1200**
4    **Fax: (213) 694-1234**

5    **BRIAN C. LEIGHTON (SBN 090907)**
     bleighton@arrival.com
6    **LAW OFFICES OF BRIAN C. LEIGHTON**

7    **Attorneys for Plaintiffs**
     **DELANO FARMS COMPANY, FOUR STAR FRUIT, INC.;**
8    **GERAWAN FARMING, INC.**

9

10                      UNITED STATES DISTRICT COURT

11                      EASTERN DISTRICT OF CALIFORNIA

12

13   DELANO FARMS COMPANY; FOUR          )   Case No.1:07-cv-01610-SEH-JLT
     STAR FRUIT, INC.; GERAWAN           )
14   FARMING, INC.,                      )   **PLAINTIFFS' POST TRIAL PROPOSED**
                                         )   **FINDINGS OF FACT AND**
15                    Plaintiffs,        )   **CONCLUSIONS OF LAW**
                                         )
16           vs.                         )   JUDGE:        Hon. Sam E. Haddon
                                         )
17   THE CALIFORNIA TABLE GRAPE          )
     COMMISSION; UNITED STATES OF        )
18   AMERICA; UNITED STATES              )
     DEPARTMENT OF AGRICULTURE; TOM      )
19   VILSACK, SECRETARY OF THE UNITED    )
     STATES DEPARTMENT OF                )
20   AGRICULTURE (IN HIS OFFICIAL        )
     CAPACITY),                          )
21                                       )
                     Defendants.         )
22                                       )
                                         )
23   ─────────────────────────────────  )

24

25

26

27

28   Case No. 1:07-CV-01610-SEH-JLT              POST-TRIAL PROPOSED FINDINGS OF FACT
                                                        AND CONCLUSIONS OF LAW

905209

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

Plaintiffs Delano Farms Company, Four Star Fruit, Inc., and Gerawan Farming hereby provide the following post-trial proposed findings of facts and conclusions of law:

**PROPOSED FINDINGS OF FACT**

*Background*

1.     This case concerns two varieties of table grapes (*i.e.*, grapes for fresh consumption), Autumn King and Scarlet Royal, developed and patented by the United States Department of Agriculture ("USDA") as a part of a program partially funded by the California Table Grape Commission ("Commission") through fees accessed on table grape growers.  These growers include Plaintiffs Delano Farms Company, Four Star Fruit, Inc., and Gerawan Farming, Inc.  Although the development of the patented varieties was funded in part through fees assessed by the Commission on Plaintiffs, the Commission, as the exclusive licensee of the patents, requires nurseries to pay royalties on each sale of the patented varieties, which the nurseries pass on to growers.  Plaintiffs have entered into license agreements with the Commission for the patented varieties and paid royalties for the purchase of the patented varieties, which have been passed to the Commission. Plaintiffs now seek to invalidate the patents for these two varieties under 35 U.S.C. § 102(b) on the ground that the varieties were in "public use" more than a year before USDA sought patent protection through uses by Larry Ludy and Jim Ludy on farms located in Delano, California.

2.     This Court denied cross-motions for Summary Judgment on the validity issues concerning the patented varieties in an Order filed March 25, 2013.  Dkt. 217.  Thereafter, the parties agreed to a bench trial before Judge Sam E. Haddon of the District of Montana.  A bench trial was held before Judge Haddon from June 10-13, 2013 in Fresno, California.

*The Parties*

3.     Plaintiff Delano Farms Company is a Washington corporation with its principle place of business at 815 Eighth Street, P.O. Box 240, Hoquiam, Washington 98550.  Dkt. 224 ¶ 1.

4.     Plaintiff Four Star Fruit, Inc. is a California corporation with its principle place of business at 13830 Avenue 24, Delano, California 93215.  Dkt. 224 ¶ 2.

1    5.    Plaintiff Gerawan Farming, Inc. is a California corporation with its principle place of

2    business at 15749 East Ventura, Sanger, California.  Dkt. 224 ¶ 3.

3    6.    Plaintiffs are engaged in the business, inter alia, of growing, harvesting and selling

4    table grapes.  Dkt. 224 ¶ 4.

5    7.    Defendant the California Table Grape Commission ("Commission") was established

6    in 1967 as a government corporation of the State of California by an act of the California Legislature

7    called the Ketchum Act, Cal. Food & Agric. Code § 65500 et seq.  The Commission's principal

8    place of business is at 392 W. Fallbrook, Suite 101, Fresno, California 93711.  Dtk. 224 ¶ 5.

9    8.    One of the purposes of the Commission is to expand and maintain the market for

10   California table grapes for the benefit of the State of California and California's table grape growers.

11   The Commission is funded primarily by assessments levied on each shipment of California table

12   grapes.  Those assessments are paid by table grape shippers, who are authorized to collect such

13   assessments from table grape producers.  Dkt. 224 ¶ 5.  The amount of the assessment is the same

14   regardless of the table grape variety sold.  (Tr. 36 (L. Ludy)).

15   9.    Defendant the United States of America and its representative, the United States

16   Department of Agriculture ("USDA"), reside and conduct business within the territorial jurisdiction

17   of this Court.  Dkt. 224¶ 6.

18   ***The Autumn King and Scarlet Royal Patents***

19   10.    United States Patent PP16,229 ("the '229 patent"), issued January 31, 2006, describes

20   and claims the grapevine denominated "Scarlet Royal."  Dkt. 224 ¶ 7; JX 2.

21   11.    United States Patent PP16,284 ("the '284 patent"), issued February 21, 2006,

22   describes and claims the grapevine denominated "Autumn King."  Dkt. 224 ¶ 8; JX 1.

23   12.    David W. Ramming and Ronald E. Tarailo are the named inventors on the '284

24   patent and the '229 patent. Dkt. 224 ¶ 10.

25   13.    At the time of the inventions claimed in the '284 and '229 patents, David Ramming

26   and Ronald Tarailo were employed by USDA. Dkt. 224 ¶ 11.

27

28

Case No. 1:07-CV-01610-SEH-JLT                                    POST TRIAL PROPOSED FINDINGS OF FACT
                                                                  AND CONCLUSIONS OF LAW

McKool Smith Hennigan, P. C.
LOS ANGELES, CALIFORNIA

1    14.    The '284 and '229 patents are owned by the United States, as represented by the

2  Secretary of Agriculture. Dkt. 224 ¶ 14.

3    15.    The '284 and '229 patents are exclusively licensed to the California Table Grape

4  Commission, which makes them available to growers through sublicensed nurseries. Dkt. 224 ¶ 15.

5    16.    The applications for the '284 patent and the '229 patent were filed on September 28,

6  2004. Dkt. 224 ¶ 8.  Accordingly, the critical date for both the Autumn King and Scarlet Royal

7  varieties for purposes of the public use bar to patentability in 35 U.S.C. § 102(b) is September 28,

8  2003.

9    *Overview of Table Grape Farming in Central Valley*

10    17.    The California Central Valley, including the Delano area, provides an ideal location

11  for table grape farming.  Delano, California, located north of Bakersfield, has been described as the

12  table grape capital of the world.  Table grape farmers in the California Central Valley are highly

13  knowledgeable about table grapes and table grape farming.  To stay abreast of developments, table

14  grape farmers in the Central Valley observe what table grape varieties other farmers grow on their

15  farms and what new table grape varieties are under development.  Tr. 19-23 (L. Ludy); 231-32 (R.

16  Sandrini); 413 (K. Nave).

17    18.    Two ways exist to produce a table grape vine.  One is to plant.  Another way is to

18  graft.  To graft, grafting material called "wood" or "sticks" is used.  A stick of wood may have

19  several buds.  The wood with a bud is grafted onto a rootstock, and the variety of the graft becomes

20  the new grapevine plant.  In general each bud can produce a new grapevine.  Tr. 14-17 (L. Ludy).

21    19.    With grafting, the ideal time to graft is in February or March, after the last frost.  For

22  grafts, a canopy will usually develop within six months, and the first fruit will usually be visible

23  within that time frame.  Accordingly, if grafts are done in March, a canopy will exist by August and

24  grapes will be visible by September.  Tr. 18 (L. Ludy).

25    20.    Experienced table grape farmers in the California Central Valley can distinguish

26  between different types of table grapes, sometimes by looking at the leaves and sometimes by

27  looking at both the leaves and fruit.  Tr. 13 (L. Ludy), 233-34 (R. Sandrini).

28

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

Case No. 1:07-CV-01610-SEH-JLT                    POST TRIAL PROPOSED FINDINGS OF FACT
                                                  AND CONCLUSIONS OF LAW

*USDA Breeding Program*

21.    A number of growers in the California Central Valley have breeding programs for the development of new table grape varieties.  Tr. 244 (R. Sandrini).

22.    The USDA also maintained a table grape breeding program at two locations -- one in Parlier, California and one on leased property on the campus of California State University at Fresno.  Dr. David Ramming was employed by the USDA as a research horticulturist and headed the USDA breeding program at these locations from 1975 to 2013.  Tr. 435-36 (D. Ramming).

23.    The Commission funds part of Dr. Ramming's breeding program (about one-third of the costs) though the assessments it received on boxes of table grapes sold.  Tr. 271 (R. Sandrini), 344, 380 (K. Nave).  In this regard, California Table grape growers invest in Dr. Ramming's USDA breeding program.  Tr. 380 (K. Nave).

24.    Neither Dr. Ramming nor the USDA was in the business of growing table grapes for commercial sales.  Rather, for successful new varieties developed Dr. Ramming in his breeding program, consumers would benefit only if California table grape farmers invested in the varieties by devoting acreage and selling to buyers.  Tr. 265-66 (R. Sandrini), 380 (K. Nave).  For this reason, Dr. Ramming welcomed input on the varieties under development from California table grape farmers and kept them up to date on his development activities.  Tr. 474 (D. Ramming).

