**FILED**

SEP 1 2 2013

Clerk, U.S. District Court
District Of Montana
Helena

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELANO FARMS COMPANY; FOUR STAR FRUIT, INC.; AND GERAWAN FARMING, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> THE CALIFORNIA TABLE GRAPE COMMISSION; UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF AGRICULTURE; AND TOM VILSACK, SECRETARY OF THE UNITED STATES DEPARTMENT OF AGRICULTURE (IN HIS OFFICIAL CAPACITY), <br><br> Defendants. | 1:07-CV-01610-SEH-JLT <br><br> FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER |

INTRODUCTION

This case involves a challenge to the validity of patents for two table grape varieties developed by the United States Department of Agriculture ("USDA") and exclusively licensed to the California Table Grape Commission ("Commission"). The varieties at issue include the Scarlet Royal and the Autumn King. Plaintiffs Delano Farms Company, Four Star Fruit, Inc., and Gerawan Farming, Inc. have sought to invalidate both patents based upon the "public use" bar of 35 U.S.C. § 102(b), arguing that both varieties were "available to the public" for more than one year before the USDA sought patent protection for the two varieties. Following protracted litigation, the sole issue to be resolved at trial was whether Jim and Larry Ludys' possession and cultivation of the Autumn King and Scarlet Royal plant material prior to September 28, 2003, was "public" so as to invalidate

the patents for both varieties under § 102(b).

A non-jury trial was held on June 10–12, 2013, in Fresno, California. Decision was reserved at the conclusion of the trial. Post-trial proposed findings of fact and conclusions of law were submitted on July 5, 2013.[1]

## FINDINGS OF FACT

### I. The Parties

1. Plaintiff Delano Farms Company is a Washington corporation with its principle place of business in Hoquiam, Washington. Plaintiff Four Star Fruit, Inc. is a California corporation with its principle place of business in Delano, California. Plaintiff Gerawan Farming, Inc. is a California corporation with its principle place of business in Sanger, California. At all relevant times, Plaintiffs were engaged in the business of growing, harvesting, and selling table grapes.

2. Defendant Commission is a corporation of the State of California, established by the 1967 Ketchum Act. The Commission's principal place of business is Fresno, California, and its stated purpose is to expand and maintain the market for California table grapes for the benefit of the State of California and its table grape growers. Defendant USDA, of which Tom Vilsack is Secretary, is an executive agency of the United States. The USDA, *inter alia*, sponsors agricultural research programs to develop new varieties of agricultural commodities.

### II. The Scarlet Royal and Autumn King Varieties

3. As a part of the USDA's table grape breeding program, Dr. David Ramming ("Dr. Ramming"), who was employed by the USDA as a research horticulturalist from 1975 to 2013, and his technician Ronald Tarailo ("Tarailo") developed numerous new table grape varieties at two USDA breeding facilities in California. The Scarlet Royal and Autumn King varieties (referred to collectively as "unreleased varieties") were among those developed by Dr. Ramming and Tarailo.

---

[1] Documents Nos. 259–260.

4. Dr. Ramming and Tarailo applied for patents for both the Scarlet Royal[2] and Autumn King[3] varieties on September 28, 2004.

5. The undisputed "critical date"—one year before the Dr. Ramming and Tarailo applied for patent protection for both varieties—is September 28, 2003.

6. U.S. Patent No. PP16,229 entitled "Grapevine Denominated Scarlet Royal" ("'229 patent" or "Scarlet Royal patent") was issued on January 31, 2006.

7. U.S. Patent No. PP16,284 entitled "Grapevine Denominated Autumn King" ("'284 patent" or "Autumn King patent") was issued on February 21, 2006.

8. Dr. Ramming and Tarailo are the named inventors of the '229 and '284 patents. Both were employed by the USDA at the time of the claimed inventions.