25.    Once Dr. Ramming was satisfied with new variety developed in the USDA breeding program, he recommended that it be "released."  This meant that the variety would be made available to growers and nurseries for propagation.  The USDA notified growers and nurseries about a release through a one-page announcement.  Tr. 453 (D. Ramming).

26.    The Commission, though the Commission's Research Committee, often made recommendations to Dr. Ramming on when new table grape varieties were ready for release to table grape farmers, and Dr. Ramming historically followed those recommendations most of the time.  Tr. 383-84.

McKool Smith Hennigan, P. C.
LOS ANGELES, CALIFORNIA

Case No. 1:07-CV-01610-SEH-JLT

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

***Development of Autumn King and Scarlet Royal***

27.    Autumn King was known at various times prior to release as C67-120, C10, Big White, and Late White.

28.    Scarlet Royal was known at various times prior to release as B34-82, B1 and Crimson Killer.

29.    Dr. Ramming started the development of Scarlet Royal at the Fresno State facility in 1992. As with other new varieties, the development process began with hybridizing (which involves taking pollen from a male parent and putting it on the pistol of the female parent) two selected varieties, extracting the aborted seeds from the berries of the resulting plant (for seedless selections), and planting the group of plants from the cross-combinations. For Scarlet Royal, this resulted in 30-40 individual plants at the USDA Fresno State facility. From those plants, one was selected that had the desired characteristics. That plant was then used to propagate 24-25 plants in the breeding block at Fresno State. The selected plant from which the 24-25 plants were propagated was indentified as B34-82 (later B1 and Scarlet Royal). All subsequent propagations of Scarlet Royal are genetically identical to the originally-selected B34-82 plant. Tr. 436-42 (D. Ramming). Dr. Ramming confirmed that the invention claimed in the Scarlet Royal '229 patent existed by 1995, and nothing further was done after that date to genetically change the plant. Tr. 447-48 (D. Ramming).

30.    Dr. Ramming followed the same process for Autumn King, which was started about one year after Scarlet Royal. Accordingly, Dr. Ramming prepared the hybridized crosses for Autumn King in 1993, which produced approximately 500 plants put in the ground at Fresno State. One plant was selected as C67-120 (later identified as C10 and renamed Autumn King). From that plant, a breeding block of 25 plants was propagated in approximately 1996 at Fresno State. All subsequent propagations of Autumn King are genetically identical to the originally-selected C67-120 plant. Tr. 442-44 (D. Ramming). Dr. Ramming confirmed that the invention claimed in the Autumn King '284 patent existed by 1995, and nothing further was done after that date to genetically change the plant. Tr. 446-47 (D. Ramming).

Case No. 1:07-CV-01610-SEH-JLT

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

31.     All the data needed Dr. Ramming would have needed to file a patent application on Autumn King and Scarlet Royal could have been obtained by Dr. Ramming, and patent applications could have been filed on the varieties, by 2002.  Tr. 463 (D. Ramming).

### The Commission's Patent and Licensing Program

32.     Prior to the patent and licensing program, once a new table grape variety developed in Dr. Ramming's breeding program was released, there were no restrictions on where a table grape grower could get sticks of wood for grafting or how the grower could do the grafting.  For example, the plant material could be obtained from the nurseries, from the Fresno State facility (at no cost), or from other growers.  Tr. 38-39 (L. Ludy), 269-70 (R. Sandrini), 454-55 (D. Ramming).

33.     For all new varieties prior to Autumn King and Scarlet Royal, Dr. Ramming provided unreleased plant material to certain California table grape farmers for grower trials.  Table grape farmers participating in grower trials had no restrictions on what they could do with table grapes produced, and Dr. Ramming assumed the grapes were harvested and sold to market.  Tr. 271 (R. Sandrini), 455-56 (D. Ramming).  The only two varieties that Dr. Ramming has released without grower trials are Autumn King and Scarlet Royal.  Tr. 388 (K. Nave), 457 (D. Ramming).

34.     For Dr. Ramming's breeding program, there were many instances of table grape farmers obtaining plant material for varieties under development prior to release and outside grower trials.  For example, Larry Ludy testified that the obtained an unreleased variety called Red Muscat (later identified as Scarlet Royal) from a nursery owner named Russell Williams.  Mr. Williams told Larry Ludy that other table grape farmers had grafted other of Dr. Ramming's new varieties prior to release, including a farmer names Luther Kojanian, who had "fields" of an unreleased variety called Autumn Royal.  (Tr. 39-40).  Larry Ludy grafted the unreleased Red Muscat on his farm and gave some of the Red Muscat wood to his cousin Jim Ludy to graft on his farm.  Tr. 42 (L. Ludy), 592-93 (J. Ludy).  In another case, a person named Rodney Klassen (who worked at a USDA breeding facility) let Jim Ludy take sticks of an unreleased variety called Melissa (later called Princess) from a truck containing cuttings of the variety.  Jim Ludy used those sticks to graft the Melissa on his farm prior to release. Tr. 592-93 (J. Ludy).

Case No. 1:07-CV-01610-SEH-JLT

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

35.     Richard Sandrini, a Delano-areas table grape farmer and shipper, also was aware of growers having access to unreleased plant material from Dr. Ramming's breeding program outside grower trials.  For example, Mr. Sandrini had received and grafted unreleased Autumn Royal plant material on his farm.  In another instance, Mr. Sandrini testified that a nursery had 20 acres of Dr. Ramming's Fantasy Seedless variety prior to release.  Tr. 271-72 (R. Sandrini).

36.     Until the Commission's patent and licensing program, neither the Commission nor USDA had ever taken any action against a grower suspected of having unreleased plant material from Dr. Ramming's breeding program.  Tr. 275 (R. Sandrini).  In fact, the Commission had no responsibility for the way in which California table grape farmers obtained table grape plant material.  Tr. 386-87 (K. Nave).

37.     Prior to 2002, Dr. Ramming gave table grape farmers tours of the vineyards at the USDA leased facility on the Fresno State campus and showed table grape farmers new varieties under development as part of his breeding program.  In 2002, after starting the patent and licensing program, Dr Ramming stopped giving tours at the Fresno State facility.  Tr. 473-74 (D. Ramming).

38.     Prior to the patent and licensing program, the USDA had never sought patent protection for a table grape variety developed though Dr. Ramming's breeding program.  Tr. 392 (K. Nave).  In the late 1990, the Commission approached the USDA with a proposal to begin patenting new varieties developed under Ramming's breeding program and to grant an exclusive license to the Commission for licensing and enforcement.  Tr. 390-92 (K. Nave).

39.     Before implementing the patent and licensing program, the Commission and Dr. Ramming understood that it would be necessary to change the way table grape farmer could see and access unreleased varieties because it the wood from these varieties were stolen and propagated, it could jeopardize the ability to later patent the variety.  Tr. 398-400 (K. Nave), 473 (D. Ramming); PX 164.  According to a June 19, 2001 email, Kathleen Nave and David Ramming discussed potential solutions to protect the varieties considered for patenting, including placing fences around the Fresno State breeding facility, increasing on-site security, and applying for patents earlier in the process.  Tr. 400-405 (K. Nave); PX 164.  None of these potential solutions were implemented.  Part

McKool Smith Hennigan, P. C.
LOS ANGELES, CALIFORNIA

1   of the reason for not seeking patent protection earlier was economics.  Tr. 405 (K. Nave).

2      40. With the patent and licensing program, the rules changed for distribution of plant

3   material for varieties developed by Dr. Ramming and identified for patenting.  Tr. 387 (K. Nave).

4   Under the Commission's patent and licensing program, a grower who seeking to farm Autumn King

5   or Scarlet Royal must enter into a domestic grower license agreement with the Commission, then

6   purchase the Autumn King or Scarlet Royal plants from a licensed nursery.  Nurseries pay $5000 to

7   the Commission for a license to sell Autumn King and Scarlet Royal.  When a grower purchases

8   Autumn King or Scarlet Royal from a nursery, the nursery collects a one dollar per vine royalty,

9   which is pays to the Commission.  Each nursery sends a period report to the Commission with the

10   royalty payments, identifying the grower that purchased the vine and the amount of royalty

11   collected.  Tr. 376-78 (K. Nave).

12      ***Release and Patenting of Autumn King and Scarlet Royal***

13      41. As discussed above, at the time of Dr. Ramming's development of Autumn King and

14   Scarlet Royal, and follow-on observations of the varieties in the breeding plot at Fresno State, the

15   USDA had never applied for a patent a table grape variety created at the breeding facility.  Dr.

16   Ramming did not learn that the Autumn King and Scarlet Royal might be the subjection of a patent

17   application until sometime after 2000.  Accordingly, during the development and observations of

18   Autumn King and Scarlet Royal, Dr. Ramming did not know that the USDA might seek patent

19   protection on them.  Tr. 451-52 (D. Ramming).

20      42. At the same time, Dr. Ramming wanted feedback from table grape growers regarding

21   his newly-developed selections.  To seek this feedback, Dr. Ramming provided table grape growers

22   with detailed descriptions regarding varieties in his breeding plots and showed growers those plots.

23   With this information, he expected that California table grape growers would be able to identify the

24   varieties in his breeding program and was not concerned about whether providing such information

25   would affect the ability to patent the varieties.  Tr. 475-76 (D. Ramming).

26      43. Because the Commission funds part of Dr. Ramming's research, Dr. Ramming

27   produced an Annual Report for the Commission.  The Annual Report included information on new

28

Case No. 1:07-CV-01610-SEH-JLT       POST TRIAL PROPOSED FINDINGS OF FACT
                     AND CONCLUSIONS OF LAW

McKool Smith Hennigan, P. C.
LOS ANGELES, CALIFORNIA

table grape varieties developed at the USDA breeding facility at Fresno State.  For each unreleased variety, the report provided an identifier (such as C10 or B1) followed by a complete and detailed description of the characteristics of the variety.  The Commission published the Annual Reports along with other information on California table grapes entitled "Viticulture Research Report."  The Commission made the Viticulture Research Reports available to table grape growers.  Tr. 263-64 (R. Sandrini); 416 (K. Nave).  For unreleased USDA varieties, this book can be used by table grape farmers to assist in providing feedback on the USDA breeding program.  It can also be used by table grape farmers to identify the pre-release varieties at the Fresno State facility.  Tr. 234 (R. Sandrini).