9. The USDA owns the Scarlet Royal and Autumn King patents on behalf of the United States of America.

10. The Commission is the exclusive licensee of the Scarlet Royal and Autumn King patents.

11. Both the Scarlet Royal and Autumn King varieties were released by the USDA on July 13, 2005, which meant that they were available to growers.

12. Prior to their release, no grower was authorized by the USDA or Commission to possess either the Scarlet Royal or Autumn King varieties.

### III. Jim Ludy, Larry Ludy, and Richard Sandrini

13. Jim Ludy and his brother Jack Ludy grew table grapes at J&J Ludy Farms in the Delano, California region from 1976 until 2003, when they sold the majority of the farm to their cousin. Jim Ludy, however, retained 40 acres on which he continues to grow table grapes.

14. Larry Ludy, who is Jim and Jack Ludys' first cousin, farms table grapes in the Delano,

---

[2] The Scarlet Royal variety has been referred to by various names including: "Crimson Killer"; "C.K."; "B1"; and "B34-82."

[3] The Autumn King variety has been referred to by various names including: "Big White"; "Late White"; "C10"; and "C67-120."

California region near where the J&J Ludy farm was located. He owns two properties on which he cultivated the unreleased varieties. They include the 320-acre "Garces Highway property" and the 155-acre "Sheep Camp Ranch."

15. Richard Sandrini ("Sandrini") was Larry Ludy's table grape marketer, neighbor, and mentor. Sandrini was also Jim Ludy's longtime table grape marketer. His farm is located in the same vicinity as Jim and Larry Ludys' farms in Delano, California.

### IV. Ludys' Unauthorized Acquisition of Scarlet Royal and Autumn King

16. On August 22, 2001, Jim and Larry Ludy attended a USDA Experimental Variety Open House, at which attendees could view and taste the fruit from the Scarlet Royal and Autumn King varieties. Only the mature fruit from the varieties—and not the plant material—was on display at the open house.

17. During the August 22, 2001 open house, Kathleen Nave ("Nave"), the President of the Commission, informed those in attendance of plans by the Commission and the USDA to patent new varieties of table grapes. When asked by Larry Ludy whether the growers would be permitted to view the experimental varieties in the field, Nave informed those in attendance that they would not be permitted to do so because of the patenting program.

18. More critically, Jim and Larry Ludy also spoke with a USDA employee named Rodney Klassen ("Klassen"), whom Jim Ludy had known previously. Klassen performed several duties for the USDA at the breeding sites including operating a tractor, spraying grape plots for disease and weed control, and pruning. Despite not having authorization to do so—when asked by Jim Ludy whether Klassen could obtain "sticks" of the unreleased varieties for him—Klassen informed Jim Ludy that he would "take care" of him.

19. At this time, the Scarlet Royal and Autumn King varieties remained the exclusive property of the USDA. Neither variety had been released to the public, nor had the USDA or Dr. Ramming authorized any distribution of either variety to growers. No one on Dr. Ramming's staff, including Klassen, had the authority to distribute plant material from the Scarlet Royal or Autumn King varieties.

20. In early 2002, Klassen made good on his promise and distributed cuttings of the Scarlet Royal and Autumn King to Jim Ludy. In doing so, he told Jim Ludy not to let the material "get away from him" and not to put any of the grapes "in a box," *i.e.*, not to sell them commercially. At this time, Jim Ludy was aware that neither variety had been released by the USDA and that he was not authorized to have the plant material.

21. Thereafter, Jim Ludy gave "a few buds"[4] of the Scarlet Royal and Autumn King to Larry Ludy, at which time he told Larry Ludy that they should "keep it to ourselves." Larry Ludy understood that the varieties had come from a USDA facility and had not yet been released by the USDA. In addition, Jim Ludy expected their possession of the unreleased varieties to remain private.

22. Despite Jim Ludy's admonition to keep the unreleased varieties to themselves, Larry Ludy shared enough wood with Sandrini in early 2004 for Sandrini to graft 19 acres of Autumn King on his property. Prior to the critical date, however, Sandrini did not have possession of either of the unreleased varieties.