44.     In Dr. Ramming's 2002 Annual Report to the Commission (published as part of the 2002-2003 Viticulture Research Report), Dr. Ramming recommended that Autumn King and Scarlet Royal be released.  Tr. 467-70 (D. Ramming); PX 181, 181A.

45.     On March 28, 2002, the Commission recommended that the USDA not release Autumn King, and to continue evaluating the variety for another year.  Dr. Ramming followed the recommendation.  Tr. 408-09 (K. Nave); JX 20.

46.     On February 21, 2003, the Commission recommended that the USDA not release Autumn King, and Scarlet Royal, and to continue evaluating the varieties for another year.  Dr. Ramming followed the recommendation.  Tr. 409-410 (K Nave); 469 (D. Ramming), JX 22.

47.     During the continued evaluation, the Commission and USDA did not consider filing a patent application on either variety. even though the Commission knew that getting a patent application on file would preserve the ability to patent if wood from the varieties was stolen and propagated.  Tr. 410-11 (K. Nave).

48.     The USDA released Autumn King and Scarlet Royal on July 13, 2005.  Dkt. 224 ¶¶ 12-13.

**The *Sandrini* Lawsuit**

49.     On July 3, 2006, the Commission filed a patent infringement suit against a table grape grower named Richard Sandrini, who had been growing unlicensed Autumn King vines. See generally *California Table Grape Comm'n v. RB Sandrini, Inc.*, 1:06-CV-00842 OWW TAG, 2007

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

WL 1847631 (E.D. Cal. June 27, 2007).  Following discovery, the parties filed cross-motions for summary judgment on numerous issues, including whether the Autumn King patent is invalid due to the alleged public use of the variety by three cousins, Jim, Jack, and Larry Ludy, who obtained the variety before its official release.  *Id.* at *11-*17. The cross motions were denied and the case proceeded to trial. *Id.* at *28; Sandrini,1:06-cv-0842, Doc. 153 (Pretrial Order).  After opening statements, Mr. Sandrini agreed to settle by removing all of his Autumn King vines and dropping his claim that the Autumn King patent is invalid, in exchange for a release of the Commission's claims against him.  *See* Sandrini, 1:06-cv-0842, Doc. 201 (Stipulated Settlement and Order).

### *Jim Ludy's Use of Autumn King and Scarlet Royal Prior to September 28, 2003*

50.     Jim and Jack Ludy are brothers who grew grapes at J&J Ludy Farms in Delano, California, from 1976 to 2003.  Dkt. 224 ¶ 18

51.     Jim Ludy is Larry Ludy's cousin.  In 2002, Jim and his brother Jack Ludy owned a table grape farm adjacent to the southwest corner of Larry Ludy's Valoff property in the Delano area near the corner of Magnolia and Garces Highway.  Tr. 25-26 (L. Ludy); JX 37-1.

52.     Richard Sandrini marketed table grapes for Jim and Jack Ludy and his company loaned money to the Jim and Jack Ludy farm.  Tr. 235-36 (R. Sandrini).

53.     In August 2001, Jim Ludy attended a USDA Experimental Evaluation meeting at Fresno State, hosted by the Commission.  At the meeting, the USDA displayed table grapes from unreleased vines grown in Dr. Ramming's breeding plots at Fresno State.  Tr. 532-34 (J. Ludy). This included both the Autumn King and Scarlet Royal varieties.  Tr. 525-26 (J. Ludy).

54.     At the meeting, Jim Ludy spoke with Rodney Klassen.  Mr. Ludy knew that Mr. Klassen worked at a USDA facility.  Previously, Mr. Klassen had allowed Jim Ludy take unreleased USDA Melissa vines from the back of his truck for grafting on his property.  At that time, Mr. Klassen had indicated that the Melissa was about to be released by the USDA.  Shortly after Jim Ludy grafted the Melissa on his farm, it was released.  Based on this prior experience, Jim Ludy asked whether Mr. Klassen could get him some vines for the red and white varieties later identified as Scarlet Royal Autumn King.  Mr. Klassen indicated that he could "take care" of Mr. Ludy and get

McKool Smith Hennigan, P. C.
LOS ANGELES, CALIFORNIA

some wood for him.  Tr. 528-30 (J. Ludy).

55.     In early 2002, Jim Ludy arranged to get wood from Mr. Klassen at the Tulare Farm Show.  Mr. Klassen gave Mr. Ludy several bundles of wood for different varieties.  The bundles had some form of label that identified them as "Crimson Killer," "Late White," and other names.  Tr. 548 (J. Ludy).  Mr. Ludy knew that the wood originated from varieties in the USDA breeding plots that had not been released, but did not know whether Mr. Klassen was authorized to provide the wood.  Tr. 533-34 (J. Ludy).  Mr. Ludy recalls that Mr. Klassen told him words to the effect of "play with them" but "don't put them [the fruit] in a box."  Tr. 533-34 (J. Ludy).

56.     In early 2002, Jim Ludy used the wood received from Mr. Klassen to graft varieties on his farm in Delano, including the Late White and Crimson Killer.  Jim Ludy grafted approximately 46-47 vines of the Late White and somewhat less of the Crimson Killer.  Tr. 589 (J. Ludy).  Mr. Ludy also gave sticks of the varieties to Larry Ludy for grafting on this farm.  Tr. 541-42. 550-51 (J. Ludy).  Mr. Ludy selected a place on his farm for grafting that had available root stock; he did not select a place to conceal the grafts.  Tr. 545 (J. Ludy).  After grafting, the canopy from the Late White and Crimson Killer would have been visible from public roads, but the not the fruit on the vines.  Tr. 542-44 (J. Ludy).

57.     When Jim Ludy grafted the Late White and Crimson Killer vines on his farm, he expected the varieties to be released very shortly, as had happened with the Melissa variety that he received from Mr. Klassen.  Once the variety was release, Jim Ludy intended to use the grafted vines to produce table grapes on a commercial scale.  At the time, Jim Ludy was having financial problems and was in danger of losing his farm.  Mr. Ludy hoped that the Late White and Crimson Killer would be commercially successful, and might solve his financial predicament.  Tr. 573-76 (J. Ludy).

58.     While Jim Ludy intended to keep the varieties to himself, he gave wood to Larry Ludy.  At that point, Jim Ludy recognized that the wood, including the Late White and Crimson Killer, was out of this control.  In other words, as Mr. Ludy agreed, the "cat was out of the bag."  Tr. 577-78, 600. 619-20 (J. Ludy).

Case No. 1:07-CV-01610-SEH-JLT

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

McKOOL  SMITH  HENNIGAN , P. C.
LOS ANGELES , CALIFORNIA

59.     When Mr. Klassen gave the wood to Jim Ludy, he did not restrict Jim Ludy from giving wood to others.  Nor did Mr. Klassen ask Mr. Ludy to keep the wood secret.  Because Jim Ludy believed that the Late White and Crimson Killer varieties grafted on his farm would be released shortly (consistent with his experience in grafting the Melissa wood), Jim Ludy took no precautions to conceal the grafts on his farm to keep it secret. Tr. 585-86 (J. Ludy).

60.     Jim Ludy handled the Late White and Crimson Killer wood in essentially the same manner as he had the Melissa wood.  With the Melissa, Jim Ludy gave some wood to Larry Ludy for grafting.  Since he expected the Melissa to be released shortly, Jim Ludy placed no restrictions on what Larry Ludy could do with the Melissa or who he could tell.  For the Late White and Crimson Killer, Jim Ludy did nothing different when he gave the wood to Larry Ludy, again because of its expected imminent release.  Jim Ludy placed no restriction on what Larry Ludy could do with the Late White and Crimson Killer, who he could tell, where he could graft, or how much he could graft.  Nor did Jim Ludy ask Larry Ludy to take any precautions to conceal his grafts.  Tr. 587-88, 599-600 (J. Ludy).

61.     After grafting the varieties received from Mr. Klassen in 2002, Jim Ludy attended an evaluation meeting in August 2002 at Fresno State where grapes from Dr. Ramming's breeding plot were displayed.  Jim Ludy also had been given tours of Dr. Ramming's breeding plots in prior years and seen vines in the plots. Tr. 581 (J. Ludy).  Based on seeing the vines and fruit on his farm, Mr. Ludy was able to correctly identify the grapes labeled "C10" by the USDA as "Late White" and the grapes labeled "B1" by the USDA as "Crimson Killer."  Tr. 558-60; 589-91, 593-94 (J. Ludy); JX 13.

62.     Prior to September 2003, Jim Ludy showed the grafts of the vines received from Mr. Klassen to a number of people.  First, Jim Ludy showed Larry Ludy where he did the grafting of Late White and Crimson Killer on his farm. Tr. 74 (L. Ludy).  Jim Ludy did not ask Larry Ludy to keep the existence of these varieties secret or confidential in any way.  Tr. 594-95 (J. Ludy).  Second, Jim Ludy showed the vines to Fred Valoff, a small table grape farmer and his Pest Control Advisor.  Again, Mr. Ludy did not ask Mr. Valoff to keep the vines confidential.  Tr. 595-96 (J.

McKool  Smith  Hennigan,  P. C.
Los  Angeles,  California

POST TRIAL PROPOSED FINDINGS OF FACT
                                                                     AND CONCLUSIONS OF LAW

1   Ludy).  Third, Jim Ludy showed the fines to his nephew, Brent Ludy without any confidentiality

2   restrictions.  Tr. 596 (J. Ludy).  Finally, Jim Ludy showed the Late White and Crimson Killer

3   grapevines he had grafted to Richard Sandrini.  Tr. 243-44 (R. Sandrini), 596-97 (J. Ludy).  As with

4   the others, Mr. Ludy did not asked Mr. Sandrini to maintain any confidentiality or to keep what he

5   saw secret.  Tr. 245-46 (R. Sandrini), 596-98 (J. Ludy).