V. **Larry and Jim Ludys' Cultivation of the Scarlet Royal and Autumn King Varieties**

   A. **Larry Ludy's Cultivation**

23. With the buds given to him by Jim Ludy, Larry Ludy hired Chris Garcia ("Garcia") in March 2002 to graft eight vines of the Scarlet Royal and 25 vines of the Autumn King at his Garces Highway property. Ludy recorded the event in his logbook, which stated that on March 2, 2002, "Chris grafted . . . 8 vines Best New Red known as C.K." Pl. Ex. 105 at 166. On March 21, 2002, the logbook entry stated: "Chris started grafting 25 vines late white." *Id.* at 156. However, the logbook's references to "C.K." and "late white" were written in a different color and Larry Ludy admitted that it is possible those references had been written at some point after the original entries.

24. The vines containing the unreleased varieties were located on Larry Ludy's Garces Highway property and were all located in one outside row on his farm. The row was visible from a

---

[4] There are two ways to produce new table grape vines. The first is to simply plant. The second is to "graft." Grafting requires plant material called "wood" or "sticks." These sticks may have several "buds" on them. When the sticks are physically attached to existing rootstock, each bud has the potential of becoming a new grape vine.

-5-

dirt road running north to south perpendicular to the row. No fences surrounded the vines and the road was publicly accessible.

25. In or around March 2003, Larry Ludy hired Joel de Santiago ("de Santiago") to graft an additional 108 vines of the Scarlet Royal and 650 vines of the Autumn King on his Sheep Camp property. Those vines ran east to west and extended to a dirt road running north to south. As with Ludy's Garces Highway property, the Sheep Camp property was not fenced and the dirt roads were publicly accessible.

26. In addition to the logbook, Plaintiffs submitted two checks relating to the grafting services on Larry Ludy's property in 2002 and 2003. The first was a check for $300.00 made out to Garcia on March 22, 2002, for "grafting." PX 105. The second was for $934.40 made out to de Santiago on February 28, 2003, also for "grafting." *Id.* No references were made on either check to Scarlet Royal, Autumn King, or any other names used to describe the unreleased varieties.

27. In late 2002, Larry Ludy showed Sandrini the Autumn King vines that were growing on his Garces Highway property.

28. At sometime prior to September 2003, Larry Ludy showed Sandrini the Scarlet Royal vines that were growing at his Sheep Camp property.

29. Other than Jim and Jack Ludy and Sandrini, Larry Ludy did not disclose his possession of the unreleased varieties to anyone.

30. Prior to September 2003, Larry Ludy did not give any wood from the unreleased varieties to anyone.

31. None of Larry Ludy's Scarlet Royal or Autumn King vines were marked with signs or labeled in any way.

32. Prior to the critical date, Larry Ludy's Scarlet Royal vines produced very little fruit of which none "turned out." He neither sold the grapes commercially nor gave away any of the mature fruit.

33. Larry Ludy harvested his Autumn King vines in 2004 and sold his grapes through Sandrini. Sandrini intentionally mislabeled the grapes as "Thompson Seedless" to avoid alerting the

-6-

1  Commission to Larry Ludy's unauthorized possession of the Autumn King. Sandrini received a
2  premium price for the grapes, significantly more than was typical for genuine Thompson Seedless he
3  sold. The 2004 sale marked the first instance in which either Jim or Larry Ludy made commercial
4  use of the mature fruit from the unreleased varieties.

**B.    Jim Ludy's Cultivation**

34.    Jim Ludy used the plant material he obtained from Klassen to plant a test plot on his property that included both the Scarlet Royal and Autumn King varieties. He planted at most 50 vines of Autumn King and fewer than 50 vines of Scarlet Royal.