6       63.     Mr. Sandrini saw nothing to conceal the Late White or Crimson Killer vines on Jim

7   Ludy's farm.  In fact, Mr. Sandrini understood that Jim and Jack Ludy intended to use the vines to

8   do more grafting and to produce commercial crops, and Mr. Ludy expected that Mr. Sandrini would

9   market his grapes.  He also knew that Mr. Sandrini was in contact with buyers.  Tr. 246-47 (R.

10  Sandrini), 598-99 (J. Ludy).

11  ***Larry Ludy's Use of Autumn King and Scarlet Royal Prior to September 28, 2003***

12      64.     Larry Ludy is a table grape farmer in Delano area.  He owns two properties.  One is

13  near intersection of Garces Highway and Magnolia.  He refers to that property as the Valoff Ranch.

14  JX 37-25.  The Valoff ranch is 320 acres.  The other property is near Peterson Road.  He refers to

15  that property as the Sheep Camp Ranch.  JX 37-7.  The Sheep Camp ranch is 155 acres.  Tr. 8-10 (L.

16  Ludy).

17      65.     In 2002, Larry Ludy was aware of a breeding program to develop new table grape

18  varieties at Fresno State.  Tr. 36(L. Ludy).  Prior to 2002, Larry Ludy had attended at least one of

19  Dr. Ramming's tours of the USDA leased area on the Fresno State campus.  Larry Ludy recalls

20  seeing the Crimson Killer grapevine plants on a tour and was provided samples of the fruit.  Tr. 33-

21  34, 98 (L. Ludy).  Larry Ludy also saw Crimson Killer and Late White grapes during meetings

22  hosted by the Commission on August 22, 2001 and August 28, 2002.  Tr. 100-101 (L. Ludy).

23      66.     In or about March 2002, Larry Ludy received sticks of Crimson Killer and Late

24  White, along with other varieties, from Jack Ludy.  This happened on two occasions.  On the first

25  occasion, Larry Ludy picked up what he understood were red varieties.  One of the varieties was

26  labeled "CK".  Shortly after, Larry Ludy went back and picked up sticks for what he understood

27  were green varieties.  One was labeled Late White or Big White.  Tr. 27-28 (L. Ludy).

28

-13-

67.     At the time he received the wood, Larry Ludy only recalls Jim Ludy telling him to not give it to Richard Sandrini. Tr. 29 (L. Ludy). At the time, Richard Sandrini marketed and shipped table grapes for both Larry Ludy and Jim Ludy. Mr. Sandrini also grew table grapes at a nearby farm. Tr. 22 (L. Ludy), 230 (R. Sandrini). Larry Ludy understood that Jim Ludy did not want Richard Sandrini to have any of the wood because Jim Ludy was upset with Mr. Sandrini and did not feel that he was getting a fair price for Jim Ludy's grapes. Tr. 29 (L. Ludy).

68.     When Jim Ludy gave Larry Ludy the sticks, he understood that Larry Ludy would use it to graft new grapevines on his Valoff property, including the Crimson Killer and Late White grapevines. Larry Ludy was not asked to keep his possession of the wood or grafts secret or not tell anybody about the wood or grafts, to take any precautions that would prevent others from accessing the location of the grafts or seeing the grafts on his property, to conceal the grafts in any way, to limit where he placed the grafts, to not sell or distribute grapes produced from the grafts, or to limit the number of grafts on his properties. Tr. 30-32 (L. Ludy).

69.     At the time Larry Ludy received the wood, he understood that the wood originated from Fresno State and came from unreleased varieties developed at Fresno State. Tr. 32 (L. Ludy).

70.     Larry Ludy recorded in a logbook the grafting of the Crimson Killer and Late White on his Valoff property. PX 105-1; Tr. 44-45 (L. Ludy). The logbook entry dated March 2, 2002 states that "Chris" grafted 8 vines of "Best New Red." Larry Ludy testified that sometime after, he entered into his log book that the "Best New Red" was "known as C.K." meaning Crimson Killer. He also wrote that on March 21, 2002, 25 vines of "late white" were grafted. The March 21, 2002 logbook entry also states that "Chris started grafting" and "25 vine late white." Larry Ludy identified "Chris" as Chris Garcia, a person who did grafting for Larry Ludy. PX 105-1; Tr. 49-50(L. Ludy). A check from Larry Ludy to Chris Garcia dated March 22, 2002 shows that Mr. Garcia was paid $300 for grafting, which is consistent with the grafts recorded in the logbook for March 2002. PX 110; Tr. 50-51 (L. Ludy).

71.     Larry Ludy's grafting of the varieties received from Jim Ludy on his Valoff property were all located in one outside row on his farm. Two dirt roads run in a north-south direction on

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

both sides of the row.  From the dirt road in the east to west direction, the row contained 1 vine of "Crimson," followed by 7 vines of "New Red," followed by 8 vines of "Crimson Killer," followed by 4 vines of "New Black," followed by 30 vines of "Early White," followed by 25 vines of "Late White," followed by 15 vines of "Red Muscat."  PX 105-1; Tr. 52-53 (L. Ludy).  As noted, Larry Ludy received the Red Muscat from Russell Williams, not Jim Ludy.

72.     In 2002, to the north of the row containing Crimson Killer and Late White was another dirt road then a wheat field.  North of the wheat field was another dirt road.  The Valoff property ended on the other side of that dirt road, beyond which was a desert area.  To the south of the row at issue were other grapevines of different varieties.  Tr. 53-54 (L. Ludy).

73.     None of Larry Ludy's property contained fences and the dirt roads were all drivable and contained no fences.  Tr. 55, 216 (L. Ludy).  People used the dirt roads to access the fields and to travel in the area.  JX 37-25; Tr. 57-58 (L. Ludy).

74.     In late 2002, the Late White vines produced fruit, which Larry Ludy showed to at least Mr. Sandrini.  Tr. 59 (L. Ludy).  Mr. Sandrini confirmed that the Late White and Crimson Killer vines on the Valoff property was located on an outside row exposed to an open field.  Tr. 248 (R. Sandrini).

75.     In or around March 2003, Larry Ludy used wood from the Valoff property to reproduce additional vines of Crimson Killer and Late White on his Sheep Camp property at the intersection of two dirt roads.  Larry Ludy grafted 108 vines of Crimson Killer, taking approximately one-half row running in the east-west direction and extending to the dirt road running in the north-south direction.  Larry Ludy grafted the next two rows to the south with approximately 650 vines of Late White -- with both rows again extending to the north-south dirt road.  JX 37-7; Tr. 60, 65-66, 73 (L. Ludy).

76.     Larry Ludy's 2003 logbook for February 15, 2003, states that cuttings were made for the wood used in grafting at the Sheep Camp property, including eight bundles of the "big white" and four bundles of the "CK" (i.e., Crimson Killer).  PX 105-1.  On February 28, 2003, Larry Ludy wrote a check to Joel Santiago in the amount of $934.40 for grafting, which is consistent with the

1  amount of vines grafted on the Sheep Camp property.  PX 110; Tr. 63 (L. Ludy).

2      77.     As with the Valoff property, none of Larry Ludy's Sheep Camp property contained

3  fences and the dirt roads were all drivable and contained no fences.  People used the dirt roads to

4  access the fields and to travel in the area.  Tr. 68; 216 (L. Ludy).

5      78.     By the first of August 2003, the Late White and Crimson Killer vines in the Sheep

6  Camp property had developed a canopy.  Tr. 73-74 (L. Ludy).

7      79.     From the dirt roads around both the Valoff and Sheep Camp properties, both the

8  vines and fruit for the Late White and Crimson Killer were visible.  Tr. 215-16 (L. Ludy).

9  Additionally, the wheat field on the Valoff property to the north of the outside row containing the

10  Late White and Crimson Killer could be accessed by foot.  Tr. 217-18 (L. Ludy).  In fact, dove

11  hunters used the wheat field for hunting, which begins on September 1 of each year.  Tr. 58-58, 218

12  (L. Ludy); 603-05 (J. Ludy).

13      80.     Larry Ludy's logbook entry for October 21, 2003, states that he picked six boxes of

14  late white from the Valoff property for a storage test.  PX 105-1; Tr. 71.

15      81.     Larry Ludy told Richard Sandrini about the Crimson Killer and Late White at both

16  the Valoff and Sheep Camp properties and showed Mr. Sandrini both varieties at both locations

17  prior to September 28, 2003.  (Tr. 83-85 (L. Ludy).  Mr. Sandrini confirms that he saw the Late

18  White and Crimson Killer vines and fruit on Larry Ludy's Valoff and Sheep Camp properties in

19  2002 and 2003.  According to Mr. Sandrini, he "watched [the varieties] grow" over a period of time,

20  observing the plants and the mature fruit, all prior to September 2003.  Tr. 324-25 (R. Sandrini).

21  Mr. Sandrini did this because he planned to graft the Late White vines on a number of acres at his

22  property.  *Id.*  Larry Ludy did not ask Mr. Sandrini to maintain any confidentiality regarding the

23  Late White or Crimson Killer on either property or to otherwise keep the vines secret.  Mr. Sandrini

24  also saw nothing to conceal the Late White or Crimson Killer vines on either Larry Ludy property.

25  Tr. 248-54 (R. Sandrini).  Larry Ludy did not consider the information provided to Mr. Sandrini

26  regarding the Late White and Crimson Killer confidential.  (Tr. 213).

-16-

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

82.     Larry Ludy also told his cousin Jack Ludy about the grafting he undertook at both locations. Tr. 84 (L. Ludy). Jim Ludy saw the Late While and Crimson Killer vines and fruit on both the Valoff and Sheep Camp properties. Jim Ludy confirmed that he did not see anything to conceal the vines on the properties, and that the vines and fruit were visible from the dirt roads and from the wheat field. Tr. 605-06, 609 (J. Ludy). Jim Ludy also confirmed that Larry Ludy did not ask Jim Ludy to keep the existence of the vines confidential or secret. Tr. 607-08 (J. Ludy).