35.    Of the vines Jim Ludy planted, only the foliage—and not the ripe fruit—was visible from a public road.

36.    None of Jim Ludy's Scarlet Royal or Autumn King vines were marked with signs or labeled in any way.

37.    Jim Ludy's vines containing the unreleased varieties produced very few grapes prior to the fall of 2003.

38.    Jim Ludy did not give any vines or any mature fruit to anybody outside his family prior to the critical date. He also admitted that he wanted to keep "close tabs" on the unreleased varieties, and that he "didn't want it getting out until it was released."

39.    No evidence was submitted demonstrating that Jim Ludy harvested any of the mature fruit from the unreleased varieties prior to the critical date.

40.    Nor did he sell any mature fruit from the unreleased varieties commercially prior to the critical date.

**VI.    Ludys' Use of Scarlet Royal and Autumn King**

41.    Plaintiffs' claims of public use of Scarlet Royal and Autumn King are limited exclusively to Jim and and Larry Ludys' use of the plant material.

42.    Prior to September 28, 2003, the Ludys kept the Scarlet Royal and Autumn King plant material entirely to themselves. Neither of the Ludys gave away the Scarlet Royal plant material to anyone and only after the critical date did Larry Ludy give Sandrini cuttings from the Autumn King.

-7-

Therefore, nobody other than Jim and Larry Ludy had possession of either the Scarlet Royal or Autumn King varieties prior to the critical date.

43. It is impossible to reproduce a grapevine without possessing plant material for the vine. Merely seeing the vine or possessing the fruit is not sufficient to allow reproduction.

44. Despite speculation as to what dove hunters, horsemen, or other members of the public might have seen in the Ludys' fields, no witnesses testified to having seen or recognized the vines or mature fruit from the unreleased varieties prior to the critical date.

45. Further, even experienced growers cannot identify grape varieties such as Scarlet Royal and Autumn King simply by viewing the vines alone. Even Dr. Ramming—the inventor of both varieties who spent more than ten years studying the plants—could not identify the varieties just by looking at the vine.

### VII. Ludys' Incentives to Keep Their Possession of Unreleased Varieties Private

46. The Ludys and Sandrini each had incentives to keep their unauthorized possession of the unreleased varieties private.

47. First, the Ludys and Sandrini had economic incentives to keep private their possession of the unreleased varieties. In 2002, Jim and Jack Ludys' farm was losing money on varieties that were not proving economically viable and they needed to graft over their existing vines to a more profitable variety to avoid going out of business. Obtaining the Scarlet Royal and Autumn King plant material prior to its release provided Jim Ludy a "big advantage[]" over other growers. Larry Ludy also recognized the competitive advantage of having the Autumn King prior to its release given the premium price he received for his grapes in 2004. He admitted that he wanted to keep that advantage to himself and his friends. Finally, Sandrini recognized the competitive advantage of having the unreleased varieties prior to other growers in that he could learn how to grow the new variety before other growers. Like Larry Ludy, Sandrini admitted that he wanted to keep that advantage to himself.

48. Second, a fear of discovery by the USDA or the Commission also prompted the Ludys to keep their possession of the unreleased varieties secret. Each was aware at the time he received

the Scarlet Royal or Autumn King varieties that they had not been officially released by the USDA, and both feared that disclosing their unauthorized possession of the unreleased varieties could subject Klassen to discipline or other repercussions for impermissibly distributing the plant material.

### VIII. USDA's and Commission's Knowledge of the Ludys' Possession of the Unreleased Varieties

49. In 2002 and 2003, Dr. Ramming had no reason to believe that any growers were in possession of or cultivating the Scarlet Royal or Autumn King. Nor did he have any reason to believe that plant material from the Scarlet Royal or Autumn King had been removed from the USDA facility.

50. Similarly, Commissioner Nave was unaware of the Ludys' and Sandrini's unauthorized possession of the unreleased varieties; she first heard of the same in 2006.

## CONCLUSIONS OF LAW

### I. Overview of Patent Challenges

1. Patents are presumed valid, and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282(a).

2. The challenging party must prove a patent's invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, ___ U.S. ___, 131 S. Ct. 2238, 2242 (2011).