83.     In September or October 2004, Larry Ludy harvested late white fruit from the Sheep Camp ranch. Mr. Sandrini sold 465 boxes of Late White the fruit for Mr. Ludy. Tr. 70, 80 (L. Ludy), 257 (R. Sandrini). Mr. Ludy provided no instruction to Mr. Sandrini regarding what to label the boxes. (Tr. 81 (L. Ludy), 254-55 (R. Sandrini). When Mr. Sandrini sold the Late White fruit, he labeled the boxes "Thompson." Tr. 256 (Sandrini). Mr. Sandrini paid the Commission the assessment on the boxes and also identified the boxes as "Thompson Seedless" on the report to the Commission. Mr. Sandrini obtained a premium on pricing for the grapes. While the actual variety name did not matter to the buyers, Mr. Sandrini's sales person told the buyers that the grapes were not Thompson Seedless. Tr. 259, 318, 334-35 (R. Sandrini).

84.     Larry Ludy did not do anything prior to September 28, 2003 to hide or conceal the Late White or Crimson Killer vines at either the Valoff or Sheep Camp properties and placed no restrictions on what employees could say or disclose about the vines. Tr. 78-79 (L. Ludy).

85.     Larry Ludy and Richard Sandrini were able to determine that the Late White and Crimson Killer vines on Larry Ludy's property were developed under the Dr. Ramming's USDA breeding program at Fresno State. (Tr. 96-97 (L. Ludy). Using Mr. Sandrini's copy of the 2002/2003 Viticulture Research report, Messrs. Ludy and Sandrini were able to identify the Crimson Killer as B1 and the Late White as C10. Tr. 96-97 (L. Ludy), 266-68 (R. Sandrini). After making the identification, Larry Ludy did not take any steps to hide the vines. (Tr. 97 (L. Ludy).

86.     One of the reasons that Larry Ludy grafted the two rows of Late White at the Sheep Camp ranch was to make available more wood for further grafting. Sometime between October and December of 2003, Larry Ludy gave Richard Sandrini Late White wood from the Sheep Camp

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

property, which Mr. Sandrini used to graft 19 acres of Late White on his property in early 2004.  Tr. 85-87 (L. Ludy), 237 (R. Sandrini).  When Larry Ludy gave Richard Sandrini the Late White wood for grafting, he placed on restrictions on how much Mr. Sandrini could graft or where he could graft. Tr. 94-95 (L. Ludy), 266-68 (R. Sandrini).

87.     Jim Ludy found out that Larry Ludy intended to give Richard Sandrini Late White wood to graft on Mr. Sandrini's farm.  While Jim Ludy was concerned about this plan, he did not ask Mr. Sandrini to refrain from grafting.  Tr. 601 (J. Ludy).

88.     DNA tests confirmed that the Late White on Larry Ludy's property was Autumn King.  Tr. 109-110 (L. Ludy); PX 152.

89.     Neither Jim Ludy nor Larry Ludy acted under Dr. Ramming's direction in connection with their reproductions of Autumn King and Scarlet Royal grapevines.

90.     The reproductions of Autumn King and Scarlet Royal in 2002 and 2003 by Jim Ludy and Larry Ludy all occurred prior to the critical date of September 28, 2003.  DNA tests conducted in 2006 confirm that Larry Ludy possessed Autumn King on his farm as of that date.  Dkt. 2224 ¶ 44.

91.     On November 28, 2006, Larry Ludy (and Larry Ludy Farms) entered into a Settlement Agreement and Release with the Commission whereby Larry Ludy was required to destroy all "Unauthorized Plant Material" including the unauthorized Autumn King and Scarlet Royal plants on his property.  Pursuant to the Settlement Agreement, Larry Ludy also provided the Commission with "immediate access to his vineyard for the purpose of identifying whether Mr. Ludy possessed the Autumn King variety or any other USDA-developed grape variety that was not obtained from an authorized source."  Based on the Settlement Agreement, Larry Ludy complied with the Commission's demand that he remove and destroy all Autumn King and Scarlet Royal on his property not obtained from an authorized source.  In removing the Autumn King and Scarlet Royal vines, Larry Ludy cut the vines below the grafting point on the rootstock.

1

## PROPOSED CONCLUSIONS OF LAW

2

### Overview of Plant Patents and the Public Use Bar

3

1.      Plant patents may be granted to "whoever invents or discovers and asexually

4

reproduces any distinct and new variety of plant...." 35 U.S.C. § 161. "Once issued, a patent grants

5

certain exclusive rights to its holder, including the exclusive right to use the invention during the

6

patent's duration." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). "One of the

7

enumerated defenses to any action involving the validity of a patent is "[i]nvalidity of the patent or

8

any claim in suit on any ground specified in part II of this title as a condition for patentability[.] 35

9

U.S.C. § 282. Among the so-called "statutory bars" enumerated in part II is the "public use" bar,

10

which is set forth in 35 U.S.C. § 102(b):

11

12

> A person shall be entitled to a patent unless--(b) the invention was
> patented or described in a printed publication in this or a foreign
> country or in public use or on sale in this country, more than one year
> prior to the date of the application for patent in the United States...

13

14

2.      Section 102(b) establishes a one-year grace period based on publication or public use

or sale, after which an inventor is barred from access to the patent system. *Id.* The Patent Act

15

expressly makes plant patents subject to the novelty and statutory bar provisions, including the "on-

16

sale" and "public use" provisions of 35 U.S.C. § 102(b). 35 U.S.C. § 161; 8-24 CHISUM ON

17

PATENTS, § 24.02[e] (2012) ("The statutory bar provisions in Sections 102(b).... fully apply to

18

plants.").

19

3.      The extent of the public use is not important for a single use is just as effectual as

20

many to bar the right to a patent." *Bourne v. Jones*, 114 F. Supp. 413, 419 (S.D. Fla. 1951), *aff'd*

21

207 F.2d 173 (5th Cir. 1953), *cert. denied* 346 U.S. 897 (1953).

22

4.      In the Order on Summary Judgment, this Court concluded that a "public use" may

23

occur even if the plant material reproduced by Jim Ludy and Larry Ludy was misappropriated.

24

Thus, whether the sticks of Autumn King and Scarlet Royal that Jim Ludy and Larry Ludy used for

25

the reproductions of these varieties prior to the critical date were misappropriated by Mr. Klassen

26

and given to Jim Ludy lacks any relevance to the application of the public use bar in this case.

27

28

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

McCOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

5.      In general, "public use" includes "any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Netscape Communications Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002); *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). In considering whether a particular use was a public use within the meaning of 35 U.S.C. § 102(b), a court should consider the totality of the circumstances in conjunction with the policies underlying the public use bar, *Baxter Int'l, Inc. v. COBE Labs., Inc.*, 88 F.3d 1054, 1058 (Fed. Cir. 1996), which include:

> (1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.

*Id.* However, section 102(b) "is primarily concerned with the policy that encourages an inventor to enter the patent system promptly, while recognizing a one year period of public knowledge or use or commercial exploitation before the patent must be filed." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998). "Thus an inventor's own prior commercial use, albeit kept secret, may constitute a public use or sale under section 102(b), barring him from obtaining a patent." *Id.*

6.      In the context of plant patents, possession of information that "enables a person of skill in the art to practice asexual reproduction of the plant in a manner consistent with the statute can … act as a §102(b) bar." *In re Elsner*, 381 F.3d 1125, 1129 (Fed. Cir. 2004). "In the case of plant patents, the touchstone of the statutory subject matter is asexual reproduction of a unique biological organism. When [§102(b) prior art] … puts one of ordinary skill in the art in possession of the plant itself, which, based on the level of ordinary skill in the art, permits asexual reproduction without undue experimentation, that combination of facts and events so directly convey the essential knowledge of the invention … to erect a statutory bar." *Id.* "Since a plant variety that can be asexually reproduced is incapable of being perfected or improved in the ordinary sense, any use must perforce be of the complete[d] invention or discovery." *Bourne,* 114 F. Supp at 419; *see also*

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

1  *Ex Parte C*, 27 U.S.P.Q.2d (BNA) 1492 (Bd. of Pat. App. 1992) ("use of seed, by growers, with no

2  special requirements for secrecy and confidentiality constituted commercial activity....").

3      7.    "[A] third party may, and often does, initiate a public use." *Eolas Technologies Inc.*

4  *v. Microsoft Corp.*, 399 F.3d 1325, 1334 (Fed. Cir. 2005).  Where a third party makes "no attempt to

5  maintain confidentiality or to deliberately evade disclosure…[such] activities may erect a third party

6  public use bar." *Id*. at 1335.

7      8.    A bar under section 102(b) arises when the claimed invention is in public use or on-

8  sale before the "critical date." *Invitrogen Corp. v. Biocrest Mfg. L.P.*, 424 F.3d 1374, 1379 (Fed.

9  Cir. 2005). The critical date is "one year prior to the date of the application for patent in the United

10  States." *Orion IP, L.L.C. v. Hyundai Motor Am.*, 605 F.3d 967, 974 (Fed. Cir. 2010).

11      9.    Because "[a] patent shall be presumed valid.... The burden of establishing invalidity

12  of a patent or any claim thereof shall rest on the party asserting such invalidity."  35 U.S.C. § 282.