3. The Patent Act expressly applies to plants. 35 U.S.C. § 161 ("Whoever invents or discovers and asexually reproduces any distinct and new variety of plant . . . may obtain a patent therefor . . . ."). Further, it makes plant patents subject to the novelty and statutory bar provisions, including the "on-sale" and "public use" provisions of § 102(b). *Id.*

4. Plaintiffs, therefore, bear the burden of proving by clear and convincing evidence that the Ludys' use of the Scarlet Royal and Autumn King varieties made them "available to the public" within the meaning of § 102(b) prior to September 28, 2003.

## II.      Public Use Bar Under 35 U.S.C. § 102(b) (2006)

5.      The version of 35 U.S.C. § 102(b) applicable in this case[5] states:

> A person shall be entitled to a patent unless . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

6.      The "prior use bar" of § 102(b) "establishes a one year grace period based on publication or public use or sale, after which an inventor is barred from access to the patent system." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998).

7.      To determine whether the use at issue qualifies as "public use" the Court must determine "whether the purported use: (1) was accessible to the public; or (2) was commercially exploited." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005).

8.      Factors helpful in determining whether the purported use qualifies as "public use" include: "the nature of the activity that occurred in public; the public access to and knowledge of the public use; [and] whether there was any confidentiality obligation imposed on persons who observed the use." *Dey, L.P. v. Sunovion Pharms, Inc.*, 715 F.3d 1351, 1355 (Fed. Cir. 2013) (internal quotation marks omitted) (alterations in original).

9.      Patent challenges under § 102(b) generally fall under two categories: (1) uses by the inventor-patentee or by someone authorized by the inventor-patentee to use the invention and (2) uses by third parties unconnected to the inventor-patentee. *See id.* at 1355. Both situations may raise a public use bar under § 102(b). *Id.* The Federal Circuit in *Dey* drew a fundamental distinction between these two standards. *Id.* at 1358.

10.     In the first situation, "public use" generally includes "any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002) (internal quotation marks omitted) (alterations in original).

11.     The *Dey* court, however, expressly distinguished this reasoning with respect to third-

---

[5] References to 35 U.S.C. § 102(b) are to the pre-2011 version of the Patent Act.

-10-

1 party use cases in stating:

> As is clear from the context, . . . those statements are not meant to apply to third-party use cases. If they did, any unaffiliated third-party use, no matter how secret, would necessarily invalidate a patent because such uses are, by definition, made by persons not owing a duty of secrecy "to the inventor." Our third-party use precedent is not so limited.

715 F.3d at 1358. As such, secret or confidential uses by third parties do not invalidate later filed patents. *Id.* at 1355.

12. Instead, third-party use cases require that the invention be "accessible to the public." *Id.* Thus, the Court's responsibility is "to assess whether the third party's use was sufficiently 'public' to impose the section 102 bar." *Id.* at 1358–59.

13. Axiomatically, third-party use is not "public" when such "prior use or knowledge is not available to the public." *Woodland Trust*, 148 F.3d at 1371.

14. Whether an invention is available to the public "depends, at least in part, on the degree of confidentiality surrounding its use . . . ." *Dey*, 715 F.3d at 1355. The degree of confidentiality that would negate a finding of public use depends, of course, on the factual circumstances presented. *Id.*

15. "Even limited disclosure to those who are skilled enough to know, understand, and 'easily demonstrate the invention to others,' may mean that there was no reasonable expectation of secrecy and that the invention was therefore in public use." *Id.* at 1355–56 (quoting *Netscape Commc'ns Corp.*, 295 F.3d at 1321.

16. Conversely, limited disclosure to a small number of "uninformed observers" may not establish public use because "there may be no reason to believe 'that a viewer . . . could thereby learn anything of [the later-patented invention]' and disclose the invention to others." *Id.* at 1356 (quoting *W.L. Gore & Assocs. Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1549 (Fed. Cir. 1983) (alterations in original). "In such cases, a finder of fact might reasonably conclude that the third party's use remained confidential and that the invention was not 'accessible to the public.'" *Id.*

17. Finally, "[i]f members of the public are not informed of, and cannot readily discern, the claimed features of the invention in the allegedly invalidating prior art, the public has not been

-11-

put in possession of those features." *Id.* at 1359.