13  A party challenging a patent's validity must carry a "heavy burden" by proving invalidity by clear

14  and convincing evidence. *Microsoft*, 131 S. Ct. at 2246, 2250.  In addition, a party asserting

15  invalidity may not rely only on uncorroborated, self-serving oral testimony. *Woodland Trust,* 148

16  F.3d at 1371 ("Corroboration of oral evidence ... is the general rule in patent disputes.").

17      ***Public Use v. Secret Use***

18      10.    Although a "secret" public use of an invention by a third party is not an invalidating

19  public use, the minimum standard for what constitutes a "public" use (*i.e.*, a non-secret use) by a

20  third party encompasses nearly any unrestricted usage of the patented process or apparatus.  2

21  CHISUM ON PATENTS, § 6.02[5][c] at 69 (2012)  For example, "[t]he statutory phrase 'public use'

22  does not necessarily mean open and visible in the ordinary sense; it includes any use of the claimed

23  invention by a person other than the inventor who is under no limitation, restriction, or obligation of

24  secrecy to the inventor." *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297

25  (Fed. Cir. 2002) (holding invalid a patent where the patented method was performed at a

26  commercial jobsite); *See also Chemithon Corp. v. Procter & Gamble Co.*, 287 F. Supp. 291, 306-14

27  (D. Md. 1968), aff'd, 427 F.2d 893 (4th Cir.), *cert denied*, 400 U.S. 925 (1970) (holding defendants'

28

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

-21-

1   use of a chemical process "public" even though it occurred inside machinery because defendants did

2   not "physically isolate the areas in its several plants where all these processes were utilized," did not

3   place 'not authorized' signs on the doors, did not screen employees entering the area, and "none of

4   these employees, . . . were obliged to keep [the] processes secret."); *In re Smith*, 714 F.2d 1127,

5   1134 (Fed. Cir. 1983) (defining public use as "any use of [an] invention by a person other than the

6   inventor who is under no limitation, restriction or obligation of secrecy to the inventor").

7         11.   A recent district court decision succinctly and accurately summarized the complex

8   lattice of relevant authorities defining "public use":

9         Generally, public use includes "'any use of the claimed invention by a
10   person other than the inventor who was under no limitation, restriction
    or obligation of secrecy to the inventor.'" *Petrolite Corp. v. Baker
    Fuse, Inc.*, 96 F.3d 1423, 1425 (Fed. Cir. 1996).  (citations omitted).
11   An invention is in public use when it is (1) publicly accessible or (2)
    commercially exploited. [*Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424
12   F.3d 1374, 1380 (Fed. Cir. 2005)]. ***

13         The Federal Circuit has identified several factors to determine whether
    an invention is publicly accessible, including: evidence of
14   experimentation, the nature of the activity that occurred in public,
    public access to the use, and confidentiality obligations imposed on
15   observers. Id. Despite these factors, the determination of whether there
    is a public use often turns on whether there was an expectation or
16   assurance of confidentiality or steps taken to conceal the claimed
    invention. *Dey, Inc. v. Sepracor, Inc.*, 847 F. Supp. 2d 541, 550
17   (S.D.N.Y. 2012); *see also Advanceme Inc. v. RapidPay, LLC*, 509 F.
    Supp. 2d 593, 608–09 (E.D. Tex. 2007) (collecting and comparing
18   cases).

19         "For a method or system to be in 'public use' within the meaning of
    35 U.S.C. § 102(a) or (b), the method or system must be used in the
20   ordinary course of business without active efforts to conceal its
    operation." *Advanceme*, 509 F. Supp. 2d at 608–09 (citing *New
21   Railhead Mfg. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1298–1300 (Fed.
    Cir. 2002) (finding that performance of the claimed method of drilling
22   in rock at a commercial jobsite under public land, hidden from view,
    constituted public use); *Lockwood v. Am. Airlines*, 107 F.3d 1565,
23   1570 (Fed. Cir. 1997) (finding that the defendant's use of the high-
    level aspects of its computer reservation system was a prior public use
24   of a means plus-function claim for a computer system); *Baxter Int'l v.
    COBE Labs.*, 88 F.3d 1054 (Fed. Cir. 1996) (finding that a scientist's
25   use of a machine implementing the claimed method in a laboratory at
    the National Institute of Health, without the public's awareness of the
26   method employed by the machine, was a prior public use); *Elec.
    Battery Co. v. Shimadzu*, 307 U.S. 5, 20 (1939) ("The ordinary use of
27   a machine or the practice [sic] of a process in a factory in the usual
    course of producing articles for commercial purposes is a public

28

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

use")). "Cases in which courts find that a prior use was not a 'public use' within the meaning of 35 U.S.C. § 102 have found active concealment of the method or system by the prior user, typically by contractual agreements to maintain secrecy." *Advanceme*, 509 F. Supp. 2d at 608–09. (citing *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983) (finding that company told all employees that the prior art machine was confidential and required them to sign confidentiality agreements, thus concealing the machine); *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376 (Fed. Cir. 2007) (finding that the prior art user was required to sign a non-disclosure agreement related to the prior art, thus concealing the prior art)).

When a party asserts prior public use based on the actions of a third party, section 102(b) is not a bar when the prior use is not available to the public. *Woodland Trust*, 148 F.3d at 1371. Indeed, "secret activity" by a third party who "elects to avoid the patent system" does not constitute public use. *W.L. Gore*, 721 F.2d at 1550.

*Seed Research Equip. Solutions v. Gary W. Clem, Inc.*, 2012 WL 6650873 *6-*7 (D. Kan. Dec. 20, 2012) *modified on reconsideration on other grounds* 2013 WL 823379 (D. Kan. Mar. 6, 2013) (citations in footnotes inserted into text).

12.    *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983), involved a patent for a process permitting production of Teflon tape, commonly used to keep pipe joints from leaking.  The inventor, W.L. Gore, sued a producer of a similar product (Garlock) for patent infringement.  *Id*. at 1545-46. Garlock claimed that Gore's patent was invalid in part because a third manufacturer (Budd) used a machine employing a similar process to produce similar tape before the critical date.  *Id*. at 1546. The Federal Circuit refused to find Budd's use "public" for several reasons.  First, although the a former Budd employee testified Budd "made no effort to keep the secret," Budd told all of its employees that the machine in question was confidential and required them to sign confidentiality agreements.  *Id*. at 1549 ("That Budd did not keep the machine hidden from employees legally bound to keep their knowledge confidential does not evidence a failure to maintain the secret.").  In addition, although employees from another company visiting the Budd plant were shown the machine to see if they could help increase its speed, there was "no evidence that a viewer of the machine could thereby learn anything of which process, among all possible processes, the machine is being used to practice." *Id*.  This viewing did not make "knowledge of the claimed process accessible to the public."  *Id*. (emphasis added).

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

13.     Importantly, under 35 U.S.C. § 101, a patent may claim a "process, machine, manufacture, or composition of matter…."  But the only claims alleged to be invalid under the public use bar in the *Gore* case were process claims of U.S. Patent No. 3,953,566, which claimed a "process for the production of a porous article of manufacture…."  *Id*. at 1546.   Unlike *Gore*, the patents at issue in this case claim plants, which are made eligible for patenting under 35 U.S.C. § 161.  The circumstances necessary to place a claimed "process" in the public domain differ from the circumstances necessary to place a "plant" in the public domain.  For example, as *Gore* found, viewing a machine that uses an inventive process, or selling a product produced from that machine, may not suffice to make the claimed *process* "public."  In contrast, when the public views an inventive grapevine and receives plant material from that grapevine, those acts may well result in the plant itself being placed in the public domain.

14.     Several years following the *Gore* decision, the Federal Circuit expressly rejected the argument that *Gore* supports "the broad proposition that the 'secret' commercialization of an invention by a third party creates no [public use or on sale] bar."  *J.A. La Porte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1582-83 (Fed. Cir. 1986).  Besides rejecting the notion that *Gore* created a broad exception to the public use bar for secret commercialization, the Federal Circuit's *La Porte* decision upheld the public use bar where the invention was discoverable from the sale of a device embodying the invention.  *Id.*  In fact, the Federal Circuit agreed that photographs of the device sent to a third party "fully disclosed" the invention.  *Id*. at 1583 n. 9.  The Federal Circuit also confirmed that the use by or sale to "a member of the relevant public" prior to the critical date sufficed to render the later-acquired patent invalid.  *Id.*

15.     For this reason, expanding *Gore* beyond its facts to inventions outside claimed processes would not be faithful to the overwhelming focus of the "public use" authority not on whether and to what extent a use can be "observed" but rather on whether the public user was required to or did engage in active efforts to conceal that use.  *Gore* itself emphasized the primacy of secrecy and concealment.  In concluding its discussion on the applicability of the § 102 bar, *Gore* reasoned:

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

> Early public disclosure is a linchpin of the patent system. As between a prior inventor who benefits from a process by selling its product but suppresses, conceals, or otherwise keeps the process from the public, and a later inventor who promptly files a patent application from which the public will gain a disclosure of the process, the law favors the latter.

721 F.2d 1550 (internal citations omitted).

16.     Secrecy and confidentiality are the lynchpins of numerous other cases.  In *Baxter*, for example, a third party scientist's use of patented centrifuge in public building without any effort to conceal it, coupled with the "free flow into his laboratory of people, including visitors [], who observed the centrifuge in operation and who were under no duty of confidentiality" supported "only one conclusion: that the centrifuge was in public use." 88 F.3d at 1058-59; *see also Eolas Technologies Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1335 (Fed. Cir. 2005) (third party inventor of anticipatory technology showing invention to others without any attempt at maintaining confidentiality erected a third party public use bar).  The district court decision in *Advanceme*, relied upon in Seed Research, recognized the key issues to be decided in a public use inquiry:

> For a method or system to be in "public use" within the meaning of 35 U.S.C. § 102(a) or (b), the method or system must be used in the ordinary course of business without active efforts to conceal its operation.... [¦] Cases in which courts find that a prior use was not a "public use" within the meaning of 35 U.S.C. § 102 have found active concealment of the method or system by the prior user, typically by contractual agreements to maintain secrecy.

*Advanceme Inc.*, 509 F. Supp. 2d at 608-09 (internal citations provided in Seed Research quotation above).