## III. Corroboration Requirement

18. "Corroboration of oral evidence . . . is the general rule in patent disputes." *Woodland Trust*, 148 F.3d at 1371. Further, "[u]ncorroborated oral testimony by interested parties 'is insufficient as a matter of law to establish invalidity of [a] patent.'" *Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1189 (Fed. Cir. 2002) (quoting *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1370 (Fed. Cir. 1999) (alterations in original).

19. Here, corroboration is clearly required because Plaintiffs rely heavily on oral testimony regarding instances of public use said to occur, at times, over a decade prior to trial. *See Woodland Trust*, 148 F.3d at 1371 ("There is a very heavy burden to be met by one challenging validity when the only evidence is the oral testimony of interested persons and their friends, particularly as to long-past events.").

20. The testimony of uninterested witnesses, however, is also subject to the corroboration requirement when such testimony is received on behalf of an interested party. *Finnigan Corp.*, 180 F.3d at 1367.

21. To determine whether oral testimony is sufficiently corroborated, the Court may consider the following factors:

(1) the relationship between the corroborating witness and the alleged prior user,

(2) the time period between the event and trial,

(3) the interest of the corroborating witness in the subject matter in suit,

(4) contradiction or impeachment of the witness' testimony,

(5) the extent and details of the corroborating testimony,

(6) the witness' familiarity with the subject matter of the patented invention and the prior use,

(7) probability that a prior use could occur considering the state of the art at the time,

    (8)  impact of the invention on the industry, and the commercial value of its practice.

*Woodland Trust*, 148 F.3d at 1371.

  22.  A rule of reason is employed in analyzing these factors. *Id.*

  23.  Documentary or physical evidence made contemporaneously with the actions alleged provide the most reliable proof that the interested witness's testimony has been corroborated. *Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350–51 (Fed. Cir. 2001).

## DISCUSSION

Upon review of all the evidence and the applicable law, the Court finds that Plaintiffs have not met the heavy burden of proving by clear and convincing evidence that Jim and Larry Ludys' use of Scarlet Royal and Autumn King prior to September 28, 2003, made the varieties "available to the public" so as to invalidate the patents at issue under § 102(b).

Outside of the USDA, Jim and Larry Ludy were the only two individuals who possessed the Scarlet Royal and Autumn King varieties prior to the critical date. They came into possession of the varieties following the unauthorized removal and distribution of the varieties from the USDA facility. Nobody at the USDA authorized the distribution and, in fact, the USDA and the Commission took steps to ensure that growers did not have access to the vines or wood of the unreleased varieties prior to their release.

Jim and Larry Ludys' use and cultivation of the unreleased varieties was both limited in scope and private prior to the critical date. While each planted test plots that included the unreleased varieties prior to the critical date, their Scarlet Royal and Autumn King vines produced little mature fruit prior to the critical date. No evidence was admitted demonstrating that either Jim or Larry Ludy had harvested or commercially exploited the mature fruit prior to the critical date. Moreover, no witness—other than Jim and Larry Ludy and Sandrini—testified to having seen the unreleased varieties or known of the Ludys' possession of them prior to the critical date. Given the economic advantage and fear of discovery by the USDA or Commission, the Ludys and Sandrini had strong incentives to keep the Ludys' possession of the unreleased varieties secret. Jim and Larry Ludy, at a minimum, implicitly understood that their possession of the Scarlet Royal and Autumn King

-13-

varieties was to remain private. Both recognized the economic advantage that their possession of the unreleased varieties provided, and both feared getting Klassen in trouble for his unauthorized distribution of the plant material.