17.     *Seed Research* applied this framework to a patented seed planter that makes use of a GPS system to keep track of seed research plots.  2012 WL 6650873, *1.  An unrelated third party allegedly created a similar planting system, the "HarvestMaster," which also used GPS to track research plot plantings, and which was used by a major agribusiness company to plant research fields prior to the critical date.  *Id*. at *3, *7.  Because there was no evidence that the HarvestMaster planting was performed in secret or that either the inventor of the HarvestMaster, its purchaser, or manufacturer took any "steps to conceal the planting," the HarvestMaster planting constituted a "public use" barring patenting of the patented system. Id. at *7.  The *Seed Research* court also noted

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

McKool Smith Hennigan, P. C.
Los Angeles, California

that the inventor of the HarvestMaster testified that his work to develop the system was well known throughout the industry well before the critical date. *Id*. In addition, the fact that the HarvestMaster planting was described in a public brochure and presentation demonstrated that the planting was not conducted in secret. *Id*. The fact that a video of the HarvestMaster planting was designated "Confidential"; the planting was conducted on private rather than public land, and the general industry expectation that new devices or processes and seed research planting were considered confidential did not overcome the other evidence suggesting the use was public. *Id*. at *8.

18.     The Federal Circuit's most recent decision regarding public versus secret use is *Dey, L.P. v. Sunovion Pharms., Inc.*, 2013 U.S. App. LEXIS 10010 (Fed. Cir. May 20, 2013). The *Dey* decision applies the same "public use" standards adopted by this Court in its March 25, 2013 Order on Cross Motions for Summary Judgment. Indeed, the issue identified by the Federal Circuit for trial in *Dey* is essentially the same issue that this Court identified for trial here -- namely, whether the Ludys "used the varieties openly and in the ordinary course of business without an attempt to conceal the use…." (MSJ Order at 29).

19.     In discussing the legal standards for the public use bar, the Federal Circuit confirmed the following points of law:

> "To decide whether a prior use constitutes an invalidating 'public use,' we ask 'whether the purported use: (1) was accessible to the public; or (2) was commercially exploited.' *Invitrogen Corp. v. Biocrest Mfg.*, L.P., 424 F.3d 1374, 1380 (Fed. Cir. 2005)." *Id*. at *7.

> "[W]e have set forth factors that may be helpful in analyzing the question of public use, including 'the nature of the activity that occurred in public; the public access to and knowledge of the public use; [and] whether there was any confidentiality obligation imposed on persons who observed the use.' *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1379 (Fed. Cir. 2004). And we have said that a public use may occur when 'a completed invention is used in public, without restriction.' *Allied Colloids Inc. v. Am. Cyanamid Co.*, 64 F.3d 1570, 1574 (Fed. Cir. 1995)." *Id*. at *8.

> "Although prior uses are often carried out by or at the direction of the inventor-patentee, we have held that 'third party prior use accessible to the public is a section 102(b) bar.' *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1334 (Fed. Cir. 2005). But even in the case of third-party uses, being 'accessible to the public' still requires public

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

availability; secret or confidential third-party uses do not invalidate later-filed patents." *Id*. at *9.[1]

"[W]e have applied section 102(b) to invalidate a patent based on third-party use when the third party 'made no attempt to maintain confidentiality or to deliberately evade disclosure,' *Eolas*, 399 F.3d at 1335; made no 'discernible effort to maintain the [invention] as confidential,' *Baxter*, 88 F.3d at 1058; or 'made no efforts to conceal the device or keep anything about it secret,' *Beachcombers v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1160 (Fed. Cir. 1994)." *Id*. at *10.

"The degree of confidentiality necessary to avoid a finding of public use naturally depends on the circumstances.  For example, if there is no confidentiality agreement in place, the skill and knowledge of those observing an invention can shed light on the degree to which it was kept confidential.  Even limited disclosure to those who are skilled enough to know, understand, and "easily demonstrate the invention to others," may mean that there was no reasonable expectation of secrecy and that the invention was therefore in public use.  *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002)." *Id*.

20.    Applying these already-settled legal standards, the Federal Circuit found that the district court erred in holding, on summary judgment, that Dey's patents on drug formulations for the treatment of chronic obstructive pulmonary disease were invalid.  In holding Dey's patents invalid, the district court found that the defendant's (Sunovion) earlier clinical trials on the same formulations in a product called Brovana resulted in invalidating public uses under § 102(b).  But under the facts of the case, the Federal Circuit found that invalidity as a matter of law could not be

---

[1] Later in the opinion, the Federal Circuit distinguished between public uses by the inventor (or under the direction of the inventor) and "third-party use cases." *Id*. at *19.  In making this distinction, the Federal Circuit found that statements in earlier cases to the effect that a public use "includes any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor" to be inapplicable to third-party use cases.  *Id*. (internal citations and emphasis omitted).  Although *Dey* involved a alleged invalidating prior use by a third party, the district court had relied significantly on inventor public use cases in granting summary judgment of invalidity.  In contrast, here the distinction between inventor public uses and third-party public uses is not determinative.  One reason the distinction makes no difference is because Larry Ludy, took no precautions to exclude members of the public from obtaining information about his uses of Autumn King and Scarlet Royal.  Accordingly, the public use bar applies under either rule.  Nonetheless, Plaintiffs reserve their right to assert on appeal that § 102(b) of the Patent Act makes no distinction between inventor public uses and third-party public uses.  *See, e.g.*, *CLS Bank Int'l v. Alice Corp. Pty*, 2013 U.S. App. LEXIS 9493, at *182-*183 (Fed. Cir. May 10, 2013) (Additional Reflections of Chief Judge Rader) ("When all else fails, consult the statute!").

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

granted.  Specifically, the Federal Circuit found that the following facts raised a triable issue as to

whether Sunovion had taken "sufficient precautions . . . to exclude members of the public from

obtaining information about the potentially invalidating" drug formulation (*id*. at *11):

> "The participants [in the clinical studies] . . . were given some
> information about the study and were subjected to certain controls."
> *Id*. at *4.  But "[p]articipants were not provided any more specific
> information about the formulation [used in the clinical studies].  A
> Sunovion witness testified that the specific formulation of Brovana
> remained '[un]available to the public' and 'confidential' even as of the
> time this action was brought."  *Id*. at *5.

> "The participants in the study signed a consent form stating that the
> medications "must be taken only by the person for whom it was
> intended" and that subjects would have to keep usage logs and return
> unused medications."  *Id*.

> "The test administrators [who were the only persons with knowledge
> of the inventive formulations] were also subject to detailed
> restrictions.  They had to sign a formal 'Clinical Investigator
> Confidentiality Agreement' directing them to hold all proprietary
> information in confidence for five years.  They were forbidden from
> disclosing the study protocols or dispensing the drug to any person
> who was not a trial subject, and they were held accountable for
> securely storing the drug and maintaining records of its disposition
> and use.  Like the trial subjects, the investigators were instructed that
> unused supplies of the drug were to be returned upon completion or
> termination of the study."  *Id*. at *5-*6.

> "While [participants] were informed about the active chemical
> compound and the range of possible dosages being investigated, they
> were not even told the identity of the particular drug or formulation
> they were receiving.  Also, "while it is true that participants were
> permitted to discuss the study with their doctors, they were not in a
> position to reveal the composition of the allegedly invalidating prior
> art, because they were unaware of the specifics of the inventive
> formulations."  *Id*. at *15.

### *Corroboration Requirement*

21.     In examining factual questions concerning application of the public use bar, the Court

must keep in mind the corroboration requirement.  "Throughout the history of the determination of

patent rights, oral testimony by an alleged inventor asserting priority over a patentee's rights is

regarded with skepticism, and as a result, such inventor testimony must be supported by some type

of corroborating evidence."  *Woodland Trust*, 148 F.3d at 1371.  The same rule applies where the

testimony is from an accused infringer concerning the sale or public use of an invention before the

Case No. 1:07-CV-01610-SEH-JLT

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

McKool Smith Hennigan, P. C.
Los Angeles, California

1  critical date. *Id.* In assessing corroboration, the Federal Circuit has endorsed consideration of the

2  following factors:

> (1)  the relationship between the corroborating witness and the alleged prior user,
>
> (2)  the time period between the event and trial,
>
> (3)  the interest of the corroborating witness in the subject matter in suit,
>
> (4)  contradiction or impeachment of the witness' testimony,
>
> (5)  the extent and details of the corroborating testimony,
>
> (6)  the witness' familiarity with the subject matter of the patented invention and the prior use,
>
> (7)  probability that a prior use could occur considering the state of the art at the time,
>
> (8)  impact of the invention on the industry, and the commercial value of its practice.

*Id.* While applying these factors, "an evaluation of all pertinent evidence must be made...." *Lacks Industries Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1349 (Fed. Cir. 2003) (internal citation and quotation omitted). "[A] 'rule of reason' analysis is applied to determine whether ... testimony ... has been corroborated." *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001).

22.  Oral testimony of an interested witness may not be corroborated by oral testimony of another interested witness. *See id.* at 1350 (testimony of employee of alleged infringing company could not be corroborated by testimony of other employees of the same company). Rather, documentary evidence and/or the testimony of uninterested witnesses must be presented as corroboration, all of which must be viewed together when determining whether the clear and convincing evidence burden has been met. *See id.; see also Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 743 (Fed. Cir. 2002) ("Reliable evidence of corroboration preferably comes in the form of physical records that were made contemporaneously with the alleged prior invention."); *Sandt*, 264 F.3d at 1350-51 ("Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been

Case No. 1:07-CV-01610-SEH-JLT                    POST TRIAL PROPOSED FINDINGS OF FACT
                                                              AND CONCLUSIONS OF LAW

McKool Smith Hennigan, P. C.
LOS ANGELES, CALIFORNIA

1    corroborated.").

2        23.    If testimonial evidence by uninterested persons testifying on behalf of a party is used

3    to corroborate, it must actually corroborate the material facts.  No case holds that testimonial

4    evidence is per se ineligible to serve as corroboration.  *Cf. CNET Networks, Inc. v. Etilize, Inc.*, 584

5    F. Supp. 2d 1260, 1272-73 (N.D. Cal. 2008) ("a potential myriad of witnesses may testify as to a

6    102(b) date and corroboration thus generally goes to the issue of credibility").