Although the Ludys took no affirmative steps to keep secret their vines of the unreleased varieties by signing a confidentiality agreement, by erecting a fence, or otherwise, the anonymity of the unreleased varieties was assured because not even the inventor of the varieties, Dr. Ramming, could identify a variety solely by looking at the vines, buds, or cuttings. Essentially, the vines were hiding in plain sight. Further, no witnesses testified that they had seen or recognized the Scarlet Royal and Autumn King vines or mature fruit prior to September 28, 2003. This includes Garcia and de Santiago who originally grafted the unreleased varieties for Larry Ludy. Each may have observed the sticks or buds, but neither testified to having recognized or understood that the varieties at issue had not yet been released by the USDA. Similarly, despite speculation as to what dove hunters or other members of the public may have seen in the Ludys' fields, no testimony was received from any member of the public indicating public awareness of the Ludys' possession of the unreleased varieties.

Simply put, the Ludys' use of the Scarlet Royal and Autumn King varieties prior to the critical date was limited, isolated, and unknown to anybody outside of Jim and Larry Ludy and Sandrini. Each had incentives to keep the Ludys' possession secret, creating an environment of confidentiality. Each maintained tight control over who knew about the Scarlet Royal and Autumn King vines and their use, so limited in scope, in no way demonstrates that the unreleased varieties were available to the public. Without the physical buds, sticks, or vines, it is impossible to reproduce a specific grape variety, and nobody other than Jim and Larry Ludy possessed the physical plant material of the unreleased varieties prior to the critical date.

Section 102(b) requires that an invention be "accessible to the public" or "commercially exploited for more than one year before the inventor sought patent protection. *Invitrogen Corp.*, 424 F.3d at 1380. It is undisputed that the Ludys did not commercially exploit the Scarlet Royal and Autumn King varieties prior to the critical date. Nor, given the foregoing, were the unreleased varieties available to the public prior to September 28, 2003. Instead, the Ludys' use was a secret,

1  third-party use that does not invalidate patents under § 102(b). *Dey*, 715 F.3d at 1355. Plaintiffs,
2  therefore, have failed to demonstrate that the Ludys' use was by any measure public, much less to the
3  clear and convincing standard required to prove invalidity.
4        Although Plaintiffs have failed as an threshold matter to prove that the Ludys' use of the
5  unreleased varieties made the material accessible to the public, they have also failed to satisfy the
6  corroboration requirement inherent in patent challenges involving oral testimony. Plaintiffs did not
7  corroborate the testimony of Jim and Larry Ludy and Sandrini. Corroboration is required given that
8  all three are arguably interested witnessws whose testimony, nevertheless, concerned events long
9  past. *See Woodland Trust*, 148 F.3d at 1371. What little documentary evidence admitted at trial fails
10 to corroborate the testimony received. First Larry Ludy's diary at most demonstrates his own
11 knowledge of the grafting of the unreleased varieties. It fails to establish that any member of the
12 public, including Garcia, was aware that the varieties grafted included the Scarlet Royal and Autumn
13 King. Likewise, the checks to Garcia and de Santiago only reference "grafting" generally and do not
14 indicate that the varieties grafted included the unreleased varieties. Nor do they demonstrate that by
15 simply grafting the varieties were they somehow made available to the public. The documentary
16 evidence received, therefore, falls well short of the corroboration requirement.

## CONCLUSION

Because Plaintiffs have failed to demonstrate by clear and convincing evidence that the Ludys' use of Scarlet Royal and Autumn King made them "available to the public" and have failed, in any event, to provide sufficient corroboration of the oral testimony received at trial, the Court finds that their challenge to the Scarlet Royal and Autumn King patents under § 102(b) fails. For these reasons and those stated above, the Court enters judgment in favor of Defendants.

ORDERED:

1. Judgment is entered on behalf of Defendants.
2. The Clerk of Court shall enter judgment accordingly.

DATED this 12th day of September, 2013.

*Sam E. Haddon*
SAM E. HADDON
United States District Judge