7        24.    Nonetheless, where multiple witnesses and consistent documents all support each

8    other's testimony, even where some witnesses are "interested," the corroboration requirement can

9    still be satisfied:

10           We have held that a patent cannot be invalidated based on one
11           person's testimony alone without corroborating evidence, particularly
             documentary evidence.  However, this is not a case where one person
12           makes a naked, unsupported assertion years after the fact that he made
             an invention before a patentee. Such self-serving statements based
13           only on memory and susceptible to interpretations favorable to the
             witness are properly discounted.  Here there were a number of
14           statements made by different witnesses, all corroborating each other,
             accompanied by various supportive and consistent documents.  The
15           testimony of the witnesses together with the documentary evidence
             provided a coherent and convincing story.

16   *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1371 (Fed. Cir. 2007) (internal citation omitted).

17        ***Conclusions Regarding the Ludys' Uses of the Autumn King and Scarlet Royal***

18        25.    Under the law regarding public use, the parties essentially agree that the issue is

19   whether Jim Ludy and Larry Ludy kept their uses of Autumn King and Scarlet Royal secret or

20   otherwise concealed their uses prior to the critical date of September 28, 2003.  *See Dey, L.P. v.*

21   *Sunovion Pharms., Inc.*, 2013 U.S. App. LEXIS 10010 (Fed. Cir. May 20, 2013); *J.A. La Porte, Inc.*

22   *v. Norfolk Dredging Co.*, 787 F.2d 1577, 1582-83 (Fed. Cir. 1986); *Baxter Int'l v. COBE Labs.*, 88

23   F.3d 1054 (Fed. Cir. 1996); *Seed Research Equip. Solutions v. Gary W. Clem, Inc.*, 2012 WL

24   6650873 *6-*7 (D. Kan. Dec. 20, 2012) *modified on reconsideration on other grounds* 2013 WL

25   823379 (D. Kan. Mar. 6, 2013); *Advanceme Inc. v. RapidPay, LLC*, 509 F. Supp. 2d 593, 608–09

26   (E.D. Tex. 2007); Dkt. 235 at 4; Dkt. 236 at 12 (The question is "whether the Ludys 'engaged in any

27   active efforts to conceal their use.'").

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McCOOL   SMITH   HENNIGAN,   P. C.
LOS ANGELES, CALIFORNIA

26.     The facts establish that Jim Ludy and Larry Ludy made no attempt to maintain confidentiality or to deliberately evade disclosure of their Autumn King and Scarlet Royal grapevines prior to September 28, 2003.  Jim and Larry Ludy collective grafted both varieties on three separate occasions prior to September 28, 2003.  Neither Jim Ludy nor Larry Ludy undertook any effort to place the grafts in locations that would conceal the vines in any way.  While the actual fruit may not have been visible from public roads, the canopies of the vines were visible and both the vines and the fruit were visible from dirt roads accessible to the public.  In fact, Larry Ludy's vines at the Valoff property were placed on an outside row next to an open wheat field used by dove hunters.  Further, both Jim and Larry Ludy showed their vines to a number of people, including Richard Sandrini.  Mr. Sandrini was under no limitation, restriction, or obligation of secrecy to Jim Ludy or Larry Ludy.

27.     The number of Autumn King and Scarlet Royal vines grafted by Jim Ludy and Larry Ludy were not insignificant.  Prior to September 28, 2003, the Ludys collectively grafted approximately 750 vines of Autumn King and 175 vines of Scarlet Royal.

28.     At the time Jim Ludy and Larry Ludy reproduced the Scarlet Royal and Autumn King vines in 2002 and 2003, Dr. Ramming's breeding of these varieties was well known to table grape farmers in the California Central Valley.  Information regarding these varieties, including detailed descriptions, was published and made available to table grape farmers.  Dr. Ramming also had shown table grape farmers his breeding plots and Fresno State and displayed the fruit from these varieties.  In fact, the evidence shows that both Dr. Ramming and the Commission provided substantial information regarding the Scarlet Royal and Autumn King varieties to the table grape farming community to get feedback prior to release.  Although Dr. Ramming and the Commission knew that substantial information had been disclosed regarding these varieties, and that unauthorized propagations would affect the ability to obtain a patent, the USDA delayed seeking patent protection for several years -- from at least 2002 until September 2004.  In the meantime, with the publicly available information on Scarlet Royal and Autumn King, skilled and knowledgeable table grape farmers, including Jim Ludy, Larry Ludy, and Richard Sandrini, were

Case No. 1:07-CV-01610-SEH-JLT

POST TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

1    able to identify the grafted vines at the three separate Ludy properties as the Autumn King invention

2    later claimed in the '284 patent and the Scarlet Royal invention later claimed in the '229 patent.

3        29.    Larry Ludy's testimony about the timing of his initial grafting activities in 2002 is

4    corroborated by his own contemporaneous grafting notes, which are, in turn, corroborated by two

5    checks issued for grafting activities in the March 2003 timeframe. *See Sandt*, 264 F.3d at 1350-51

6    ("Documentary or physical evidence that is made contemporaneously with the inventive process

7    provides the most reliable proof that the inventor's testimony has been corroborated.").  The

8    testimony of Richard Sandrini is further corroborated by the grafting notes and checks.  Finally, the

9    testimony of Larry Ludy and Richard Sandrini about the about the timing of Ludy's initial grafting

10   activities in 2002, Ludy's grafting activities in 2003, and Sandrini's observations of these plants is

11   all consistent and corroborated by the existence of mature Autumn King and Scarlet Royal

12   grapevines located on Larry Ludy's farm in 2007, which appeared to have been grafted some years

13   before.  No evidence exists that these plants could have come from another source at a different

14   time.

15       30.    Even assuming there is no evidence to independently corroborate Larry Ludy's

16   specific assertion that he was never asked to restrict his own use of the plant material in any way, the

17   "rule of reason" "does not impose an impossible standard of independence on corroborative

18   evidence by requiring every point necessary to prove invalidity be corroborated by evidence having

19   a source totally independent of the [witness]." *Finnigan Corp. v. US Intn. Tr. Com.*, 180 F.3d 1354,

20   1369 (Fed. Cir. 1999) (internal citation and quotation omitted).  The key is whether under the

21   totality of the circumstances, the offered corroborating evidence is sufficiently corroborating of

22   otherwise uncorroborated testimony of invalidating activities.  *Id*.  Under the circumstances of this

23   case, Larry Ludy's grafting notes and related financial documents are the only reasonably available

24   documentary evidence a farmer could produce to corroborate his testimony.

25       31.    Further, Jim Ludy, Larry Ludy, and Richard Sandrini are not all "interested"

26   witnesses for purposes of the corroboration requirement.  Larry Ludy, Jim Ludy, and Richard

27   Sandrini all testified against their interests in admitting to the possession of Autumn King and

28

POST TRIAL PROPOSED FINDINGS OF FACT
                                                      AND CONCLUSIONS OF LAW

McKOOL SMITH HENNIGAN, P. C.
LOS ANGELES, CALIFORNIA

1   Scarlet Royal grapevines.  Indeed, the Commission required all these individuals to remove and

2   destroy their grapevines.  For Larry Ludy, this resulted in the removal of over 700 plants.  Larry

3   Ludy also paid monetary fine to the Commission.  PX 114.  At the time of their trial testimony in

4   this case, none of these witnesses possessed unlicensed Autumn King or Scarlet Royal grapevines

5   and none of these witnesses had raised any challenge to the validity of these grapevine varieties.

6   Thus, none had any interest in the outcome of this case.  *Cf Memory Corp. v. Ky. Oil Tech., N.V.*,

7   2007 U.S. Dist. LEXIS 89645 (N.D. Cal. Nov. 27, 2007) (finding a witness "interested" for purpose

8   of corroboration where the witness was a co-collaborator with an infringement defendant, was

9   former employee of the defendant, financially invested in the outcome of the case, and was serving

10  as the client representative).

11          32.     In sum, clear and convincing evidence shows that Jim Ludy and Larry Ludy publicly

12  used both Autumn King and Scarlet Royal varieties before the critical date of September 28, 2002.

13  Larry Ludy used the varieties openly and in the ordinary course of his farming business without an

14  attempt to conceal his uses.  Indeed, he disclosed his uses to others.  Accordingly, the reproductions

15  of Autumn King and Scarlet Royal by Larry Ludy in 2002 and 2003 constitute public uses under 35

16  U.S.C. § 102(b).  *See 3M Unitek Corp. v. Ormco Co.*, 96 F. Supp. 2d 1042, 1049 (C.D. Cal. 2000);

17  *Seed Research*, 2012 WL 6650873.

18          33.     The Court finds that the Scarlet Royal patent (U.S. Patent PP16,229) and the Autumn

19  King patent (U.S. Patent PP16,284") are invalid based on prior public use under 35 U.S.C. § 102(b).

20

21                                          Respectfully submitted:

22  DATED:  July 5, 2013
                                            MᴄKᴏᴏʟ Sᴍɪᴛʜ Hᴇɴɴɪɢᴀɴ, P.C.
23
                                            By:___/s/ Lawrence M. Hadley_____
24                                              Lawrence M. Hadley

25                                          **Attorneys for Plaintiffs**
                                            **DELANO FARMS COMPANY, FOUR**
26                                          **STAR FRUIT, INC.;**
                                            **GERAWAN FARMING, INC.**
27

28

McKᴏᴏʟ Sᴍɪᴛʜ Hᴇɴɴɪɢᴀɴ, P. C.
ʟᴏꜱ ᴀɴɢᴇʟᴇꜱ, ᴄᴀʟɪꜰᴏʀɴɪᴀ

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on July 5, 2013 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.  Any other counsel of record will be served by electronic mail, facsimile, U.S. Mail and/or overnight delivery.


                                    /s/ *Lawrence M. Hadley*
                                    Lawrence M. Hadley

McKool Smith Hennigan, P. C.
Los Angeles, California